**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| LAND GRANTORS IN HENDERSON, UNION, AND WEBSTER COUNTIES, KENTUCKY AND THEIR HEIRS | ) | |
| Plaintiffs, | ) | No. 93-648X |
| | ) | Judge Susan G. Braden |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO VACATE THE NOVEMBER 24,1998 ORDER</u>**

Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW
1350 Connecticut Avenue, N.W.
Suite 410
Washington, DC 20036
(202) 822-6760

M. Stephen Pitt
Merrill S. Schell
Jean W. Bird
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street
Suite 2800
Louisville, KY 40202-2898
502.562.7372

March 6, 2008

# TABLE OF CONTENTS

I. INTRODUCTION ..... i

II. BACKGROUND ..... 3

III. FACTS ..... 4

IV. ARGUMENT ..... 6

A. The Hearing Officer Improperly Confined the Inquiry to the Language of the Proposed Bill. ..... 9

B. The Hearing Officer Incorrectly Interpreted the Language of the Proposed Bill. ..... 12

1. "Condemnation" Occurred with the Filing of the Condemnation Petitions and the Orders of Possession. ..... 12

2. The Term "Sold," as Used in Eminent Domain Matters, Includes all Means by Which the Government Acquires Title to Property. ..... 18

3. "Grantors" of the Camp Breckinridge Lands Include All Those Whose Properties Were Condemned. ..... 22

4. The Intent of the Bill's Congressional Sponsor Supports a More Expansive Interpretation of S. 794. ..... 23

C. The Court is not Required to Reopen Landowner Judgments in Order to Decide Plaintiffs' Equitable Congressional Reference Claims. ..... 25

D. All Former Landowners and Heirs Are Included in the Class. ..... 30

E. Suggested Procedures And Remedy For The Court's Final Report ..... 34

APPENDIX

Exhibit A: April 23, 1998 letter from former Senator Wendell Ford

## TABLE OF AUTHORITIES

## FEDERAL CASES

*Best v. Humboldt Placer Mining Co.*, 371 U.S. 334,
83 S.Ct. 379, 9 L.Ed. 2d 350 (1963)........................................................ 14

*Blacklock v. United States*, 208 U.S. 75 (1908)............................................ 10, 11

*Burkhardt v. United States*, 113 Ct.Cl. 115, 82 F.Supp. 333 (1949) ....................... 26, 27

*California Canners & Growers Ass'n v. United States*, 9 Cl.Ct. 774, 785 (1986) ........... 25

*Danforth v. United States*, 308 U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240 (1939).......21, 23, 33

*Florida Power & Light Co. v. United States*, 66 Fed.Cl. 93 (2005) .................................. 4

*Foster v. United States*, 607 F.2d 943 (Ct.Cl. 1979) ................................................ 14

*Herman B. Taylor Constr. Co. v. Barram*, 203 F.3d 808 (Fed.Cir. 2000)....................... 31

*Higginson v. United States*, 384 F.2d 504 (6th Cir. 1967)............................................ 17

*J.A. Zachariassen & Co. v. United States*, 136 Ct.Cl. 63, 141 F.Supp. 908 (1956)......... 26

*John R. Sand & Gravel Co. v. United States*,
128 S.Ct. 750 the Court dismissed parallel civil action No. 93-648-1L................ 1

*KLK, Inc. v. United States Department of the Interior*, 35 F.3d 454 (9th Cir. 1994)....... 12

*Kinkead*, 150 U.S. at 497 (emphasis added)................................................................ 11

*Kirby Forest Industries, Inc. v. United States*,
467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed. 2d 1 (1984) .............................20, 21, 23, 33

*Kochendorfer v. United States*, 193 Ct.Cl. 1045, 1055 (1970)....................................... 25

*Land Grantors in Henderson, Union and Webster Counties,*
*Kentucky v. United States*, 64 Fed.Cl. 661 (2005) ...................................... passim

*Land Grantors in Henderson, Union and Webster Counties, Kentucky v. United States*,
74 Fed. Cl. 518 (2006)........................................................................... 35

*Landmark Land Co. v. United States*, 46 Fed.Cl. 261 (2000)....................................... 36

*Landmark Land Co. v. Federal Deposit Ins. Corp.*, 256 F.3d 1365 (Fed. Cir. 2001) ...... 36

*Lutz v. United States Postal Service*, 485 F.3d 1377 (Fed. Cir. 2007)............................ 31

*Marconi Wireless T. Co. of Am. v. United States*, 320 U.S. 1 (1943)............................... 4

*Mizokami v. United States*, 188 Ct.Cl. 736, 414 F.2d 1375 (1969) ................................ 17

*Mizokami v. United States*, 414 F.2d 1375, 188 Ct.Cl. 736 (1969) .......................... 27, 28

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S.Ct. 1447,
131 L.Ed. 2d 328 (1995) ......................................................................... 27

*Paul v. United States*, 20 Cl. Ct. 236 (1990), *aff'd*., 21 Cl.Ct. 758 (1990)....................... 10

*Pope v. United States*, 323 U.S. 1, 65 S.Ct. 16, 89 L.Ed. 3 (1944) .......................... 28, 29

*Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*,
36 U.S. 420, 11 Pet. 420 (1837) ............................................................... 22

*R.J. Widen Co. v. United States*, 357 F.2d 988 (Ct.Cl. 1966) ........................................ 14

*Sargent v. Columbia Forest Products, Inc.*, 75 F.3d 86 (2nd Cir. 1996)......................... 29

*Saulsberry v. Maddix*, 125 F.2d 430 (6th Cir. 1942) .................................................... 30

*Shane v. United States*, 3 Cl.Ct. 294, 304 (1983) ......................................................... 26

*The Atlantic Works v. United States*, 46 Ct.Cl. 57 (1911).............................................. 10

*United States v. $277,000 U.S. Currency*, 69 F.3d 1491 (9th Cir. 1995)......................... 36

*United States v. 26.3765 Acres of Land*, 62 F.Supp. 910 (E.D. N.Y. 1945) .................... 16

*United States v. 40,379 Square Feet of Land*, 58 F.Supp. 246 (D. Mass. 1944) .............. 13

*United States v. 45,149.58 Acres of Land*, 455 F.Supp. 192 (E.D. N.C. 1978)................ 13

*United States v. $515,060.42*, 152 F.3d 491 (6th Cir. 1998)........................................... 36

*United States v. 72 Acres of Land*, 37 F.Supp. 297 (N.D. Cal. 1941)............................. 33

*United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971).... 31

*United States v. Catlin*, 142 F.2d 781 (7th Circuit 1941).............................................. 16

*United States v. Certain Parcels of Land in Sewickley Tp*,
54 F.Supp. 943 (W.D. Pa. 1944) ............................................................ 13

*United States v. Clarke*, 445 U.S. 253, 100 S.C. Ct. 1127, 63 L.Ed.2d 373 (1980) ......... 12

*United States v. Dow,*
357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed. 2d 1109 1958)..................... 12, 13, 14, 16, 17

*United States v. Forbes*, 259 F. 585 (M.D. Ala. 1919) .................................................. 33

*United States v. General Motors Corporation*,
323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945) ............................................... 14

*United States v. Miller,* 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943) ...................... 17

*United States v. Realty Co.*, 163 U.S. 427, 16 S.Ct. 1120, 41 L.Ed. 215 (1896)............. 29

*United States v. Union Pac. R. Co.*, 353 U.S. 112, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957).. 22

*Webb v. United States*, 192 Ct.Cl. 925, 932 (1970) ....................................................... 25

*Wolfchild v. United States*, 68 Fed.Cl. 779 (2005) ......................................................... 4

**STATE CASES**

*Harris v. Strawbridge*, 330 S.W.2d 911 (Tex. Civ. App. 1959)...................................... 23

*Hendrickson v. Dept. of Highways*, 196 S.W.2d 876 (Ky. 1946).................................... 23

*Higginbothom v. Higginbothom*, 177 Ky. 271, 197 S.W. 627 (1917) ............................. 37

*Jennings v. Jennings*, 299 Ky. 779, 187 S.W.2d 459 (1945) .......................................... 37

*Porreca v. LaFerrierre*, 543 A.2d 102 (N.J. Super. 1988) ............................................ 17

*Rose v. Bryant*, 251 S.W.2d 860 (Ky. 1952) .................................................................. 23

*White v. Rosenthal*, 35 P.2d 154 (Cal. App. 1934) ........................................................ 23

**FEDERAL STATUTES**

40 Stat. 241, 50 U.S.C. §171 ............................................................................................ 6

40 U.S.C. §257 ................................................................................................................ 20

40 U.S.C. §258(a) ..........................................................................................13, 17, 20

10 U.S.C. §2663 .... 6

40 U.S.C. §3113 .... 20

40 U.S.C. 3114(b) .... 17, 20

28 U.S.C. §1491(a)(1) .... 1

28 U.S.C. § 1492 .... 9

28 U.S.C. §2509(c) .... 26, 27

28 U.S.C. §798(c) .... 36

28 U.S.C. §2507 .... 35

S. 794, 103d Cong., 1st .... 7

**STATE STATUTES**

KRS, Ch. 391 .... 37

**RULES**

FRCP 71A .... 20

Fed.R.Evid. 803(3) .... 24

Fed.R.Evid. 807 .... 24

RCFC 53 .... 36, 37

**MISCELLANEOUS**

7 U.S.Op.Atty.Gen. 114, 1855 WL 2289 (U.S.A.G., April 24, 1855) .... 19

*Black's Law Dictionary*, p. 700 (6th Ed. 1990) .... 22

Nichols on Eminent Domain (3rd ed.), Vol. 8, §18.01[2][a] .... 8

S. 794, 103d Cong., 1st .... 7

## I. INTRODUCTION

In its April 1, 2005 "Interim Report and Memorandum Opinion," *Land Grantors in Henderson, Union and Webster Counties, Kentucky v. United States*, 64 Fed.Cl. 661 (2005) ("*Land Grantors I*"), the Court referred to the November 24, 1998 Order ["1998 Order" Docket No. 65], which effectively dismissed from the case Plaintiffs owning approximately 75% of the acres comprising Camp Breckinridge:

> [if] the court exercises jurisdiction under 28 U.S.C. §1491(a)(1), then the November 24, 1998 Order in this case should be vacated and all former landowners and heirs that complied with the court's deadline and were named as Plaintiffs in the September 22, 1995 First Amended Complaint are entitled to receive their proportionate share of damages. In the event the court is reversed on appeal, the court would lift the stay, *reinstate the November 24, 1998 Order*, finalize this Interim Report, and forward it to the Review Panel. In the event the court is affirmed on appeal, Plaintiffs can proceed to enforce the judgment.

*Id*. at 717-718 (emphasis added). The Court never finally exercised jurisdiction under 28 U.S.C. § 1491(a)(1) and there has been no reversal on appeal. Accordingly, it appears that the 1998 Order is still in effect.

Subsequent to *Land Grantors I*, and in light of the January 8, 2008 United States Supreme Court decision in *John R. Sand & Gravel Co. v. United States*, 128 S.Ct. 750 (2008), the Court *sua sponte* dismissed parallel civil action No. 93-648-1L, leaving this congressional reference action to proceed. But the efficacy of the 1998 Order does not depend upon whether Plaintiffs' claims proceed under the Tucker Act or as a congressional reference. The 1998 Order was wrongly decided and should be vacated prior to entry of the Court's final congressional reference report.

This action was filed on January 12, 1994 in the name of "the Breckinridge Land Committee." Subsequently, on September 22, 1995, the Plaintiffs filed a First Amended Complaint in which 1,011 former landowners and heirs were named as individual Plaintiffs.[1] On February 14, 1998 the Government moved to dismiss a substantial number of Plaintiffs whose claims it argued were beyond the scope of S. 794, 103d Congress, 1st Session (1993), the proposed bill giving rise to this congressional reference action. In the 1998 Order, the previous hearing officer, Hon. James F. Merow, Senior Judge, granted the Government's motion in substantial part, holding that only those landowners who "sold" their properties to the Government "under threat of condemnation" were covered under S. 794. According to the hearing officer, this meant those "individuals who agreed to sell their land after initiation of condemnation proceedings but before declarations of taking were filed and estimated compensation deposited in the district court." [1998 Order at 6]. Individuals "whose land was acquired by the Government through declarations of taking or final judgments entered in the condemnation proceedings" were dismissed as Plaintiffs [*Id.* at 9]. The 1998 Order effectively removed from the case Plaintiffs representing about seventy-five percent (75%) of the total acreage acquired for Camp Breckinridge, *i.e.*, 26,995.37 acres out of a total of 35,854.88.[2]

---

[1] On October 3, 2005, a Second Amended Complaint was filed in which 1,092 individual Plaintiffs were named.

[2] Owners of 137 properties comprising some 8,859.51 acres (25%) entered into negotiated option agreements with the Government after the United States filed condemnation petitions relating to their properties but before any declarations of taking were filed. The owners of 290 properties, some 16,558.68 acres (46%), reached negotiated selling prices with the Government after the filing of declarations of taking on their properties but before trial. The owners of 67 properties involving 10,436.69 acres (29%) went to trial and had the sales price of their properties determined by a jury. No landowner conveyed his or her property to the Government prior to the filing of a condemnation petition and entry of an order giving immediate possession to the Government. *See*, CX 79, 80 (excluding easement tracts) and CX 260 (Table 1, p. 25).

The 1998 Order was entered long before highly relevant condemnation-related documents had been produced by the Government, overlooked crucial facts, relevant legal precedents and principles, misinterpreted S. 794 and, in short, was incorrectly decided. Because the 1998 Order impacts approximately 75% of the acreage involved in this action, Plaintiffs urge the Court to reconsider and vacate it before making its final report and recommendation.

## II. <u>BACKGROUND</u>

This is a highly unusual case. Indeed, this Court itself has characterized it as "unique and *sui generis*." *See Land Grantors I*, 64 Fed.Cl. at 707, 713, 716. Many important facts and documents only came to light in last-minute pretrial discovery, after Plaintiffs' document requests went unanswered for nearly a decade. The documents believed by the Plaintiffs to be the universe of documents through and including 1998 were largely comprised of a one-box "administrative record" made available by the Government in January, 1996. Prior to Summer, 2004, neither the parties nor the Court had seen many of the court files relating to the various condemnation petitions. The former hearing officer was not provided those petitions and did not have the benefit of the excellent historians' reports generated by Drs. Johnson and Brigham in 2004. Nor did the Court or the parties have court files that revealed the contractual agreements reached by almost 300 landowners whose properties were condemned but who were sued in declaration of taking actions, and settled with the Government as to price prior to any trial regarding compensation. Thus, the former hearing officer was not aware of all the facts and arguments necessary to arrive at a fully informed and accurate conclusion as to the scope of S. 794.

Given the undeniably unique nature of this case, and the serious ramifications of the 1998 Order, this Court can and should reconsider that order before issuing its final report to the review panel. The Court has the power to reconsider earlier rulings in a case prior to the case

becoming final. In fact, this Court's "Memorandum Opinion and Order granting Plaintiffs' Motion for Class Certification," reported at 71 Fed.Cl. 614 (2006) ("*Land Grantors III*"), is on point:

> It is well established that the court has authority to reconsider prior rulings before the entry of a final judgment. *See Marconi Wireless T. Co. of Am. v. United States*, 320 U.S. 1 47-48 (1943)(holding that the trial court has the power, "at any time prior to entry of its final judgment…to reconsider any portion of its decision and reopen any part of the case.")(citations omitted); *see also Wolfchild v. United States*, 68 Fed.Cl. 779, 784 (2005)("At an interlocutory stage, the common law provides that the court has power to reconsider its prior decision on any ground consonant with application of the law of the case doctrine.")(citations omitted); *Florida Power & Light Co. v. United States*, 66 Fed.Cl. 93, 96 (2005)("The decision to grant or deny a motion for reconsideration under the Federal Rule lies largely within the discretion of the trial court.")(citation omitted). In light of the amendment to RCFC 23 after the entry of Senior Judge Merow's December 23, 1997 Order Denying Class Certification and the court's well-reasoned decision in *Barnes*, the court has decided to reconsider entry of the December 23, 1997 Order.

*Id*. at 621. Applying this reasoning, the Court should reconsider and vacate the 1998 Order.

## III. <u>FACTS</u>

The facts necessary for consideration of this motion, facts not considered by the former hearing officer, are largely set out in *Land Grantors I*, 64 Fed.Cl. 661 at 666-673, where the Court discussed in detail the five petitions condemning the acreage needed for Camp Breckinridge and noted the subsequent declarations of taking filed incidental to the second of those petitions.

### <u>The First Condemnation Petition</u>

The evidence before the Court established that in the summer of 1941 the Government began preparations for the acquisition of land for, and construction of, Camp Breckinridge. As this Court noted,

> "On February 14, 1942, the local U.S. District Attorney filed the first petition under the War Powers Act of 1917, 40 Stat. 241, condemning 10,427.70 acres in Union County, Kentucky [Civil Action No. 74]. On February 16, 1942 Deputy U.S. Marshal O.A. Denton served the first 121 Orders to Vacate 99 condemned tracts of land… Thereafter, each of the landowners was visited by a member of the Corps of Engineers' negotiating team…
>
> Landowners and the families were given until March 3, 1942 to vacate so that construction could begin by March 15, 1942."

64 Fed.Cl. at 668-669 (brackets added). Thereafter, as the Court found, "[a]pproximately 85% of the owners of the 10,427.70 acres in Union County agreed to voluntary sales and to deliver to the United States [general warranty deeds conveying fee simple title.]" *Id*. at 669 (brackets added).

**<u>The Second Condemnation Petition</u>**

In its Interim Report, the Court similarly noted that a second condemnation petition under the War Purposes Act was filed on March 31, 1942 "condemning 19,517 acres located in Union and Henderson counties," (Civil Action No. 77) and that "On April 2, 1942 …the second group of landowners were served with notices to vacate by May 18, 1942." *Id*. The Court discussed a May 14, 1942 public meeting "where a majority of the landowners expressed continued dissatisfaction with the prices being offered, despite the fact that many had sold their land to the Government at a negotiated price, rather than insisting on a jury determination." *Id*. at 670. "By May 21, 1942, over half of the landowners in the second condemnation of 20,000 acres agreed to negotiated prices." *Id*.

**<u>The Third, Fourth and Fifth Condemnations Petitions</u>**

"On June 22, 1942, the U.S. District Attorney for the Western District of Kentucky filed a third Petition pursuant to the War Powers Act condemning 824 acres in Union County." *Id*. at 671 (Civil Action No. 81). "On October 23, 1942, the fourth Petition was filed

to condemn 5,400 acres located in northwestern Webster County." (Civil Action No. 88) *Id*. "On May 12, 1944, the local U.S. District Attorney filed a fifth Petition to condemn 16.37 acres, located in Union County, Kentucky." (Civil Action No. 134). *Id*. at 672.

The acreage condemned by the five condemnation petitions totaled 36,185.07.[3] Condemnation Petition Nos. 74 and 77, the first two filed, comprised almost 30,000 of the total acreage acquired for Camp Breckinridge. The fourth condemnation petition, in Civil Action No. 88, involved the third largest taking, 5,400 acres. *See* JX503 at CON3830. This, along with the third condemnation petition condemning 824 acres, brought the total to 36,168.70 acres. *Land Grantors I*, 64 Fed.Cl. at 671. The fifth petition, filed in 1944, condemned another 16.37 acres. JX529.

Pursuant to the War Purposes Act,[4] immediate possession was granted to the Government after it filed each Petition.[5] The Government then filed various declarations of taking subsequent to each Petition.[6] *Id.* at 670-671.

## IV. <u>ARGUMENT</u>

S. 794, a proposed Bill "For the relief of land grantors in Henderson, Union, and Webster Counties, Kentucky, and their heirs," provides, in relevant part:

Section 1. Authorization.

---

[3] *Compare Land Grantors I*, 64 Fed.Cl. at 664 (35,849.28 acres) and S. 794 (35,684.99 acres). The Government may not have ultimately taken title to all of the condemned acres.

[4] 40 Stat. 241, 50 U.S.C. §171, currently codified at 10 U.S.C. §2663.

[5] *See Land Grantors I*, 64 Fed.Cl. at 669-670.

[6] Four declarations of taking were filed under the first condemnation petition, Civil Action No. 74. JX 206a – JX 206d. Seven declarations of taking were filed incident to the second condemnation petition, Civil Action No. 77. JX 264a – 264j.

> The Secretary of the Treasury is authorized and directed to pay, out of money not otherwise appropriated, to the individuals (and in any case in which such individual is deceased, the heirs of such individual) who **sold** their land in Henderson, Union, and Webster Counties, Kentucky, to the United States Government **under threat of condemnation** in order to provide the 35,684.99 acres necessary for the military training camp known as Camp Breckinridge, the sum of $__________, such sum being in full satisfaction of all claims by such individuals against the United States arising out of such sale.
>
> Section 2. Reason for Relief.
>
> The individuals described in Section 1 assert that they were-
>
> (1) promised they would be given priority to repurchase land **sold** by them if **sold** by the United States Government; and
>
> (2) paid less than reasonable value due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights.[7]

S. 794, 103d Cong., 1st Session (1993) (emphasis added).

The Government argued in its 1998 motion to dismiss that landowners whose properties were acquired by the Government after the filing of declarations of taking did not technically fall within the scope of S. 794, *i.e.*, they had not "sold" their properties under "threat of condemnation" and the acquisitions of property by the Government through judgments were not through "sales." Thus, at the urging of the Government, Judge Merow focused on the word "sold" and the phrase "under threat of condemnation" in interpreting the congressional reference.

Without considering the five condemnation petitions or, apparently, the several individual declarations of taking under each, the previous hearing officer concluded that in order to be covered by S. 794, a landowner must have "*sold*" his or her property to the Government

---

[7] The Court has ruled that proof established both assertions by a preponderance of evidence. *Land Grantors I*, 64 Fed.Cl. at 697.

under "*threat*" that the landowner's property *would be* condemned if the landowner did not negotiate a "voluntary" sale. Both the facts of this case and the law relating to federal eminent domain proceedings, particularly under "quick-take" statutes such as the War Purposes Act, demonstrate the flawed underpinnings of the 1998 Order.

The hearing officer construed S. 794 based upon a strict and technical interpretation of its language. Hearing officers, however, are not strictly bound to the language in a congressional reference bill but are compelled, as fact-finders, to report facts back to Congress in order to permit that body to appropriately frame the ultimate legislation, which may be different than the bill referred.

Judge Merow incorrectly equated the filing of "declarations of taking" with the word "condemnation" contained in S. 794 and concluded that all events preceding the filing of declarations of taking were *before* "condemnation," and were thus "*under threat* of condemnation," whereas events *after* the declarations of taking were filed were no longer "under threat" of "condemnation." The 1998 Order was thus based on the faulty conclusion that any landowner who agreed to a price for his or her property prior to the filing of a declaration of taking for that property "sold" "*under threat* of condemnation,"[8] and were covered by the reference. Conversely, under Judge Merow's rationale, those properties which were acquired by the Government after the filing of relevant declarations of taking were not obtained "under threat of condemnation" and were thus not within the scope of the reference. Most respectfully, that

[8] To the extent the phrase "threat of condemnation" has any particular technical meaning in eminent domain matters, it has been referred to as that period of time after the public becomes aware that a public project is being contemplated and before the actual filing of the condemnation petition. Property values may decrease rapidly on some properties during the period of uncertainty, *i.e.*, while there is only a "threat of condemnation." *See*, *Nichols on Eminent Domain* (3rd ed.), Vol. 8, §18.01[2][a]. There is no evidence, however, that that definition has any application to this action.

was not the law in 1942 and 1943 and is not the law today. That analysis is inaccurate, at least in quick-take condemnation matters.

Under the law, "condemnation" occurs as soon as a condemnation petition is filed and certainly no later than the date the Government is given possession of the property. In situations like those under the War Purposes Act, possession routinely is granted the Government immediately after the filing of the petition. In such cases, a subsequent declaration of taking has little practical or legal meaning despite the import placed on it in the 1998 Order. Further, the word "sale," or "sold," as used in connection with condemnation proceedings, has a much broader meaning than in common parlance and includes all ways in which the Government takes title to property after the filing of a condemnation petition. Thus, pinpointing the time of "condemnation" in the 1998 Order as the date when declarations of taking were filed is inconsistent with well-settled law, as well as this Court's own interpretation in the Interim Report. The 1998 Order's restrictive interpretation of the word "sold" is likewise incorrect.

### A. The Hearing Officer Improperly Confined the Inquiry to the Language of the Proposed Bill.

Under the congressional reference statute, either house of Congress is authorized to refer a bill, excluding those for pensions, to the Chief Judge of the Court of Federal Claims for a report. *See* 28 U.S.C. § 1492. Upon referral, a designated hearing officer investigates the facts and formulates conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or gratuity, and if applicable, the amount due from the United States to the claimant. *Id.* Several cases discuss the extent to which the Court is bound by the literal language of proposed bills when issuing its report to Congress.

This Court's predecessor court described its responsibilities in congressional reference cases as follows:

> The court is "to find the facts" on every bill properly referred … and report "conclusions". … Every issue material to a full investigation must be found and reported…This means an independent investigation by the court of all the facts material to a full understanding of the merits of the matter referred so that the conclusions shall unmistakably show the nature and character of the proposed measure ***to the end that the Congress may not be left in doubt in framing legislation for relief if any be sought further***.

*The Atlantic Works v. United States*, 46 Ct.Cl. 57 (1911) (emphasis added).

Other cases support this interpretation of the Court's expansive fact-finding function in congressional reference cases. In *Paul v. United States*, 20 Cl. Ct. 236 (1990), *aff'd*., 21 Cl.Ct. 758 (1990), for example, an attorney for a group of native Alaskans sought a bill for additional compensation for services provided in connection with the Alaska Native Claims Settlement Act. Paul contended that a strict reading of the proposed bill and referring resolution "virtually required" a favorable recommendation to Congress. *Id.* at 265. The Court described Paul's position as a "misunderstanding of Congressional procedures, as well as a misstatement of the reasons a bill is referred to the court for a report." *Id.* The Court ruled that "[t]he reference of the bill for a report under 28 U.S.C. § 2509 ***does not amount to adoption of the language of the bill to be referred…***" *Id.* (emphasis added). It opined that "[t]he function of the congressional reference procedure that is most beneficial to Congress is the clarification and determination of the many tenuous and frequently complex facts that a claimant alleges to apply to equities in the claim." *Id.* at 266. Thus, the Court ruled that it was not strictly bound by the language of the proposed bill.

The plaintiff in *Blacklock v. United States*, 208 U.S. 75 (1908), similarly argued that the Court of Claims should be bound by the language of a proposed bill. In *Blacklock*, the plaintiff law firm contended that the language in a proposed bill required the court to determine that the firm had a lien on certain real property superior to the Government because the proposed bill stated that the firm "had a prior lien." *Id*. at 84. The Supreme Court flatly rejected this

argument, finding that the statement merely recited claims made by the plaintiff and "could not have been intended as an admission by Congress that no [prior] lien existed in favor of the United States." *Id.* The Court found it "well settled 'that a mere recital in an act, whether of fact or of law, is not conclusive unless it be clear that the legislature intended that the recital should be accepted as a fact in the case.'" *Id*. at 85, *quoting, Kinkead v. United States*, 150 U.S. 483, 497 (1893). The Court found that such an intent could not be imputed to Congress. Rather, the very referral of the matter to the Court of Claims made it "manifest that Congress intended that the claim of the parties was to be judicially investigated and determined according to all the facts as disclosed by the evidence adduced." *Id.* Accordingly, the Court held that regardless of the language in the proposed bill, it was required to independently find whether the United States had a prior lien on the property as revealed by its investigation.

In *Kinkead*, the petitioners unsuccessfully argued that recitals in the act of Congress referring the matter to the Court of Claims should be accepted as true and should thereby estop the court from considering the question of title to the real property at issue. The Supreme Court dismissed this argument: "***it is impossible that [C]ongress could have intended by the recital to estop the court of claims from passing upon the very question referred to it for judicial determination.***" *Kinkead*, 150 U.S. at 497 (emphasis added).

These cases demonstrate that the Court, as hearing officer, is not restricted to a blind technical interpretation of the language in a proposed bill when hearing a congressional reference case.[9] Judge Merow was incorrect in so fettering himself. Rather, the Court must

[9] Indeed, this Court's finding, at *Land Grantors I*, 64 Fed.Cl. at 664, that "35,849.28 acres" were acquired by the Government, which is not precisely the number of acres recited in S. 794 ("the 35,684.99 acres"), suggests the Court's recognition that slavish adherence to the bill's wording is not required.

conduct an independent and thorough judicial investigation of all material facts, so that it can make fully informed conclusions to pass on to Congress for use in its ultimate legislative decision. Accordingly, this Court is not strictly bound by the imprecise and general language in proposed bill S. 794 when issuing its report to Congress. Because the 1998 Order improperly rested on an unnecessarily strict and erroneous construction of ambiguously stated proposed legislation, rendered before any factual investigation had occurred, this Court should vacate it before issuing its congressional reference report for consideration by the review panel.

### B. The Hearing Officer Incorrectly Interpreted the Language of the Proposed Bill.

#### 1. "Condemnation" Occurred with the Filing of the Condemnation Petitions and the Orders of Possession.

In the 1998 Order, the previous hearing officer erred in equating the time of "condemnation" with the filing of declarations of taking. To the contrary, it is well-settled in cases from both the United States Supreme Court and elsewhere in the federal system that when the Government files a condemnation petition and takes possession of the subject property at the outset, the "taking" occurs at that point and any subsequent declaration of taking is merely "ancillary or incidental."

In *United States v. Clarke*, 445 U.S. 253, 254 100 S.C. Ct. 1127, 1128, 63 L.Ed.2d 373 (1980), the United States Supreme Court defined "condemnation" as " *a judicial proceeding* instituted for the purpose of acquiring title to private property and paying just compensation for it." (emphasis added). "Condemnation" occurs "when the government *initiates condemnation proceedings* against property prior to seizing the property." *KLK, Inc. v. United States Department of the Interior*, 35 F.3d 454, 455, n.1 (9th Cir. 1994) (emphasis added).

*United States v. Dow*, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed. 2d 1109 (1958) is the seminal case in this area. Like this case, *Dow* involved a condemnation under the War Purposes

Act where the United States filed a condemnation petition and the district court ordered the Government into immediate possession of the property.[10] The issue in *Dow* was whether the date of taking was the date of the Government's entry into possession of the property or the date of a subsequent filing of a declaration of taking under 40 U.S.C. §258(a). The Supreme Court ruled that:

> [I]n cases where there has been an entry into possession before the filing of a declaration of taking, such entry has been considered the time of "taking" for the purposes of valuing the property and fixing the date on which the Government's obligation to pay interest begins to run.

78 S.Ct. at 1045. The Court reasoned:

> The Taking Act does not bestow independent authority to condemn lands for public use. On the contrary, it provides a proceeding "*ancillary or incidental* to suits brought under other statutes," [citing case]. Such a proceeding can be instituted either at the commencement of the condemnation suit under the 'other statutes' or, as in this case, after such a suit has been commenced and either before or after the Government has taken possession. In both situations the Taking Act enables the United States to *acquire title* simply by depositing funds for "on account" of the just compensation to be awarded the owners, rather than by making payment pursuant to a court order. *In those cases where the Government has not yet entered into possession*, the filing of the declaration enables it to enter immediately and relieves it of the burden of interest from the time of filing to the date of judgment in the eminent domain of proceedings.

*Id*. (emphasis added, citation omitted).

---

[10] This procedure is typical in condemnation actions under the War Purposes Act, under which the Government obtains the right to immediate possession. *See, e.g.*, *United States v. Certain Parcels of Land in Sewickley Tp*, 54 F.Supp. 943 (W.D. Pa. 1944); *United States v. 40,379 Square Feet of Land*, 58 F.Supp. 246 (D. Mass. 1944) (characterizing a declaration of taking filed after the Government already had filed its condemnation petition and secured an order of immediate possession as an "ambivalent" practice.); *United States v. 45,149.58 Acres of Land*, 455 F.Supp. 192 (E.D. N.C. 1978).

Other Supreme Court cases state the same principle. For example, in *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 340, 83 S.Ct. 379, 384, 9 L.Ed. 2d 350 (1963), the Court ruled:

> [the Government] may take property pursuant to its power of eminent domain, either by entering into physical possession of the property without a court order, or by instituting condemnation proceedings under various Acts of Congress. [citing *Dow*]. Title to the property passes later, though the *entry into possession marks the taking,* gives rise to the claim for compensation, and fixes the date as of which the property is to be valued (emphasis and brackets added).

In such cases, the Government's taking of "possession" is not limited to actual physical possession, but may arise from a deprivation of the owner's possessory rights. In *United States v. General Motors Corporation*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945), another War Purposes Act case, the Court wrote:

> The courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking. Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking.

323 U.S. at 378. The former Court of Claims similarly has defined a taking by the Government as "a direct interference with or disturbance of property rights." *R.J. Widen Co. v. United States*, 357 F.2d 988, 993 (Ct.Cl. 1966). *See also Foster v. United States*, 607 F.2d 943, 951, n. 8 (Ct.Cl. 1979) ("property is deemed taken when the Government substantially disturbs the owner's use and possession of the subject property.")

In *Land Grantors I*, this Court recognized and discussed the distinction between the two methods of land acquisition. 64 Fed.Cl. at 688. In the Camp Breckinridge landowner cases, the Government already had entered into possession at the outset, well before any declarations of taking were filed. The Government acceded to the right of possession of the

subject Camp Breckinridge properties immediately after the filing of its condemnation petitions relating to those properties. *See Land Grantors I*, 64 Fed.Cl. at 668-669. This Court has found that the Government obtained possession of the properties needed to form Camp Breckinridge immediately after it filed the five War Purposes Act petitions. *See* 64 Fed.Cl. at 666-667. Under the War Purposes Act, "immediate possession [of the properties] may be taken to the extent of the interest to be acquired and the lands may be occupied and used for military purposes[.]" *Id*. at 667. In fact, immediately after the filing of the first two Camp Breckinridge condemnation petitions (totaling almost 30,000 acres), on February 14 (No. 74) and March 31, 1942 (No. 77), motions for immediate possession were made and granted. Even though the Government permitted the landowners two or three weeks to vacate the properties, the Government had the right of immediate possession and, at a minimum, materially disturbed the landowners' rights in their properties. Within weeks, the landowners' actual physical possession had ceased. Yet, in establishing the date "condemnation" occurred, the previous hearing officer made no reference to the condemnation petitions that were filed pursuant to the War Purposes Act or the fact that the landowners' legal rights to possess their properties were taken away immediately upon the filing of the petitions.

As the Court also has found, after the first condemnation petition was filed on February 14, 1942, the landowners were only given until March 3, 1942 to vacate and on February 16, 1942 the U.S. Marshal "served the first of 121 Orders to vacate 99 *condemned* tracts of land." 64 Fed.Cl. at 669 (emphasis added). The Court likewise has found that on March 31, 1942 the second petition was filed "*condemning* 19,517 acres" and that on "April 2, 1942 the second group of landowners were served with notices to vacate by May 18, 1943." *Id*. at 669 (emphasis added).

Thus, this Court has recognized that the first 10,427.70 acres were "condemned" with the filing of the first petition and the second petition was filed on March 31, 1942 "condemning" another 19,517 acres. The Court has similarly found that the Government acquired the right to immediate possession of those some 30,000 acres and ordered the landowners and families to be off the properties within a short time. *Land Grantors I*, 64 Fed.Cl. at 668-669.

Directly to the point, this Court stated:

> *Once property was judicially condemned*, the landowners either could voluntarily negotiate a sale price with federal agents or require "just compensation" to be determined by a jury trial.

*Id.* at 664 (emphasis added). The properties were judicially condemned with the filing of each petition. Thus, this Court already has recognized the fundamental mistake in Judge Merow's 1998 Order: the "voluntary" negotiations and jury trials *all* occurred *after condemnation*, *i.e.*, the filing of the petitions—not "under threat of condemnation."

The hearing officer, however, relied upon the dates the United States filed the declarations of taking as key for purposes of construing S. 794. But using the declaration of taking dates as the "condemnation" dates ignores *Dow* and other cases holding that declarations of taking are merely "ancillary or incidental" in cases like this, where the Government has filed its condemnation petition and already obtained possession of the property well before the filing of the declaration of taking. In such cases, "the filing of a declaration of taking is *optional* with the Government and *purely incidental to the main suit*," and its "primary purpose… is to diminish interest liability." *United States v. 26.3765 Acres of Land*, 62 F.Supp. 910, 911 (E.D. N.Y. 1945)(emphasis added), citing *United States v. Catlin*, 142 F.2d 781 (7th Circuit 1941);

*United States v. Miller*, 317 U.S. 369, 381, 63 S.Ct. 276, 87 L.Ed. 336 (1943).[11] While "title" may pass with the filing of a declaration of taking and depositing of estimated funds for payment,[12] S. 794 speaks in terms of "condemnation," not the passing of title. The dates of the declarations of taking filed relative to the Camp Breckinridge properties do not carry the significance ascribed to them by Judge Merow. They are not the dates on which "condemnation" of the properties occurred.

The former hearing officer's choice of the declarations of taking dates for establishing the date after which a "threat of condemnation" no longer existed was incorrect and, most respectfully, leads to a nonsensical result. Since "condemnation" actually occurred with the filings of the petitions, under the 1998 Order even the landowners who are said to have "voluntarily sold" before the filing of a declaration of taking arguably would not qualify as plaintiffs. They sold after condemnation. Thus, the former hearing officer's conclusion could render **all** landowners and heirs ineligible to be plaintiffs. That result would cause S. 794 to be meaningless and this action to be futile *ab initio*. *See Mizokami v. United States*, 188 Ct.Cl. 736, 414 F.2d 1375, 1379 (1969) (improper to "presume that Congress passed the bill in question merely to send plaintiffs to this forum for a … dismissal of their petition.")[13]

---

[11] *See also*, *Higginson v. United States*, 384 F.2d 504, 508 (6th Cir. 1967)(declaration of taking statute is an "ancillary statute…used to implement" the War Purposes Act).

[12] *See Dow*, 78 S.Ct. at 1045; 40 U.S.C. 3114(b) (previously codified at 40 U.S.C. 258).

[13] *Porreca v. LaFerrierre*, 543 A.2d 102, 105 (N.J. Super. 1988) put in another way: "'[s]tatutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as 'consonant to reason and good discretion.' [citations omitted]. And 'where a literal reading of the statute leads to absurd consequences 'the court must restrain the words' and seek the true legislative intent.'" Statutory construction must not be "'at odds with the sense of the situation.'"

Any interpretation of S. 794 that results in 75% of the landowners—or, indeed no landowner—being covered is, to say the least, worthy of reconsideration. To the contrary, the only logical intent of S. 794 was to provide compensation to ***all*** landowners (and their heirs) whose properties were condemned with the filing of each of the five condemnation petitions. They include (1) those who negotiated sale prices and signed options prior to the filing of declarations of taking, (2) those who negotiated and reached sales agreements with the Government after the declarations of taking were filed but before a jury set the price, and (3) those who went to trial and had the jury tell them how much they should receive. *Land Grantors I*, 64 Fed.Cl. at 664. That interpretation is consistent with the intent of one of the bill's primary sponsors, former Sen. Wendell H. Ford,[14] whose interpretation to that effect the previous hearing officer refused to consider. *See*, Order of November 24, 1998 [Docket No. 64], denying Plaintiffs' motion to submit an explanatory letter from Sen. Ford. Any conclusion that results in either all or a great majority of landowners not being covered by S. 794 is unsupportable and incompatible with the congressional reference. It could not have been the result that Congress contemplated when it referred the matter to this Court.

**2. The Term "Sold," as Used in Eminent Domain Matters, Includes all Means by Which the Government Acquires Title to Property.**

In the 1998 Order, the former hearing officer put great emphasis on the word "sold" contained in S. 794. The hearing officer, however, mistakenly failed to apply the term in a manner that comports with the intent to provide relief to the "grantors" of the Camp

---

[14] *See Land Grantors I*, 64 Fed.Cl. at 685-686, where Sen. Ford's role in assisting the landowners is discussed. Sen. Walter D. Huddleston, an original co-sponsor with Sen. Ford, left the Senate after the 1984 election. He was succeeded in 1985 by Sen. Mitch McConnell, who from the beginning of his service strongly supported the legislative effort to compensate the former landowners and heirs, and does so today. *See*, 64 Fed.Cl. at 718.

Breckinridge acreage, as is required. "Sold" was not put in its proper context in the 1998 Order. Judge Merow interpreted the language of S. 794 as being unambiguous in its use of "sold," thus requiring no broader inquiry or consideration.

While the word "sold" may have one definition in common parlance, it has quite another in the context of eminent domain matters. A broader definition of "sold" and similar words in property condemnation settings has been recognized for many years. Consistent with the historic nature of the instant case, reference to historic, as well as legal, precedent is appropriate. An 1855 U.S. Attorney General's opinion from Attorney General Caleb Cushing (1853-57) to U.S. Secretary of War Jefferson Davis, addressed a question concerning the Government's acquisition of private property in Maryland for the construction of an aqueduct. A statute under which the property was actually being acquired by the Government under eminent domain procedures stated that "no public money shall be expended upon any site or land hereafter to be *purchased* by the United States…until the written opinion of the Attorney General shall be had in favor of the title, and also the consent of the legislature of the State in which that land or site may be, shall be given to said *purchaser*." 7 U.S.Op.Atty.Gen. 114, 1855 WL 2289 (U.S.A.G., April 24, 1855)(emphasis added). In opining as to whether the Government had acquired clear title to the property, which had been obtained by the United States through eminent domain rather than by means of traditional "purchase," which the literal language of the enabling statute would have seemed to require, the Attorney General recognized that:

> [I]n common parlance, "purchase" imports the buying of property by contract, and therefore would not include the present case of acquisition by statute or by condemnation and expropriation.
>
> *But the legal meaning of "purchase" applied to real estate, goes much beyond this*, for the phrase "title by purchase," is often employed *to embrace all the forms of acquisition* except that by "descent"… When accurately defined, the distinction is between titles acquired through some agreement *or other act* [italics

> original] of the party acquiring, which is "purchase;" and titles acquired by the mere devolution of law, without any act of the party, which is "descent."… *Undoubtedly, the present case, of* ***title to the United States by expropriation, is purchase*** within the scope of the statute, and is a form of acquisition justified by acts of Congress not less than by the Constitution of the United States.
>
> As to all this part of the subject, then, *my conclusion is that the acquisition of land by the United States for the use of the Washington Aqueduct, through the means of a statute process of expropriation, is a lawful "**purchase**,"* such as, if done in strict accordance with the form of the statute, may be certified by the Attorney General as vesting a valid title in the United States. (Brackets and some emphasis added; citations omitted).

7 U.S.Op.Atty.Gen. at 121-122 (brackets and some emphasis added; citations omitted).

This definition of "purchase," as embracing all the forms of acquisition, including through statutory condemnation, has continued to be recognized by the federal courts. A similar question arose in *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 104 S.Ct. 2187, 81 L.Ed. 2d 1 (1984). There, the Government filed a traditional "straight-condemnation" petition under 40 U.S.C. §257[15] to acquire over 2,000 acres of timberland for a national reserve. Unlike this case and other "quick-take" petitions filed under statutes such as the War Purposes Act, the Government did not seek immediate possession of the property or file a "declaration of taking" under 40 U.S.C. §258(a),[16] which would have permitted immediate possession upon the payment into court of the estimated value of the property. Rather, it chose to proceed under FRCP 71A, which prescribes the filing of a "complaint in condemnation," a trial on the question of the amount of compensation due the owner, followed by payment and possession. Interest was awarded from the date of the judgment. The landowner objected, claiming that interest should

---

[15] Currently codified at 40 U.S.C. §3113.

[16] Currently codified at 40 U.S.C. §3114.

have been calculated from an earlier date. In its opinion, the Supreme Court equated the *final judgment* in a condemnation case with an *option to purchase* on the part of the Government:

> The practical effect of final judgment on the issue of just compensation is to give the Government an *option to buy* the property at the adjudicated price. *Danforth v. United States*, 308 U.S. 271, 284, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939). If the Government wishes to exercise that option, it tenders payment to the private owner, whereupon title and right to possession vest in the United States. If the Government decides not to exercise its option, it can move for dismissal of the condemnation action. (Emphasis added).

104 S.Ct. at 2191 (emphasis added).

Similarly, in *Danforth v. United States*, 308 U.S. 271, 284, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939), a condemnation case under the Flood Control Act of 1928, the Court was asked to determine the date on which the Government actually took the owners' property, in order to determine when interest began to run. As in *Kirby Forest Industries*, the Court equated the final judgment in a condemnation case to contractual offer and acceptance:

> Unless a taking has occurred previously in actuality or by a statutory provision, which fixes the time of taking by an event such as the filing of an action [*e.g.*, the War Purposes Act], we are of the view that the taking in a condemnation suit under this statute [the Flood Control Act of 1928] takes place upon the payment of the money award by the condemnor. No interest is due upon the award. *Until taking, the condemnor may discontinue or abandon his effort. The determination of the award is an offer subject to acceptance by the condemnor and thus gives to the user of the sovereign power of domain an opportunity to determine whether the valuations leave the cost of completion within his resources. Condemnation is a means by which the sovereign may find out what any piece of property will cost.* "The owner is protected by the rule that title does not pass until compensation has been ascertained and paid…"

60 S.Ct. at 236, *citing*, *Hanson Lumber Co. v. United States* 261 U.S. 581, 587 43 S.Ct. 442, 444, 67 L.Ed. 809 (emphasis and brackets added). A reading of S. 794 in its proper context demonstrates that the Senate could not have intended to limit potential claimants to only those

who had "voluntarily sold" their properties to the Government before a declaration of taking had been filed. Indeed, there is no factual support or reason for any such restriction.

In addition, the word "sold" in S. 794 is modified by the phrase "in order to provide **the 35,684.99 acres** necessary" to establish Camp Breckinridge (emphasis added). That language demonstrates that the owners (and heirs) of **all** of the 35,684.99 acres were covered. If the language in S. 794 had been "sold…in order to provide ***some (or part)*** of the 35,684.99 acres," then an intent to limit the scope of possible claimants arguably might be inferred. But such limiting language is not contained in S. 794.

### 3. "Grantors" of the Camp Breckinridge Lands Include All Those Whose Properties Were Condemned.

The title of S. 794 also assists in defining its scope: A Bill "For the relief of land ***grantors*** in Henderson, Union and Webster Counties, Kentucky, and their heirs." (emphasis added). A "grantor" is defined as "[t]he person by whom a grant is made. A transferor of property." *Black's Law Dictionary*, p. 700 (6th Ed. 1990). In turn, "grant" is defined as:

> A conveyance; *i.e.* transfer of property real or personal by deed or other instrument. **A generic term applicable to all transfers of real property, including transfers by operation of law as well as voluntary transfers**.

*Id*. at 699 (emphasis added).

Both the United States Supreme Court and the courts of Kentucky echo this interpretation. For example, in *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. 420, 457, 11 Pet. 420 (1837), the Court described the ability of a state to exercise its condemnation powers as extinguishing the rights of the "grantor" to the land. Similarly, in *United States v. Union Pac. R. Co.*, 353 U.S. 112, 131-132, 77 S.Ct. 685, 695, 1 L.Ed.2d 693 (1957), Justice Frankfurter noted in his dissent case law holding that if future use of condemned property were to be inconsistent with that of a railroad, the land should revert to the "grantor."

*See also*, *Rose v. Bryant*, 251 S.W.2d 860, 861 (Ky. 1952)(upon abandonment, condemned property would revert back to the "grantor"); *Hendrickson v. Dept. of Highways*, 196 S.W.2d 876, 877, 878 (Ky. 1946)(recipients of funds from condemnation referred to as "grantors" of the property.)

Other state court cases identify the "grantor" as the actual source of the property conveyed. *White v. Rosenthal*, 35 P.2d 154, 155 (Cal. App. 1934), for example, holds that "grantor" applies to all transfers of real estate, including those by operation of law, and that "[t]he sale under the decree of foreclosure of a mortgage is a judicial sale and is regarded at law as a sale by the judgment debtor." This, by analogy, applies equally to judicial condemnations where the condemnee is regarded as the seller. Similarly, *Harris v. Strawbridge*, 330 S.W.2d 911, 915 (Tex. Civ. App. 1959) holds that the "grantor" of property is the person who receives the consideration, *i.e.*, the former owners of the Camp Breckinridge properties.

The nomenclature in both the encyclopedia and cases demonstrates that "grant" encompasses both voluntary and involuntary transfers of property. Such an involuntary transfer would arise by operation of law as part of a condemnation proceeding. This is perfectly consistent with the Supreme Court's broad use of "sale" and "purchase" language in *Kirby Forest Industries* and *Danforth*, as well as in Attorney General Culver's 1855 opinion to Secretary of War Davis.

**4. The Intent of the Bill's Congressional Sponsor Supports a More Expansive Interpretation of S. 794.**

The former hearing officer's restrictive definition of "sold" in the 1998 Order is contrary to the settled usage in the eminent domain context, and is not justified or required by the language of S. 794. This is borne out by an April 23, 1998 letter from then-Senator Ford, one of the original sponsors and backers of this congressional reference, a life-long resident of

Owensboro, in the western Kentucky area near Camp Breckinridge. In his letter [attached as Exh. "A"], Sen. Ford stated, *inter alia*:

> I wrote and sponsored legislation in the United States Senate which was intended to allow a group of individuals the opportunity to have their day in court. There has been a great deal of speculation as to the scope of this legislation. I can assure you that the intent behind my legislation was to include a class of individuals (and in any case in which any such class member is deceased, the heirs of such member) who were the former owners of properties located in Henderson, Union and Webster Counties, Kentucky *which were condemned or otherwise procured by the United States Government in order to provide the approximately 36,000 acres necessary for the military training camp known as Camp Breckinridge. To be quite clear, my legislation was never intended to be limited to only those individuals who negotiated sales with the federal government.* (Emphasis added).

S. 794 is not currently the law of the land and may never be in its present form. It is, at most, proposed legislation. As discussed above in Section IV. A., the language may change, depending upon the result of this Court's investigation and report to Congress, and that body's decision-making process. In the absence of a record of discussion or debate on S. 794, a reliable source of information concerning its intent is the word of one of the bill's authors and sponsors, Senator Ford. Were S. 794 an existing statute, passed by Congress and signed by the President, for which there is an existing legislative history, perhaps Senator Ford's statement of intent would have less weight. That is not the case, however, and Senator Ford's opinion can and should be considered by the Court as further support of the most reasonable interpretation of S. 794.[17]

---

[17] Senator Ford's letter may be considered by the Court pursuant to Fed.R.Evid. 803(3) or Fed.R.Evid. 807. It contains a clear and unequivocal statement of his intent at the time S. 794 was drafted and voted upon. Pursuant to Fed.R.Evid. 803(3), Senator Ford's then-existing state of mind as to intent is capable of consideration. Moreover, under the "Residual Exception" provision of Fed.R.Evid. 807, Senator Ford's statement has "equivalent circumstantial (continued…)

**C. <u>The Court is not Required to Reopen Landowner Judgments in Order to Decide Plaintiffs' Equitable Congressional Reference Claims.</u>**

Notwithstanding a footnoted suggestion by the previous hearing officer in the 1998 Order [at 5, n. 2.], the inclusion of these landowners (or their heirs) as Plaintiffs does not mean that this Court would have to reopen, vacate, or somehow go behind the judgments rendered in the 67 cases that went to trial on the issue of price, or the 290 others who negotiated agreed-upon settlements. The purpose of S. 794 is to benefit **all** grantors of Camp Breckinridge lands who were paid less than fair and reasonable value because of not receiving appropriate value for their minerals. Honoring this purpose would not require the Court in any way to inquire behind, or set aside, those judgments. The Court's restitution recommendation would simply supplement amounts that landowners (or heirs) originally received, whether by negotiated agreement as to price or by trial.

There is no doubt that courts in congressional reference cases can further consider the equitable side of the claims even though the legal claims have been disposed of previously by judgment. "Equitable," as the term is used in congressional reference cases, is different from the usage afforded to it in ordinary civil actions. *See*, *Land Grantors I*, 64 Fed.Cl. at 696; *California Canners & Growers Ass'n v. United States*, 9 Cl.Ct. 774, 785 (1986) ("the government committed a negligent or wrongful act" that "caused damage to the claimant."); *Webb v. United States*, 192 Ct.Cl. 925, 932 (1970) ("broad moral responsibility…some unjustified act or omission to act which caused plaintiffs' damage."); *Kochendorfer v. United States*, 193 Ct.Cl. 1045, 1055 (1970) ("some unjustified act or omission that caused the claimants' damage");

(…continued)

guarantees of trustworthiness," and is extremely probative of the intent of S. 794. *See*, *Land Grantors I*, 64 Fed.Cl. at 700-701, fn 36, for a discussion of those rules.

*Shane v. United States*, 3 Cl.Ct. 294, 304 (1983) ("some unjustified government act that caused damage to claimants.")

Consideration of equitable claims occurs without the need to reopen or vacate any applicable preceding judgment. *Kochendorfer, supra*; *J.A. Zachariassen & Co. v. United States*, 136 Ct.Cl. 63, 141 F.Supp. 908, 911 (1956); *Burkhardt v. United States*, 113 Ct.Cl. 115, 82 F.Supp. 333 (1949). The question in congressional reference cases is, after all, largely a legislative and political one for Congress, with the assistance of the Court as investigator and fact finder. The cases cited by the previous hearing officer in the 1998 Order at 6, n. 2, where he alluded to the possibility that "difficult issues regarding the Constitutionality of the reference" would be raised by the Court being required to "reopen those proceedings [the judgments involving the former landowners] to determine if adequate compensation was awarded," are inapposite. That is simply not a relevant and legitimate concern in congressional reference cases where claimants' "equitable" claims are concerned.

In *Kochendorfer*, for example, plaintiffs' claims had been fully and finally tried in district court with no liability having been found against the Government. While finding that "the question of legal liability of the United States is *res judicata* and has been decided against the plaintiffs," the former Court of Claims determined that

> This, of course, is not the end of the matter. Even though there is no legal liability, in a congressional reference case, Congress desires to be advised whether an "equitable claim" exists. 28 U.S.C. §2509(c).

193 Ct.Cl. at 1055. The hearing officer and review panel in *Kochendorfer* then found that despite the prior judgment, plaintiffs did "have an 'equitable claim'" and recommended damages, including 6% interest. *Id*. at 1075. *See also*, *J.A. Zachariassen*, 136 Ct.Cl. at 911. ("[In] a congressional reference such as this, the court will further consider the equitable side of

the claims even though the legal questions have been disposed of previously."); *Burkhardt v. United States*, 113 Ct.Cl. 115, 82 F.Supp. 333, 335 ("What is asked of the court now is not a reversal or review of an earlier decision, but merely a review of the facts in that case. …[If equities are indicated] the court will call attention to the facts. The Senate can then determine whether they are of a nature which should persuade it to act…")

Upon review, the cases cited by the previous hearing officer do not, in reality, even support his fear that consideration of the claims of those landowners who previously were parties to judgments would be impermissible. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed. 2d 328 (1995) is a case in which a statute was enacted providing for reinstatement by motion of any action which had been dismissed under a then-existing one-year statute of limitations. The Court held that the statute contravened the separation of powers doctrine by expressly requiring federal courts to reopen final judgments entered before its enactment. *Plaut* was not a congressional reference action and did not arise under 28 U.S.C. §2509, which gives this Court authority, upon referral from Congress, to determine "whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant."

*Mizokami v. United States*, 414 F.2d 1375, 188 Ct.Cl. 736 (1969) is no more supportive of the previous hearing officer's concern than *Plaut* and, in fact, is supportive of Plaintiffs. In *Mizokami*, spinach growers from Colorado obtained a special bill from Congress for damages allegedly resulting from erroneous determinations by the FDA that their spinach was contaminated by a pesticide. The Government moved to dismiss on the ground that had the same claim been brought under the Federal Tort Claims Act, it would have been precluded by the "*Neustadt* rule." The Court of Claims denied the motion, holding:

> To hold otherwise would be to presume that Congress passed the bill in question merely to send plaintiffs to this forum for a ritual confirmation of the *Neustadt* rule and concomitant dismissal of their petition.

*Id*. at 1379. The Court then proceeded to determine an award of damages in favor of the growers.

*Pope v. United States*, 323 U.S. 1, 65 S.Ct. 16, 89 L.Ed. 3 (1944), like *Mizokami*, also actually supports Plaintiffs and does not support a concern about a need to reopen any of the landowners' judgments. *Pope* involved a special act of Congress conferring jurisdiction on the former Court of Claims to "hear [and] determine" and to "render judgment" upon, certain claims of an excavation company arising from excavation for a tunnel. The excavator had already sued in the Court of Claims and lost. After appeals were exhausted, Congress gave the company new life through passage of a special act. The Court initially dismissed the proceeding under the special act, saying it impermissibly conferred "upon the plaintiff the unusual privilege of litigating the same case a second time." 65 S.Ct. at 20. The Supreme Court disagreed, stating:

> [W]e do not construe the Special Act as requiring the Court of Claims to set aside the judgment in a case already decided or as changing the rules of decision for the determination of a pending case.
>
> * * * * *
>
> Congress, by the creation of a legal, in recognition of a moral, obligation to pay petitioner's claims plainly did not encroach upon the judicial function which the Court of Claims had previously exercised in adjudicating that the obligation was not legal.

*Id*. at 21. The Court concluded that:

> [T]he effect of the Special Act was to authorize petitioner to invoke the judicial power of the Court of Claims, and that he has done. It is true that Congress has imposed on that court…nonjudicial duties of an administrative or legislative character.

*Id*. at 23. Those duties are not unlike those assumed by this Court in congressional reference cases.

*Sargent v. Columbia Forest Products, Inc.*, 75 F.3d 86 (2nd Cir. 1996), also cited in footnote 2 of the 1998 Order, does little more than reiterate the laudable legal platitudes of the "sanctity of final judgments in our federal system" and "that there be an end of litigation." *Id*. at 89. In doing so, however, it also notes that "[we] have the power to reopen a case at any time. However, this power is to be 'exercised sparingly' and reserved for 'exceptional circumstances." *Id*. (citations omitted). Were it necessary for this Court to reopen any of the 1940s judgments, which it is not, congressional references would almost certainly fall within the "exceptional circumstances" category.

Obligations of the Government may rest open equitable obligations, as Congress has shown in enacting the congressional reference statute. As recognized by the Supreme Court long ago in *United States v. Realty Co.*, 163 U.S. 427, 440-441, 16 S.Ct. 1120, 1125-26, 41 L.Ed. 215 (1896), the recognition of "equitable" obligations is exclusively for Congress to decide:

> [The] term "debts" include those debts or claims which rest upon a merely equitable or honorary obligation, and which would not be recoverable in a court of law if existing against an individual. The nation, speaking broadly, owes a "debt" to an individual when his claim grows out of general principles of equity and justice… The power of congress extends, at least, as far as the recognition and payment of claims against the government which are thus founded…. Their recognition depends solely upon Congress, and whether it will recognize claims thus founded must be left to the discretion of that body.

The actions which resulted in formal judgments as to value in the 1940s, whether agreed-upon or as the result of jury decisions, were judicial in nature. The instant matter is essentially legislative, with the assistance of this Court. Those "legal" judgments from the 1940s involving the landowners need not be vacated or set aside in order for this Court to assist

Congress in its legislative function by advising it whether Plaintiffs *equitable* claims justify additional compensation and they are no impediment to that task.

The Court already has found facts sufficient to support Plaintiffs' equitable claim. In addition, the Government acted in an unjustified fashion in applying its own acquisition guidelines in acquiring the properties. Those written guidelines made clear that the Government should not acquire mineral rights: "Acquisition of land which necessitates the acquisition of mineral rights … **will** be avoided." DX 183, Brigham Report, Exh. 42, paragraph 4 at p. 2 (emphasis added). The Government's own guidelines also required a "clear statement of the pertinent facts and circumstances" justifying the taking of minerals in addition to the surface land needed. Brigham Report at 20-21. Here, there is no proof that such justification was given by the Government. The Government always envisioned only the temporary use of the Camp Breckinridge surface lands. DX 182, Johnson Report at 43. There is nothing in any of the Government's condemnation petitions or any other takings documents indicating any need for the minerals underlying the Camp Breckinridge lands. It is beyond question that a grantor of real estate may convey only the surface without also conveying the mineral estate. *See*, *Saulsberry v. Maddix*, 125 F.2d 430, 433 (6th Cir. 1942)(applying Kentucky law.) Thus, the Government's condemnation and taking of Plaintiffs' mineral interests which it clearly did not need, did not justify or explain, and which violated its own guidelines (absent justification), must fall within the "unjustified government act or omission to act" provision sustaining equitable relief.

**D. <u>All Former Landowners and Heirs Are Included in the Class.</u>**

As shown, S. 794 encompasses ***all*** landowners (and their heirs) whose properties were acquired for Camp Breckinridge, whether by negotiated sale prior to trial or after a trial. The word "sold" in the context of this case and S. 794 includes not only those landowners who negotiated sale prices and conveyed their properties prior to the filing of declarations of taking,

but also those who negotiated sales prices and entered into agreed judgments after the declarations of taking were filed in lieu of going through jury trials[18] and those who went to trial on the issue of value.

On June 22, 2006, the Court certified a class in this case, finding, *inter alia,* that class "certification is a superior method of presenting the case for appeal or further consideration by Congress." *Land Grantors III*, 71 Fed. Cl. 614 (2006)(citing RCFC App. D-1.) Following class certification, the parties filed arguments related to the form and content of the notice to be sent to potential class members. The parties submitted arguments on disputed issues.[19] The Court has not resolved those issues.

Plaintiffs proposed that the notice contain a definition that consists of all landowners, or their descendants, in Henderson, Union and Webster Counties, Kentucky, whose land was condemned by the United States between 1942 and 1944 to establish Camp Breckinridge, regardless of whether the sale price of the condemned land was negotiated or litigated to verdict. The underlying mutual lack of knowledge that allowed the Government to acquire all of the Plaintiffs' land for less that true value, *i.e*., that insufficient quantities of coal,

---

[18] Courts have long held that settlement agreements and consent judgments are contractual in nature, and are governed under general contract principles. *See, e.g., United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) ("[c]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement …."); *Lutz v. United States Postal Service*, 485 F.3d 1377, 1381 (Fed. Cir. 2007) (a settlement agreement is a contract); *Herman B. Taylor Constr. Co. v. Barram*, 203 F.3d 808 (Fed.Cir. 2000) (agreement incorporated into agency findings and conclusions is contractual).

[19] The Court ordered the parties to submit Joint Status Report "indicating whether any further action is required in this case to meet the class notice requirements of RCFC 23 (c)." *Land Grantors III*, 71 Fed.Cl. at 627. The parties submitted a Joint Status Report as ordered, indicating that they needed additional time to discuss these issues or to present their respective positions to the Court separately. Unable to agree on all issues, Plaintiffs submitted their arguments in the form of a Supplemental Status Report. Defendant filed its arguments as a "Request to Approve Proposed Class Notice." Both documents were filed August 26, 2006.

gas, oil, or other mineral deposits existed under the condemned properties to economically support exploration or operations, is common to all members of the putative class.

Plaintiffs' proposed definition is particularly appropriate given the equitable nature of these congressional reference proceedings. But the Court's certification order, entered in the context of a presumed Tucker Act case, defines the class as only those landowners who had executed an "Affidavit of Vendor." *Land Grantors III*, 71 Fed. Cl. at 626. Similar in impact to the 1998 Order, this affidavit requirement, which may have been necessary in order to establish a contractual requirement for Tucker Act purposes, is not necessary for an equitable congressional reference claim and would unjustifiably eliminate many otherwise similarly situated landowners from the putative class.

Additionally, some landowners or heirs may unfairly lose their right to participate in any congressional award because the vendor affidavit related to their property was not included in the Government's files and neither the putative class members nor the Government can locate them at this point. This Court already has found that landowners and the Government were operating under a mutual lack of information regarding the full nature, extent and economic mineability of minerals under the surface of Camp Breckinridge. That one landowner (or heir) may be able to locate a vendor affidavit but another cannot should not carry the day. Because the existence of a contract is not required to establish an equitable claim, as perhaps opposed to a "legal" Tucker Act claim, contractual documents such as vendor affidavits are not necessary.

All landowners who reached agreed-upon sales prices with the Government without resort to a jury verdict—whether before or after declarations of taking were filed—"sold" their properties, even giving that word its ordinary meaning. They were "land grantors" as referred to in S. 794. And, with the filing of the condemnation petitions and orders of

possession, the "threat of condemnation" had long since passed as to both groups. After that, there was no more "threat" of condemnation; the condemnation had occurred. Those who negotiated and reached sales agreements with the Government both before the declarations of taking were filed (137 properties/8,859.51 acres) and after (290 properties/16,558.68 acres) amount to 25,418.19 acres, or approximately 71% of the total. Those landowners who settled as to price short of a trial nevertheless negotiated sales prices the same as those who did so prior to the filing of declarations of taking.

The landowners who did not negotiate agreed-upon sale prices with the Government and went through jury trials represent 67 properties [*see* CX 79, 260.] Those 67 farms comprise 10,436.69 acres, about 29% of the total acreage, and they too are covered by S. 794. The Government condemned and took possession of their properties at the time of the filing of the condemnation petitions and entry of the orders of possession the same as with the others. As this Court already has recognized, the only issue at the time of the trials was the amount of compensation they would receive. *Land Grantors I*, 64 Fed.Cl. at 664 ("Once property was judicially condemned, the landowners either could voluntarily negotiate a sale price with federal agents or require 'just compensation' to be determined by a jury trial.") [20] Deeds for their properties were conveyed to the Government just like with other landowners with the main distinction being that a jury set the price. The jury fixed the compensation for the parties and, as explained by the Supreme Court in *Kirby Forest Industries* and *Danforth*, and by Attorney General Culver, the Government "purchased" the properties and the landowners "sold"

[20] Courts may not, of course, look behind or second-guess the decision of the Secretary of War to condemn property under the War Purposes Act. *United States v. 72 Acres of Land*, 37 F.Supp. 297, 299 (N.D. Cal. 1941)("the determination of the Secretary is conclusive and not subject to review"); *United States v. Forbes*, 259 F. 585, 590 (M.D. Ala. 1919)("the [Secretary's] exercise of such authority is final, and is not traversable in this proceeding.")

them for the fixed price. They were "land grantors," *i.e.*, transferors of land, just like those 427 landowners who negotiated sales prices with the Government rather than have juries decide the prices.

In the instances of the 67 properties whose values were established at trial, neither the district court, Government, landowners nor jurors had any more knowledge as to the full nature and extent of the vast mineral reserves underlying the properties than did the 427 other landowners who "voluntarily" negotiated sales prices with the Government. The true facts were not revealed until years later. *See* 64 Fed.Cl. at 673. The same basic lack of knowledge and fundamental unfairness apply to these 67 properties as to all the others. Nor did the Government provide the justification required by its own acquisition guidelines for taking the Plaintiffs' minerals—for which history shows it had no legitimate need—in addition to their surface interests. As shown in Section IV. C., the judgments entered in those cases do not preclude this Court's consideration of their equitable claims for additional compensation. The class definition should be modified to eliminate the vendor affidavit requirement, thus making the class definition inclusive of all Plaintiffs.

**E. Suggested Procedures And Remedy For The Court's Final Report**

In view of the above, Plaintiffs suggest to the Court that it proceed with providing notice to a class consisting of all of the "land grantors" (or their "heirs" or "descendants" in the case of deceased "land grantors") whose property became part of Camp Breckinridge, regardless of the manner in which the acquisitions occurred. The notice should allow the members of the class a reasonable period of time within which to opt into the class. At that point, the persons contemplated in S. 794, a Bill "For the relief of land grantors in Henderson, Union and Webster Counties, Kentucky and their heirs," will be identified and before the Court.

Consistent with *Land Grantors I*, Plaintiffs suggest that the Court recommend in its Final Report that Congress:

> (1) appropriate the sum of at least $34,303,481, representing the minimum total amount the Government derived from sales of minerals from Camp Breckinridge in 1965-66;[21]
>
> (2) appropriate the sum of at least $1,398,850, representing the minimum amount of estimated royalties the Government has derived from Mineral Tracts 7A and 7B for the periods of time the Government has provided limited or no data in response to the Court's requests; and direct the Secretary of the Interior to take all necessary actions to proportionately assign the Government's future royalty interests in Tracts 7A and 7B, and any still unsold mineral rights of any tract, to the original land grantors of these tracts or their statutory heirs who opt into the class, per stirpes, with such heirs who do not opt in being treated as deceased.[22]

---

[21] This total amount of $34,303,481 is the sum of the individual items in the Court Addendum to its Second Interim Report, Memorandum Opinion and Order, reported as *Land Grantors in Henderson, Union and Webster Counties, Kentucky v. United States*, 74 Fed. Cl. 518, 527 (2006) (*Land Grantors II*). Because the Government continues to receive royalties on production from at least Tracts 7A and 7B, the Court should require the Government to update its receipts to the present.

[22] Exercising its powers under the "Call Statute," 28 U.S.C. §2507, the Court requested the Government to produce its records on all royalties it has received on the oil and gas leases on Tracts 7A and 7B. The amounts the Government acknowledged receiving are contained in the $34,303,481 figure in Paragraph (1), above. However, the Government also responded that it had no data for the years 1964 to 1983 and only limited data for 1983 forward. Accordingly, the amounts for these missing periods were estimated by Dr. Charles F. Haywood based upon Kentucky production records from these tracts, and applying the Government's royalty rate under the leases to that production at the prices prevailing for that time period. *See*, Affidavit of Dr. Charles Haywood on the Government's Enrichment By Oil Royalties From Camp Breckinridge Tracts 7A and 7B, filed with Plaintiffs' Motion for Leave to Respond to Court's December 15, 2005 Order and to Comprehensively Summarize Mineral Sale Proceeds, Docket No. 200 (April 25, 2006), and Order granting Motion, Docket No. 201 (April 27, 2006). The Government has filed no rebuttal to Dr. Haywood's conclusion.

(3) appropriate $35,017,115.60 representing estimated royalties paid by Peabody Coal Company to the United States, through TVA.[23]

(4) appropriate additional amounts sufficient to disgorge the amounts saved by the Government's avoidance of having to borrow and pay interest on the above sums until the date of payment, in order to make Plaintiffs whole and fully restore them;[24]

(5) authorize the Secretary of the Treasury to pay counsel for the Plaintiffs from such appropriated funds the costs and expenses incurred in the prosecution of this action, and attorneys fees in an amount to be set by the Court, but not less than the 10% contained in S. 794;

(6) authorize the Secretary of the Treasury to pay the remaining balance of such sums into the Registry of this Court to be

---

[23]The Court also requested that the Government ascertain the amount of royalties which TVA received from Peabody Coal. The Government produced instruments between TVA and Peabody which reflected an obligation to pay royalties, but stated that it was unable to locate "any document that shows the total amount of royalties (if any)" received from this source. *Land Grantors II*, Second Interim Report, Memorandum Opinion and Order, 74 Fed. Cl. 518, 523. Based upon official production records, however, Dr. Haywood estimated that TVA would have received $35,017,115.60 in royalties from Peabody. *See,* Affidavit of Charles F. Haywood on the Government's Enrichment From Royalties on Coal Mined From Seams #9 and #11 situated in the Camp Breckinridge Property, filed with Docket No. 200, *supra* n. 2. The Government has filed no rebuttal to Dr. Haywood's conclusion.

[24] This will convert 1965-1966 era dollars to 2008 dollars, using very conservative methodology, and provide the required full restitution to Plaintiffs. *See Landmark Land Co. v. United States*, 46 Fed. Cl. 261, 266, 270 (2000); *Landmark Land Co. v. Federal Deposit Insurance Corp.*, 256 F.3d 1365, 1374 (Fed. Cir. 2001)("the remedy of restitution may include compensation for lost use value where necessary to restore the plaintiff to its status quo *ante* by providing compensation for use of the subject matter for the period during which [it] was deprived."); *United States v. $515,060.42*, 152 F.3d 491, 504 (6th Cir. 1998) (seized funds should be treated as constructively earning interest); *United States v. $277, 000 U.S. Currency*, 69 F.3d 1491, 1492 (9th Cir. 1995)(Government should return benefit it receives.) The methodology for determining of this amount and the resulting total amount through fiscal year 2005 is shown in the Affidavit of Dr. Charles F. Haywood on Government's Enrichment by Avoidance of Interest Payments filed as Exhibit 1 to Claimant's Memorandum on Order to Show Cause Regarding Entry of Final Judgment, Docket No. 182. This amount may and should be brought forward to the date of payment by simply extending Dr. Haywood's methodology and calculations, which the Government has made no effort to rebut.

disbursed to the original land grantors or their heirs who opt into the class, in proportion to the amount of acreage each original land grantor's tract bears to the total acreage of the mineral tract or tracts within which it was located;[25]

(7) direct that the Chief Judge of this Court appoint a Special Master pursuant to the provisions of 28 U.S.C. §798(c) and Rule 53 of the Rules of this Court empowered to: (a) resolve any disputes regarding whether any particular individual is an "heir" of an original land grantor; (b) determine the amount of appropriated funds deposited into the Registry which are properly allocated to each individual member of the class under the Court's rulings; and (c) authorize the Clerk to withdraw such sums from the Registry and pay them to the individual members of the class;

(8) direct that, in the event an original land grantor is deceased, the Special Master is to authorize payment of the entire amount allocated to the original land grantor's tract to his or her statutory heirs who opt into the class, such amount to be distributed per stirpes in accordance with the laws of descent and distribution of Kentucky, KRS Ch. 391, with such heirs who do not opt into the class being treated as deceased;[26]

(9) direct that the Chief Judge authorize the Clerk to withdraw from the appropriated amounts deposited in the Registry an amount sufficient to pay the compensation and expenses of the Special Master as set by the Chief Judge pursuant to Rule 53, and

---

[25] The Court indicated this methodology was appropriate in *Land Grantors I*, 64 Fed. Cl. at 712-713 ("From this information, an amount per acre can be determined and matched against the acreage of the condemned properties, which then can be attributed to the appropriate Plaintiff"). The calculations under such a methodology are shown in the Mattingly Affidavit, a part of Docket No. 200, *supra*, n. 2.

[26] S. 794 refers, of course, to compensation of "heirs," where landowners are deceased. Under Kentucky law, "heirs" is construed as "those persons who take under a decedent's estate by inheritance, according to the statute." *Jennings v. Jennings*, 299 Ky. 779, 788 187 S.W.2d 459, 464 (1945). Those who take under a will are generally denominated as "devisees or legatees." *Id.*; *Higginbothom v. Higginbothom*, 177 Ky. 271, 197 S.W. 627, 628 (1917) (although "heir" is sometimes given a liberal meaning, it technically refers to "[the] person who is appointed by law to take the estate" rather than the "one who takes property under a will.") In the interest of consistency, "heir" should be given this meaning and the Kentucky "Descent & Distribution" statutes, including KRS 391.010 ("Descent of real estate"), 391.030 ("Descent of personal property") and 391.040 ("Descendants of distribution take per stirpes"), should be used for purposes of determining class members entitled to compensation.

the expenses of the Clerk, such compensation and expenses to be paid before any other amounts are paid from the appropriated funds deposited into the Registry;

(10) direct the Special Master to file a written report to Congress, the Chief Judge, the Review Panel and the Hearing Officer setting forth the amounts which have been paid from the Registry of the Court, and the amount which remains deposited in the Registry of the Court after payment of the Special Master's compensation and fees, the Clerk's expenses, all payments to members of the class, and any other payments of any nature; and

(11) direct that upon expiration of 180 days after the filing of the Final Report of the Special Master, or the final termination of any proceedings challenging the Final Report, whichever is later, the Clerk is to pay all funds remaining in the Registry to the Secretary of the Treasury for deposit into the general fund of the Treasury.

## CONCLUSION

Based upon all of the foregoing reasons and authorities, Plaintiffs respectfully request that the Court vacate the November 24, 1998 Order. Such a ruling will ensure that the most reasonable interpretation of S. 794 is followed and that the broadest number of eligible individuals will be in position to obtain such compensation as the Court may recommend in its report and as Congress might determine. It would also ensure that referral of S. 794 to this Court was not a futile act as to 75% or more of the acreage taken for Camp Breckinridge. Should the Court do so, it should also modify its June 22, 2006 Order [Docket No. 211], 71 Fed.Cl. 614, 626 (Ct.Cl. 2006), to remove any requirement that class members must have executed an affidavit of vendor as being unnecessary due to the dismissal of the Tucker Act claims.

Respectfully submitted,

Nancie Marzulla
Roger Marzulla
MARZULLA & MARZULLA
1350 Connecticut Avenue, N.W.
Suite 410
Washington, D.C. 20036

s/M. Stephen Pitt
M. Stephen Pitt
Merrill S. Schell
Jean W. Bird
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street
Suite 2800
Louisville, KY 40202-2898
502.562.7372

20294434.2