**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| LAND GRANTORS IN HENDERSON, UNION and WEBSTER COUNTIES, KENTUCKY and THEIR HEIRS, | ) | |
| Claimants, | ) | No. 93-648X |
| v. | ) | Judge Susan G. Braden |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**UNITED STATES' OPPOSITION TO CLAIMANTS' MOTION TO VACATE**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**EXHIBIT LIST** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

**PRELIMINARY STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**I. Procedural Background Related to the November 1998 Order** . . . . . . . . . . . . . . . . . 2

**II. Claimants' "Motion to Vacate" Should Be Treated as a Motion for Reconsideration** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**III. Claimants' Motion is Untimely and, if Granted, Would Violate the Doctrine of the Law of the Case, Prejudice the United States, and Result in Chaotic Future Proceedings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**IV. The Court Considered and Rejected Claimants' Arguments Regarding the Scope of the Congressional Reference** . . . . . . . . . . . . . . . . . . . . . . . . 7

- **A. Claimants Do Not Identify Any Legal Error in the November 1998 Order** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
  - **1. The Court Correctly Determined that this Matter is Defined by the Terms of the Congressional Reference** . . . . . . . . . . . . 7
  - **2. The Court Correctly Interpreted the Unambiguous Language of the Congressional Reference** . . . . . . . . . . . . . . . . . . . . . . 10
  - **3. Claimants' Argument that All Tracts Were Condemned is Incorrect** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
- **B. Claimants Do Not Identify Any Factual Error in the November 1998 Order** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
- **C. Claimants' Argument is Contradicted by the Legislative History** . . . . . . . . 19

**V. The Court Should (Again) Strike the April 23, 1998 Letter** . . . . . . . . . . . . . . . . . . . 20

**VI. The Court Should Reject Claimants' "Suggested Procedures and Remedy"** . . . . . 21

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES

### CASES


Augustine v. Principi, 343 F.3d 1334 (Fed. Cir. 2003) . . . . . . . . . . 4

Banfi Products Corp. v. United States, 40 Fed. Cl. 107 (1997) (Cong. Ref.), aff'd, 41 Fed. Cl. 581 (1998) . . . . . . . . . . 8

Barenblatt v. United States, 360 U.S. 109 (1959) . . . . . . . . . . 15

Beistline v. City of San Diego, 256 F.2d 421 (9th Cir. 1958), cert. denied, 358 U.S. 865 (1958) . . . . . . . . . . 10

Bishop v. United States, 26 Cl. Ct. 281 (1992) . . . . . . . . . . 4

Blacklock v. United States, 208 U.S. 75 (1908) . . . . . . . . . . 9

Coconut Grove Entm't, Inc. v. United States, 46 Fed. Cl. 249 (2000) . . . . . . . . . . 4, 12

Elterich v. City of Sea Isle City, 477 F.2d 289 (3rd Cir. 1973) . . . . . . . . . . 10

First Fed. Lincoln Bank v. United States, 60 Fed. Cl. 501 (2004) . . . . . . . . . . 4, 8, 16

Fru-Con Constr. Corp. v. United States, 44 Fed. Cl. 298 (1999) . . . . . . . . . . 1, 4, 7

Hart v. United States, 58 Ct. Cl. 518 (1923) (Cong. Ref.) . . . . . . . . . . 8

Hulsey v. United States, 6 Cl. Ct. 593 (1984) (Cong. Ref.) . . . . . . . . . . 8

Jaynes v. United States, 69 Fed. Cl. 450 (2006) . . . . . . . . . . 4

Kinkead v. United States, 150 U.S. 483 (1893) . . . . . . . . . . 9

Land Grantors v. United States, 80 Fed. Cl. 196 (2008) . . . . . . . . . . 1, 6

Mackie v. United States, 172 Ct. Cl. 393, 1965 WL 8267 (1965) (Cong. Ref.) . . . . . . . . . . 19

Mendenhall v. Barber-Greene Co., 26 F.3d 1573 (Fed. Cir. 1994), cert. denied, 513 U.S. 1018 (1994) . . . . . . . . . . 5, 7

Paul v. United States, 20 Cl. Ct. 236 (1990) (Cong. Ref.), aff'd, 21 Cl. Ct. 758 (1990) . . . . . . . . . . 9

Perez v. United States, 156 F.3d 1366 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Shirlington Limousine & Transp., Inc. v. United States, 78 Fed. Cl. 27 (2007) . . . . . . . . . . . . . . . 4

United States v. Brown, 381 U.S. 437 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Dow, 357 U.S. 17 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

**LEGISLATIVE MATERIALS**

Proposed Senate Bill 2563, 103d Cong., 2d Sess. (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

Senate Bill 794, 103d Cong., 1st Sess. (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**FEDERAL RULES**

RCFC 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**EXHIBIT LIST**

| **Exhibit Number** | **Description** |
|---|---|
| 1 | Letter from Silvia Sepulveda-Hambor to Holliday Hopkins Thacker, dated January 23, 1996 |

**PRELIMINARY STATEMENT**

Defendant, the United States of America, hereby responds to Claimants' Motion to Vacate the November 24, 1998 Order, filed March 6, 2008 (Doc. No. 240) ("Claimants' Motion"). Claimants' Motion asks the Court to reconsider the November 1998 Order, a decision that dismissed claims and claimants outside the scope of the Congressional Reference Bill, S. 794, 103d Cong. (1993) ("S. 794"). Claimants' Motion seeks to overturn that portion of the November 1998 Order that dismissed any individual whose property had been condemned, rather than "sold . . . under threat of condemnation." Nov. 1998 Order at 4-6 (citing S. 794, Sec. 1). The November 1998 Order was a pivotal decision in this litigation – both parties relied upon the order to guide their fact and expert discovery, develop their settlement and trial positions, and direct their arguments and presentation of evidence at trial.

The Court should deny Claimants' Motion because the motion is untimely. Claimants did not challenge the November 1998 Order for nearly nine-and-a-half years, and their Motion comes years after the parties completed trial proceedings, and only a month before the expected issuance of the Court's Final Report. See Land Grantors v. United States, 80 Fed. Cl. 196, 197 (2008) ("[T]he court will issue a Final Report on or before April 14, 2008."). A decision to reconsider the November 1998 Order would violate the doctrine of the law of the case by destroying the parties' shared expectations about this case, prejudicing the United States, and creating a chaotic situation in future proceedings.

In addition, the Court should deny Claimants' Motion because Claimants fail to identify any "extraordinary circumstances which justify relief" or a "manifest error of law or mistake of fact," as required in a motion for reconsideration. See Fru-Con Constr. Corp. v. United States,

44 Fed. Cl. 298, 300 (1999). Claimants do not suggest that there is an intervening change in controlling law, and their assertion that the Court lacked certain documents at the time of the November 1998 Order cannot be supported. Claimants fail to meet their burden, and the November 1998 Order should not be overturned at this late date.

To support their motion, Claimants attach an April 23, 1998 letter. See Claimants' Mot. at Ex. 1. Although Claimants' Motion does not discuss the matter at any length, the Court previously considered the parties' extensive arguments about the admissibility and relevance of this document. In a separate order, also issued on November 24, 1998 (Doc. No. 64), the Court granted the government's motion to strike the letter, finding the document inadmissible and irrelevant for the purpose for which it was submitted. Claimants do not identify any factual or legal error in the Court's analysis related to the letter and, in fact, do not even move for reconsideration of the Court's order striking that document. Claimants' violation of the Court's earlier order to strike should not be permitted, and the Court should again strike the letter.

## ARGUMENT

### I. Procedural Background Related to the November 1998 Order

The Court first expressed concern about the scope of the Congressional Reference nearly fourteen years ago – on August 11, 1994. See Order, dated Aug. 11, 1994 (Doc. 16) ("Aug. 1994 Order"). As the Court correctly noted,

> [T]he S. 794 Reference is drafted to cover individuals who sold their land in the listed counties "under threat of condemnation." The Complaint in this matter appears to plead claims not only on behalf of individuals who so "sold" their land under the threat of condemnation, but also on behalf of individuals whose land was taken by means of a formal condemnation proceeding. The proceedings in a Congressional Reference Case are restricted by the scope of the Reference. * * * If there is any controversy concerning the scope of the Reference in this matter, this should now be presented and resolved as it has an obvious impact on who can

be an individual claimant.

Id. at 2.

Recognizing the importance of this issue and the need to resolve it early in this litigation, the Court stayed proceedings and established a process to allow individuals to join this lawsuit. See id. at 3-4. After the Court notified potential claimants of the action and provided them an opportunity to join, Claimants filed a First Amended Complaint and a Motion to Certify this Matter as a Class Action (Doc. Nos. 25, 26). The parties briefed the merits of Claimants' Motion for Class Certification, and the Court denied Claimants' motion in December 1997 (Doc. 42).

On January 9, 1998, the United States filed an unopposed motion to stay pre-trial proceedings until the Court resolved which individuals were within the scope of the Congressional Reference (Doc. No. 43). The Court granted the government's motion on January 12, 1998 (Doc. No. 44). On February 13, 1998, the United States filed a Motion to Dismiss Claims and Parties Outside the Scope of the Congressional Reference (Doc. No. 48). Among other arguments, the United States' Motion to Dismiss argued that the Congressional Reference Bill did not include any individual whose property had been condemned. Claimants opposed the United States' Motion (Doc. No. 51). The Court granted the government's Motion to Dismiss, in part, on November 24, 1998, dismissing those individuals whose property was acquired through condemnation proceedings. See Nov. 1998 Order at 5, 6 n.3 ("Any claimant whose land was acquired by declaration of taking is not authorized to bring a claim under S. 794.").

## II. Claimants' "Motion to Vacate" Should Be Treated as a Motion for Reconsideration

The Court's rules do not recognize a "Motion to Vacate," and Claimants cite no rule as

the basis for their motion. Since Claimants' Motion urges the Court to reconsider a previous order made in this case, Claimants' Motion to Vacate should be treated as a Motion for Reconsideration, pursuant to Rule 59 of the Rules of the Court of Federal Claims.

Under Rule 59, the Court may grant reconsideration "to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States." RCFC 59. This Court has held that a motion for reconsideration under Rule 59 must be supported "by a showing of extraordinary circumstances which justify relief." Fru-Con Constr. Corp., 44 Fed. Cl. at 300. To meet this burden, the motion for reconsideration "must be based 'upon manifest error of law, or mistake of fact, and is not intended to give an unhappy litigant an additional chance to sway the court.'" Id. (quoting Bishop v. United States, 26 Cl. Ct. 281, 286 (1992)). "To show a 'manifest error of law or fact,' the moving party must demonstrate either '(1) that an intervening change in controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice.'" Shirlington Limousine & Transp., Inc. v. United States, 78 Fed. Cl. 27, 29 (2007) (quoting First Fed. Lincoln Bank v. United States, 60 Fed. Cl. 501, 502 (2004)). In addition, "[t]he movant does not persuade the court to grant such a motion by merely reasserting arguments which were previously made and were carefully considered by the court." Coconut Grove Entm't, Inc. v. United States, 46 Fed. Cl. 249, 255 (2000) (citing Principal Mut. Life Ins. Co. v. United States, 29 Fed. Cl. 157, 164 (1993), aff'd, 50 F.3d 1021 (Fed. Cir. 1995)).

"Judges of this court have held that interlocutory orders are to be reconsidered in accordance with the doctrine of 'law of the case.'" See Jaynes v. United States, 69 Fed. Cl. 450,

453 (2006). Under the doctrine of the law of the case, "a court will generally refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation." Augustine v. Principi, 343 F.3d 1334, 1339 (Fed. Cir. 2003) (citation omitted). The doctrine exists to prevent relitigation of issues that have been decided and to protect the settled expectations of the parties and promote orderly development of the case. See Mendenhall v. Barber-Greene Co., 26 F.3d 1573, 1582 (Fed. Cir. 1994), cert. denied, 513 U.S. 1018 (1994).

As explained below, Claimants' Motion fails to meet these requirements and, therefore, must be denied.

## III. Claimants' Motion is Untimely and, if Granted, Would Violate the Doctrine of the Law of the Case, Prejudice the United States, and Result in Chaotic Future Proceedings

As Judge Merow discussed in 1994, questions about the scope of the Congressional Reference and the identification of the individual Claimants are fundamental issues, which were properly addressed early in this litigation. See Aug. 1994 Order. The Court understood that it would be impossible for the parties to litigate this matter, or for the Court to assess any claims, until after the Claimants were identified. The November 1998 Order, which unequivocally and unmistakably excluded individuals whose property was condemned, guided the parties' discovery, the parties' briefing, the parties' litigation strategies, and the parties' presentation of evidence at trial. The post-trial elimination of the parties' settled expectations by vacating the 1998 Order in violation of the law of the case doctrine would be in error.

To take just one example, consider the nature of the parties' expert evidence. As directed by the terms of the Congressional Reference, both parties' expert witnesses focused, in part, on whether the former landowners were "paid less than reasonable value due in part to the refusal of

the United States Government to compensate owners for the mineral, oil and gas rights." S. 794, Sec. 2(2). In addressing this issue, Claimants assumed that the condemnees, who had been dismissed in the November 1998 Order, received fair market value. See, e.g., Def.'s Post-Trial Br. at 131. Based on that assumption, Claimants attempted to show that the voluntary sellers received less per acre for their properties than the condemnees. The United States' argument and evidence responded to Claimants' comparison. At trial, the Court agreed that the parties' approach was appropriate:

> [T]he best evidence of [underpayment] is what you did earlier, which is where you compared the prices of condemned properties. The properties went through condemnation versus the properties that, you know, were sold voluntarily. You take a look to see, you know, if hopefully if they were like-kind properties and which ones had mineral interests and which ones didn't. That's the best evidence of that.

Trial Tr. at 679:17-25.

Claimants' trial position – and the United States' response – was directly tied to the Court's November 1998 Order. Indeed, Claimants' very position at trial was that the condemnees received adequate compensation. There can be no doubt that both parties' litigation strategies would have looked significantly different but for the November 1998 Order. Eliminating the parties' settled expectations now, years after the close of discovery and after trial, would severely prejudice the United States. See, e.g., Def.'s Resp. to Court's Show Cause Order, dated Oct. 3, 2005 (Doc. No. 181) (discussing similar prejudice caused by assertion of new claim after trial); Def.'s Opp'n to Claimants' Proposed Second Am. Compl., dated Oct. 18, 2005 (Doc. No. 185) (same).

In addition, granting Claimants' Motion would create serious difficulties in future proceedings. The Court has previously indicated that it intends to issue a Final Report by April

14, 2008. See Land Grantors, 80 Fed. Cl. at 197. Reconsideration of the November 1998 Order would add hundreds of new individuals to this action. Those individuals did not participate in discovery or trial, and would almost certainly raise entirely different theories from those litigated at trial. Granting Claimants' Motion at this late date would result in extremely confusing and potentially chaotic proceedings if this matter is eventually appealed to the Review Panel.

Despite knowing about the November 1998 Order and relying upon it for the last decade, Claimants waited until a month before the Court intends to resolve this matter before seeking reconsideration. There is no reasonable excuse for Claimants' delay. Reconsidering the November 1998 Order now would interfere with the parties' settled expectations, prejudice the United States and result in a chaotic conclusion to this long-lasting case. The doctrine of the law of the case prevents precisely this situation. See Mendenhall, 26 F.3d at 1582.

## IV. The Court Considered and Rejected Claimants' Arguments Regarding the Scope of the Congressional Reference

Even apart from the doctrine of the law of the case, the Court should deny Claimants' Motion because Claimants fail to meet their burden under Rule 59 to show either a "manifest error of law, or mistake of fact. . . ." Fru-Con Constr. Corp., 44 Fed. Cl. at 300.

### A. Claimants Do Not Identify Any Legal Error in the November 1998 Order

#### 1. The Court Correctly Determined that this Matter is Defined by the Terms of the Congressional Reference

As the United States explained ten years ago, the plain language of S. 794 directed the Court to evaluate the claims of those individuals "who sold their land . . . under threat of condemnation. . . ." S. 794, Sec. 1. Congress limited relief under the bill to those individuals who were "given priority to repurchase land sold by them" and who received less than

reasonable value due, in part, to the United States' refusal to compensate the owners for subsurface mineral rights. S. 794, Sec. 2. A Congressional Reference proceeding is bound to the language of the reference. See Banfi Products Corp. v. United States, 40 Fed. Cl. 107, 130 (1997) (Cong. Ref.) ("The terms of the congressional reference set forth the parameters of the court's negligence inquiry. . . ."), aff'd 41 Fed. Cl. 581 (1998); Hulsey v. United States, 6 Cl. Ct. 593, 595 (1984) (Cong. Ref.) (court lacks jurisdiction over claims "not within the scope of the reference"); Hart v. United States, 58 Ct. Cl. 518 (1923) (Cong. Ref.) (stating that the court's jurisdiction extends only to language of the bill). As Judge Merow explained in his November 1988 decision, there is no jurisdiction over claims or claimants outside the scope of the reference. See Nov. 1998 Order at 4. The Court, in short, can only review what Congress tells it to review.[1/]

When the parties first briefed this issue 10 years ago, Claimants agreed with this fundamental principle: "Claimants fully agree that the proceedings in a Congressional Reference action are restricted by the scope of the Reference and that claims outside of that scope should not be before this Court." Claimants' Opp'n to Mot. to Dismiss (Doc. No. 51) at 7 (citing Hulsey, 6 Cl. Ct. at 595-96). Now, for the first time, Claimants argue for exactly the opposite proposition: "this Court is not strictly bound by the imprecise and general language in proposed Bill S. 794 when issuing its report to Congress." Claimants' Mot. to Vacate at 12. Claimants do

---

[1/] The Congressional Reference Bill in The Innocent Victims of the Occupation of Wounded Knee, South Dakota v. United States, Case No. 4-76 (filed June 10, 1981) (Cong. Ref.), was somewhat analogous to the instant matter. There, the referred bill identified the claimants merely as "innocent victims of the occupation of Wounded Knee, South Dakota." The Court determined the identity of claimants early in the proceeding, before beginning its evaluation of the individualized proof offered for each claimant. Individuals who were not "innocent victims" were not permitted to participate in the lawsuit.

not suggest that "an intervening change in controlling the law has occurred," First Fed. Lincoln Bank, 60 Fed. Cl. at 502, and offer no explanation for their change in position on this fundamental point. In any event, Claimants' current position is incorrect.

To support their new position, Claimants rely on several cases, which discuss an entirely unrelated principle. For example, Claimants cite Paul v. United States, 20 Cl. Ct. 236, 265 (1990) (Cong. Ref.), aff'd, 21 Cl. Ct. 758 (1990), for the unremarkable holding that Congress' decision to refer a bill to this Court for review "does not amount to adoption of the language of the bill to be referred." Claimants' Mot. at 10. As the Paul Court explained, a bill "is sent to the court under the reference statute only in those situations where there is a serious question as to the merit of the claim." 20 Cl. Ct. at 265. Hence, the Court should not just blindly accept the truthfulness of a claimant's allegation or a statement in a referenced bill. That principle is beyond dispute – the very purpose of a Congressional Reference proceeding is to evaluate the facts and provide Congress with an analysis of the merits of claimants' allegations; that purpose would be vitiated if the Court were to merely accept the language of the bill as correct.[2/]

The United States certainly agrees with the principle discussed in Paul. Indeed, the principle explains why the government has defended this lawsuit with such vigor – the process only works if the Final Report is based on competent and admissible evidence, and contains sufficient analysis and detail to inform Congress whether any individual Claimant is entitled to

---

[2/] The other cases cited in Claimants' Motion stand for similar propositions. See Blacklock v. United States, 208 U.S. 75, 84 (1908) (statement in bill was not intended as an admission by Congress); Kinkead v. United States, 150 U.S. 483, 497 (1893) (same).

relief under the terms of the Congressional Reference bill.[3/] That principle, however, does not support Claimants' new argument that the Court can ignore or expand the terms of the Congressional Reference bill.

**2. The Court Correctly Interpreted the Unambiguous Language of the Congressional Reference**

After extensive briefing on the meaning of the Congressional Reference, Judge Merow concluded that the language of S. 794 was unambiguous – it authorizes claims of "individuals . . . who sold their land . . . to the United States Government under threat of condemnation. . . ." S. 794. "Claims of individuals who *did not* sell their lands, *despite* the threat of condemnation, are clearly not authorized." Nov. 1998 Order at 5 (emphasis in original). Any other reading of S. 794 results in the nonsensical conclusion that the Senate intended the phrase "sold . . . under threat of condemnation" to mean "condemned," and that the Senate actually wanted the Court to consider claims of individuals whose property was condemned "under threat of condemnation." There is no ambiguity in the bill's language – "sold . . . under threat of condemnation" means exactly what it says. See Black's Law Dictionary (8th ed. 2004) (defining "sell" to mean "transfer (property) by sale" and "condemnation" to mean "the exercise of eminent domain by a governmental entity); see also Elterich v. City of Sea Isle City, 477 F.2d 289, 290-91 (3rd Cir.

---

[3/] Indeed, it is the United States' position that Claimants' newly-formulated post-trial argument – essentially that the United States should be held strictly liable without any individualized proof as to any Claimant merely because the United States sold these properties for more money in the 1960s than it paid for the properties in the 1940s – violates this fundamental principle. The Senate knew when it transmitted this bill in 1993 that the Breckinridge Properties had been sold for more money that the United States had paid to acquire them. The Senate directed this Court to investigate the individualized proof as to (a) whether repurchase promises were made and relied upon and (b) whether Claimants received less than reasonable value due, in part, to the government's refusal to pay for minerals. Claimants have failed to make such a showing.

1973) (differentiating between properties acquired by condemnation and by sale "under the threat of condemnation" and concluding that "those who sold under threat of condemnation" gave up their right to assert certain matters "at the sale they fully accepted"); Beistline v. City of San Diego, 256 F.2d 421, 423 (9th Cir. 1958) (by selling under threat of condemnation, landowner "chose, by settlement, to avoid and not to force or endure any 'taking' of his property"), cert. denied, 358 U.S. 865 (1958). Because the language of the bill is unambiguous, extrinsic evidence is inadmissible. See Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998) ("If [the language of a statute] is unambiguous, it controls.") (cited in November 1998 Order at 5).

Regarding the text of the bill, Claimants essentially raise two arguments. First, Claimants argue that the term "sold" includes all means by which the government acquires title, including condemnation. In support, Claimants cite an 1855 United States Attorney General opinion ("1855 AG Op."), which addressed the government's purchase of private property in Maryland. See Claimants' Br. at 18-22. Claimants argue that the definition of "purchase" in that document supports a broad reading of the Senate's use of the phrase "sold . . . under threat of condemnation" in the Congressional Reference Bill. Claimants' reliance on extrinsic evidence is improper because S. 794 is not ambiguous. In addition, Claimants offer no evidence that the Senate was aware of the 1855 AG Op. or intended to relate the phrase "sold . . . under threat of condemnation" in S. 794 with the definition of "purchase" in the 1855 AG Op. "Sold . . . under threat of condemnation" means exactly what it says, and there is no basis to interpret that unambiguous phrase by reference to the definition of "purchase" in an unrelated 130-year-old Attorney General opinion.

Second, Claimants argue the word "grant" should be broadly interpreted to include the condemned properties. See Claimants' Br. at 22-23. The word "grant" does not even appear in the portion of the bill describing the Claimants or the claims. In addition, Claimants made the same argument in 1998, and after careful consideration, the Court rejected Claimants' argument. Compare Claimants' Opp'n to Mot. to Dismiss (Doc. No. 51) at 9 (arguing for broad reading of the term "grant") with Claimants' Mot. to Vacate at 22 (same); Compare Claimants' Opp'n to Mot. to Dismiss (Doc. No. 51) at 7-9 (focusing on the phrase "in order to provide the 35,684.99 acres") with Claimants' Mot. to Vacate at 22 (same). A motion for reconsideration is not intended to provide a litigant with a second chance to reassert arguments that "were previously made and were carefully considered by the court." Coconut Grove Entm't, Inc., 46 Fed. Cl. at 255. Claimants' argument is still incorrect, and Claimants' repetition of the same argument now cannot justify reconsideration.

**3. Claimants' Argument that All Tracts Were Condemned is Incorrect**

The Court is bound to the unambiguous language of the Congressional Reference, and need not evaluate Claimants' other arguments. If the Court is inclined to consider Claimants' other arguments, those additional arguments do not justify reconsideration. At pages 12 to 18 of their Motion, Claimants offer a lengthy discussion of irrelevant legal principles to support an argument that Judge Merow "erred in equating the time of 'condemnation' with the filing of declarations of taking." Claimants' Mot. at 12. Under this novel theory, S. 794 could not mean what it says because all of the Breckinridge Properties (by Claimants' theory) were condemned (and hence, under the November 1998 Order, "all landowners and heirs [would be] ineligible to be plaintiffs"). Claimants' Mot. at 17.

Claimants' argument is inconsistent with (and contradicted by) Claimants' own arguments since the Court issued the November 1988 Order. See Claimants' Pre-Trial Br. at 15 (conceding that the Court's November 1998 decision excluded approximately 75% of the acreage at issue); PX64 (listing of tracts that were voluntarily sold, together with corresponding Claimants, if any); PX66 (same); PX77A (map, showing condemned and purchased properties); PX83 (Tract Register, prepared in February 1949, designating tracts as either "purchased" or "condemned"). Both parties have long recognized that there are fundamental differences between the properties that were condemned and the properties that were sold under threat of condemnation. Claimants do not identify any change in legal precedent or newly discovered evidence to support their new argument, and they should not be permitted to change course now simply because they are dissatisfied with the effects of the November 1998 Order.

In addition, Claimants' argument should be rejected because Claimants misapply an unrelated legal principle. In support of this argument, Claimants rely primarily on United States v. Dow, 357 U.S. 17 (1958), a case involving an unrelated issue. In Dow, the United States instituted a condemnation proceeding to acquire a right-of-way, and then immediately physically occupied the property. See id. at 18. Before the United States filed a declaration of taking, the original owner conveyed the tract to Dow. See id. at 19. The Supreme Court concluded that Dow was entitled to a portion of the just compensation because the "taking" occurred when the United States entered into physical possession of the land, before Dow acquired the property. Id. at 21. Claimants seek to extend this principle here in order to argue that all of the Breckinridge Properties were "condemned" and that none of the properties were "sold . . . under threat of condemnation."

Dow (and the other cases cited for the same principle) is not legally relevant here, and Claimants' effort to extend that case is faulty. These cases do not discuss what is meant by the phrase "sold . . . under threat of condemnation," and there is no suggestion that the Senate engaged in the hyper-technical analysis Claimants now propose. This Congressional Reference bill limits recovery to those individuals who agreed to sell their property without engaging in the available judicial condemnation process. Those individuals who declined the government's offer, never "sold" their properties, but instead had their properties condemned. The parties have recognized this basic fact for approximately a decade, and Claimants' argument that all of these properties were condemned finds no support in Dow.

Claimants' hyper-technical argument is also flawed because it is based on the false assumption that the United States was in physical occupation of the "sold properties" before the option agreements were signed. Claimants offer no evidence in support of this assumption, and it is easily disproven by a counterexample. Consider, for example, Tract No. E-600, a property that both parties have long-agreed was "sold . . . under threat of condemnation." The former owners of Tract No. E-600 signed an option agreement on December 2, 1942, pursuant to which the United States acquired the right to purchase the "valid, indefeasible fee simple title to said land." See JX575 at CHI-044-E600-0019. As part of the option agreement, the former owner granted the United States the "right of immediate occupancy and use of the land . . . and upon demand the Vendor will immediately vacate the property and deliver possession to the United States." Id. at 0018. After completing the necessary title and documentary work, the former owners deeded their property to the United States. See id. at 0004.

There is no definitive evidence showing when the United States entered into actual

possession of Tract No. E-600, but there is good reason to assume that the United States was not in actual possession until well after the parties signed the option agreement – owners of nearby properties, for example, were instructed to vacate their property no later than December 14, 1942, after the option agreement for Tract No. E-600 was signed. See JX508 at CON3966; JX509 at CON4005. (There is no evidence that the owners of Tract No. E-600 received such a notice). The former owners of Tract No. E-600, therefore, sold their property to the United States, under threat of condemnation. When the United States entered into physical occupation of Tract No. E-600, it did so under the terms and conditions of the written option agreement, not by virtue of any condemnation proceeding (a process in which the landowners had decided to forego). Claimants' unsupported contention that the United States was in actual physical possession of Tract No. E-600 before the option agreement was signed, therefore, is not supported by the record. Tract No. E-600, then, was sold to the United States under threat of condemnation.

The landowners who decided to proceed through condemnation encountered a much different process. Their properties were re-appraised by court-appointed appraisers (the government agreed to pay the higher of the two appraisals); they had the opportunity to retain legal counsel (and many did); they had the opportunity to reappraise the property themselves; they had the right to file exceptions to the appraised value; they had the right to a jury trial; and they had the right to appeal an adverse decision. Their just compensation award was a judicial decision, not a contract. In short, their properties were condemned, not "sold . . . under threat of

condemnation."[4]

**B. Claimants Do Not Identify Any Factual Error in the November 1998 Order**

In their motion, Claimants cite the five condemnation petitions in connection with an assertion that certain facts were "not considered by the former hearing officer." See Claimants' Mot. at 4-6. Although their point is not entirely clear, Claimants may intend to argue that reconsideration is proper because "previously unavailable evidence is now available." First Fed. Lincoln Bank, 60 Fed. Cl. at 502. This is incorrect. Judge Merow considered the condemnation petitions, and his discussion of the facts is accurate. The United States' Motion to Dismiss discussed these documents, as well as the statutory basis for the government's petitions. See Def.'s Mot. to Dismiss at 2-3. Some of these same documents were attached to, and discussed in, the parties' briefs addressing Claimants' Motion for Class Certification, which had been filed in 1995. See Def.'s Opp'n to Claimants' Mot. to Certify a Class at Ex. 2-A, dated Oct. 31, 1995 (Doc. No. 38). The United States had provided each of these documents, together

---

[4] Claimants' Motion also takes issue with footnote two in the November 1998 Order:

> [I]f S. 794 were construed to cover individuals whose land was acquired through condemnation proceedings, it would essentially require the court to reopen those proceedings to determine if adequate compensation was awarded even though final judgments have been entered by an Article III court. This result would raise difficult issues regarding the Constitutionality of the reference.

Nov. 1998 Order at 5 n.2. The Court's concern is valid, and Claimants' argument to the contrary is in error. In evaluating a Congressional Reference claim, this Court essentially acts as an arm of Congress. Congressional investigation and evaluation of a purely judicial decision (the reasonableness of a condemnation award) raises serious separation of powers concerns. See, e.g., Barenblatt v. United States, 360 U.S. 109, 111-12 (1959) ("Since Congress may only investigate into those areas in which it may potentially legislate or appropriate, it cannot inquire into matters which are within the exclusive province of one of the other branches of the Government. Lacking the judicial power given to the Judiciary, it cannot inquire into matters that are exclusively the concern of the Judiciary."); United States v. Brown, 381 U.S. 437 (1965) (holding that "Congress possesses full legislative authority, but the task of adjudication must be left to other tribunals" in holding bill of attainder unconstitutional).

with a wealth of other documents, to Claimants several years before the United States filed its Motion to Dismiss. See Trial Tr. at 626:17 to 631:20. These facts were, therefore, "available" previously, and Claimants' baseless assertion that the Court lacked certain facts cannot be supported.

In connection with this argument, Claimants assert that certain discovery requests "went unanswered for nearly a decade," and that they were led to believe that a twenty-volume "administrative record" that the United States provided to Claimants in 1996 was the entire "universe of documents." Claimants' Mot. at 3. Both assertions are without merit. In 1994, the Court stayed this matter in order to resolve Claimants' class motion and determine the scope of the reference. See Aug. 1994 Order. Although the United States provided an "administrative record" to Claimants in 1996, it informed Claimants at that time that those documents did not constitute all potentially relevant documents. E.g., Joint Case Management Schedule & Related Mot. to Stay, dated July 29, 1994 (Doc. No. 15) ("The underlying documents are voluminous and are apparently housed in several federal record repositories throughout the country."); Def.'s Ex. 1 (Jan. 23, 1996 letter stating that the "administrative record" did not constitute all relevant documents).

From time to time, Claimants have sought to gain an advantage from both the Court's decision to stay this matter (in 1994 and again in 1998), and Claimants' failure to independently investigate their own claims, by urging that the United States failed to disclose certain documents. The United States is compelled to note, again, that there is no merit to Claimants' aspersions. Indeed, Claimants' counsel has conceded that there was no document discovery done during this time by "agreement of the Claimants" and with the Court's approval. Trial Tr.

at 627:16-23. Claimants' tired attempt to cast blame on this issue is without merit.

Once the Court lifted the previously-imposed stay in 2004, the parties searched for relevant documents, and located some historic documents – primarily documents generated during the acquisition of these properties in the 1940s. These documents were publicly-available, and there is undisputed evidence that Claimants saw these documents as early as 1978, when they first began to investigate these issues, approximately twenty years before the Court issued the November 1998 Order. See PX-267 (deposition of Kevin Murphy, whom the former landowners retained in the late 1970s to conduct research, discussing research at various record depositories); id. at Ex. 8 (November 21, 1978 letter from Mr. Murphy to A.G. Pritchett enclosing representative sample copies of the "federal court documents I examined"); id. at Ex. 7 (December 19, 1978 letter from Mr. Murphy to A.G. Pritchett, discussing the condemnation documents he had reviewed and stating that he "was sorry to have to report that there was nothing in the federal court documents upon which to build a misrepresentation argument"). Claimants' argument that these documents were not available in 1998 cannot be supported.

If Claimants thought additional discovery was necessary to respond to the government's motion to dismiss, they could have sought to conduct additional discovery pursuant to Rule 56(f) in 1998. Instead, they now complain about supposed discovery violations some ten years after the fact.[5/]

Claimants do not identify any "manifest factual error" that could justify a motion for

[5/] Claimants clearly had these supposedly-missing documents in their possession when they filed this lawsuit in 1994, but they never provided copies to the United States. The United States was, therefore, forced to investigate Claimants' allegations anew; relocate the same documents Claimants had located in 1978; and provide copies of those documents to Claimants, who had apparently forgotten they had found those very documents decades earlier.

reconsideration. Claimants' Motion, therefore, must be rejected.

**C. Claimants' Argument is Contradicted by the Legislative History**

The language of the Congressional Reference Bill is unambiguous, and resort to extrinsic evidence is unnecessary and improper. If the Court intends to consider extrinsic matters, however, Claimants' position is easily disproven by the legislative history of the Congressional Reference Bill. Senate Bill 794 was passed in September 1993, and transmitted to this Court shortly thereafter. In November 1994, after the Court expressed concern about the scope of the bill, Senator Ford introduced "The Kentucky Land Grantors Relief Act of 1994," S. 2563, 103d Cong., 2d Sess. (1994) ("S. 2563"). Proposed Senate Bill 2563 was a modified version of S. 794, and would have given the Court jurisdiction to consider the claims of former owners whose properties "were condemned or otherwise procured by the United States Government. . . ." In addition, Proposed Senate Bill 2563 stated that relief would be granted to those individuals who were "promised they would be given priority to repurchase land sold by the United States Government. . . ." Had Proposed Senate Bill 2563 been agreed to by the Senate and transmitted to this Court as a Congressional Reference Bill, the posture of this case would have been much different.[6] However, Proposed Senate Bill 2563 was referred to the Senate Judiciary Committee, where it was never acted upon. The full Senate never considered Proposed Senate Bill 2563,

---

[6] Consider, for example, the very different circumstance presented in Mackie v. United States, 172 Ct. Cl. 393, 1965 WL 8267 (1965) (Cong. Ref.). In that case, the Senate bill directed the Court to consider a claim arising "as a result of [the claimant's] blood pressure dropping too low during the course of an operation performed on him. . . ." Id. at *20. Before proceedings were completed, the Senate passed a supplemental bill, which directed the Court to consider any claims arising "as the result of improper care . . . including, but not limited to the lowering of his blood pressure. . . ." Id. at *21. The Court was able to consider evidence beyond the blood pressure question only because the Senate transmitted the supplemental bill.

voted upon it, or transmitted it to this Court.

Claimants' Motion effectively asks this Court to issue a Final Report in accordance with Proposed Senate Bill 2563. The Senate could have transmitted Proposed Senate Bill 2563 to this Court for review, but it did not. Instead, the Senate transmitted S. 794, a bill that does not include condemnees. The November 1998 Order is fully consistent with this legislative history, and Claimants' implicit request that this Court issue a Final Report in accordance with Proposed Senate Bill 2563 must be rejected.

## V. The Court Should (Again) Strike the April 23, 1998 Letter

In support of their motion, Claimants attach an April 23, 1998 letter from Kentucky Senator Wendell H. Ford. See Claimants' Mot., Ex. 1. Claimants presented this same letter to Judge Merow in connection with the United States' Motion to Dismiss. The admissibility and relevance of the letter were extensively briefed,[7] and Judge Merow definitively resolved the issue in a separate order, also issued on November 24, 1998:

> Accordingly, it is concluded that the April 23, 1998 letter and claimants' proposed supplemental brief discussing it cannot appropriately be considered in ruling on defendant's motion to dismiss. Therefore, claimants' May 14, 1998 motion is **DENIED**. The clerk is directed to return, unfiled, claimants' Supplemental Response to Defendant's Motion to Dismiss and all copies thereof.

Order, dated Nov. 24, 1998 (Doc. 64) (emphasis in original). Claimants' Motion to Vacate offers no argument that Judge Merow's decision was legally or factually incorrect. Therefore,

---

[7] See Claimants' Mot. for Leave to File a Supplemental Resp., dated May 14, 1998 (Doc. No. 55); Def.'s Opp'n to Claimants' Mot. for Leave to File a Supplemental Resp., dated May 26, 1998 (Doc. No. 56); Claimants' Reply in Support of Mot. for Leave to File a Supplemental Resp., dated June 4, 1998 (Doc. No. 57); Def.'s Surreply to Claimants' Reply, dated June 29, 1998 (Doc. No. 60); Claimants' Surreply in Support of Claimants' Mot., dated July 15, 1998 (Doc . No. 63).

Claimants are not entitled to reconsideration with respect to this issue, and the Court should, again, strike this letter from the record.

## VI. The Court Should Reject Claimants' "Suggested Procedures and Remedy"

Claimants' Motion includes a lengthy discussion about suggested further proceedings, repeating their earlier arguments related to the Court's June 22, 2006 order on class certification. See Claimants' Mot. at 31-34. The parties have briefed these issues at length.[8]

Claimants also propose a variety of other suggestions for the Court's Final Report, including the assignment of certain mineral rights to heirs, the appropriation of certain monies, and the appointment of a Special Master (who, incredibly, Claimants suggest can take evidence on individual Claimants' rights and then write an additional report to Congress). The United States opposes each of these suggestions. However, the Court has not solicited suggestions from either party, and Claimants' effort to sway the Court is inappropriate in the context of a motion for reconsideration. If the Court intends to entertain Claimants' suggestions or believes that additional briefing on any of these issues would be helpful, the United States requests an opportunity to address those matters in subsequent briefing.

## CONCLUSION

For the reasons discussed above, the Court should deny Claimants' Motion to Vacate. In addition, the United States requests that the Court strike Exhibit 1 to Claimants' Motion again.

---

[8] See, e.g., Def.'s Resp. to Court's Dec. 29, 2005 Order (Doc. No. 194); Def.'s Mot. to Strike Mot. for Reconsideration (Doc. No. 197); Def.'s Reply in Support of Mot. to Strike (Doc. No. 199); Def.'s Opp'n to Claimants' Mot. to Reconsider Class Cert. (Doc. No. 207); Def.'s Mot. to Approve Proposed Class Notice and Proposed Request to Join (Doc. No. 214); Claimants' Status Report (Doc. No. 213).

Respectfully submitted this 24th day of March, 2008.

RONALD J. TENPAS
Assistant Attorney General

/s/ William J. Shapiro
WILLIAM SHAPIRO
United States Department of Justice
Environment and Natural Resources Division
501 I Street
Suite 9-700
Sacramento, CA 95814
(916) 930-2207 (phone)
(916) 930-2210 (fax)

TOM C. CLARK II
Principal Deputy Section Chief
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
601 D Street, NW
Room 3152
Washington, DC 20530
(202) 514-3553 (phone)
(202) 305-0506 (fax)
Attorneys for the United States

Of Counsel:
Dale Holmes
Stephen J. Allison
U.S. Army Corps of Engineers
600 Dr. Martin Luther King Place
Louisville, KY 40202

Martin Cohen
U.S. Army Corps of Engineers
20 Massachusetts Ave., N.W.
Washington, DC 20314-1000