**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

LAND GRANTORS IN HENDERSON, UNION, AND WEBSTER COUNTIES, KENTUCKY AND THEIR HEIRS

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 93-648X
Judge Susan G. Braden

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO VACATE THE NOVEMBER 24,1998 ORDER**

Nancie G. Marzulla
Robert J. Marzulla
MARZULLA LAW
1350 Connecticut Avenue, N.W.
Suite 410
Washington, D.C. 20036
(202) 822-6760

M. Stephen Pitt
Merrill S. Schell
Jean W. Bird
WYATT, TARRANT & COMBS, LLP
500 W. Jefferson Street
Suite 2800
Louisville, KY 40202-2898
(502) 562-7372

April 7, 2008

# TABLE OF CONTENTS

**I. INTRODUCTION** ........ **1**

**II. ARGUMENT** ........ **7**

- **A. Plaintiffs Meet the Test for Reconsideration.** ........ 7
- **B. The Motion is Timely and Would not Prejudice the United States or Foment Chaos.** ........ 9
- **C. The 1998 Order was Based Upon a Fundamental Legal Error.** ........ 11
- **D. The 1998 Order is Based Upon a Misinterpretation of the Facts.** ........ 13
- **E. S.2563 Supports the Correct Interpretation of S.794.** ........ 14
- **F. Senator Ford's Letter, While Not Crucial to this Court's Determination, is Nevertheless Admissible.** ........ 15

**CONCLUSION** ........ **15**

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Banfi Products Corp. v. United States*, 40 Fed.Cl. 107 (1997) ........................................ 11

*Foster v. United States*, 607 F.2d 943 (Ct.Cl. 1979) ........................................................ 13

*Hart v. United States*, 58 Ct.Cl. 518 (1923) .................................................................. 11

*Hulsey v. United States*, 6 Cl.Ct. 593 (1984).................................................................. 11

*John R. Sand & Gravel Co. v. United States*, 128 S.Ct. 750 (2008).................................. 6

*KLK, Inc. v. United States Department of the Interior*, 35 F.3d 454 (9th Cir. 1994)... 8, 12

*Kirby Forest Industries, Inc. v. United States*, 467 US 1 (1984)....................................... 2

*Land Grantors I*, 64 Fed.Cl. 661 (2005) ................................................................ passim

*Land Grantors III*, 71 Fed.Cl. 614 (2006).................................................................... 1, 7

*R.J. Widen Co. v. United States*, 357 F.2d 988 (Ct.Cl. 1966) ........................................ 13

*Shirlington Limousine & Transportation, Inc. v. United States*, 78 Fed.Cl. 27 (2007)...... 7

*United States v. Clarke*, 445 U.S. 253 (1980) ......................................................... 7, 12, i

*United States v. Dow*, 357 U.S. 17.......................................................................... 12

*United States v. General Motors Corp.*, 323 U.S. 373 (1945) ........................................ 12

### FEDERAL STATUTES

28 U.S.C. §1491(a)(1) ..................................................................................... 5

28 USC §2507 .............................................................................................. 5

28 U.S.C. § 2509(d) ........................................................................................ 3

40 U.S.C. § 258a ............................................................................................ 2

## FEDERAL RULES

Fed.R.Evid. 803(3)........................................................................................................ 15

Fed.R.Evid. 807 ............................................................................................................ 15

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LAND GRANTORS IN HENDERSON, UNION, AND WEBSTER COUNTIES, KENTUCKY AND THEIR HEIRS<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 93-648X<br>Judge Susan G. Braden |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO VACATE THE NOVEMBER 24,1998 ORDER**

## I. INTRODUCTION

Plaintiffs agree that the 1998 Order was a pivotal event in this litigation. Just as pivotal, however, was Judge Merow's 1997 Order denying Plaintiffs' motion for class certification, an Order this Court reconsidered in 2006 *Land Grantors III*, 71 Fed.Cl. 614 (2006). This Court's June 22, 2006 class certification Order gave potential life to the claims of Plaintiffs who were dismissed from these proceedings in the 1998 Order. The fact that the Government agrees that the 1998 Order was pivotal is all the more reason to reconsider it at this juncture, before a final report and recommendation is made for further review by the Review Panel. Efficiency and judicial economy demand no less.

The Government's Opposition fully supports Plaintiffs' position that Judge Merow was operating in 1998 without the benefit of a full understanding of the facts and, hence, the applicable law. Judge Merow's misunderstanding was first expressed *sua sponte* in an Order

entered August 11, 1994 ("1994 Order"), shortly after the Government's Answer was filed and before any documents had been exchanged or any arguments advanced by the parties:

> The Complaint in this matter appears to plead claims not only on behalf of individuals who so "sold" their land under the threat of condemnation, but also on behalf of individuals whose land was taken by means of formal condemnation proceedings.

1994 Order at 2 [Docket No. 16].

When Judge Merow subsequently made official his initial impression of the congressional reference's scope, he did so without the benefit of crucial documents not produced by the Government until 2004 - the original condemnation petitions and related information - and made a crucial error of law: his 1998 Order mistakenly relied solely on the Declarations of Taking Act, 40 U.S.C. § 258a, which speaks to the passage of title, a point not relevant to an interpretation of the congressional reference or even mentioned in the proposed bill, and ignored the fact that "condemnation" of these properties—including immediate possession—occurred earlier, with the filing of the petitions, rendering the later declarations of taking largely superfluous.

The congressional reference itself keys off of the time of "condemnation," not the time titles passed. In the 1998 Order, the Court never even mentioned the War Purposes Act, under which Plaintiffs' properties were condemned and taken in "quick-take" fashion. Judge Merow was not aware of the fact and must have assumed that the landowners' properties were taken in the ordinary "straight-condemnation" fashion, which would have placed more significance on the declarations of taking. *See Kirby Forest Industries, Inc. v. United States*, 467 US 1, 104 S.Ct. 2187, 2190-2191, 81 L.Ed. 2d 1 (1984). In the 1998 Order, the hearing officer relied on a declaration of taking filed in the record as part of the Government's opposition to class

certification, even though the controlling law looked to the date a petition for condemnation was filed to determine the date of condemnation.

None of the petitions were available or presented to the Judge Merow for his consideration. In 1994, at the time Judge Merow developed his initial *sua sponte* impression, and in 1998, there was nothing in the record to point the hearing officer to the historical nature of the takings involved in this case. The mistakes here were fundamental, doing manifest injustice to hundreds of former landowners and heirs.

The Government's complaints about a delay on Plaintiffs' parts in seeking reconsideration of the 1998 Order are unfounded. After briefing in 1998, those individuals whose claims are the subject of this motion were dismissed from these proceedings. They had no right of appeal from that dismissal and RCFC 59 motions for reconsideration are not required. Their option at that time was to await entry of a final report and recommendation mandated under 28 U.S.C. § 2509(d) and seek redress by the Review Panel, including a possible remand. As the Court recognized in *Land Grantors I*, from that point this litigation remained stayed for settlement discussions until 2003, when it was assigned to this Court as Hearing Officer. Only once it became clear to the Court that the Government had no serious interest in settlement, was discovery reopened and the case set for hearing.

After the 1998 Order and the multi-year settlement discussions, the remaining Plaintiffs were left to play the hand that they had been dealt. As this Court is aware, the extensive work the Plaintiffs performed between 2000 and 2003 to further prospects of settlement formed the underpinning for how the evidence went in at the hearing. *See, Land Grantors I* at 690-91. But even given that background, both the Government and the Plaintiffs introduced a substantial amount of evidence at the hearing related to the properties of the Plaintiffs whom Judge Merow

had dismissed. *See, e.g.*, JX 205-536F (over 300 jointly offered exhibits generated during condemnation proceedings); CX 270, 272, 274, 275, 276, 269, 126, 142, 143, 144, 147, 155, 163, 167, 168, 169, 173, 182, 183, 190, 196, 197, 202, 204, 198, 226, 232, 184, 133, 149, 206 (depositions and affidavits of numerous owners and/or heirs the titles to whose land was acquired after the declarations of taking were filed.) This evidence also included the excellent historical evidence generated by Dr. Johnson and Dr. Brigham, which did not discriminate among those landowners who agreed to transfer their titles to the Government before the filing of declarations of taking from those who did so later. Thus, as a practical matter, the settlement-generated damage theory had no real impact on the evidence introduced at the hearing and, although feigning prejudice, the Government points to no way in which it would have done anything materially different had the 1998 Order never been entered or had been reconsidered and set aside by this Court prior to the hearing in 2004. Indeed, before the hearing the Government had agreed that

> [b]ased on the fact that the condemned properties were treated the same way as the purchased properties, we believe that there's really no evidence, at least at this point [2004], that we've seen, that the property owners that voluntarily sold were treated any different than the property owners that were condemned.

*Land Grantors I*, at 691-92 (brackets added).

The Court has unmistakenly found that the facts and law in this matter – based largely on evidence that the Government itself introduced - are amply supported by the record. The Court did so based on the evidence before it, as it was compelled to do in its broad role as fact-finder for Congress. Thus, the Government's prejudice argument actually goes to the overall merits of the Court's decision—an argument which it unsuccessfully has made *ad infinitim* since April 1, 2005—not which, or how many, landowner/heirs might recover under the award.

Since the hearing proceedings and the additional post-hearing evidence gathering, several significant events have occurred that make Plaintiffs' motion timely and the Government's procedural objections unavailing.

*First*, this Court issued its Interim Report and Opinion in *Land Grantors I* on April 1, 2005. In that Opinion, the Court indicated its intent to enter judgment under the Tucker Act, 28 U.S.C. §1491(a)(1), ***and to vacate the November 1998 Order.*** *Land Grantors I* at 717-718. The Court further indicated that if its anticipated judgment based on the Tucker Act claim were reversed on appeal, it would reinstate the 1998 Order, finalize its report and make recommendations for the Review Panel. *Id*.

*Second*, on October 3, 2005, the Plaintiffs filed a Second Amended Complaint at the Court's direction, in order to conform the pleadings to the evidence introduced during the hearing and afterward, which the Court had obtained *sua sponte* through its statutory authority to "call" evidence from the Government. 28 USC §2507. Even though the congressional reference claims were stayed under *Land Grantors I*, all Plaintiffs, including those whose claims were dismissed under the 1998 Order, were included in the caption of the Second Amended Complaint and the congressional reference claims of all Plaintiffs were fully realleged, along with renewed class allegations and request for class status. By Order of July 31, 2007, the Court gave the Government until October 1, 2007, to make any motions to dismiss the Second Amended Complaint it wished to make. Although the Government filed a motion to dismiss Count I, the Tucker Act claim, it did not move to dismiss any other claims or parties, including the Plaintiffs representing the properties the Government says are outside the scope of the congressional reference.

*Third*, the Court granted Plaintiffs' motion to reconsider Judge Merow's prior denial of class action status. The Court reconsidered the class certification denial and certified a class based upon the evidence it received during and after the formal hearing proceedings and the subsequently filed Second Amended Complaint. In defining the class, the Court did not exclude any Plaintiff based on the "sold under threat of condemnation" language of the congressional reference, even though the class certification order made clear that it covered both the Tucker Act and the congressional reference claims. The class was certified well after the filing of the Second Amended Complaint and the Government's Answer. Arguably, at that point, the November 1998 Order was moot.

*Fourth*, the United States Supreme Court decided *John R. Sand & Gravel Co. v. United States*, 128 S.Ct. 750 (2008), which compelled dismissal of the Plaintiffs' Tucker Act claims on January 8, 2008 and perhaps triggered the Court's intention to "reinstate" the 1998 Order. Plaintiffs' motion to reconsider and vacate was filed March 6, 2008, less than two months later. There is no prejudice to the United States. What there is, however, is potential manifest prejudice to the many Plaintiffs whose claims were dismissed at a time when the previous hearing officer developed an early erroneous impression of the scope of the reference, knowing little about the facts, the documents or the applicability of quick-take condemnation law to this case, and made a fateful decision contrary to all three.

The Government makes no serious effort to argue that this Court lacks the power to reconsider the 1998 Order or that the Order is substantively correct. Rather, it reverts back to the already failed argument that it will somehow be prejudiced—an argument the Court dealt with and rejected in *Land Grantors I* and since—by the Court utilizing evidence which the Government largely introduced and without making any meaningful case as to how and why it

will be prejudiced. The Government likewise does not address why this Court should not now clarify the scope of the reference issue, rather than leaving it to the Review Panel to do so.

Notwithstanding the Government's failure to effectively respond and rebut the substance of Plaintiffs' Motion to Vacate, Plaintiffs will briefly reply.

## II. ARGUMENT

### A. Plaintiffs Meet the Test for Reconsideration.

*Shirlington Limousine & Transportation, Inc. v. United States*, 78 Fed.Cl. 27 (2007) reiterates that courts will reconsider and, where appropriate, set aside, earlier orders where the "moving party identify[s] a manifest error of law or mistake of fact." In order to meet that standard,

> [The] moving party must demonstrate either '(1) that an intervening change in controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice.'

*Id*. at 29 (*quoting First Fed. Lincoln Bank v. United States*, 60 Fed.Cl. 501, 502 (2004)). Here, Plaintiffs have urged the Court to "reconsider and vacate" the 1998 Order before making its final report and recommendation [*See* Plaintiffs' Memorandum in Support, at 3, 4.]. There is no question but that the Court is authorized to do so and it has done so previously in this case. *See Land Grantors III*, 71 Fed.Cl. 614, 621 (2006).

While there has been no intervening change in controlling law since 1998, a movant need only meet one of the three grounds. Both the second and third elements for reconsideration are satisfied. It is beyond question that Judge Merow did not have before him in either 1994 or 1998 all relevant facts upon which to base his conclusion as to when "condemnation" occurred.[1] The

[1] In the 1994 Order, Judge Merow cited the need for a "formal" condemnation proceeding to mark the "under threat of condemnation" milepost. Setting aside that S.794 nowhere mentions a (continued…)

Government admittedly had not produced to the Court or Plaintiffs the War Purposes Act condemnation petitions that were filed in 1942 regarding the Camp Breckinridge properties. All Judge Merow had before him was a declarations of taking and a supplemental petition, that were among the many papers of materials attached as exhibits by the Government to its 1995 response to Plaintiffs' Motion for Class Certification, which served only to reinforce the Court's previous mistaken impression of the congressional reference. Making use of what was before him, Judge Merow erroneously, but perhaps not surprisingly, focused upon the declarations of taking as representing the dates on which condemnation occurred.

Although the Government seeks to shift blame to Plaintiffs for not obtaining and producing the petitions to Judge Merow, the fact remains that the Government reassured ***the Court*** that it was gathering relevant documents. See August 11, 1994 Order, p.2 ("Defendant's counsel is to be commended for undertaking to assemble relevant documentation in this matter and making it available to plaintiffs"). Formal discovery was stayed and the petitions were not provided to Judge Merow at the time of the 1998 briefing. It was not until 2004, after discovery had been reopened, that the petitions and documents relating to the immediate orders of possession entered by the district court actually surfaced. These documents could and should have made a significant difference to Judge Merow. They would have shown him that the subject property takings were not ordinary "straight" condemnations, but were quick-take

---

(…continued)

"formal" condemnation proceeding, the filing of the initial condemnation petitions under the War Purposes Act would be those formal proceedings, not the later filings of the largely superfluous declarations of taking. *See United States v. Clarke*, 445 U.S. 253, 254, 100 S.Ct. 1127, 1128, 63 L.Ed. 2d 373 (1980); *KLK, inc. v. United States Department of the Interior,* 35 F.3d 454, 455, N.1 (9th Cir. 1994).

proceedings under the extraordinary powers given by the War Purposes Act—a fact completely overlooked in the 1998 Order.

Reconsideration is also appropriate in order to prevent manifest injustice. The fact remains that if the Order is not vacated, it could have the effect of rendering any final award unavailable to Plaintiffs representing over 75% of the acres acquired by the Government for Camp Breckinridge. Judge Merow was wrong in the 1998 Order; its effect is clearly contrary to the intent of the congressional reference sponsors. Judge Merow's error would impact the owners of over three-quarters of the approximately 36,000 acres taken. It is difficult to imagine how that result would not amount to a manifest injustice.

In making their motion, asking the Court to reconsider and vacate the 1998 Order, Plaintiffs are not simply reiterating arguments made during the 1998 briefing process. In fact, the Plaintiffs were in no position to make the arguments that are the subject of this motion due to the unavailability of the actual condemnation petitions and related documents, which prevented them from recognizing compelling arguments later derived from having access to the documents.

### B. The Motion is Timely and Would not Prejudice the United States or Foment Chaos.

While the Government claims that it will be prejudiced if the Court reconsiders and sets aside the 1998 Order, it makes no persuasive argument as to why or how it will be prejudiced. It is not as if the Plaintiffs representing properties whose titles were acquired by the Government after the filing of the declarations of taking were ignored during the formal hearing procedures. In fact, as mentioned, supra, that is clearly not the case. Whether all landowners and heirs are included as Plaintiffs, or just those who signed options and agreed to sell prior to the declarations of taking being filed, largely is irrelevant to the great mass of underlying facts found by this Court in *Land Grantors I*.

The critical fact, regardless of whether this case is a Tucker Act case or a congressional reference case, is that neither the Government nor the landowners were even remotely aware of the full nature and extent of the minerals underlying the landowners' properties until many years after the properties were condemned. *Land Grantors I* at 703. That lack of knowledge affected equally those landowners who signed options and conveyed title prior to the filing of declarations of taking, those who negotiated and consummated settlements and resulting sales agreements after those dates, and those who went to the hearing and had a jury decide the price they would receive. This mutual ignorance, coupled with the fact that the Government undeniably failed to follow its own written acquisition guidelines by neglecting to justify its condemnation of the minerals, led to its unjust enrichment to the tune of millions of dollars in 1965-1966 and thereafter. That unjust enrichment continues even to this day, as additional natural gas and oil continue to be extracted from the properties. Those basic facts, all of which are demonstrated in the record, are not dependant upon how many Plaintiffs are parties and how many former properties are represented in the case. They apply to all landowners. In its true context, the Government's prejudice argument falls flat.

The Government's prediction of "chaotic future proceedings" should the Court determine the 1998 Order to be ineffective, likewise is without merit. Well over one thousand Plaintiffs are named in the Second Amended Complaint. A large proportion of those Plaintiffs represent properties that could be excluded by the 1998 Order, despite the Court's class certification order. Plaintiffs set forth in Section IV.E. of their opening Memorandum a scenario of how this case could reasonably proceed at this point. Given class certification and the opt-in procedures

available to class members, there is no reason why the chaos predicted by the Government would ever occur.[2]

### C. **<u>The 1998 Order was Based Upon a Fundamental Legal Error</u>.**

The Government argues that the scope of the case is defined by the terms of the congressional reference itself. This argument is misleading. As argued by Plaintiffs in their opening Memorandum, the congressional reference bill is itself only proposed legislation and is not strictly binding on this Court as hearing officer. The Government makes no effort to rebut the cases that recognize a hearing officer's broad mandate in construing congressional reference language and making its factual determinations. Rather, the Government cites three cases holding that the hearing officer cannot venture off into some area completely foreign to the reference. One of those cases, *Hulsey v. United States*, 6 Cl.Ct. 593 (1984), held it inappropriate for the hearing officer to find that the plaintiff suffered from vasculitis or Guillian Barre Syndrome as a result of swine flu inoculation, rather than suffering from polymyositis, which was the only disease set forth in the reference.[3] Here, Plaintiffs do not ask the Court to add some alien claim, but simply to reconsider who is covered by the existing claim.

To the extent that it has any guiding effect, the text of S.794 is certainly not crystal clear. In order to ascertain its true meaning and intent the meaning of the word "sold" must be

---

[2] Indeed, the "chaos" argued by the Government is more likely to occur if the true scope of the reference is not re-addressed until the review panel stage. In the event the Court were to not review and revise the 1998 Order and the Review Panel were to agree with Plaintiffs as the correct interpretation of S.794, but otherwise affirm this Court's report, a remand for further proceedings could be possible.

[3] Similarly, in *Hart v. United States*, 58 Ct.Cl. 518 (1923), the plaintiff improperly sought to greatly expand the specific fact allegations alleged in the bill and was precluded. In *Banfi Products Corp. v. United States*, 40 Fed.Cl. 107 (1997), also is cited out of context, the court was simply looking to the bill for guidance in its negligence inquiry, rather than dealing with the issue of whether the language of the bill strictly defined its factual or other determinations.

ascertained in the context of a "condemnation" and, more importantly, the word "condemnation" must be viewed in this quick-take context to understand "under threat of condemnation." With all due respect, Judge Merow erred on this fundamental point. While his error may well have been due to his lack of full knowledge concerning the War Purposes Act quick-take aspects of these takings, he nevertheless was clearly wrong in defining the date of condemnation the dates on which declarations of taking were filed. In fact, "condemnation" occurred earlier.

As Plaintiffs demonstrated in their initial Memorandum, it is simply beyond question, given existing Supreme Court law, that condemnation occurs when the Government initiates condemnation proceedings. *See, United States v. Dow*, 357 U.S. 17, 78 S.Ct. 1039, L.Ed. 2d 1109 (1958); *United States v. Clarke*, 445 U.S. 253, 254 100 S.Ct. 1127, 1128, 63 L.Ed. 2d 373 (1980); *KLK, Inc. v. United States Dept. of Interior*, 35 F.3d 454, 455, N.1 (9th Cir. 1994). Moreover, in War Purposes Act cases, particularly where, like here, the government obtains immediate possession, subsequent declarations of taking are insignificant. *Dow*, 78 S.Ct. at 1045. The record shows that, upon the filing of the condemnation petitions, the Government sought and obtained the right of immediate possession of the properties. *See Land Grantors I* at 668-669. The Government's argument that it may not have "physically" gone onto all properties immediately after the petitions were filed is superfluous. The evidence has established that, after the Government obtained orders of immediate possession, it ordered the landowners off of their properties within a short period of time, thus interfering with the owners' rights to exclusive ownership, possession and use of their properties. They remained only at the Government's sufferance. The Government's argument on this point runs directly counter to well-settled opinions of both the Supreme Court and this Court. In *United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945), a War Purposes Act case, the Court stated:

> The courts have held that the deprivation of the former owner rather than accretion of a right or interest to the sovereign constitutes the taking. Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter to amount to a taking.

323 U.S. at 378. *See also R.J. Widen Co. v. United States*, 357 F.2d 988, 993 (Ct.Cl. 1966); *Foster v. United States*, 607 F.2d 943, 951 N.8 (Ct.Cl. 1979)("property is deemed taken when the Government substantially disturbs the owner's use and possession of the subject property.")

The previous hearing officer clearly erred in holding that "condemnation" occurred with the filings of the declarations of taking, rather than the initial War Purposes Act petitions and orders of immediate possession. That is a serious fundamental legal error which undermines the entire 1998 Order and, if unabated, will result in manifest injustice.

Additionally, Judge Merow's overly simplistic definition of the word "sold" in S.794, which does not give deference to the condemnation context in which it is used, is also erroneous. *See* Plaintiffs' Memorandum at Section IV.B.2. The Government's Opposition does nothing to detract from Plaintiffs' argument.

### D. <u>The 1998 Order is Based Upon a Misinterpretation of the Facts.</u>

The failure to acknowledge the proper statutory underpinnings of this case, including the orders of immediate possession, is a substantial factual error. The Government's statement at page 6 of its Opposition that "Judge Merow considered the condemnation petitions, and his discussion of the facts is accurate," is perplexing because it is simply wrong, and ignores the Hearing Officer's earlier expressed opinion on the scope of the congressional reference, before any materials were made available. In any event, without question, Judge Merow did not have the crucial original petitions or orders of immediate possession. Otherwise, he might well have held differently.

While inaccurately asserting that Judge Merow had the petitions, the Government devotes most of its argument to casting blame on the Plaintiffs for not providing the petitions. Aside from the internal inconsistency of this argument, the important point is that either Judge Merow had the petitions before him (and therefore no one is to blame) or he did not. But certainly they were critical to a correct decision on the Government's own motion to dismiss. The fact is that, although they were in the Government's possession, they were not provided as part of the "administrative record," and were not given to Judge Merow. This has resulted in an erroneous decision which, if allowed to stand, would result in manifest injustice to hundreds of individuals.

### E. S.2563 Supports the Correct Interpretation of S.794.

The Government grasps at straws in arguing that S.2563 somehow supports Judge Merow's interpretation of S.794. In fact, after Judge Merow's August 11, 1994 Order, in which he *sua sponte* called into question the scope of S.794, Sen. Ford was surprised and offered to submit a new bill clarifying any perceived ambiguity. S.2563 was filed on November 30, 1994. Since the 103d Congress was set to expire at the end of 1994, some six weeks later, it is not surprising that S.2563 was never considered. It died a natural legislative death when the 103d Congress expired and was never resubmitted.

There was never any consideration or vote on S.2563. Thus, any suggestion that Congress somehow rejected S.2563 overlooks the realities of the legislation process. The only import that can be drawn from the filing of S.2563 is that it was filed in 1994 to clarify Judge Merow's stated mis-impression, thus undermining the accuracy of that impression and supporting the interpretation of S.794 Plaintiffs advance.

**F. <u>Senator Ford's Letter, While Not Crucial to this Court's Determination, is Nevertheless Admissible.</u>**

Sen. Ford's April 23, 1998 letter clarifies his intent in helping file and advance S.794 and, in doing so, undermines both the 1998 Order and the Government's position. As Plaintiffs have argued in Section IV.B.4. of their Memorandum, this Court may consider Sen. Ford's letter pursuant to either Fed.R.Evid. 803(3) or Fed.R.Evid. 807. In its opposition, the Government does not rebut the applicability of either evidentiary rule, but relies solely upon the fact that Judge Merow rejected the letter in 1998. The Government's inability to contest the applicability of either evidentiary rule underscores the admissibility of the Ford letter. Although not crucial to this Court's decision, the Ford letter is helpful from historic and factual standpoints and provides added evidence that Plaintiffs' arguments concerning the interpretation of S.794 are correct.

## <u>CONCLUSION</u>

The congressional reference bill, S.794, is not binding on this Court as hearing officer. To the extent it is, the previous hearing officer materially misinterpreted it. The previous hearing officer clearly lacked significant facts and documents that should have changed the result. The 1998 Order was fundamentally wrong. In order to prevent manifest injustice, this Court should reconsider and set aside the 1998 Order before finalizing its report and recommendation.

Respectfully submitted,

Nancie Marzulla
Roger Marzulla
MARZULLA & MARZULLA
1350 Connecticut Avenue, N.W.
Suite 410
Washington, D.C. 20036
202.822.6760

s/M. Stephen Pitt
M. Stephen Pitt
Merrill S. Schell
Jean W. Bird
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street
Suite 2800
Louisville, KY 40202-2898
502.562.7372

20297010.1