# In the United States Court of Federal Claims

No. 93-648X
Filed: April 18, 2008
**TO BE PUBLISHED**

| | |
|---|---|
| LAND GRANTORS IN HENDERSON, UNION, and WEBSTER COUNTIES, KENTUCKY and THEIR HEIRS,<br><br>Claimants,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Class Action;<br>Congressional Reference, 28 U.S.C. § 2509;<br>Estimated Damages;<br>Interest On Claims Against Government, 28 U.S.C. § 2516(a);<br>"Lost Use" Value;<br>Mutual Mistake;<br>RESTATEMENT (SECOND) OF CONTRACTS §§ 152, 154(a), (c), 158(1), 352(a), 384;<br>RESTATEMENT (FIRST) OF RESTITUTION §§ 1, 157(1)(a);<br>Restitution;<br>Unjust Enrichment. |

**Nancie G. Marzulla** and **Roger J. Marzulla**, Marzulla & Marzulla, Washington, D.C., **Mark Stephen Pitt**, Wyatt, Tarrant & Combs, LLP, Louisville, Kentucky, for Claimants.

**William James Shapiro**, United States Department of Justice, Sacramento, California, for Defendant.

## FINAL REPORT AND MEMORANDUM OPINION REGARDING S. 794, "A BILL FOR THE RELIEF OF LAND GRANTORS IN HENDERSON, UNION, AND WEBSTER COUNTIES, KENTUCKY, AND THEIR HEIRS."[1]

[1] Reports and Memorandum Opinions previously issued in this congressional reference by the undersigned are incorporated herein: *Land Grantors* v. *United States*, 64 Fed. Cl. 661 (2005) ("*Land Grantors I*") (determining that the 1942-1944 contracts were based on a mutual mistake); *Land Grantors* v. *United States*, 71 Fed. Cl. 614 (2006) ("*Land Grantors II*") (granting Claimants' Motion for Class Certification and appointing the law firm Marzulla & Marzulla as Class Co-Counsel); *Land Grantors* v. *United States*, 74 Fed. Cl. 518 (2006) ("*Land Grantors III*") (determining that the interests of justice required deferral of a final disposition until the *en banc* decision in *Kirkendall* v. *Dep't of the Army*, 412 F.3d 1273, 1275-78 (Fed. Cir. 2005) (holding that the presumption of equitable tolling applied to Veterans Employment Opportunity Act claims) was decided *en banc* and was final and requesting views of parties regarding mediation); *Land Grantors* v. *United States*, 77 Fed. Cl. 686 (2007) ("*Land Grantors IV*") (denying the Government's objection to filing of Claimants' Second Amended Complaint, but granting the Government's

**BRADEN, *Judge* and Hearing Officer.**

Following the onset of World War II, the United States ("Government") acquired, pursuant to the War Purposes Act of 1917, 40 Stat. 241 (codified as amended at 50 U.S.C. § 171) (repealed 1956) ("War Purposes Act"), approximately 35,849.28 acres of land in the counties of Henderson, Union, and Webster, Kentucky, to establish an Army training facility that was named Camp Breckinridge. Almost all of this property: was owned by farmers who resided on their land; had been in the same families for generations; and constituted the entirety of these families' livelihood. On February 4, 1942, the Department of War authorized the first of five subsequent condemnation petitions, filed during 1942-1944 in the United States District Court for the Western District of Kentucky. Once these properties were condemned, the owners either could voluntarily negotiate a sale price and contract with federal agents or demand a jury trial to determine the amount of "just compensation" that the Government should pay for the appropriation of their land. At the end of this process, the Government ultimately paid the landowners approximately $3.7 million for their property, whether it was purchased under contract or conveyed under judicial order.

A decade after World War II was over, the Government began to lease and sell all the coal, gas, oil, and other mineral rights discovered under the former landowners' properties, that ultimately generated tens of millions of dollars of revenue. In 1968, after the appeal of a failed lawsuit was exhausted, the landowners turned to Congress for help. Twenty five years later, "a bill for the relief of land grantors in Henderson, Union, and Webster Counties, Kentucky, and their heirs," was enacted. This bill recognized the basic injustice of the Government's actions and allowed the landowners to pursue their claims in the United States Court of Federal Claims. *See* S. 794, 103d Cong. (1993).

On January 12, 1994, a Complaint was filed and assigned to another judge. Intermittent settlement negotiations and discovery disputes ensued for over a decade.[2] On August 15, 2003, this case was transferred to the undersigned. On September 8-10, 2004 and November 23, 2004, an evidentiary hearing and trial was held. On April 1, 2005, an Interim Report And Memorandum Opinion was issued, that found any representations that the Government employees or agents may have made about Claimants' ability to repurchase their land after World War II were unauthorized and therefore did not contractually bind the Government. *See Land Grantors I*, 64 Fed. Cl. at 703-04. The April 1, 2005 Interim Report And Memorandum Opinion, however, also found that the 1942-1944 contracts conveying the landowners' property to the Government were based on a mutual mistake that no coal, gas, oil, or other mineral deposits existed under the condemned properties at that time that would support exploration or operation. *Id*. at 703-08. Therefore, restitution was

---

request to file a Motion To Dismiss in Case No. 93-6481L); and *Land Grantors* v. *United States*, 80 Fed. Cl. 196 (2008) ("*Land Grantors V*") (dismissing Case No. 93-6481L, as barred by 28 U.S.C. § 2501).

[2] An overview of the procedural history between 1994 and August 15, 2003, is set forth in *Land Grantors I*, 64 Fed. Cl. at 685-89.

required, because Claimants were "paid less than reasonable value due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights." S. 794, § 2(2); *see also Land Grantors I*, 64 Fed. Cl. at 666, 691. After trial, Claimants amended their Complaint, pursuant to RCFC 15(b), to conform to evidence adduced at trial by adding a legal claim under the Tucker Act, 28 U.S.C. § 1491 and renewing their equitable claim under 28 U.S.C. § 2509.

Subsequently, considerable effort was undertaken to ascertain the amount of revenues that the Government received for the lease and sale of the coal, gas, oil, or other mineral interests at issue. It appears, however, that the Government destroyed and/or misplaced many of the documents that would verify the proper amount of restitution owed to Claimants, even during the period that this reference was pending. For this and other reasons, Justice Sandra Day O'Connor agreed to be appointed as a Mediator to assist the parties in reaching a settlement. Unfortunately, those efforts were unsuccessful. A few months later, Claimants' ability to continue pursuing a legal claim was extinguished. *See John R. Sand & Gravel Co.* v. *United States*, 128 S. Ct. 750, 753 (2008) ("forbidding a court to consider whether certain equitable considerations warrant extending a limitations period"). Nevertheless, for the reasons discussed herein, the record provides substantial evidence to support Claimants' entitlement to the equitable remedy of restitution, at least in the amount of $34,303,980.42.

To facilitate panel and congressional review of this Final Report and Memorandum Opinion, the following outline is set forth:


**I. RELEVANT FACTUAL BACKGROUND.**

**A. Condemnation Proceedings During 1942-1944.**

**1. The February 1942 Condemnation Of 10,427.70 Acres In Union County.**

**2. The March 1942 Condemnation Of 19,517 Acres In Union And Henderson Counties.**

**3. The June 1942 Condemnation Of 824 Acres In Union County.**

**4. The October 1942 Condemnation Of 5,400 Acres In Webster County.**

**5. The January 1943 Condemnation Of 280 Acres.**

**6. The May 1943 Condemnation Of 9.4 Acres In Union County.**

**7. The May 1944 Condemnation Of 16.37 Acres In Union County.**

**B. Disposition Of Waller Young Property In 1957.**

C. The Department Of The Interior's 1956 Discovery Of Oil And Issuance Of Oil And Gas Leases in 1957 And 1959.

D. The Closure and Disposition Of Camp Breckinridge.

1. The Sale Of Coal, Gas, Oil, And Other Mineral Rights In 1965.

2. The Sale Of Coal Rights In 1967.

a.) Tract No. 1.

b.) Tract No. 7A.

c.) Tract No. 7B.

E. The Enactment Of S. 794 In 1993.

II. RELEVANT PROCEDURAL HISTORY.

III. DISCUSSION.

A. Jurisdiction.

B. Standing.

C. Standard of Review.

D. Claimants' Agreement To Sell Their Land In 1942-1944 Was Based On A Mutual Mistake.

1. The "Basic Assumption" On Which The Claimants Agreed To Sell Their Land Was That No Coal, Gas, Oil, Or Other Mineral Deposits Existed Under The Condemned Properties In 1942-1944 That Would Support Exploration Or Operation.

2. The "Basic Assumption" Had A "Material Effect" On The Agreed Exchange Of Performance.

3. Claimants Should Not Bear Risk Of The Mutual Mistake.

E. The Remedy For Mutual Mistake Is Restitution, Measured By The Government's Enrichment From The Lease And Sale Of The Coal, Gas, Oil, Or Other Mineral Deposits.

**F. The Recommended Amount Of Restitution Due.**

**1. The Undisputed Amount Of Revenues Received By The Government For The Lease Or Sale Of Coal, Gas, Oil, Or Other Mineral Deposits That Existed Under The Condemned Properties In 1942-1944.**

**2. Claimants' Estimate Of Royalties Derived From Tracts 7A And 7B From 1964-1983 And 1983-2006 Is Not "Reasonably Certain."**

**3. Claimants' Estimate Of Royalties Derived From Seams #9 And #11 From TVA Coal Leases And Easements Is Not "Reasonably Certain."**

**G. Claimants' March 6, 2008 Motion To Vacate The November 24, 1998 Order Is Granted, In Part.**

**H. Claimants' March 6, 2008 Request To Modify Proposed Class Is Denied.**

**I. Claimants Are Entitled To Reasonable Attorneys Fees, Reasonable Expenses And Costs.**

**IV. CONCLUSION.**

* * *

# I. RELEVANT FACTUAL BACKGROUND.[3]

## A. Condemnation Proceedings During 1942-1944.

Early in 1942, Congressman Benjamin Vincent announced that the Government decided to condemn and take immediate possession of 10,470 acres in Union County, Kentucky and that federal negotiators would begin meeting with property owners to negotiate voluntary sales. Therefore, Government agents advised the public that:

> Farmers who are not satisfied with land prices will have the opportunity to appeal their case but will have to move from their homes during the litigation period. Part of the purchase money will be available to them during the period.

DX 182 at DOJ1933-34 (*Cantonment Families Get 13-Day Notices*, HENDERSON GLEANER–JOURNAL, Jan. 30, 1942, at 1, 8).

### 1. The February 1942 Condemnation Of 10,427.70 Acres In Union County.

On February 4, 1942, the Adjutant General's Office of the Department of War issued a directive to the Under Secretary that there was a "military necessity for the acquisition of lands to provide cantonment building areas for triangular divisions and other troops" at Morganfield, Kentucky of approximately 10,427 acres, which was estimated to cost $1,011,723. *See* JX 13; *see also* JX 14; JX 22. This land was to be "acquired by such methods as [were] to the best interests of the United States in accordance with the policies outlined [by the Department of War's Adjutant General's Office] February 7, 1942, AG 601.1 (1-21-42) MO-D-M, Subject: War Department Real Estate Policy." JX 14.

On February 14, 1942, the local U.S. District Attorney filed the first Petition, pursuant to the War Purposes Act, condemning 10,427.70 acres in Union County, Kentucky. On February 16, 1942, Deputy U.S. Marshal O. A. Denton served the first of 121 Orders to Vacate 99 condemned tracts of land. *See United States* v. *10,427.70 Acres Situated in Union County, Kentucky,* No. 74 (W.D. Ky. filed Feb. 14, 1942); *see also* DX 182 at DOJ2075, 2079, 2085 (*Condemn 10,427.70 Acres; Will Include 20,000 More*, UNION COUNTY ADVOCATE, Feb. 19, 1942; *Over Half of Cantonment Area Acquired, Manager Says*, UNION COUNTY ADVOCATE, Feb. 26, 1942; *Between 3 and 4 Hundred Tracts in Second Area*, UNION COUNTY ADVOCATE, Mar. 4, 1942). Thereafter, each of the landowners was visited by a member of the Corps of Engineers' Negotiating Team led by: Willard Ewing, Land Acquisition Manager, from Cincinnati, Ohio; J. M. Canary, Chief Negotiator, from

[3] A complete statement of facts was set forth in *Land Grantors I*, 64 Fed. Cl. at 666-86. For the convenience of congressional and panel review, a substantial portion of those facts are re-stated herein.

Hardinsburg, Kentucky;[4] Sterling Towles from Danville, Kentucky;[5] and Cosby Campbell from Dixon, Kentucky.

The landowners and their families were given until March 3, 1942 to vacate their property so that construction could begin by March 15, 1942. According to contemporaneous press accounts, this effort was not met with opposition. *See* DX 182 at DOJ2075, 2079, 2085 (*Condemn 10,427.70 Acres; Will Include 20,000 More*, UNION COUNTY ADVOCATE, Feb. 19, 1942; *Over Half of Cantonment Area Acquired, Manager Says*, UNION COUNTY ADVOCATE, Feb. 26, 1942; *Between 3 and 4 Hundred Tracts in Second Area*, UNION COUNTY ADVOCATE, Mar. 4, 1942). Approximately 85% of the owners of the 10,427.70 acres in Union County agreed to voluntary sales and to deliver to the United States "a general warranty deed conveying said land to the United States of America in fee simple, free from all encumbrances" for $1 and at the price offered by the Government land appraisal, to be paid when the United States exercised an option that would expire within 3 months." The other 15% of owners were settled after federal condemnation proceedings were initiated. *See generally* JX 205-536H.

By the beginning of December 1942, the Government negotiated a "moratorium" with the oil companies that had leases with the former landowners. *See* DX 627 (Dec. 4, 1942 letter of Eli H. Brown, Jr., United States Attorney, Western District of Kentucky). The oil companies were advised "they will not be entitled to exercise any of their rights under their leases for the duration of the war [but after] the war they will be entitled to exercise these rights." *Id.*

### 2. The March 1942 Condemnation Of 19,517 Acres In Union And Henderson Counties.

On March 7, 1942, the Adjutant General's Office notified the Under Secretary of War that military necessity required the acquisition of approximately 29,945 acres (including the 10,427.70 acres subject to the February 4, 1942 condemnation action) in the Morganfield area. The amount paid to the landowners subject to the February 4, 1942 and March 7, 1942 condemnations was estimated at $2,927,360. *See* JX 14; JX 22 at DOJ1349. On March 31, 1942, the local U.S. District

---

[4] A June 10, 1942 Report of Efficiency Rating for Chief Negotiator James M. Canary for the period January 22, 1942 to March 31, 1942 was "unsatisfactory," because his conduct "showed partiality in government dealings with public, used threatening & abusive methods of doing business, respectful to those of wealth and education, exceedingly abusive of ignorant & poverty stricken." DX 261 at PER0322-23. Canary's February 4, 1943 Report of Efficiency Rating for the period April 1, 1942–May 25, 1942 also was "unsatisfactory," because "as negotiator he used duress and threatening tactics." DX 261 at PER0324-25; *see also* CX 122 (May 25, 1979 J. Sterling Towles Aff. (former negotiator stated that "government negotiators were instructed by their superiors that if the property owners questioned whether or not they would be able to repurchase the property they were to be told that they would have the first option to repurchase the property after the war.")).

[5] *See supra* note 4.

Attorney filed a second petition under the War Purposes Act condemning 19,517 acres located in Union and Henderson counties. *See United States* v. *19,517 Acres Situated in Union and Henderson Counties*, No. 77 (W.D. Ky., filed Mar. 31, 1942).

On April 2, 1942, the Cantonment area at Morganfield, Kentucky was named Camp Breckinridge. *See* JX 16. On that date, the second group of landowners were served with notices to vacate their properties by May 18, 1942. This event sparked a protest and meeting of the landowners that took place on August 14, 1942. One of the major concerns expressed was that land prices escalated after the Government initiated the first condemnation, making it difficult for the landowners to purchase new farms in the area at the appraisal prices being offered by the Government. Over 80 landowners signed a petition stating that the Government appraisals amounted to only 50% of their properties' value, precluding their ability to purchase suitable replacement property. On April 22, 1942, a Petition was sent to President Roosevelt stating:

> We have been faced at every turn with the "take it or leave it" proposition insofar as compensation is concerned and we have been afforded no opportunity to make any speedy adjustment with the Government for a reasonable compensation for our lands. . . .
>
> We are being told in many instances by representatives of the Federal Government, that unless we accept the unreasonable offers being made by representatives of the Government as compensation for the lands we are being deprived of, that it will be years before we will be able to obtain any compensation for the property from which we have been dispossessed. In many instances, we are unable to go to the expense of getting our claims adjusted in the Courts and we think that it is unreasonable that we should be required to do so.

DX 182 at DOJ2376-77; *see also* DX 69 at DOJ1301.

The Department of the Army was charged with investigating the Petition. After an initial investigation, a public meeting was convened in Morganfield on May 14, 1942, attended by Captain Robert C. Tyler, Ohio River Division's Chief Counsel, where a majority of the landowners expressed continued dissatisfaction with the prices being offered, despite the fact that many had sold their land to the Government at a negotiated price, rather than insisting on a jury determination. Captain Tyler advised the landowners that the Department of War was concerned about learning that high pressure methods had been used to persuade some owners to sell their property.[6] Nevertheless, by May 21, 1942, over half of the landowners in the second condemnation agreed to sell at negotiated prices.

---

[6] *See supra* note 4.

Based on the results of the Tyler/Harmon Report, on May 23, 1942, President Roosevelt sent a letter to the landowners that was published in the local newspaper, advising:

> You are advised that the War Department has investigated the situation at Morganfield and reports that the appraisers assigned to the task of making impartial, unbiased appraisals for the properties being acquired were carefully selected and are believed to be eminently qualified to determine real estate values in that particular location. The appraisals have been carefully reviewed by appraisal supervisors who state that the values placed on the properties are liberal and in line with present economic conditions in the community. The fact that approximately 70% of the landowners in the entire area have now voluntarily agreed to convey their property to the government at prices based upon the appraisals appears to confirm that view.
>
> As you are aware, no citizen is required to give an option to the Government at a price which does not meet with his or her approval. In any instance where the owner does not desire to execute an option, the War Department acquires such property through condemnation proceedings, in which event the amount of the estimated compensation will be deposited in the Registry of the Federal Court, and may be withdrawn by the owner under a Court Order without prejudice to his right to contest for a higher valuation.

DX 183A at DOJ3355.

On June 29, 1942, the Secretary of War filed Declaration of Takings No. 1 to acquire 5,004.97 acres in fee simple and deposited $312,239.00 into the Registry of the United States District Court for the Western District of Kentucky ("Registry") to compensate landowners who sold their property to the Government at a negotiated price, as a result of the condemnation in *United States* v. *19,517.30 Acres*. *See* JX 264A-B.

**3. The June 1942 Condemnation Of 824 Acres In Union County.**

On June 9, 1942, the Adjutant General's Office notified the Under Secretary of War that a military necessity existed for the acquisition of 824 acres at an estimated cost of $80,600. *See* JX 22 at DOJ1349. On June 22, 1942, the U.S. District Attorney for the Western District of Kentucky filed a third Petition, pursuant to the War Purposes Act, condemning 824 acres in Union County. *See United States* v. *824 Acres in Union County*, No. 81 (W.D. Ky., filed June 22, 1942).[7]

On June 27, 1942, Declaration of Takings No. 2 was filed to acquire 2,171.16 acres in fee simple for which $219,807.00 was deposited into the Registry. These properties were subject to *United States* v. *19,517.30 Acres*. *See* JX 264C, D.

---

[7] This property was owned by 15 landowners: Marion Russell; J.E. Caton; Kathryn Caton; W.B. Caton; Ella Caton; the Nancy E. Ward Estate; A.O.S. Wilson; Hessie Adamson (two tracts); Nelson Tilley; Erlene Liggett; Roy Tilley; Ruby Key; Illoff Tilley; Henry Tilley; and W.E. Liles.

On July 6, 1942, Declaration of Takings No. 3 was filed to acquire 3,813.52 acres in fee simple for which $236,149 was deposited into the Registry. *See* JX 264E. On July 27, 1942, Declaration of Takings No. 4 was filed to acquire 3,915.72 acres in fee simple for which $253,372 was deposited into the Registry. *See* JX 264F-G. On August 27, 1942, Declaration of Takings No. 5 was filed to acquire 1,691.86 acres in fee simple for which $128,419 was deposited in the Registry. *See* JX 264H.

### 4. The October 1942 Condemnation Of 5,400 Acres In Webster County.

On October 15, 1942, an additional 5,400 acres was approved for acquisition, bringing the total to 36,199 acres at an estimated cost of $3,727,460. *See* JX 19; JX 22 at DOJ1349. On October 23, 1942, the fourth Petition was filed to condemn 5,400 acres located in northwestern Webster County. *See* JX 503 at CON3830. The largest landowner, Judge Robert L. Higginson, owned 803 acres; Mr. Nealie Tapp and his sons, Bryon, Milton, and Jesse, owned 605 acres.[8]

### 5. The January 1943 Condemnation Of 280 Acres.

In January 1943, the Government condemned 280 acres to expand an air field.[9] On April 13, 1943, Declaration of Takings No. 6 was filed to acquire 1,138.40 acres in fee simple. *See* JX 264I.

On May 20, 1943, Declaration of Takings No. 6-R was filed to acquire 433.71 acres in fee simple for which $27,320 was deposited into the Registry. *See* JX 264J. In October 1943, the Government condemned 1,072 acres near Sturgis, Kentucky for use as an air field.[10] *See* JX 536G.

### 6. The May 1943 Condemnation Of 9.4 Acres In Union County.

On May 4, 1943, the Office of the Chief of Engineers of the War Department stated there was a military necessity for the acquisition of 9.4 acres in fee for a right-of-way easement for construction

---

[8] The Government also had acquired an additional 300 acres from the Tapp family in a prior condemnation. *See United States* v. *5,400 Acres Situated in Henderson, Union, and Webster Counties*, No. 88 (W.D. Ky., filed Mar. 8, 1943); JX 504 at CON3834.

[9] The owners of this property were: Nina Sue Simpson; J.S. McKesig Estate; West Kentucky Coal Company; J.C. Welch; Ralph E. Dudley; G.T. Davis; John G. Wynns; R.E. Wynns; and Otis Caldwell. *See* JX 536H.

[10] The owners of this property were: John G. Wynn; Francis Meacham; Oliver Harley; George Davis; Ralph Dudley; Beulah Shoulders; Otis Caldwell; West Kentucky Coal Company; the F.M. Gilchrist Estate; the J.C. Welch Estate; C.W. Dunn; Cecilia Staton Sprauge; and J.S. McKeigh. *See* JX 536G.

After World War II, the Government transferred the Air Field to Union County, which became the site of the Sturgis Kentucky Municipal Airport.

and maintenance of a raw water line for a well. *See* JX 22 at DOJ1349. The estimated cost was $8,440. *Id.* This land, located in Union County, was described as "[a]gricultural land without improvements *but active mineral rights*." *Id.* (emphasis added). This appears to be the first indication that the Government was aware of the potential value of mineral rights on the condemned properties. *Compare* with JX 13 at DOJ1294; *see also* JX 14 at DOJ1296; JX 21 at DOJ1336; JX 25 at DOJ1357; JX 22 at DOJ1349.

**7. The May 1944 Condemnation Of 16.37 Acres In Union County.**

On May 12, 1944, the local U.S. District Attorney filed a fifth petition to condemn 16.37 acres, located in Union County, Kentucky. *See United States* v. *16.37 Acres Situated in Union County Kentucky*, No. 134 (W.D. Ky., filed May 12, 1944).

**B. Disposition Of Waller Young Property In 1957.**

On December 9, 1954, the Department of Defense ("DOD") declared that approximately 212.5 acres of Camp Breckinridge was excess real property. *See* JX 6 at DOJ0298 (indicating that this land was subject to an agricultural lease to Mr. Waller Young, the former owner for the term March 1, 1951–February 28, 1956).[11] On May 28, 1956, upon receiving $48,875.00, or $230 per acre,[12] GSA executed a quit claim deed to Waller Young, pursuant to the Federal Property and Administrative Services Act of 1949 (40 U.S.C. § 471, *et seq*.), and regulations and orders promulgated thereunder. *See* JX 6 at DOJ0305-06.

Although documents in the record state that this property was advertised to the general public in advance of sale and sold at public auction, in fact, none of these documents evidence that the Government advertised the availability of this specific land for purchase. *See* JX 10 at DOJ0996 (March 4, 1968 Tract Register re: Quit Claim Deed, dated 5-28-56 re: 3.30 acres sold to Waller Young for "Maintenance of Water Line," March 10, 1954 Directive, pursuant to DA ACS 5th Ind.); *see also* JX 60 at DOJ1586 ("In 1954, a 212.5-acre parcel of installation land was determined to be

---

[11] *See* JX 46 at DOJ1531 (April 16, 1957 letter from Floyd S. Bryant, Assistant Secretary of Defense to Congressman William N. Natcher, Second District of Kentucky, advising that approximately 1/3 of Camp Breckinridge or 12,000 acres was outleased for agricultural purposes); *see also* PX 272 (July 13, 1995 William Logan Newman Dep.) at 15-17 (Mr. Newman testified that he had a five-year lease on some of his property after World War II, but his lease was terminated after the Camp was revived. During 1953-1954, Newman again leased this property, but the lease expired after the Camp was designated as a summer training facility for Reserve Troops in 1955); DX 64 at DOJ1219.

[12] This was the 212.5 acres previously conveyed to the Government on March 18, 1944, following a jury determination that the fair market value of the land was $26,711.86 or $125.70 per acre, including $2,643.40 for oil and gas rights. JX 6 at DOJ0300-01; *see also* JX 10 at DOJ0957 (indicating that Waller Young sold 1,026.8 acres to the Government on April 18, 1944 for $147,663.16 or $143.80 per acre).

excess[.] After clearance with the Armed Services Committees of the Congress, (10 U.S.C. [§] 2662), the land was reported to the General Services Administration[.]"); DX 64 at DOJ1198 (indicating that the 212.5 acres were sold "following agreement with the respective Committees on Armed Services in Army Disposal Project No. 28[.]").

Although the Waller Young property was located almost in the middle of Camp Breckinridge, DOD identified this sole parcel as "excess real property." *See* PX 77a. Mr. Waller Young was the former Mayor of Morganfield.

**C. The Department Of The Interior's 1956 Discovery Of Oil And Issuance Of Oil And Gas Leases in 1957 And 1959.**

On February 14, 1946, the Chief Engineer for the Department of the Army advised Congressman Earle C. Clements, Second District of Kentucky, that:

> The Government is the owner and in possession of considerable land at each of these installations (Ohio River Ordnance Works and Camp Breckinridge, Kentucky). There has been considerable prospecting for oil in the two counties where these Government properties are located and there has been much speculation as to whether or not the Government would consider an oil lease to private interests on either or both of these installations. Under existing law [Surplus Property Act of 1944, as amended], should this land be disposed of to private interests, *the former owner would be given preference and it is my judgment since there is a prospect of this occurring there should be no separation of the surface and mineral rights.*

JX 46 at DOJ1531-32 (emphasis added).

Nevertheless, on January 2, 1948, the U.S. District Attorney instituted condemnation proceedings regarding existing oil and gas leases on real properties. *See United States* v. *Leasehold Interest In Oil and Gas Rights in 2,314.14 Acres Situated in Union, Webster, and Henderson Counties*, No. 371 (W.D. Ky., filed Jan. 2, 1948); *see also* JX 535.

On June 19, 1951, jurisdiction over all gas and oil deposits on the Camp Breckinridge site was transferred from DOD to the Department of the Interior ("DOI"), pursuant to an April 24, 1943 Executive Order No. 9337, to protect the Government's interests from loss due to "drainage or threatened drainage [of oil and gas.]" *See* JX 4 (16 FED. REG. 6132-35 (June 26, 1951)).

Sometime in May 1954, DOI's Office of Geological Survey identified potentially significant oil and gas deposits present under the Camp Breckinridge lands. *See* DX 40 at DOJ0311. In August 1956, that Office confirmed that oil and gas deposits under Camp Breckinridge were being lost due to "drainage," caused by wells adjacent to the Camp's boundaries. *See id.* at DOJ0311. On or about March 15, 1957, DOI announced the intention to issue "protective leases" to prevent those oil and gas deposits from being drained. *See* DX 158 at DOJ1527.

On March 15, 1957, Dr. W. H. Puryear of Morganfield, Kentucky and Judge A. G. Pritchett of Henderson, Kentucky wrote a letter to DOI's Director of the Bureau of Land Management to protest the proposed protective leases of oil "underlying the lands owned by us until same were condemned by the United States" and to demand the right to "receive our proportionate part of the royalty oil that is produced and sold from the lands formerly owned by us until taken from us by the Government for military purposes. . . . Will you kindly acknowledge the filing of this protest so that we may protect our rights in property that we believe when it ceases to be used for military purposes or is classified as excess or surplus land, that we should be given preference in repurchasing it from your Department or some other branch of the Government[?]" DX 158 at DOJ1527-28.

Less than a month later, on April 22, 1957, without a formal hearing, DOI's Director of the Bureau of Land Management issued a "Decision" dismissing the "Protest." *See* DX 40; *see also* DX 182A at DOJ2699 (Mar. 22, 1957 letter from the President of Felmont Oil to Bureau of Land Management requesting that the 30-day appeal period be eliminated).

The April 22, 1957 Decision conceded that:

> *Lands acquired by the Government for use for military purposes,* such as the Camp Breckinridge area, *are not subject to lease for development of the mineral deposits therein under the general authority contained in the Acquired Lands Mineral Leasing Act of August 7, 1947* (61 Stat. 913, 30 U.S.C. [§] 351) which is administered by this Department.

DX 40 at DOJ0310 (emphasis added).

Nevertheless, the DOI's Director of the Bureau of Land Management, without a hearing, concluded that:

> the Attorney General has ruled that, in those cases where lands are being drained through operations on adjoining privately-owned lands, there is implied authority for the United States to take such action as may be necessary to adequately protect itself from loss by reason of the drainage (40 Op. Atty. Gen. 41).
>
> Although this protective action may be taken by the branch of the Defense Department which acquired the land, jurisdiction over the oil and gas deposits for that purpose may be transferred to another department or agency if it is deemed advisable to do so. Jurisdiction over the oil and gas deposits underlying the Camp Breckinridge area, comprising a total of 35,839.88 acres, was transferred to this Department by Public Land Order No. 729 dated June 19, 1951, under the express condition that the Department of the Army shall exercise primary jurisdiction over these lands for military purposes.
>
> No steps have heretofore been taken to offer any of the lands for oil and gas leasing because of the intensified military use of the camp area which commenced in September 1950. Investigation of the drainage situation by the Geological Survey of

> this Department in May 1954 disclosed that the threat of drainage from oil wells in the South Morganfield oil field had been diminished to a considerable extent, if not entirely eliminated. Consequently, further action on this matter was then suspended pending completion of a study by the Army of its need for the land for military purposes.
>
> The situation with respect to drainage of the oil and gas deposits at Camp Breckinridge remained unchanged until August 1956, when the Geological Survey reported that a total of 14 wells had been completed during 1956 in the Dixie, West Field or Abell area of Henderson County, Kentucky, adjacent to the east boundary of the camp. These wells were producing from the First and Second Pennsylvania sands at an approximate depth of 975 feet, except for one well producing from the Cypress sand of the Mississippian age at a depth of 2,260 feet. Initial daily production capacities of the wells ranged from about 25 to 120 barrels of oil, with production at that time from 8 wells being 168 barrels per day. The camp is offset directly by 5 of these wells. In order to protect the United States against loss by reason of the drainage of the oil and gas deposits occurring from the Camp Breckinridge lands, the tract of 190 acres on the east boundary of the camp was offered for leasing on March 20, 1957.
>
> The jurisdiction over the oil and gas deposits now being vested in the Department of the Interior, this Department has the legal obligation to take such measures as may be necessary to protect the interests of the United States from loss through the extensive drainage of these deposits presently occurring from the Camp Breckinridge lands.
>
> Inasmuch as exclusive jurisdiction over these lands is vested in the Department of the Army, the future disposition of such lands rests with that agency and in the event the lands should be declared surplus, the disposition of the minerals therein will be governed by the law in effect at that time.
>
> In view of the foregoing circumstances, and in the absence of legislation, this Department would be remiss in its duty of protecting the Government property and the public interests from loss by reason of the drainage of the oil and gas deposits in the Camp Breckinridge lands if the issuance of an oil and gas lease for this 190-acre tract were withheld. Accordingly, the protests against the leasing of this land are hereby dismissed.

*Id.* at DOJ0310-12. There is no record of whether the former landowners filed any appeal or collateral attack of DOI's decision in federal court.

On May 1, 1957, the Government entered into a lease, KYBLM-A-044315, with Felmont Oil Corporation of Owensboro, Kentucky ("Felmont Oil") for oil and gas underlying 190 acres of Camp Breckinridge. *See* DX 183A (Ex. 73) at DOJ3440; *see also* Gov't May 26, 2004 Answer to Interrogatory No. 8 at 12. This lease indicates that it was subject to prior leases with [Judge] Ashley

G. Pritchett and Willard Greenwell who had occupied the land for "agricultural and grazing purposes." DX 183A (Ex. 73) at DOJ3442.

The following map shows the 190 acres leased by Felmont Oil.




DX 183A (Ex. 73) at DOJ3441.

The Felmont Oil lease produced 611,235 barrels of crude from August 6, 1957–April 30, 1964, during which period the Government received $272,883 in royalty payments and a "bonus" of $432,236. *See* DX 183A (Ex. 80) at DOJ3569; *see also* DX 182A at DOJ2699.

On December 1, 1959, the Government entered into a second lease, KYBLM-A-050213, with Kingwood Oil Company ("Kingwood Oil") for oil and gas underlying 700 acres of Camp Breckinridge. *See* DX 183 (Ex. 74) at DOJ3451; *see also* Gov't May 26, 2004 Answer to Interrogatory No. 8. This lease was subject to prior leases with Mark Greenwell for "agricultural and grazing purposes" that expired on October 21, 1959. DX 183 (Ex. 74) at DOJ3452.

The following map shows the 700 acres leased by Kingwood Oil.




DX 183 (Ex. 74) at DOJ3461.

From January 19, 1960–April 30, 1964, the Kingwood Oil lease produced 934,498 barrels of crude oil, during which time the Government received 15% of the gross production in royalties or $418,443 and a "bonus" of $708,253. *See* DX 183 (Ex. 80) at DOJ3569.

### D. The Closure and Disposition Of Camp Breckinridge.

On March 14, 1946, certain housing facilities at Camp Breckinridge were declared surplus property. *See* JX 27. On January 16, 1948, the United States Housing and Home Finance Agency transferred other facilities to the Department of Army. *See* JX 30. On July 15, 1948, however, Camp Breckinridge was returned to active status, because of the onset of the Korean War. *See* JX 31; *see also* JX 32; JX 37. By the fall of 1949, however, some of the land at Camp Breckinridge was offered to the former landowners to farm, but only on a five-year lease. *See, e.g.,* DX 643; CX 272 (July 13, 1995 Newman Dep. at 15-17; Tilley Dep. at 39-40). After the Korean War ended in 1954, Army Reserve and National Guard units continued to train on the site until 1959.

On October 31, 1962 and November 2, 1962, Army Disposal Report No. 2 was submitted to the United States Senate and United States House of Representatives Armed Services Committees, respectively, pursuant to 10 U.S.C. § 2662. *See* JX 58 at DOJ1580; *see also* DX 64 at DOJ1179, 1198-99 (Disposal Report); DX 77 at DOJ3463; JX 7; JX 60 at DOJ1586. In December 1962, after both Committees approved the Disposal Report, DOD issued a Report of Excess Real Property that was forwarded to GSA for implementation, in a manner consistent with the "best interests" of the Government. *See* Surplus Property Act, Section 502, 50 U.S.C. §§ 1611-46 (1944).

#### 1. The Sale Of Coal, Gas, Oil, And Other Mineral Rights In 1965.

On January 5, 1965, GSA issued Invitations for (Sealed) Bids on all mineral rights on approximately 36,000 acres comprising Camp Breckinridge. *See* JX 47 at DOJ1535-36; JX 58 at DOJ1581; *see also* DX 183 at DOJ2789 (July 21, 2004 Brigham Direct at 34) (reporting that the January 7, 1965 edition of the UNION COUNTY ADVOCATE stated that more than 500 sealed bids were submitted to GSA for these rights).

The GSA advertisement read as follows:

**POTENTIAL UNDERGROUND WEALTH!**

**U.S. GOVERNMENT SALE**

**FULL SUB-SURFACE INTEREST**

**MINERAL RIGHTS**

**COAL, OIL, GAS AND ALL OTHER MINERALS**

**CAMP BRECKENRIDGE**

**1 ½ MILES EAST OF MORGANFIELD, KENTUCKY**

**GSA DISPOSAL NO. [ILLEGIBLE]**

**TO BE SOLD BY SEALED BID**

**BID OPENING THURSDAY, APRIL 15, 1965 (3:00 P.M.-C.S.T.)**

This government property for sale is an unusually fine opportunity for the investor. Look at the facts.

**APPROXIMATELY 35,000 ACRES**–Divided into 10 tracts.

**EXISTING PRODUCING LEASES INCLUDED IN MINERAL RICH COUNTRY**–This northwestern Kentucky property off U.S. Highway 60 is located in Henderson, Union and Webster Counties. Here is a strategic exploratory area surrounded by the following pools: Little Dixie, Sebree, Niagara, Baskett, Henderson, Poole. The property is also in the heart of the western Kentucky coal fields.

**AND–A TOP WORK AREA**–The area offers numerous advantages: ample skilled and unskilled labor; bus, truck and rail; approximately seven miles from Ohio River port; full educational system plus four colleges nearby.

**BIDDING**–The mineral rights are being offered in tracts and not by acreage. The following items will be offered in each tract: Item A–coal rights only; Item B–oil, gas and all other minerals, except coal; Item C–all mineral rights. Bids may be submitted on individual items and tracts or any combination of items and tracts. Bids must be submitted on bid forms provided by General Services Administration.

CX 244.

On January 14, 1965, an industry publication, "Scout Check, Inc.," alerted subscribers that, because "so many requests for maps and information on the Government sale of Camp Breckinridge" had been received, the publication was featuring "a map of the camp divided into Tracts as they will be sold and showing the surrounding production and the Rough Creek Fault system, making this piece of oil property one of the most attractive in the country to oil and coal prospectors." Court Ex. 4 at 1. This report advised that Camp Breckinridge was divided into ten tracts, excluding Tract #1 and the Barracks area from sale. *Id*. Although the mineral rights were to be sold, the surface rights were reserved for sale at a later date. *Id.*

Regarding the upcoming mineral rights sale, it was reported that:

the [C]amp has tremendous possibilities for oil being found under it. All of the fields around the [C]amp have been discovered since the [C]amp was built. In 1956, the

> Dixie West Pool was discovered in the southwest quarter of 0-22, in Pennsylvanian and Cypress sands, and has accumulated over 4 ½ million barrels of oil to date with the field still producing over 80,000 barrels per month. Felmont Oil (now owned by Cities Service Oil) leased 190 acres of the camp from the Government and has produced over 718,000 barrels from 18 wells, still producing 12,800 barrels per month. (See Tract 7-B)[.]
>
> In late 1959, Kingwood Oil leased an additional 700 acres from the Government (see Tract 7-A) and has produced over 1,021,000 barrels to date, still making 10,600 barrels per month from 14 wells. Kingwood paid a bonus of $708,000.00 for their acreage and Felmont paid $432,000.00 to the Government. . . .
>
> Other fields around the [C]amp that will probably be extended are the Morganfield South Pool, discovered in 1948, accumulating 7,250,000 barrels to date, producing 40,500 barrels per month. This field lies on the west side of the reservation, just north of the Rough Creek Fault, and will probably be extended well into Tract 2, along the fault zone. Four miles straight east of this field, back in 1930, there were several holes drilled in the northwest corner of 1-N-20 that had shows of oil in the Pennsylvanian, with one or two of them producing for a short time. There will probably be oil found somewhere between these dry holes and the Morganfield South production.

*Id*.

The following map shows the 10 tracts of coal, gas, oil, and other mineral rights to be awarded at the April 15, 1965 auction.




Court Ex. 3I at 12; Court Ex. 4 at 2.

All of the bids were to be sealed, forwarded with a cash deposit, and received by April 15, 1965 at 3:00 p.m. at the GSA's Business Center in Chicago. *See* CX 244.[13]

On June 11, 1965, Public Land Order No. 729 (of June 19, 1951) was revoked by Public Land Order No. 3706, pursuant to Executive Order No. 10355 (17 FED. REG. 4831) and jurisdiction over Camp Breckinridge's oil and gas rights was transferred from DOI to GSA. *See* DX 183 (Ex. 72) at DOJ3437.

On June 18, 1965, GSA Administrator Lawson B. Knott, Jr., advised Congressman Edward Gurney that as a result of the April 15, 1965 offer to sell coal, gas, oil, or other mineral rights, the GSA received "high bids" of $31,982,547.70. *See* JX 48 at DOJ1537. In fact, the Tennessee Valley Authority ("TVA") alone was awarded coal rights on 30,590 acres as "the highest bidder [of approximately $7,410,000] in a 1965 sale conducted by the General Services Administration." *See* WALL ST. J. (Feb. 11, 1969) at 24; *see also* DX 183 at DOJ2789; DX 183 (Ex. 83) at DOJ3576-77; DX 183 (Ex. 84) at DOJ3579. It appears that TVA's bid was quite a bargain since only four years later - - on or about February 11, 1969 - - TVA awarded Peabody Coal Co. a lease to mine these coal reserves at Camp Breckinridge for $400 million. *See* WALL ST. J. (Feb. 11, 1969) at 24.

**2. The Sale Of Coal Rights In 1967.**

On August 24, 1967, GSA announced that coal rights on 4,800 acres consisting of 3,930 acres (Tract 1), 700 acres (Tract 7A) and 190 acres (Tract 7B) would be subject to a sealed bid auction to be held in Chicago on September 29, 1967. *See* Court Ex. 3A (Aug. 24, 1967 GSA News Release); *see also* Court Ex. 3I.

It appears, however, that GSA sent "invitations to bid" only to selected entities. Of further interest is a caveat on the "Notice to Prospective Bidders," which stated:

> *Under no circumstances* should this invitation be given to any other person or firm for use in submitting a bid. The General Services Administration, Region 5, maintains and furnishes copies of this Invitation to any parties interested in submitting a bid. Interested parties should contact the Business Service Center for Invitation copies and information desired.
>
> The Business Service Center maintains a record of the names and addresses of all parties issued copies of this Invitation to Bid[.]

Court Ex. 3I at 2.

The sealed bids were not opened in the local community, but at GSA's Chicago office. *Id.*

[13] It is not clear whether GSA had authority on April 15, 1965 to award bids on the oil and gas rights at issue, since the Government did not produce documents establishing that authority; however, the court assumes the relevant sales documents were executed after June 11, 1965.

**a.) Tract No. 1.**

The surface area of Tract No. 1 was described as a portion of land conveyed to the Commonwealth of Kentucky for park, recreational, and wildlife conservation purposes with a remainder to Allen D. Freer. *Id.* (Invitation for Bids at 5).

The description of Tract No. 1 indicates that the oil, gas, and other mineral rights (except coal), located in Webster and Union Counties, previously were conveyed to the Sun Oil Company and Texas Gas Exploration Corporation by recorded deed. *Id.*

**b.) Tract No. 7A.**

The surface area of Tract No. 7A, located in Union and Henderson counties, was described as "contained within portions of surface parcels" conveyed in: Parcel No. 8A in Union County to Richard L. Maloney and Patrick A Maloney. Court Ex. 3I (Invitation for Bids at 5). Parcel No. 9 in Henderson County was conveyed to the Gibson Livestock Company. *Id.* Parcel No. 9A in Henderson County was conveyed to Aaron G. Pritchett and Mary Edith Pritchett. *Id.* Parcel No. 10, located in Union, Henderson, and Webster Counties, was conveyed to James C. Bickett, Margaret Agnes Bickett, Edmond Bickett, and Lula Margaret Bickett. *Id.* at 6.

Oil, gas, and other mineral rights (except coal) on Tract No. 7A were reported as subject to Federal Lease BLM-A-050213 with the Kingwood Oil Company. *Id*.

**c.) Tract No. 7B.**

The surface area of Tract No. 7B, a portion of surface Parcel No. 9A, located in Henderson County, was conveyed to Aaron G. Pritchett and Mary Edith Pritchett by warranty deed. *See* Court Ex. 3I (Invitation for Bids at 6).

Oil, gas, and other mineral rights (except coal) located in Henderson County, pursuant to Federal Lease BLM-A-044315, were reported as subject to a prior lease with the Felmont Corporation of Owensboro, Kentucky. *Id.*

The following map shows the location of Tract 1, Tract 7A, and Tract 7B.




Court Ex. 3I (Ex. B).

**E. The Enactment Of S. 794 In 1993.**

On April 15, 1965, Mr. Cyrus Higginson, on behalf of himself and "all other former landowners, or heirs, successors, and assigns thereof, of 36,000 acres, namely Camp Breckinridge, in Union, Henderson and Webster Counties, Kentucky" filed a class action in the United States District Court for the Western District of Kentucky, Owensboro Division. *See* DX 64 at DOJ1069. An April 29, 1965 Amended Complaint set forth claims under the Fifth and Fourteenth Amendments of the United States Constitution and violations of the Surplus Property Act of 1944, both as to land and mineral rights. *See id*. at DOJ1080-85. At the conclusion of a July 30, 1965 trial, the Chief Judge of the United States District Court for the Western District of Kentucky delivered an oral decision and entered an Order sustaining the Government's motion to dismiss. DX 64 at DOJ1209. A written order was issued on August 2, 1965. *Id*.; *see also id.* at DOJ1247 (Sept. 9, 1965 Final Order).

On September 28, 1967, the United States Court of Appeals for the Sixth Circuit, in a *per curiam* opinion, held that since the Surplus Property Act was repealed in 1949, "13 years before Camp Breckenridge was declared surplus and 16 years prior to commencement of this action[,] [o]bviously no right could accrue to plaintiff thereunder." *Higginson* v. *United States*, 384 F.2d 504, 506 (6th Cir. 1967); *see also Land Grantors I*, 64 Fed. Cl. at 680-81.

Sometime in 1968, after the United States Supreme Court denied *certiorari* in the *Higginson* case, a group of former landowners and/or their heirs formed the Breckinridge Land Committee and turned to Congress to seek redress.[14] *Compare* Higginson Dep. at 285, 304, 328 *and* CX 267 (Murphy Dep.) at 13-14, 18 *with* CX 53.

On or about June 6, 1973, the first specific request for a Senate inquiry of this matter appears to have been directed to the GSA by Senator Walter D. Huddleston. *See* CX 22 (Ex. B22 to Claimants' Dec. 14, 2004 Motion Regarding Trial Exhibits); *see also* JX 57 at DOJ1565 (Apr. 17, 1974 letter from Senator Marlow W. Cook to Mrs. Ruby [Higginson] Au.). The record does not reflect the result of the GSA inquiry.

Sometime in 1978, the Breckinridge Land Committee garnered the support of a non-profit environmental public interest organization, known as the Kentucky River Coalition ("KRC"). A graduate of Eastern Kentucky University in journalism, with an interest in environmental issues, was assigned to interview former landowners and government representatives and search for records that might support the former landowners' grievances. *See* CX 267 (Murphy Dep. at 9, 13, 15, 16, 17, 21, 22, 24). KRC assisted in locating many of the former landowners who signed Affidavits to preserve their knowledge of the 1942-1944 condemnations, and on April 6, 1979 a Report was

[14] *See, e.g.*, JX 58-59 (referencing letters from Mrs. Ruby Higginson Au in 1976, 1978, and 1979 to Congressman Carroll Hubbard); Court Ex. 3A (referencing Congressman Gene Snyder forwarding letter of Mrs. Ruby Higginson Au to Paul E. Goulding, Deputy Administrator, GSA).

forwarded to Senator Wendell Ford, Senator Walter Huddleston, Congressman William H. Natcher, and Congressman Carroll Hubbard. *See* CX 11.

In 1983, at the request of Senator Wendell A. Ford, Senator Charles E. Grassley, then Chairman of the Administrative Practice and Procedure Subcommittee of the United States Senate, forwarded S. 1104, "For the relief of the grantors of certain land in Henderson, Union, and Webster Counties, Kentucky" to the Senate Judiciary Committee. The Department of the Army, however, opposed enactment of S. 1104 and no further congressional action took place at that time. *See* JX 60 at DOJ1584-88.

On January 6, 1987, Senator Ford introduced a bill, substantially similar to S. 1104, that also failed to be reported out of the United States Senate. *See* 133 CONG. REC. S12183-01. Subsequent efforts again failed in 1989 and 1991. *See* 135 CONG. REC. S9366-01 (Aug. 1, 1989); 137 CONG. REC. S12183-01 (Aug. 2, 1991); *see also* CX 36 (Ex. B) (Oct. 23, 1981 letter from Senator Wendell H. Ford to Senator Charles E. Grassley, Chairman, Senate Subcommittee on Agency Administration); CX 37 (Ex. B) (Jan. 31, 1980 letter from Senator Walter D. Huddleston to Senator Edward M. Kennedy, Chairman, Senate Judiciary Committee).

On April 19, 1993, Senator Ford introduced S. 794, "a bill for the relief of land grantors in Henderson, Union, and Webster Counties, Kentucky, and their heirs." *See* S. 794, 103d Cong. (1993). On October 19, 1993, S. 794, together with S. Res. 98 (Resolution, Calendar No. 204), 103d Congress, 1st Session (Sept. 20, 1993) successfully were reported out of the United States Senate and forwarded as a congressional reference to the Honorable Loren A. Smith, then the Chief Judge of the United States Court of Federal Claims.

S. 794 provided, in relevant part:

> Section 1. Authorization.
>
> The Secretary of the Treasury is authorized and directed to pay, out of money not otherwise appropriated, to the individuals (and in any case in which such individual is deceased, the heirs of such individual) who sold their land in Henderson, Union, and Webster Counties, Kentucky, to the United States Government under threat of condemnation in order to provide the 35,684.99 acres necessary for the military training camp known as Camp Breckinridge, the sum of $_______, such sum being in full satisfaction of all claims by such individuals against the United States arising out of such sale.
>
> Section 2. Reason for Relief.
>
> The individuals described in Section 1 assert that they were–
>
> (1) promised they would be given priority to repurchase land sold by them if sold by the United States Government; and

(2) paid less than reasonable value due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights.

S. 794, 103d Cong. (1993).

S. Res. 98 directed the Chief Judge to "proceed . . . in accordance with the provisions of sections 1492 and 2509 of title 28, United States Code, and report back to the Senate, at the earliest practicable date, giving such findings of fact and conclusions that are sufficient to inform Congress of the amount, if any, legally or equitably due from the United States to the claimants individually."

## II. RELEVANT PROCEDURAL HISTORY.[15]

On December 14, 2006, a Second Interim Report and Memorandum Opinion was issued determining "that the interests of justice require deferral of a final disposition in this case until the *en banc* decision in [*Kirkendall* v. *Dep't of the Army*, 412 F.3d 1273, 1275-78 (Fed. Cir. 2005) (holding that claims under the Veterans Employment Opportunities Act of 1998, 5 U.S.C. § 3330a(1)(a)(A), may be equitably tolled)] is issued and final." *See Land Grantors III*, 74 Fed. Cl. at 525. The court also ordered the parties "to inform the court, no later than January 31, 2007, whether they consent to the designation of Mr. Fred F. Fielding as a Mediator in this case," and to relay "an appropriate time period for the court to stay this proceeding to ascertain whether a settlement may be achieved." *Id.* at 526. On January 9, 2007, however, Mr. Fielding was appointed to serve as Counsel to the President of the United States.

On February 26, 2007, a petition for certiorari was filed in *John R. Sand & Gravel Co.* v. *United States*, 457 F.3d 1345 (Fed. Cir. 2006) (holding that 28 U.S.C. § 2501 is jurisdictional and may not be waived). *See* Petition for Writ of Certiorari, *John R. Sand & Gravel Co.* v. *United States*, No. 061164, 2007 WL 579742 (U.S. Feb. 26, 2007).

In light of these developments, on February 28, 2007, the court entered an Order, pursuant to RCFC Appendix H, appointing Justice Sandra Day O'Connor to serve as a Mediator, for a term of 120 days, to commence on March 1, 2007, and ordering the parties to provide the court with a copy of any agreement reached or a status report by July 9, 2007. On that same date, the court issued an Order severing the claims in the October 3, 2005 Second Amended Complaint, asserted under 28 U.S.C. § 1491, from those asserted under 28 U.S.C. §§ 1492, 2509, and the Clerk of Court assigned a new docket number (Case No. 93-6481L) for claims asserted under 28 U.S.C. § 1491.

---

[15] The procedural history of this proceeding from January 12, 1994 until August 15, 2003, the date the undersigned was assigned to this matter, and proceedings from August 15, 2003 until issuance of the April 1, 2005 Interim Report And Memorandum Opinion, is set forth in detail in *Land Grantors I*, 64 Fed. Cl. at 685-88.

The procedural history of this proceeding from April 1, 2005 to December 14, 2006 is set forth in *Land Grantors III*, 74 Fed. Cl. at 521-23.

On May 18, 2007, Claimants filed a Notice Of Withdrawal From Mediation, advising the court that settlement negotiations had broken down and that the parties' positions were irreconcilable. On May 29, 2007, the Government filed a Response requesting that the court stay the congressional reference claims and resolve the Tucker Act claims. On that same date, the United States Supreme Court granted the petition for certiorari in *John R. Sand & Gravel Co*. *See John R. Sand & Gravel Co.* v. *United States*, 127 S. Ct. 2877 (2007) (granting petition for writ of certiorari).

On June 27, 2007, the court convened a telephone status conference to ascertain whether to enter a final judgment in the pending Tucker Act case or to enter a Final Report in the congressional reference. On July 6, 2007, Claimants filed a Response, advising the court that they were withdrawing their earlier request that the court stay the Tucker Act case and instead requested resolution of any outstanding issues regarding those pending claims and final judgment.

On July 31, 2007, a Third Interim Report, Memorandum Opinion, And Order was issued, denying the Government's October 21, 2005 Objection to the filing of Claimants' Second Amended Complaint, but granting the Government's request to file a Motion To Dismiss in Case No. 93-6481L. *See Land Grantors IV*, 77 Fed. Cl. at 687. The Government was instructed to file a Motion To Dismiss in Case No. 93-6481L and any other dispositive motions on the merits, no later than October 1, 2007. *Id*.

On October 1, 2007, the Government filed a Motion For Judgment On The Pleadings, Or, In The Alternative, Motion For Judgment On The Record, together with a supporting Memorandum, in Case No. 93-6481L. On December 14, 2007, Claimants filed a Response.

On January 8, 2008, the United States Supreme Court held that the statute of limitations governing claims filed under 28 U.S.C. § 2501 is "absolute . . . forbidding a court to consider whether certain equitable considerations warrant extending a limitations period. As convenient shorthand, the Court has sometimes referred to the time limits in such statutes as 'jurisdictional.'" *John R. Sand & Gravel Co.*, 128 S. Ct. at 753 (internal citations omitted). Accordingly, on January 10, 2008, a Memorandum Opinion And Final Judgment was promptly issued, dismissing Case No. 93-6481L as barred by 28 U.S.C. § 2501. *See Land Grantors V*, 80 Fed. Cl. at 196-97. The stay on Reference No. 93-648X was lifted and the parties were advised that a Final Report would issue on or before April 14, 2008.

On March 6, 2008, Claimants filed a Motion To Vacate a November 24, 1998 Order, together with an Exhibit ("Ex. A"), asserting this decade-old Order improperly limited the scope of Claimants who would be entitled to compensation. On March 24, 2008, the Government filed an Opposition ("Gov't Opp. Claimants' Mot."). On April 7, 2008, Claimants filed a Reply. To fully evaluate these recent findings, the issuance date of the Final Report was extended five days to April 18, 2008.

## III. DISCUSSION.

### A. Jurisdiction.

Congress enacted 28 U.S.C. § 2509 to authorize the United States Court of Federal Claims "to determine the facts, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy . . . . [a]nd inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount[.]" 28 U.S.C. § 2509(c).

In this case, the Second Amended Complaint seeks the court's exercise of jurisdiction under both 28 U.S.C. § 1492 and 28 U.S.C. § 2509(c). *See* Sec. Amend. Compl. ¶ 1 at 26. Therefore, the court has determined that the Second Amended Complaint sets forth the requisite elements of a claim for mutual mistake and entitlement to restitution. *Id.* ¶¶ 32-40 ("Mutual Mistake Claim For Restitution").

### B. Standing.

To establish injury in fact, a plaintiff must have suffered: "an invasion of a legally protected interest which is (a) concrete and particularized, *and* (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (emphasis added) (internal citations omitted).

In this case, Claimants alleged "legally protected interests" in coal, gas, oil, and other mineral rights, that were mistakenly subject to the contracts entered into with the Government during the period 1942-1944 and subsequently invaded by lease and sale of that property. *See Tenn. Elec. Power Co.* v. *Tenn. Valley Auth.*, 306 U.S. 118, 137 (1939) (holding that a claim based on the invasion of a legal right includes "one of property [and] one arising out of contract"); *cf. U.S. Trust Co. of N.Y.* v. *New Jersey*, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); *Cienega Gardens* v. *United States*, 331 F.3d 1319, 1328-31 (Fed. Cir. 2003) (same).

The burden on Claimants is to evidence "specific facts," establishing that a recovery is "concrete" and "particularized." *See Lujan*, 504 U.S. at 560-61. Both of these standing requirements have been met. *See Land Grantors I*, 64 Fed. Cl. at 696.

### C. Standard of Review.

The United States Court of Federal Claims has held that:

> the words 'legal claim' as used in the congressional reference statute imply no special meaning beyond the conventional understanding of that term: a claim based on the

invasion of a legal right, that is 'one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege.'

*Spalding & Son, Inc*. v. *United States*, 28 Fed. Cl. 242, 247 (1993) (quoting *Tenn. Elec. Power Co.*, 306 U.S. at 137-38).

The statute authorizing a congressional reference, 28 U.S.C. § 2509(c), also requires that the hearing officer determine "whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy." 28 U.S.C. § 2509(c). The inquiry is "whether the bar should be lifted only with respect to legal claims[.]" *Inslaw, Inc*. v. *United States*, 39 Fed. Cl. 307, 328 (1997). The bar may be lifted if there is "good cause." *See Kanehl* v. *United States*, 38 Fed. Cl. 89, 104 (1997). Good cause may be found where: "'the government's administrative consideration of the claim was slipshod and desultory, thereby contributing to the delay which caused the damage; where the claimant has relied on Government advice to his detriment; where he was not sleeping on his rights because justifiably relying on others; where the Government has been unjustly enriched; and where the failure to proceed in a timely fashion was the result of incapacity.'" *Id*. (citing *Neva Vera Barnes McQuown* v. *United States*, 199 Ct. Cl. 858, 874 (1972) (quoting M.T. Bennett, *Private Claims and Congressional References*, H. Comm. Print, 90th Cong., 2d Sess. 10 (1968))).

Although the congressional reference statute, 28 U.S.C. § 2509, authorizes the hearing officer to recommend whether the statute of limitations bar against a legal claim should be lifted for "good cause," in light of the United States Supreme Court's recent decision in *John R. Sand*, the vitality of this option, albeit under a different statute, is uncertain. *See John R. Sand & Gravel Co.*, 128 S. Ct. at 753 (holding that the six year statute of limitations in 28 U.S.C. § 2501 may not be waived). That issue does not need resolution in this reference, since Claimants are entitled to monetary relief from Congress arising out of an equitable claim, if the United States Court of Federal Claims determines that there has been "some unjustified governmental act that caused damage to the claimants." *Cal. Canners & Growers Ass'n* v. *United States*, 9 Cl. Ct. 774, 785 (1986) (internal citations omitted). The qualitative measure of an equitable claim requires that claimants establish a wrongful or negligent act. *See Banfi Prods. Corp*. v. *United States*, 40 Fed. Cl. 107, 121-22 (1997) (quoting *Spalding*, 28 Fed. Cl. at 250) ("Absent a finding of negligence or wrongdoing on the part of [the Government], any award . . . would be a gratuity.").

### D. Claimants' Agreement To Sell Their Land In 1942-1944 Was Based On A Mutual Mistake.

The RESTATEMENT (SECOND) OF CONTRACTS (1981) ("RESTATEMENT") § 152(2) at 385 states: "In determining whether the mistake has a material effect on the agreed exchange of performances, account is taken of any relief by way of . . . restitution, or otherwise." A mistake is defined as an "erroneous belief . . . . The belief need not be an articulated one, and a party may have a belief as to a fact when he merely makes an assumption with respect to it, without being aware of alternatives. . . . [T]he erroneous belief must relate to the facts as they exist at the time of the making of the contract." *Id.* § 151 at 383. Therefore, "[w]here a mistake of both parties at the time a

contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, [relief may be awarded to the] adversely affected party[,] unless he bears the risk of the mistake[.]" *Id.* § 152(1) at 385; *see also* E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS (3d ed. 2004) ("FARNSWORTH") § 9.3 at 595 ("A mutual mistake occurs when both parties are under substantially the same erroneous perception as to the facts.").

The United States Court of Appeals for the Federal Circuit has adopted this test. *See Dairyland Power Co-Op* v. *United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) ("To establish a mutual mistake of fact, [the plaintiff] must show that: (1) the parties to the contract were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party seeking [relief].") (citing *Atlas Corp.* v. *United States*, 895 F.2d 745, 758 (Fed. Cir. 1990)).

**1. The "Basic Assumption" On Which The Claimants Agreed To Sell Their Land Was That No Coal, Gas, Oil, Or Other Mineral Deposits Existed Under The Condemned Properties In 1942-1944 That Would Support Exploration Or Operation.**

The "basic assumption" of fact on which the parties entered into contracts in 1942-1944 was that no coal, gas, oil, or other mineral deposits existed under the condemned properties that would support exploration or operation at the time of sale.[16]

---

[16] *See* DX 183 (Direct Testimony of Government's Expert Dr. Jay L. Brigham) at 15 (reporting that "geologists [in 1942-1943] were studying the region's oil resources, although actual drilling and production were minimal."); *see also id.* at 13-14 (reporting that in Willard Rouse Jillson, *The Geology of Union County* (1943), the existence of eight well-defined oil pools located on a map of Union County was noted, but none were within the boundaries of Camp Breckinridge; however, seven "dry holes" were identified); *Id.* at 14 (the Kentucky Oil and Gas Association 1942 Report described that: four wells in Webster County produced a total of 7,075 barrels annually or an average of 4.8 barrels a day; and 176 wells in Henderson County produced 358,408 barrels annually or an average 5.5 barrels per day); *Id.* at Ex. 15 at DOJ3006-07 (Kentucky Oil and Gas Association, *A Report on The Conditions of the Oil Industry in the State of Kentucky* (1942) at 10-11 submitted to Harold Ickes, Petroleum Coordinator for National Defense, and Leon Henderson, Administrator, Office of Price Administration); *Id.* at Ex. 82 (April 26, 1965 UNION COUNTY ADVOCATE reporting that "[a]t the time (1941-1943) there had been little or no exploration of what was under the surface of the ground[.]"); *see also* DX 182 (Direct Testimony of Government's expert Dr. Johnson) at DOJ1853-54 (reporting that: Ashland Oil drilled a well in May 1943 on the C.T. Newman farm 2.5 miles west of Morganfield, that produced 102 barrels per day; a well was drilled on the Russelburg Farm in Hitesville 3 miles north of Waverly, producing 30 barrels per hour; and Henderson County produced 356,085 barrels in January 1943, but characterizing the production as "minuscule compared with the gushers of Texas and Oklahoma[.]").

The purchase options issued by the Government evidence this "basic assumption," since they specifically excluded "all oil and gas leases of record that are still in force, also except all coal and mineral rights heretofore conveyed if any." *See* DX 183 (Direct Testimony of Government's Expert Dr. Jay L. Brigham) (Ex. 46) at DOJ3132. In addition, the Government required two negotiators from the Department of Real Estate to attest in a Certificate of Inspection and Possession for each condemned property that:

> to the best of my information and belief after diligent inquiry and physical inspection of said premises there is no evidence whatever of any . . . exploration or operations whatever for the development of coal, oil, gas or other minerals on said lands[.]

DX 541 at CHI-002-A015-0015 (cited in Gov't Pre-Trial Mem. at 14); *see also* DX 183 (Direct Testimony of Government's Expert Dr. Jay L. Brigham) (Ex. 46) (Record of Tract E-489, GSA Records, Chicago-FRD).

In addition, the Government required the landowners to execute an Affidavit of Vendor that included the following, or substantially similar, language representing:

> That there are no explorations or rentals being paid whatever for the development of coal, oil, gas or other minerals on said lands, that there are no outstanding rights under the terms of any oil, gas, coal or other mineral leases appearing of record for the reason that no rentals under any oil, gas or mineral leases have been paid to those vendors within the past 9 months, nor to any predecessor in title within the past 10 years; that no oil, gas or mineral well was drilled on said premises as provided by the terms of said leases; that oil, gas or mineral leases are void, and all rights thereunder forfeited for the reason of non-performance on the part of the lessee or his (their) assigns to pay rental, or drill wells according to the terms of said leases, that no exploration for oil, gas or minerals are being conducted on said premises at this time, and that there are no oil wells on said premises.

DX 541 at CHI-002-A015-0036 (emphasis omitted) (cited in Gov't Pre-Trial Mem. at 14).[17]

---

[17] The record contains additional substantial evidence that a "basic assumption" of the 1942-1944 contracts was that there was no coal, gas, oil, or other mineral rights on the landowners' properties. *See*, *e.g.*, CX 126 (March 29, 1979 T. J. Tapp Aff.: "The first and last check he received from this oil well was $120.00 . . . the government had no need for the oil well during the war."); CX 133 (March 1, 1979 James L. Wathen Aff. indicating no pumping oil wells were on the property in 1942); CX 147 (Feb. 15, 1979 Ruth G. Henshaw Aff.: "No consideration was given [to grandparents] for their mineral rights."); CX 149 (Feb. 15, 1979 Benny Griggs Aff. indicating no pumping oil wells were on property of J. M. Griggs in 1942); CX 151 (March 12, 1979 T. C. Griggs Aff. indicating that no pumping oil wells were on the property of Curtis Griggs in 1942); CX 153 (March 27, 1979 Russell Babbs Aff. indicating that no pumping oil wells were on property of Otho and Fannie Babb in 1942); CX 155 (Aug. 17, 1979 Russell H. Holeman Aff. indicating no pumping oil wells were on the property of Russell J. Holeman in 1942); CX 157 (Feb. 16, 1979 Edna Lynn

---

Aff. indicating no pumping oil wells were on property of Edna V. Lynn and Jim Lynn in 1942, but had leased oil for 25¢ an acre . . . "[t]he [Government] man who came to talk to us said they did not want to pay for the oil and mineral rights as they did not [need] that to train the soldiers. So we got no money for the oil and gas."); CX 163 (March 15, 1979 Donald L. Bullock Aff. indicating that there were no pumping oil wells on property in 1942); CX 167 (Sept. 21, 1978 Clifton E. Blue Aff.: "We were told we would get the mineral rights back also, the government had no use for the minerals."); CX 168 (March 15, 1979 Ruth S. Russell Aff. indicating that there were no pumping oil wells on the property in 1942, and "there never was a price put on the oil and gas lease."); CX 169 (Feb. 16, 1979 Jessie Russell Wood Aff. indicating that there were no pumping oil wells on the property in 1942 and "the government took our oil and mineral rights and didn't pay us a penny."); CX 170 (March 9, 1982 Elvis Stone Aff. indicating that there were no pumping oil wells on the property in 1942); CX 172 (March 15, 1979 Stanley Nelson Aff. indicating that there were no pumping oil wells on the property in 1942); CX 173 (Feb. 16, 1979 Hassie Tilley Adamson Aff. indicating that there were no pumping oil wells on the property in 1942 and the "government took our mineral rights and didn't pay us a cent for it."); CX 178 (May 21, 1979 Lillie White Riggs Freer indicating that there were no pumping oil wells on the property in 1942); CX 180 (March 13, 1979 Mr. and Mrs. Puryear Aff. indicating that there were no pumping oil wells on their property in 1942. By 1979, however, "No-1 Coal Mine is mining under my farm for several years, and I have abundance of coal."); CX 182 (Feb. 6, 1979 Mrs. Joe (Caroline) Greenwell Aff. indicating that there were no pumping oil wells on the property in 1942); CX 183 (Feb. 13, 1979 Robert G. Greenwell Aff. indicating that there were no pumping oil wells on the property in 1942); CX 185 (Feb. 13, 1979 Mary Lou Spencer Caton Aff. indicating that there were no pumping oil wells on the property in 1942); CX 190 (March 2, 1979 A. J. Gibson Aff. indicating that there were no pumping oil wells on the property in 1942); CX 196 (March 15, 1979 Vendaline Nelson Aff. indicating that there were no pumping oil wells on the property in 1942); CX 197 (March 6, 1979 Jewell Duncan Aff. indicating that there were no pumping oil wells on the property in 1942); CX 198 (May 19, 1979 W. W. Pullum Aff. indicating that there were no pumping oil wells on the property in 1942, but there had been a "test oil well drilled on our property just shortly before the government took over. We had our farm leased for [oil] five years at $1.00 . . . an acre."); CX 206 (May 21, 1979 Prudy Oglesby Aff. indicating that there were no pumping oil wells on the property in 1942); CX 210 (Feb. 12, 1979 Billy J. Timmons Aff. indicating that there were no pumping oil wells on the property in 1942 and . . . [t]hey paid us nothing for mineral rights which they sold after the land was declared surplus."); CX 211 (Oct. 20, 1978 G. W. Cambron Aff.: "The oil rights underlying the affiants' father's property had been leased to an oil company at the time it was taken. The affiant's father asked, in the affiant's presence, if the government would allow him to retain the mineral rights. He was informed by the government agent that 'we will have to have this land from heaven to hell.'"); CX 212 (Feb. 6, 1979 Anne Luckett Cambron Sanley Aff. indicating that there were no pumping oil wells on the property in 1942); CX 213 (March 16, 1979 Elizabeth J. Stegar Aff.: "No consideration was given them for their mineral rights[.]"); CX 216 (Nov. 16, 1979 Samuel W. Steger Aff. indicating that there were no pumping oil wells on the property in 1942); CX 218 (May 21, 1979 Annie Miller (Day) Jenkins Aff. indicating there were no pumping oil wells on property in 1942 . . . "The Oil Company was sizagraphing for oil at the time the rumors were about us having to move . . .The oil co. would not talk to us after they found out the government might take the

land."); CX 219 (March 7, 1979 Henry V. Clements, Jr. Aff.: "We were paid . . . nothing for the oil and coal rights. This land had an oil lease on it at this time. The government took the amount of money that had been paid on the oil lease from the sale price of the land, and this amount of money was paid back to oil company."); CX 221 (Jan. 29, 1979 Charles Russell Aff. indicating there were no pumping oil wells on property in 1942); CX 223 (Feb. 2, 1979 Helburn Tapp Aff. indicating there were no pumping oil wells on property in 1942); CX 226 (May 21, 1979 Helen Whitledge Aff. indicating there were no pumping oil wells on property in 1942, however, "[a]s of this date [May 21, 1979] there are three oil wells pumping oil from this land now. They have been pumping for several years."); CX 227 (Feb. 5, 1979 Lorene Straker Aff. indicating there were no pumping oil wells on property in 1942); CX 228 (July 16, 1 979 Odessa Duncan Watson Aff. indicating there were no pumping oil wells on the property in 1942); CX 230 (May 21, 1979 Jess Anderson Tapp Aff. indicating there were no pumping oil wells on property in 1942); CX 267 (April 4, 1979 Frederick Williams Aff.: a former federal appraiser at Camp Breckinridge stating that he "was instructed by his superiors not to consider any value for the minerals underlying the said property and in fact when the Affiant made his report of appraisal for the various tracts which he had appraised, he attributed no value to the minerals underlying the property."); *see also* CX 270 (Sept. 21, 2004 John E. Johnson Dep.) at 34-35, 48 (Mr. Johnson testified that he was not aware of any oil wells on either his parents' or grandparents' land at the time the land was acquired by the government, but before Mr. Johnson's parents and grandparents were paid for their land almost two years after they moved, "there was bickering over the oil leases [with] Chester Oil Company . . . involved in leasing at that time. . . . [His parents] were more concerned about the land than they were minerals. Of course, as it turned out, I think the minerals were worth a lot more than what the land is now."); CX 271 (Oct. 1, 2004 Heady Dep.) at 60 (testifying that there were no oil or minerals developments on the land at the time it was acquired for Camp Breckinridge); CX 273 (Mrs. Thomas Raymond (Lottie May) Lynn Dep.) at 12 (The Government said the mineral rights were "of no value[.]"); *see also id.* at 17 ("Well, they told us the mineral rights was of no value."); *Id.* at 23 ("Three thousand and eight hundred . . . That was just for the land, not the oil and gas and stuff . . . we didn't get no money for it and they didn't say nothing about taking it. They just told us it was no value."); CX 275 (July 14, 1995 Mrs. Spaulding (Mary Virginia) Dixon Dep.) at 11 (Government agents advised Mrs. Dixon and her husband that "all they were interested in was the land. We would reserve the coal and oil rights."); CX 276 (July 14, 1995 Mrs. William Walter (Katherine) Pullum Dep.) at 32-35 ("They [oil company] were digging what they called a test hole just a few days before we had to vacate. And they moved out in the middle of the night and, you know, didn't tell us anything. So we had no idea what they found."); *see also id.* at 33 (The lease amount was "a dollar an acre."); *but see* July 13, 1995 Eulah P. Tilley Dep. at 31-32 ("We supposed there were [minerals on our property]; the oil were all around. They hadn't dug on us, but we presumed they were." At the time the land was acquired, the Tilleys had a mineral lease with Gulf Oil Company. Mrs. Tilley testified that, although they wanted to keep the minerals, "the man that represented the government . . . said [the Tilleys] couldn't take the minerals from the land; they had to let the minerals go."); *see also* Aug. 13, 2004 Def. Exhibits In Support of Motion in Limine Tab 4 at 20 (May 30, 1979 James Springer Aff. indicating there was no pumping oil wells on property in 1942); *Id.* at 40 (Feb. 15, 1979 Virginia G. Toombs Aff.: "No consideration was given [grandparents] for their mineral rights. Just the same old promise that they could buy their land back and [the Government] knew right then that it would

Accordingly, substantial evidence in this record establishes that the parties to the contract were mistaken in their belief that no coal, gas, oil, or other mineral deposits existed in 1942-1944 under the condemned properties that would support exploration or operation.[18]

**2. The "Basic Assumption" Had A "Material Effect" On The Agreed Exchange Of Performance.**

The commentary to RESTATEMENT § 152 requires that the plaintiff establish that there was "a material effect on the agreed exchange of performances [such] . . . that the resulting imbalance in the agreed exchange is so severe that [Plaintiffs] cannot fairly be required to carry it out." RESTATEMENT § 152 cmt. c. "Ordinarily [Plaintiffs] will be able to do this by showing that the exchange is not only less desirable to [Plaintiffs] but is also more advantageous to the other party.

---

never be done."); *but see id.* at 39 (Feb. 23, 1974 John J. Brooks, Jr., and Anne G. Brooks Aff. indicating that there were pumping oil wells on property in 1942); *see also* DX 680 (Answer to Interrogatory No. 9: "[M]y grandparents always said they were not compensated for the oil and mineral rights. They were puzzled why the government wanted the underground rights if the land was to be used for Army training."); DX 681 (Answer to Interrogatory No. 7: "Before this land grab the minerals coal and oil where [sic] untapped."); DX 695 (Answer to Interrogatory No. 7: "Prior to eviction none of minerals were on land or being extracted. Have heard since land was rich with minerals and coal."); DX 701 (Answer to Interrogatory No. 7: "There was no mineral or oils being removed at the time of eviction. After the war this land was turn[ed] into a coal mine until it was completely mined out of coal.").

[18] Moreover, where the Government was aware of *even the potential for coal, gas, oil, or mineral deposits*, because of the existence of a lease, whether being exercised or not, the lessees were paid for the leases or an agreement was negotiated whereby the lessees could resume activities after the war. *See, e.g.*, DX 627; DX 630; DX 633. In this reference, the relevance of the coal, gas, oil, and other mineral rights to the contract initially was raised by the Government. *See* Feb. 20, 2004 Pre-Trial Conference TR at 30-36, 40-43. In addition, much of the evidence adduced at trial as to mutual mistake was introduced by the Government's expert witnesses. *See* DX 182-83. Accordingly, after trial, a Second Amended Complaint was filed to conform the pleadings to the evidence. *See* RCFC 15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence . . . may be made . . . but failure so to amend does not affect the result of the trial of these issues."); *Kirkland* v. *District of Columbia*, 70 F.3d 629, 633 (D.C. Cir. 1995) (quoting CHARLES A. WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1493 at 19 (1990)) ("'Consent generally is found when . . . the party opposing the motion to amend actually produced evidence bearing on the new issue.'"); *Fejta* v. *GAF Companies*, 800 F.2d 1395, 1396 (5th Cir. 1986) (holding that an issue was tried by implied consent where evidence was introduced without objection and the opposing party introduced evidence relevant to that issue).

Sometimes this is so because the adversely affected party will give, and the other party will receive, something more than they supposed. . . . In such cases the materiality of the effect on the agreed exchange will be determined by the overall impact on both parties." *Id.*

The parties' mutual mistake that there were no coal, gas, oil, or other minerals under the condemned properties in 1942-1944 that would support exploration or operation had a material effect on the agreed exchange of performances. That effect is most vividly evidenced by the difference between the $3,727,460 price paid for all of the land conveyed to the Government, compared with the lease and sale of coal, gas, oil, or other mineral rights, which yielded the Government at least $34,303,980.42. There is no question that the financial benefit that the Government received from these assets far exceeded what was bargained for, *i.e.*, the use of the land for Camp Breckinridge, which was the sole basis of the Declarations of Taking. *See* JX 206A ("The public uses for which said lands are taken are as follows: The said lands are necessary adequately to provide for establishment of a triangular division camp. The said lands have been selected by me for acquisition by the United States for use in connection with the establishment of the Camp Breckinridge[.]"). Moreover, it is significant that there is no mention in any of the Declarations of Taking that the Government was exercising eminent domain rights over potential coal, gas, oil, or other mineral interests. *See, e.g.*, JX 206A-D, JX 264A-J, JX 485A-B, JX 504A-C, JX 530D, JX 536A.

For these reasons, Claimants have established that the "basic assumption," that no coal, gas, oil, or other mineral deposits existed in 1942-1944 under the condemned properties that would support exploration or operation, had a "material effect" on the agreed exchange of performance.

**3. Claimants Should Not Bear Risk Of The Mutual Mistake.**

The RESTATEMENT also provides that a party bears the risk of a mistake when: "(a) the risk is allocated to him by agreement of the parties, or (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so." RESTATEMENT § 154 at 402-03. On the other hand, the party adversely affected must not bear the risk of the mistake. *Id.* § 152 cmt. a.

Generally, where the parties to a transaction fail to recognize the presence of unknown value associated with the purchased item, such as deposits of minerals on a parcel of land, the seller bears the risk, because "it is thought more reasonable for the landowner to bear the risk of the mistake . . . than to pass this risk on to the purchaser." FARNSWORTH § 9.3; *cf. Tetenman* v. *Epstein*, 226 P. 966, 969 (Cal. 1924) ("If the mere ignorance as to the true value of property by one who sells it, where the sale is for a sum considerably less than its value, were a ground to set aside a deed, no transaction would be final until the validity thereof had been determined by a suit to quiet title."); *City of Everett* v. *Estate of Sumstad*, 631 P.2d 366 (Wash. 1981) (holding that the seller of a used

safe sold at auction for $50 was not entitled to $32,207 found by the buyer in locked compartment inside the safe after the sale). This rule appears to be based on concern about "conscious ignorance," where:

> Even though the mistaken party did not agree to bear the risk, he may have been aware when he made the contract that his knowledge with respect to the facts to which the mistake relates was limited. If he was not only so aware that his knowledge was limited but undertook to perform in the face of that awareness, he bears the risk of the mistake. It is sometimes said in such a situation that, in a sense, there was not mistake but "conscious ignorance."

RESTATEMENT § 154, cmt. c.

In determining whether a contracting party should be held responsible for "conscious ignorance," however, courts have considered several factors. First is whether the risk was contemplated by the parties at the time of transaction. In cases where a party recognizes that it was bargaining with incomplete knowledge about a material fact, but decided to forego taking reasonable steps to improve that knowledge, the risk of loss has been placed on the party that failed to make a reasonable inquiry. *See Harbor Ins. Co.* v. *Stokes*, 45 F.3d 499, 502 (D.C. Cir. 1995) ("Where [parties to a contract] have been explicitly concerned about an issue, but decide to press forward without further inquiry or explicit provision, it is reasonable to suppose that they intended the contract to dispose of the risk in question, *i.e.*, to bar any reopening at the behest of the party who, it turns out, would have done better without the contract."); *see also In re Schenck Tours, Inc.*, 69 B.R. 906, 914 (Bankr. E.D.N.Y. 1987) (refusing to relieve a land purchaser from contract where the purchaser voluntarily relied on incomplete soil reports due, in part, to an interest in quickly completing the land sale).

On the other hand, "where the subject of uncertainty has not been a concern of the parties . . . an inference of intentional risk allocation is questionable." *Harbor Ins. Co.*, 45 F.3d at 502. This was the situation in *Finch* v. *Carlton*, 524 P.2d 898 (Wash. 1974). *Finch* involved a general liability waiver signed by the victim of an automobile accident. The victim (plaintiff) suffered no apparent injury immediately after the accident. *Id*. at 898. The insurance company required him to sign the general liability waiver before it would provide payment to repair his automobile. *Id*. at 899. Approximately three months after the accident, and well after the waiver was signed, plaintiff was hospitalized for treatment of latent injuries resulting from the car accident. *Id*. The insurance company refused to cover these injuries, citing the general waiver. *Id*. at 901. The state appellate court, however, set aside the "broad language" of the general liability waiver, holding that it did not cover the plaintiff's injuries, because the "parties signing the release had contemplated only property damages and *not* personal injuries." *Id*. In making this determination, that court listed several factors that should be considered in determining whether a general liability release, executed without complete information, was nevertheless fair, including:

> (1) The peculiar dignity and protection to which the law cloaks the human person, as contrasted with articles of commerce;

(2) *The inequality of the bargaining positions and relative intelligence of the contracting parties;*
(3) *The amount of consideration received;*
(4) The likelihood of inadequate knowledge concerning future consequences of present injury to the human body and brain; and
(5) *The haste, or lack thereof, with which release was obtained.*

*Id*. (emphasis added).

Of course, *Finch* did not involve a land transaction. Nor did it involve a mutual mistake. Instead, the case was characterized as "present[ing] a situation where the parties presumably did not contemplate the possibility of latent injuries." *Id*. at 900. There are, however, some factual similarities to the situation presented by this reference. The plaintiff in *Finch* "sold" a waiver of any potential legal claims that he might have had against the insurance company in exchange for prompt resolution of his claim. He did this without full knowledge of the extent of his physical injuries. Subsequently, it turned out that the waiver plaintiff "sold" was considerably more valuable than either party realized at the time of sale, due to the manifestation of latent injuries, present, but unknown, at the time of contracting. Similarly, the land sold by Claimants turned out to be much more valuable to the Government than anticipated at the time of sale, because of the subsequent discovery of coal, gas, oil, and other mineral deposits that were present, but undiscovered in 1942-1944.

Of the five factors listed in *Finch*, factors two, three, and five are relevant to the contracts at issue. First, with respect to bargaining power, the United States enjoyed a significant advantage over the landowners – because of the legal authority attendant to the Declaration of Takings and the significant political and social pressure to support the Government in time of war. In addition, the former Claimants were in no position to challenge the Government, which already had access to geologists and engineers with superior knowledge about the site. Second, the amount of consideration paid to Claimants for their property was not in parity with the significant financial gain that the Government received after the discovery of the coal, gas, oil, or other mineral deposits. Finally, the "haste" in which the landowners were forced to act placed them at a significant disadvantage to seek independent advice. In fact, the landowners subject to the first condemnation petition were given less than 30 days to vacate their property. *See Land Grantors I*, 64 Fed. Cl. at 668-69 ("On February 14, 1942, the local U.S. District Attorney filed the first petition under the War [Purposes] Act of 1917, 40 Stat. 241, *condemning* 10,427.70 acres in Union County, Kentucky. . . . Landowners and the families were given [less than a month] until March 3, 1942 to vacate so that construction could begin by March 15, 1942.").

One other case requires mention. In *Wilkin* v. *1st Source Bank*, 548 N.E.2d 170 (Ind. Ct. App. 1990), a buyer purchased a parcel of land from the estate of an internationally-known artist. After the purchase, the buyer found the property to be in disrepair and executed a supplemental agreement with the estate to clean-up the property. *Id*. at 171. The parties agreed that "the [buyers] could clean the premises and keep any items of [the former owners'] personal property they wanted." *Id*. Subsequently, the buyers discovered several valuable pieces of art left on the property. *Id*. The estate sued for the return of the artwork. The state appellate court held that at the time the parties

contracted for the clean-up, both expected that any "personal property" found on the premises would consist of worthless "junk" or "trash," not valuable art. *Id*. at 172. That state court reasoned that "[t]he resultant gain to the [buyer] and loss to the [seller] were not contemplated by the parties when the [seller] agreed that the [buyer] could clean the premises and keep such personal property as they wished." *Id*. Therefore, that court concluded that it was inequitable to allow the buyer to retain the art, since the gain stemmed from "the presence of facts quite different from those on which the parties based their bargain." *Id*. (citation omitted).

In this reference, it is significant, if not determinative, that the Government did not include any language in the contracts requiring the landowners to assume the risk at issue. *See, e.g., Flippin Materials Co.* v. *United States*, 312 F.2d 408, 415-16 (Ct. Cl. 1963) ("elaborate contract provisions . . . together with the omission of the usual changed conditions clause, show that the risks of mistakes as to subsurface materials were deliberately placed" on one party). In fact, the Government agents represented that they had no knowledge that coal, gas, oil, or other mineral rights were present on the properties in 1942-1944. *See* DX 541 at CHI-002-A015-0015 (cited in Gov't Pre-Trial Mem. at 14); *see also* DX 183 (Direct Testimony of Government's Expert Dr. Jay L. Brigham) (Ex. 46) (Record of Tract E-489, GSA Records, Chicago-FRD). Moreover, the Government required that the landowners vacate the premises under very short notice. *See Land Grantors I*, 64 Fed. Cl. at 668-69. Therefore, even if a landowner may have wanted to seek a neutral professional assessment of the potential for coal, gas, oil, and other minerals on his or her property, the time and exigencies of war made that both impracticable and impossible. Therefore, under the unique and *sui generis* circumstances of this reference, the landowners should not bear the risk of the parties' mutual mistake that in 1942-1944 there were no coal, gas, oil, or other mineral deposits to support exploration or operation. Accordingly, it would be unjust and unreasonable to allocate the risk of the mutual mistake to the former landowners.

**E. The Remedy For Mutual Mistake Is Restitution, Measured By The Government's Enrichment From The Lease And Sale Of The Coal, Gas, Oil, Or Other Mineral Deposits.**

A "person who has been unjustly enriched at the expense of another is required to make restitution." RESTATEMENT (FIRST) OF RESTITUTION (1937) § 1. It is well settled that restitution is an available remedy for the Government's breach of contract with a private party. *See Mobil Oil Exploration & Producing S.E., Inc.* v. *United States*, 530 U.S. 604, 623 (2000) (holding that company's urging of performance despite the government's repudiation of a contract did not waive the right to restitution); *see also Landmark Land Co., Inc.* v. *F.D.I.C.*, 256 F.3d 1365, 1372 (Fed. Cir. 2001) ("Restitution is available to a private party to remedy a contract breach . . . by the government."); GEORGE PALMER, LAW OF RESTITUTION Ch. 10 (1978); Saul Levmore, *Explaining Restitution*, 71 VA. L. REV. 65 (1985) ("[R]estitution offers an opportunity to inspect . . . asymmetry between the law's treatment of harms and . . . benefits.").

The purpose of restitution:

> is not the enforcement of a promise, but an entirely distinct goal–the prevention of unjust enrichment. The focus is on the party in breach rather than on the injured party, and the attempt is to put the party in breach back in the position in which that party would have been had the contract not been made. The party in breach is required to disgorge what that party has received in money . . . . The interest of the injured party that is measured in this way is called the *restitution interest*. It is ordinarily smaller than either the expectation interest or the reliance interest. Although recovery measured by either of those interests takes account of cost incurred in conferring a benefit on the party in breach, the restitution interest includes neither the injured party's lost profit nor the part of that party's expenditures in reliance that conferred no benefit on the party in breach.

FARNSWORTH § 12.1 at 154-55 (emphasis in original); *see also* Fuller & Perdue, *The Reliance Interest in Contract Damages* (pt. 1), 46 YALE L. J. 52, 54 (1936) (The restitution interest has "two elements: (1) reliance by the promisee, (2) a resultant gain to the promisor . . . . In some cases a defaulting promisor may after his breach be left with an unjust gain which was not taken from the promisee, or which was not the result of reliance by the promisee[.]"). Nevertheless, unjust enrichment requires that "[t]he party in the wrong . . . disgorge the benefit it has received, putting that party back in the position in which it would have been had there been no wrong." FARNSWORTH § 3.26 at 387; *see also id.* § 12.2 at 156.

In this reference, restitution should be measured by the Government's enrichment from the sale of coal, gas, oil, or mineral rights on the Claimants' properties because, as previously determined, the risk of the mistake should not be borne by Claimants. Although Claimants do not have a legal claim based on misrepresentation,[19] the record evidences that misrepresentations made by Government agents in negotiating the 1942-44 contracts were a factor in Claimants' decision to sell, without further inquiry. *See Land Grantors I*, 64 Fed. Cl. at 702 ("[M]any of the landowners entered into Contracts with the Government in 1942-1944 with the apparent understanding [from Government employees and agents] that they could repurchase their properties after World War II was concluded and, in some cases, at the same price that the Government paid for it or at a discount."); *see also Roseburg Lumber Co.* v. *Madigan*, 978 F.2d 660, 665-66 (Fed. Cir. 1992) (Government contract) ("The general rule is that a contract made through mutual mistake as to material facts may either be rescinded or reformed. . . . Further, it is an additional rule that mistake

---

[19] The agents and/or employees who made misrepresentations did not have actual authority to bind the Government. *See Land Grantors I*, 64 Fed. Cl. at 702. Nevertheless, for purposes of awarding equitable relief, actual authority is not required, because of "the apparent authority of governmental officials . . . operating in areas of their expertise and authority[.]" *Merchants Nat'l Bank of Mobile* v. *United States*, 7 Cl. Ct. 1, 27-28 (1984) (congressional reference); *see also Gay Street Corp*. v. *United States*, 130 Ct. Cl. 341, 348-49 (1955) (congressional reference) (compensation awarded where Government obtained benefits through overreaching and misrepresentations by agent even where agent lacked actual authority to obligate Government).

on one side and misrepresentation, whether willful or accidental, on the other, constitute a ground for reformation where the party misled has relied [on] the misrepresentation of the party seeking to bind him. . . . Restitution in these circumstances may be obtained on the premise that it would be unjust to allow one who made the misrepresentation, though innocently, to retain the fruits of a bargain which was induced, in whole or in part, by such misrepresentation."); *Merchants Nat'l Bank of Mobile*, 7 Cl. Ct. at 8-9 (congressional reference) (determining that equitable relief was warranted where the Government erroneously, but without intent, misrepresented its authority to guarantee a loan). The fact that those misrepresentations were made in exigent circumstances only further supports Claimants' entitlement to the equitable remedy of restitution.

**F. The Recommended Amount Of Restitution Due.**

**1. The Undisputed Amount Of Revenues Received By The Government For The Lease Or Sale Of Coal, Gas, Oil, Or Other Mineral Deposits That Existed Under The Condemned Properties In 1942-1944.**

The following summarizes undisputed revenues, identified as of April 18, 2008, that the Government received from the sale, lease, or easement of coal, gas, oil, and other mineral rights that were on the property of the former landowners in this case:

| | | | | |
|---|---|---|---|---|
| 1. | <u>DOI-Felmont Oil Leases</u> | | | |
| | August 6, 1957-April 30, 1964 | $ | 272,883.00 | royalties[20] |
| | | $ | 432,236.00 | bonus[21] |
| | April 31, 1964-August 31, 1983 | $ | unknown[22] | |
| | September 1983-March 2005 | $ | 86,723.58 | royalties[23] |

[20] *See* DX 183 (Ex. 80) at DOJ3569; DX 182A at DOJ2699.

[21] *See supra* note 20.

[22] *See* Ct. Ex. 5 (May 23, 2005 Declaration of Linda Lautigar, Enforcement Specialist, Department of Interior, Minerals Management Service, Office of Enforcement) ("Lautigar Decl. I") (indicating that this information may be in records located at the Federal Records Center, Lakewood, Colorado-U.S. Geological Survey records); *see also* Def. Resp., *Land Grantors* v. *United States*, No. 93-468 (Fed. Cl. Dec. 23, 2005) at Tab B ("Lautigar Decl. II") (representing that none of the records at the Federal Records Centers, in Lakewood, Colorado or Fort Worth, Texas–U.S. Geological Survey records contained this information).

[23] *See* Lautigar Decl. I (referencing Lease No. 044-044315-0).

2. DOI-Kingwood Oil Company Leases

| | | | |
|---|---|---|---|
| January 19, 1960-April 30, 1964 | $ | 418,443.00 | royalties[24] |
| | $ | 708,253.00 | bonus[25] |
| April 30, 1964-August 31, 1983 | $ | unknown[26] | |
| September 1983-March 2005 | $ | 70,718.24 | royalties[27] |

3. July 9, 1965 GSA Award of Gas, Oil And Other Mineral Rights

| | | | |
|---|---|---|---|
| Tract 1-Sun Oil & Texas Gas Exploration | $ | 29,481.00[28] | |
| Tract 2-Texaco, Inc. (Tulsa) | $ | 7,612,000.00 | |
| Tract 3-Eastdil Corp. | $ | 7,260,324.00 | |
| Tract 4-Eastdil Corp. | $ | 480,076.06 | |
| Tract 5-Allied Chemical Corp. | $ | 1,011,274.00 | |
| Tract 6-Sun Oil & Texas Gas Exploration | $ | 2,251,979.00 | |
| Tract 7-Eastdil Corp. | $ | 1,664,112.00 | |
| Tract 7A-Cities Service Oil Co. | $ | 56,249.00 | (rejected) |
| Tract 7B-Cities Service Oil Co. | $ | 80,949.95 | (rejected) |
| Tract 8-Texaco Corp. | $ | 4,124,000.00 | |

4. July 9, 1965 Sale of Coal Rights

| | | |
|---|---|---|
| 30,590 acres sold to TVA | $ | 7,410,000.00[29] |

---

[24] *See* DX 183 (Ex. 80) at DOJ3569.

[25] *See supra* note 24.

[26] *See* Lautigar Decl. II (representing that none of the records at the Federal Records Center, Lakewood, Colorado-U.S. Geological Survey records contained this information).

[27] *See* Lautigar Decl. I (referencing Lease No. 044-0502123-0).

[28] *See* Gov't Resp., *Land Grantors* v. *United States*, No. 93-648X (Fed. Cl. Mar. 31, 2005) at Tab A (GSA Real Property Disposal Activities Control No. D-KY-432B indicating that coal, gas, oil, and other mineral rights were awarded on July 9, 1965 and sales were completed between October 15, 1965 and November 8, 1965); *see also* Decl. of Jay L. Brigham, *Land Grantors* v. *United States*, No. 93-468 (Fed. Cl. Apr. 12, 2005) at Tab 5 ("Bingham Decl."); Plaintiffs' Exhibit Appendix In Response To The Court's December 15, 2005 Order And Comprehensively Summarizing Mineral Sale Proceeds, *Land Grantors* v. *United States* (No. 93-648X) (Fed. Cl. April 27, 2006), at Tab (B)(1).

[29] *See* Gov't Resp., *Land Grantors* v. *United States*, No. 93-648X (Fed. Cl. Mar. 31, 2005) at Tab A (GSA Real Property Disposal Activities Control No. D-KY-432B indicating sale of coal rights on Tracts 2,3,4,5,6,7,8 representing 30,590 acres was sold on July 9, 1965); *see also* JX 58 at DOJ1581 (September 7, 1979 letter from James W. Peck, District Engineer, Army Corps of Engineers to Congressman Carroll Hubbard advising that GSA offered all mineral rights and 36,000

| | | | |
|---|---|---|---|
| 5. | August 24, 1967 Sale of Coal Rights 4,800 acres offered of former U.S. Army Garrison Camp Breckinridge. Purchaser unknown. | $ | unknown[30] |
| 6. | July 25, 1991- June 25, 1993 Coal Leases–Tract 7A Government lease to Peabody Coal Company for the period July 1, 1991- June 25, 1993. | $<br>$ | 470,976.54 royalties[31]<br>501.00 rent |
| 7. | June 18, 2004 Short Form of Coal Easement at Seam 11 from tracts located in former Camp Breckinridge | $ | unknown[32] |
| **TOTAL**: | | **$** | **34,303,980.42** |

acres of land for sale in an auction on April 15, 1965); DX 183 (Ex. 82) at DOJ3575 (*Bids Exceed $30 Million For Oil, Coal Rights At Camp*, STURGIS NEWS, April 22, 1965) ("Coal rights bids by the Tennessee Valley Authority totaled $7,410,000, which makes it appear that the right to the coal deposits will go to this government agency"); DX 183 (Ex. 84) at DOJ3576 (*TVA Coal Bids $5.7 Million High*, THE UNION COUNTY ADVOCATE, April 22, 1965) ("Tennessee Valley Authority . . . was the high bidder for 26,600 acres of coal rights underlying the Camp Breckinridge reservation."); Plaintiffs' Exhibit Appendix In Response To The Court's December 15, 2005 Order And Comprehensively Summarizing Mineral Sale Proceeds, *Land Grantors* v. *United States* (No. 93-648X) (Fed. Cl. April 27, 2006), at Tabs (B)(1).

[30] *See* Gov't Resp., *Land Grantors* v. *United States*, No. 93-468 (Fed. Cl. Mar. 11, 2005) at Tab3-I.

[31] *See* May 17, 2005 Mayhugh Decl. at 2; *see also* February 3, 2006 Declaration of Mr. Steve Gobat, Deputy State Director, Division of Natural Resources – Eastern States, Bureau of Land Management of the Department of the Interior, enclosing Exhibit A, a July 25, 1991 Coal Lease No. KYES 43034 with the Peabody Coal Company regarding the "Henderson County, Kentucky, The Camp Tract" for 167 acres at an 8% rate for value of any coal produced.

[32] *See* Brigham Decl. at Tabs 4, 7 (referencing prior Grant of Coal Easements, dated June 9, 1977, as rendered by instruments dated May 1,1981, November 11, 1985, and November 15, 1989. This Coal Easement was transferred to TVA from GSA on June 29, 1967 and subsequently was leased to the Peabody Coal Company, subject to other agreements between TVA and the Sun Oil Company, TVA and Texaco, Inc., TVA and Ashland Oil and Refining Company, and TVA and the Kingwood Oil Company). The Government did not provide the court with any of the above referenced "instruments" or Exhibits C, D, E, and F to the June 18, 2004 Coal Easement.

Because of the parties' mutual mistake, the Government was unjustly enriched by at least $34,303,980.42, which amount should be returned to the Claimants in restitution. *See* FARNSWORTH § 3.26(a) at 387 ("[R]ecovery [for liability resulting from unjust enrichment] is measured by the restitution interest . . . . The party in the wrong is required to disgorge the benefit it has received, putting that party back in the position in which it would have been had there been no wrong[.]").

**2. Claimants' Estimate Of Royalties Derived From Tracts 7A And 7B From 1964-1983 And 1983-2006 Is Not "Reasonably Certain."**

The Government asserts that royalty records of the oil and gas leases on mineral Tracts 7A (commenced January 19, 1960 with Kingwood Oil Co.) and 7B (commenced August 6, 1957 with Felmont Oil Co.) on the former Breckinridge property do not exist for the period April 1964 to August 1983, and were likely destroyed, pursuant to a document retention policy. *See* Lautigar Decl. II ¶ 8 ("My investigation revealed that the electronic royalty records do not exist for the two leases for the time period of April 1964 to August 1983"); *see also id.* ¶ 14 ("Based on my investigation, I believe that the documents requested were destroyed in accordance with the normal document retention policy" of the Department of Interior, Minerals Management Service). The Government did, however, locate royalty records for these leases for the period September 1983 to March 2005.[33] *See* Lautigar Decl. I ¶ 2 ("[T]he [Department of Interior, Minerals Management Service] has electronic records available for Kentucky leases 044-050213-0 and 044-044315-0 for production reported from September, 1983 through March, 2005. The net royalties received by the MMS for this period are $70,718.24 and $86,723.58, respectively.").

On April 27, 2006, Claimants proffered an April 7, 2006 Affidavit from Dr. Charles F. Haywood ("April 7, 2006 Haywood Aff."), former Dean of the College of Business and Economics and Professor of Economics and Finance of the University of Kentucky, previously admitted as an expert in economics and finance. Dr. Haywood's April 7, 2006 Affidavit estimated the revenues generated from royalties derived from oil and gas leases on mineral Tracts 7A and 7B for the years 1964-1983 and 1983-2005, periods for which the Government provided no or "limited" data. *See* April 7, 2006 Haywood Aff. ¶¶ 1-4.

First, Dr. Haywood obtained oil lease production information from: issues of *Petroleum Information*, published by Pipelines Production Reports, Houston, on file in the Library of the Kentucky Geological Survey; and issues of *PI/Dwights Plus IHS Energy*, published by IHS Energy and on file with the Library of the Kentucky Geological Survey and from the website "IHS Energy." *Id.* ¶ 7. Next, Dr. Haywood calculated the average price for oil from the Illinois Basin from May 1, 1964 to February 28, 2006, using data derived from the "Illinois Oil and Gas Association" website. *Id.* Utilizing this data and factoring in the Government's 15% royalty rate, Dr. Haywood estimated that the Government collected $3,389,108 in royalties from both leases since 1957. *Id.* ¶ 9. Although the Government was unable to locate records of the amount of royalties received from these leases from May 1, 1964 to December 31, 1983, Dr. Haywood estimated royalties for this

---

[33] The court included the royalties from these records in calculating the restitution interest. *See supra* § 3(F)(1).

period were $330,079 (Tract 7A) and $554,335 (Tract 7B). *Id.* ¶ 11. Instead of the Government's representation that $70,718.24 and $86,723.58 were received from royalties derived for the period 1983-2005 (*See* Lautigar Decl. I), Dr. Haywood estimated these royalties should be $218,086 for Tract 7A and $454,793 for Tract 7B, for the period December 31, 1983 through February 28, 2006. *See id.* ¶ 12.

The United States Court of Appeals for the Federal Circuit has held that a trial court has authority to estimate damages. *See Bluebonnet Sav. Bank F.S.B.* v. *United States*, 67 Fed. Cl. 231, 242-44 (2005) (expert witness allowed to estimate the amount of equity surrendered for strip financing). Plaintiffs, however, must present a model that offers "a sufficient basis . . . for estimating [damages] with reasonable certainty." *See Columbia First Bank, F.S.B.* v. *United States*, 60 Fed. Cl. 97, 106 (2004) (quoting *Commercial Fed. Bank, F.S.B.* v. *United States*, 59 Fed. Cl. 338, 344 (2004)). "Reasonable certainty" requires that the model: is based on sufficient factual evidence; uses assumptions and calculations that are based in factual evidence; and is credible. *See Columbia First Bank*, 60 Fed. Cl. at 106-08. Speculation and guess-work are not sufficient to establish "reasonable certainty," and "[d]amages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." RESTATEMENT § 352(a).

Dr. Haywood's estimate of royalty revenues derived from oil and gas leases on mineral tracts 7A and 7B is not reasonably certain. First, Dr. Haywood did not proffer copies of the sources from which he obtained the oil production data, which are not readily accessible to the court. Second, many of Dr. Haywood's royalty estimates are in direct conflict with the royalty amounts on file with the Government. *See* Lautigar Decl. I ¶ 2 ("[T]he [Department of Interior, Minerals Management Service] has electronic records available for Kentucky leases 044-050213-0 and 044-044315-0 for production reported from September, 1983 through March, 2005. The net royalties received by the MMS for this period are $70,718.24 and $86,723.58, respectively."). Third, Dr. Haywood's testimony is beyond the scope of expertise. *See* Claimants' Final Witness List ¶ 1, *Land Grantors* v. *United States* (No. 93-648X) (Fed. Cl. Aug. 6, 2004). Accordingly, Dr. Haywood's estimates are not reasonably certain. *See* RESTATEMENT § 352(a) ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").

#### 3. Claimants' Estimate Of Royalties Derived From Seams #9 And #11 From TVA Coal Leases And Easements Is Not "Reasonably Certain."

On April 27, 2006, Claimants also proffered an April 21, 2006 Affidavit of Dr. Charles F. Haywood ("April 21, 2006 Haywood Aff."). Therein, Dr. Haywood estimated the revenues the Government received from coal mined at Seams #9 and #11 on the former Breckinridge property, "which were part of the minerals acquired by the [G]overnment through the purchase of properties to establish Camp Breckinridge in 1942." *See* April 21, 2006 Haywood Aff. ¶ 2. First, Dr. Haywood relied on a February 7, 1969 document entitled "Coal Lease,"[34] under which TVA granted Peabody

[34] On January 31, 2006, the Government proffered a January 26, 2006 Declaration of James H. Edgar ("Jan. 26, 2006 Edgar Decl.") in response to the court's December 15, 2005 Order to produce documents about TVA leases. Mr. Edgar is the Properties Specialist assigned to the Coal

Coal Company rights to extract coal from the Seam #9. *Id*. ¶ 3. Therein, royalties to the Government were set at 15 cents on every ton, with a November 11, 1985 amendment increasing that amount to 25 cents per ton. *Id*. In a June 9, 1977 document, entitled "Grant of Coal Easement," TVA granted to Peabody rights to extract coal from Seam #11 on lands formally comprising Fort Breckinridge. *Id*. ¶ 4. Those royalties were set at 50 cents on every ton, with a November 11, 1985 amendment decreasing that amount to 25 cents per ton. *Id*. Second, Dr. Haywood consulted coal lease production information from the Environmental and Public Protection Cabinet of the Commonwealth of Kentucky, from which he obtained the total tonnage of coal extracted from the two seams and combined them with royalty payments paid through 2005.[35] *Id*. ¶ 5. Dr. Haywood concluded that the Government derived $35,017,115.60 in royalties from these two seams from 1971 through 2004. *Id*.; *see also id*. Table 1 (Enrichment Of U.S. Government From Coal Royalties, Camp Breckinridge Property 1971-2004). A September 1990 Third Amendment, however, forgave the payment of future royalties for coal mined on Seam #11, in exchange for Peabody having "assumed . . . substantial liabilities[36] of the grantor [TVA][.]" *Id*. (citing Jan. 26, 2006 Edgar Decl., Tab 6 (Sept. 19, 1990 Third Amendment To Coal Easement)).

Dr. Haywood's estimate of the Government's enrichment from coal mined from Seams #9 and #11 also lacks "reasonable certainty." Putting aside the issue of whether TVA can be considered the "Government" for purposes of this reference, Dr. Haywood did not proffer copies of the sources from which he obtained the coal lease production information, which are not readily accessible to the court. Second, Dr. Haywood's assertion that the Government obtained royalties from these seams directly contradicts the January 26, 2006 Declaration of James H. Edgar, Properties Specialist, assigned to TVA's Coal Acquisition and Supply Unit. *See* Jan. 26, 2006 Edgar Decl. ¶ 10 ("No royalty payments were paid by Peabody Coal Company to TVA with respect to coal mined from the #9 and #11 seams on the former Camp Breckinridge property because of the nature of the contractual

---

Acquisition and Supply Unit of the Tennessee Valley Authority ("TVA"). Mr. Edgar provided the court with coal leases and/or amendments entered into between TVA and the Peabody Coal Company on February 7, 1969, June 9, 1977, May 1, 1981, November 17, 1985, and November 15, 1989 on lands comprising the former Camp Breckinridge property, but was unable to locate "any document that shows the total amount of royalties (if any)" paid pursuant to these leases. *See* Jan. 26, 2006 Edgar Decl. ¶¶ 6-8. Mr. Edgar explained that no royalty payments were actually collected by TVA, because Peabody acted as a "captive producer" in selling all coal extracted to TVA. *Id*. ¶ 10. Mr. Edgar did not explain the significance of this status or how that would relieve Peabody from paying royalties, if in fact that occurred.

[35] Dr. Haywood also factored in *constructive* royalty payments for Seam #11, after enactment of the Third Amendment, to offset the benefit the Government received in avoiding liabilities. *See* April 21, 2006 Haywood Aff. ¶ 6. Because the nature and scope of these liabilities have not been disclosed, Dr. Haywood assumed that the enrichment from avoidance of these liabilities was roughly equal to the amount of royalties that would have otherwise been received. *Id*.

[36] The nature and scope of these liabilities have not been disclosed. *See* April 21, 2006 Haywood Aff. ¶ 4.

relationship between TVA and Peabody Coal Company."). Third, it is unclear where on the former Breckinridge property Seams #9 and #11 are located, creating a risk of duplicative damages. *See* Court Ex. 3I at 12; Court Ex. 4 at 2 (Map of Camp Breckinridge mineral tracts with no listing of Seams #9 and #11). Finally, Dr. Haywood's testimony is beyond the scope of expertise. *See* Claimants' Final Witness List ¶ 1, *Land Grantors* v. *United States* (No. 93-648X) (Fed. Cl. Aug. 6, 2004). Accordingly, Dr. Haywood's estimates are not "reasonably certain." *See* RESTATEMENT § 352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").

### G. Claimants' March 6, 2008 Motion To Vacate The November 24, 1998 Order Is Granted, In Part.

On March 6, 2008, Claimants filed a Motion To Vacate a November 24, 1998 Order, entered by the Honorable Judge James F. Merow, determining that the scope of S. 794 did not include landowners who sold their land after a Declaration of Taking was filed,[37] because property is condemned upon the filing of the declarations. *See* Order, *Land Grantors* v. *United States*, No. 93-648X (Fed. Cl. Nov. 24, 1998) ("Pursuant to the Declaration of Taking Act, title to the properties subject to the condemnation proceedings vested in the United States immediately upon the filing of declarations of taking and the deposit of estimated compensation in the district court. Any claimant whose land was acquired by declaration of taking is not authorized to bring a claim under S. 794."). Claimants assert that the November 24, 1998 Order is "contrary to the facts, the law and the intent of the sponsors of this congressional reference" and improperly limits those who are entitled to compensation under S. 794, effectively by removing about 75% of the total acreage at issue. *See* Pl. Mot. Vacate at 1.

The relevant provision of S. 794 provides that:

> The Secretary of the Treasury is authorized and directed to pay, out of money not otherwise appropriated, to the individuals . . . who sold their land in Henderson, Union, and Webster Counties, Kentucky, to the United States Government *under threat of condemnation* . . . for the military training camp known as Camp Breckinridge.

*See* S. 794, 103d Cong. § 1 (1993) (Authorization) (emphasis added).

---

[37] The Declaration of Taking Act of 1931, 40 U.S.C. § 258(a), provides, in relevant part:

> Upon the filing said declaration of taking and of the deposit in the court . . . of the estimated compensation . . . title . . . shall vest in the United States . . . and said lands shall be deemed to be condemned and taken for the use of the United States, and the right to just compensation . . . shall vest in the persons entitled thereto[.]

40 U.S.C. § 258(a) (*repealed and reenacted in 2002 by* 40 U.S.C. § 3114).

The phrase "under threat of condemnation" in S. 794 is not tied to nor dependant upon the date of filing any Declaration of Taking. More importantly, the United States Supreme Court has held that the "date of taking" occurs upon possession, or upon deprivation of the owner's possession rights, when a taking is under the auspices of the War Purposes Act. *See United States* v. *Dow*, 357 U.S. 17, 23 (1958) ("The [Declaration of Taking] Act does not bestow independent authority to condemn lands for public use. On the contrary, it [only] *provides a proceeding* ancillary or incidental to suits brought under other statutes.") (citation and quotations omitted) (emphasis added); *see also Best* v. *Humboldt Placer Mining Co.*, 371 U.S. 334, 340 (1963) ("*Title to the property passes later*, though the entry into possession marks the taking, gives rise to the claim for compensation, and fixes the date as of which the property is to be valued.") (emphasis added); *United States* v. *Gen. Motors Corp.*, 323 U.S. 373, 378 (1945) ("The courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking.").

Therefore, the filing of the condemnation petitions alone materially affected the landowners' rights to their property. *See Gen. Motors Corp.*, 323 U.S. at 378 ("Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking."); *see also Foster* v. *United States*, 607 F.2d 943, 951 n.8 (Ct. Cl. 1979) ("[P]roperty is deemed taken when the Government substantially disturbs the owner's use and possession of the subject property."). Accordingly, the language "under threat of condemnation" in S. 794 does not foreclose Claimants who sold their property subsequent to the filing of Declarations of Taking, because all of the 1942-1944 contracts were executed after the filings of the condemnation petitions. For these reasons, the November 24, 1998 Order is vacated, as it improperly forecloses claims of landowners or their heirs who sold their property after the issuance of the Declarations of Taking. *See Marconi Wireless Tel. Co. of Am.* v. *United States*, 320 U.S. 1, 47-48 (1943) (holding that the trial court had the power, "at any time prior to the entry of its final judgment . . . to reconsider any portion of its decision and reopen any part of the case.") (citations omitted).

The court is aware, however, that the intent of the principal proponent of S. 794 was to include landowners who proceeded to jury proceedings. *See* Pl. Ex. A (April 23, 1998 Letter from Senator Wendell Ford to Mr. J. Gregory Troutman) ("I wrote and sponsored legislation in the United States Senate which was intended to allow a group of individuals the opportunity to have their day in court. There has been a great deal of speculation as to the scope of this legislation. . . . To be quite clear, my legislation was never intended to be limited to only those individuals who negotiated sales with the Federal government.").[38] The plain language of S. 794, however, limits the scope of the reference to claims from landowners who sold their property to the Government, and does not include claims of landowners whose property was acquired through jury proceedings. *See* S. 794, 103d Cong. § 1 (1993) (Authorization) ("The Secretary of the Treasury is authorized and directed to pay, out of money not otherwise appropriated, to the individuals . . . who *sold* their land . . . to the United States Government[.]") (emphasis added); *see also Info. Tech. & Applications*

[38] The Government properly asserts that Pl. Ex. A is inadmissible. *See* Gov't Opp. Claimants' Mot. at 2.

*Corp.* v. *United States*, 316 F.3d 1312, 1320 (2003) ("If the statutory language is plain and unambiguous, then it controls[.]"). Accordingly, only those landowners who sold their property to the Government under *contract* based on a mutual mistake are entitled to restitution. *See Land Grantors I*, 64 Fed. Cl. at 703. Assuming, *arguendo*, that this assessment is not accurate, those landowners who elected to have a jury determine their property's value nevertheless would be excluded under S. 794, because that property was not sold pursuant to a contract with the Government, but conveyed by judicial order.

### H. Claimants' March 6, 2008 Request To Modify Proposed Class Is Denied.

On June 22, 2006, Claimants' Motion for Class Certification was granted. *See Land Grantors II*, 71 Fed. Cl. at 626-27. Therein, the class as persons, or heirs of such persons, for notice, and all other purposes, was defined as those:

> 1. who sold land in Henderson, Union, and/or Webster Counties, Kentucky during 1942-1944 to the Government under the threat of condemnation, pursuant to a contract, in order to provide the 35,684.99 acres necessary to establish the military training camp known as Camp Breckinridge;
>
> 2. who executed an Affidavit of Vendor that included the following, or substantially the following, language representing:
>
>    That there are no explorations or rentals being paid whatever for the development of coal, oil, gas or other minerals on said lands, that there are no outstanding rights under the terms of any oil, gas, coal or other mineral leases appearing of record for the reason that no rentals under any oil, gas or mineral leases have been paid to those vendors within the past 9 months, nor to any predecessor in title within the past 10 years; that no oil, gas or mineral well was drilled on said premises as provided by the terms of said leases; that oil, gas or mineral leases are void, and all rights thereunder forfeited for the reason of non-performance on the part of the lessee or his (their) assigns to pay rental, or drill wells according to the terms of said leases, that no exploration for oil, gas or minerals are being conducted on said premises at this time, and that there are no oil wells on said premises; and
>
> 3. who were within the prospective class sought to be certified, but were not named as a party or in privity to a named party in *Higginson* v. *United States*, No. 2074 (W.D. Ky. Sep. 7, 1965) (unpublished), 384 F.2d 504 (6th Cir. 1967), *cert. denied*, 390 U.S. 947, 88 S. Ct. 1034, 19 L. Ed. 2d 1137 (1968).

*Id.*

On August 2, 2006, the parties filed a Joint Status Report, supplemented by Claimants on August 25, 2006. On August 25, 2006, the Government filed a Request To Approve Proposed Class Action Notice And Proposed Request to Join Class ("Gov't Request"). *See* Gov't Request at 2.

Claimants did not object. On March 6, 2008, however, Claimants requested that the class definition be modified to eliminate the Affidavit of Vendor requirement, because the Tucker Act claims requiring privity of contract were dismissed. *See Land Grantors V*, 80 Fed. Cl. at 196 (dismissing Case No. 93-6481L as barred by the statute of limitations, 28 U.S.C. § 2501).

Since Claimants' claim arises from a mutual mistake material to the 1942-1944 contracts, the Vendor Affidavit requirement is a necessary condition for class definition and notice. *See Nat'l Austl. Bank* v. *United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006) ("Reformation of a written agreement on the ground of mutual mistake is an extraordinary remedy, and is available only [where] . . . the *parties to the contract* were mistaken in their belief regarding a fact[.]") (emphasis added). As previously discussed, the evidence in this reference indicates that a Vendor Affidavit appears to have been executed as part of all the 1942-1944 contracts, so this requirement should impose no additional burden on Claimants. *See, e.g.*, DX 541 at CHI-002-A015-0036 (emphasis omitted) (cited in Gov't Pre-Trial Mem. at 14). For these reasons, Claimants' March 26, 2008 Motion is denied. As for the Government's August 25, 2006 Request To Approve Proposed Class Action Notice And Proposed Request To Join Class, since the Government's proposed notice was premised upon this matter being resolved as a legal claim, it is now moot.

### I. Claimants Are Entitled To Reasonable Attorneys Fees, Reasonable Expenses, And Costs.

S. 794 also provides, in relevant part, that:

> No part of the amount appropriated by this Act in excess of 10 percent thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, any contract to the contrary notwithstanding. Violation of the provisions of this section is a misdemeanor punishable by a fine not to exceed $1,000.

S. 794, 103rd Cong. § 3 (1993).

Accordingly, 10 percent of the final amount that Congress appropriates, pursuant to this reference, should be paid on a *pro rata* basis to Marzulla & Marzulla and Wyatt, Tarrant & Combs, LLP, in proportion to the reasonable time each spent in litigating this reference, together with reasonable expenses and costs. The hourly rate should be based on the standard hourly rate for Washington, D.C. (Marzulla & Marzulla) and Louisville, Kentucky (Wyatt, Tarrant & Combs LLP) in the years that legal services were rendered.

## IV. CONCLUSION.

For the reasons discussed herein, Congress should appropriate at least $34,303,980.42, in restitution, the amount the Government received for the lease and sale of coal, gas, oil, or other mineral rights on the former Camp Breckinridge properties since 1957. In considering this recommendation, Congress should be mindful that the entire amount of revenue that the Government received for the lease and sale of these rights is unknown, because the Government failed to produce

or destroyed relevant documents that would verify the correct amount. In addition, the Government has avoided paying at least an additional $91,709,844.54[39] in interest on the national debt as a consequence of having the benefit of these revenues. Therefore, the $34,303,980.42 represents only 27 percent of the total benefit ($126,013,824.96) actually received by the Government.

In addition, Congress should authorize the Secretary of the Treasury to deposit the total amount appropriated in a Trust Account of a national bank located in Louisville, Kentucky that has established trust and real estate departments. The Trust Officer should have the power to: issue public notice, describing the class as set forth herein; resolve any disputes regarding whether any particular individual is an "heir" of an original landowner who sold his or her property to the Government to establish Camp Breckinridge between 1942-1944; allocate the amount of appropriated funds to each individual member of the class in proportion to his or her former ownership interest in the original tracts;[40] and pay such allocations from the Trust Account to the individual members of the class within two years after the Trust is established.[41]

Within six months after all payments are made, the Trust Officer should file a Final Accounting with Congress, setting forth the amounts that were paid from the Trust Account, the persons to whom payments were made, and any amount that remains after Claimants' lawyers and all necessary Trust Officer fees, expenses, and costs are paid. Congress should authorize the Trustee

---

[39] This amount was determined by utilizing a simple interest formula using the one-year "constant maturity" Treasury rate for each year from 1965 to 2007. *See* Sept. 29, 2005 Haywood Aff. (Dr. Charles F. Haywood, Claimants' economics and finance expert, calculating Government's avoidance of interest using one-year "constant maturity" Treasury rate from 1967 to 2005); *see also id.* Table 2 (Government's Enrichment From Avoidance Of Interest One-Year Constant Maturity Rates: 1967-2005).

[40] *See Land Grantors I*, 64 Fed. Cl. at 712-13 ("From this information, an amount per acre can be determined and matched against the acreage of the condemned properties, which then can be attributed to the appropriate Plaintiff."); *see also* Plaintiffs' Exhibit Appendix In Response To The Court's December 15, 2005 Order And Comprehensively Summarizing Mineral Sale Proceeds, *Land Grantors* v. *United States* (No. 93-648X) (Fed. Cl. April 27, 2006), at Tabs B(1-3) (Tables allocating sale and lease proceeds to each tract–*without* factoring in the 1991-1993 coal lease on Tract 7A, and interest avoided from each sale and lease); *Id.* at Tab A (Feb. 26, 2008 Declaration Of William Mattingly, principal in Coulter Mapping Solutions) (describing method by which mineral proceeds may be allocated to their original tracts).

[41] With respect to the amount that the Trust Officer should distribute to heirs, the approach suggested by Claimants is recommended, *i.e.*, if the original landowner is deceased, the Trust Officer should authorize payment of the entire amount allocated to the original landowner's tract to his or her statutory heirs who opt into the class (distributed per stirpes in accordance with the laws of descent and distribution of Kentucky, Ky. Rev. Stat. Ann. § 391.040 (Michie 2008)). Heirs who do not opt into the class by a date set by the Trust Officer should be treated as deceased.

to remit any funds remaining in the Trust Account to the Secretary of the Treasury for deposit into the General Treasury Fund.[42]

**IT IS SO ORDERED.**

s/Susan Braden
**SUSAN G. BRADEN**
**Judge and Hearing Officer**

[42] In light of the genesis of this proceeding as a congressional reference, the court is also forwarding a copy of this Final Report and Memorandum Opinion to the attention of: United States Senator for Kentucky Mitch McConnell; United States Senator for Kentucky Jim Bunning; United States Representative for Kentucky's First District Edward Whitfield; and ranking members of the United States Senate Judiciary Committee, Senator Patrick J. Leahy and Senator Arlen Specter.