**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| LAND GRANTORS IN HENDERSON, | ) | |
| UNION and WEBSTER COUNTIES, | ) | |
| KENTUCKY and THEIR HEIRS, | ) | No. 93-648X |
| | ) | |
| Claimants, | ) | Judge Charles F. Lettow (Presiding Officer), |
| | ) | Senior Judges Lawrence S. Margolis, |
| v. | ) | Loren A. Smith, Review Panel |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| ____________________________________ | ) | |

**UNITED STATES' OPENING BRIEF IN SUPPORT OF ITS NOTICE OF EXCEPTION**

**TABLE OF CONTENTS**


**TABLE OF AUTHORITIES** . . . . . vi

**ATTACHMENT LIST** . . . . . xii

**MEMORANDUM** . . . . . 1

**I. Summary of Argument** . . . . . 1

**II. Factual Background** . . . . . 4

**A. The United States' Acquisition of the Breckinridge Properties** . . . . . 4

**B. Documents Generated at or Near the Time of Acquisition** . . . . . 7

**1. The Acquisition Documents** . . . . . 7

**I. The Documents Related to the Purchased Properties** . . . . . 7

**ii. The Documents Related to the Condemned Properties** . . . . . 9

**2. Contemporaneous Correspondence** . . . . . 10

**3. Historical Newspaper Articles** . . . . . 12

**C. The United States' Sale of the Breckinridge Properties** . . . . . 13

**1. 1944 and 1949 Property Surplus Acts** . . . . . 13

**2. Sale of the Breckinridge Properties** . . . . . 15

**D. Higginson Litigation** . . . . . 16

**III. Procedural Background** . . . . . 16

**A. Pre-Trial Proceedings** . . . . . 16

**B. The First Interim Report** . . . . . 17

**C. The Final Report** . . . . . 19

**IV. Applicable Legal Standards** . . . . . 21

**A. Standard of Review of a Hearing Officer's Report** . . . . . . . . . . . . . . . . . . . . 21

**B. The Purpose and Effect of a Congressional Reference** . . . . . . . . . . . . . . . . . . 22

**C. General Rules Applicable in a Congressional Reference** . . . . . . . . . . . . . . . . 22

**V. The Reports are Fundamentally Flawed Because they Lack Claimant-Specific Findings and are Based on Flawed Inductive Reasoning** . . . . . . 25

**VI. The Hearing Officer's Conclusion that "The Doctrine of Laches is Inapplicable" is Clearly Erroneous** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**A. The Review Panel Should Recommend No Recovery Based on the Doctrine of Laches** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**B. The Hearing Officer's Factual Findings Cited to Support a Conclusion that the Doctrine of Laches is Inapplicable Are Clearly Erroneous** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**1. "Sometime in 1968, following the United States Supreme Court's denial of *certiorari* in the *Higginson* case, a group of landowners and/or their heirs formed the Breckinridge Land Committee ('the Committee') and turned to Congress to seek redress." Land Grantors I, 64 Fed. Cl. at 685.** . . . . . . . . . . . 31

**2. "The record evidences that numerous requests/petitions were made by the former landowners to repurchase their land after World War II ended." Land Grantors I, 64 Fed. Cl. at 713.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**3. "The record also evidences that there was considerable confusion about what federal office was responsible for decisions about disposal of Camp Breckinridge that was caused by the Government." Land Grantors I, 64 Fed. Cl. at 713.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**4. "The record evidences no public notice or local news article[s] about the 1957 lease to Felmont Oil or [the] 1959 lease to Kingwood Oil at the time they were entered." Land Grantors I, 64 Fed. Cl. at 714.** . . . . . . . . . . . . . . . . . . . . . . . . . 35

**5. "Landowners living in the Henderson, Union, and Webster County areas may have assumed, albeit erroneously, that sufficient efforts were made to preserve their legal rights to benefit from the doctrine of equitable tolling by the filing of the Higginson complaint." Land Grantors I, 64 Fed. Cl. at 715.** . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**6. "Plaintiffs did not have the ability to compel the Government to obtain and release information about the 1957 and 1959 leases and 1965 sales" because the "Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, ("FOIA") was not enacted until 1966." Land Grantors I, 64 Fed. Cl. at 715.** . . . . . 36

**VII. The Hearing Officer's Admission of, and Reliance on, Hearsay Evidence is Clearly Erroneous** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**A. Admission of the Affidavits After Trial Without Foundation is Erroneous** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**B. The Hearing Officer's Reasons for Admission Should Not Be Upheld** . . . . 41

**VIII. The Hearing Officer's Conclusion that "Many" Landowners Were Promised a "Priority to Repurchase Land Sold by Them if Sold by the United States Government" is Clearly Erroneous** . . . . . . . . . . . . . . . . . . . . . . . . . 43

**A. The Hearing Officer's Finding Cannot be Based on the Deposition Transcripts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**B. The Hearing Officer's Finding Cannot be Based on the Discovery Responses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**C. The Hearing Officer's Finding Cannot be Based on the Affidavits** . . . . . . . 45

**D. Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**IX. The Hearing Officer's Conclusion that the Landowners Were "Paid Less than Reasonable Value Due in Part to the Refusal of the United States Government to Compensate the Owners for Mineral, Oil and Gas Rights" is Clearly Erroneous** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**A. The Hearing Officer Disregarded the Extensive Expert Testimony that Proved Claimants Were Not Paid Less than Reasonable Value** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

B. **The Hearing Officer's Finding that the Former Landowners Did Not Receive Reasonable Value for the Breckinridge Properties is Clearly Erroneous** . . . . . 49

X. **The Hearing Officer's Application of the Doctrine of Mutual Mistake is Clearly Erroneous** . . . . . 52

A. **Claimants' Right to Avoid the Contracts Are Barred for Failure to Act Within a Reasonable Time** . . . . . 54

B. **Subsequent Discovery of Commercially Valuable Mineral Deposits Cannot Retroactively Create a Mistake of Fact** . . . . . 55

C. **The Hearing Officer's Finding that the Parties Entered the Sales Contracts With a Mutual Mistake About the Existence of Minerals is Clearly Erroneous** . . . . . 56

1. **The Hearing Officer's Finding that the Parties Were Mutually Mistaken is Not Supported by the Record** . . . . . 57

i. **The United States' Historians' Expert Reports** . . . . . 58

ii. **The Acquisition Documents** . . . . . 59

iii. **Thirty-Nine Affidavits Signed by Heirs in 1979** . . . . . 60

iv. **Five Deposition Transcripts of Former Landowners** . . . . . 61

v. **Four Interrogatory Responses** . . . . . 62

vi. **Mineral Lease Acquisitions** . . . . . 62

2. **The Hearing Officer's Finding About a Subsequent Discovery of Minerals is Not Supported by the Record** . . . . . 63

D. **The Hearing Officer's Finding that the Parties' Mistaken Belief Constituted a "Basic Assumption" Underlying the Contracts is Clearly Erroneous** . . . . . 65

E. **The Hearing Officer's Unsupported Statement that the Parties' Mistaken Belief Had a "Material Effect" on the Agreed Exchange of Performance is Clearly Erroneous** . . . . . 66

**F. Even Assuming the Parties Were Mistaken About the Existence of Minerals, the Hearing Officer's Conclusion that the Claimants Should Not Bear the Risk of Any Mutual Mistake is Clearly Erroneous** . . . . . . . . . . . . . . . . . . . . . . . . 68

**G. The Doctrine of Mutual Mistake is Not Responsive to the Terms of S. 794** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

**XI. Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

## TABLE OF AUTHORITIES

### FEDERAL CASES


A.C. Aukerman Co. v. R.L. Chaides Const. Co.,
960 F.2d 1020 (Fed. Cir. 1992) . . . . . . . . . . 27, 28

Acuna v. United States,
1 Cl. Ct. 270 (1982) . . . . . . . . . . 29

Awtry v. United States,
684 F.2d 896 (Ct. Cl. 1982) . . . . . . . . . . 28

Baker v. Penn Mutual Life Ins. Co.,
788 F.2d 650 (10th Cir. 1986) . . . . . . . . . . 55

Banfi Products Corp. v. United States,
40 Fed. Cl. 107 (1997), aff'd as modified, 41 Fed. Cl. 581 (1998) (Cong. Ref.) . . . 24, 25

Bellamy v. United States,
7 Cl. Ct. 720 (1985) . . . . . . . . . . 13, 14

Benson v. United States,
141 Ct. Cl. 273 (1958) . . . . . . . . . . 23

Blacklock v. United States,
208 U.S. 75 (1908) . . . . . . . . . . 22

United States v. 53 1/4 Acres of Land, More or Less, in Borough of Brooklyn,
176 F.2d 255 (2d Cir. 1949) . . . . . . . . . . 6

C.V. v. United States,
61 Fed. Cl. 55 (2004) . . . . . . . . . . 28-29

Cayuga Indian Nation of N.Y. v. Pataki,
83 F.Supp.2d 318 (N.D.N.Y. 2000) . . . . . . . . . . 50

Cent. Freight Lines, Inc. v. N.L.R.B.,
653 F.2d 1023 (5th Cir. 1981) . . . . . . . . . . 42

Colorado Coal & Iron Co. v. United States,
123 U.S. 307 (1887) . . . . . . . . . . 55

Dairyland Power Coop. v. United States,
16 F.3d 1197 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 55, 65-66

Emerald Maint., Inc. v. United States,
925 F.2d 1425 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Eurell v. United States,
566 F.2d 1146 (Ct. Cl. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Flippin Materials Co. v. United States,
160 Ct. Cl. 357 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Ford v. United States,
116 U.S. 213 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Grymes v. Sanders,
93 U.S. 55 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Harrison v. Phillips,
185 F.Supp. 204 (S.D. Tex. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Hart v. United States,
58 Ct. Cl. 518 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Higginson v. United States,
384 F.2d 504 (6th Cir. 1967), cert. denied, 390 U.S. 947 (1968) . . . . . . . . . . . . 15, 16, 66

Highsmith v. SW Med. Found.,
116 F.Supp. 958 (D. C. Tex. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Idaho v. Wright,
497 U.S. 805 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

INSLAW, Inc. v. United States,
39 Fed. Cl. 307 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-24

JANA, Inc. v. United States,
936 F.2d 1265 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Kanehl v. United States,
38 Fed. Cl. 89 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 28-29, 32

Kanehl v. United States,
40 Fed. Cl. 762 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24

Kerr-McGee Corp. v. United States,
36 Fed. Cl. 776 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23-24

Kirby Forest Indus., Inc. v. United States,
467 U.S. 1 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

LaCoste v. United States,
9 Cl. Ct. 313 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Land Grantors v. United States,
64 Fed. Cl. 661 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Land Grantors v. United States,
69 Fed. Cl. 435 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 59

Land Grantors v. United States,
74 Fed. Cl. 518 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Land Grantors v. United States,
77 Fed. Cl. 686 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Land Grantors v. United States,
81 Fed. Cl. 580 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Martin v. United States,
37 Fed. Cl. 86 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Mason v. United States,
169 F.Supp. 507 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Murphy v. United States,
222 Ct. Cl. 559 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Nat'l Austl. Bank v. United States,
452 F.3d 1321 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 63

Northrop Grumman Corp. v. United States,
47 Fed. Cl. 20 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Office of Personnel Mgmt. v. Richmond,
496 U.S. 414 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Palumbo v. Ewing,
540 F. Supp. 388 (D. Del. 1982) . . . . . . . . . . 68

Paul v. United States,
20 Cl. Ct. 236, aff'd, 21 Cl. Ct. 758 (1990) (Con. Ref.) . . . . . . . . . . 22

Peters v. United States,
408 F.2d 719 (Ct. Cl. 1969) . . . . . . . . . . 40

Philippine Sugar Estates Dev. Co. v. Government of Philippine Islands,
247 U.S. 358 (1918) . . . . . . . . . . 53

Rex Trailer Co. v. United States,
50 U.S. 148 (1956) . . . . . . . . . . 13

Ridgely's Estate v. United States,
180 Ct. Cl. 1220 (1967) . . . . . . . . . . 48

Sac & Fox Indians of Iowa v. Sac & Fox Indians of Okla.,
45 Ct. Cl. 287 (1910) . . . . . . . . . . 23

Sea-Gate, Inc. v. United States,
4 Cl. Ct. 25 (1983) . . . . . . . . . . 47

Seiden v. Larson,
188 F.2d 661 (D.C. Cir. 1951), cert. denied, 341 U.S. 950 (1951) . . . . . . . . . . 15

Shu-Hui Chen v. Bouchard,
347 F.3d 1299 (Fed. Cir. 2003) . . . . . . . . . . 42

J.L. Simmons Co. v. United States,
60 Fed. Cl. 388 (2004) . . . . . . . . . . 24

Spalding & Son, Inc. v. United States,
28 Fed. Cl. 242 (1993) (Cong. Ref.) . . . . . . . . . . 24

Spezzaferro v. F.A.A.,
807 F.2d 169 (Fed. Cir. 1986) . . . . . . . . . . 43

United States v. Miller,
317 U.S. 369 (1943) . . . . . . . . . . 6

United States v. Sowards,
370 F.2d 87 (10th Cir. 1966) . . . . . . . . . . 50

West Virginia v. United States,
37 Ct. Cl. 201 (1902) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Widmayer v. United States,
42 Ct. Cl. 519 (1907) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**STATE CASES**

Allied Chem. Corp. v. Union County Bd. of Supervisors,
511 S.W.2d 196 (Ct. App. Ky. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Bennett v. Shinoda Floral, Inc.,
739 P.2d 648 (Wash. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Columbia Basin Fitness Club v. TC Investments,
98 Wash. App. 1018, 1999 WL 1080343 (Wash. App. 1999) . . . . . . . . . . . . . . . . . . . . . . 71

Finch v. Carlton,
524 P.2d 898 (Wash. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Haag v. State Bd. of Univ. & School Lands,
219 N.W.2d 121 (N.D. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Pendelton v. Witcoski,
836 So.2d 1025 (Fla. Dist. Ct. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Wood v. Boynton,
64 Wis. 265 (1885) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**FEDERAL STATUTES**

5 U.S.C. § 552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

28 U.S.C. § 1346(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 U.S.C. § 1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20

28 U.S.C. § 2503(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

28 U.S.C. § 2509 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21-23, 28

40 U.S.C. § 258a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

40 U.S.C. § 301 . . . . . . . . . . 34

40 U.S.C. § 3114(b) . . . . . . . . . . 6

40 Stat. 241 . . . . . . . . . . 5

46 Stat. 1191 . . . . . . . . . . 13

58 Stat. 765 . . . . . . . . . . 13, 14

62 Stat. 1196 . . . . . . . . . . 14

Pub. L. No. 692 . . . . . . . . . . 13

**FEDERAL RULES**

Fed. R. Evid. 807 . . . . . . . . . . 38-42

**OTHER MATERIALS**

125 Cong. Rec. 166 (Nov. 27, 1979) . . . . . . . . . . 15

**ATTACHMENT LIST**[1/]

| **Attachment** | **Description** |
|---|---|
| A | Summary of Dates on Petitions in Condemnation and Declarations of Taking |
| B | Documents cited to support finding that "numerous requests/petitions were made by the former landowners to repurchase their land after World War II ended" (Land Grantors I, n.52) |
| C | Documents cited to support finding "there was considerable confusion about what federal office was responsible for decisions about disposal of Camp Breckinridge that was caused by the Government" (Land Grantors I, n.53) |
| D | Affidavits cited to support finding "many of the landowners entered into Contracts with . . . the apparent understanding that they could repurchase their properties after World War II was concluded" (Land Grantors I, n.36) |
| E | Deposition transcripts cited to support finding "many of the landowners entered into Contracts with . . . the apparent understanding that they could repurchase their properties after World War II was concluded" (Land Grantors I, n.35) |
| F | Discovery responses cited to support finding "many of the landowners entered into Contracts with . . . the apparent understanding that they could repurchase their properties after World War II was concluded" (Land Grantors I, n.37) |
| G | Different tracts relevant to finding about repurchase promises |
| H | Affidavits cited to support finding that parties mistakenly believed there were no minerals underlying the Breckinridge Properties (Land Grantors I, n.44) |
| I | Deposition transcripts cited to support finding the parties mistakenly believed there were no minerals underlying the Breckinridge Properties (Land Grantors I, n.44) |
| J | Discovery responses cited to support finding that parties mistakenly believed there were no minerals underlying the Breckinridge Properties (Land Grantors I, n.44) |
| K | Different tracts relevant to finding about mutual mistake |

[1/] In support of key findings, the Hearing Officer's Reports cite numerous trial exhibits, often in string cites in footnotes. Attachments A through K summarize the relevant information contained in those documents. Claimants' Trial Exhibits are referred to as "CX-#", United States' Trial Exhibits are referred to as "DX-#" and Joint Trial Exhibits are referred to as "JX-#."

**MEMORANDUM**

## I. Summary of Argument

Senate Bill 794, 103d Cong. (1993) ("S. 794"), directs this Court to investigate the legal and equitable claims of certain individuals (or if deceased, their heirs), who sold property in Henderson, Union, and Webster Counties, Kentucky, to the United States for the establishment of Camp Breckinridge, a military training installation. S. 794 limits relief to those former landowners who were:

> (1) promised they would be given priority to repurchase land sold by them if sold by the United States Government; and
> (2) paid less than reasonable value due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights.

S. 794, Sec. 2.[2/] The Senate directed the Chief Judge to "proceed . . . in accordance with the provisions of sections 1492 and 2509 of title 28, United States Code, and report back to the Senate, at the earliest practicable date, giving such findings of fact and conclusions that are sufficient to inform Congress of the amount, if any, legally or equitably due from the United States to the claimants individually." S. Res. 98.

The Hearing Officer's ("Officer's") conclusion that Claimants are "entitled to monetary relief from Congress arising out of an equitable claim," Land Grantors v. United States, 81 Fed. Cl. 580, 601 (2008) ("Land Grantors VI" or "Final Report"), is based on clearly erroneous

---

[2/] By its clear terms, S. 794 requires Claimants to show both requirements. In addition to the discussion below, Claimants presented no evidence that the United States refused to compensate any landowner for minerals. Consequently, Claimants did not carry their burden of proof. See Trial Tr. at 198:12-13 (CLAIMANTS' COUNSEL: "We've now found from discovery that the minerals were paid for.").

factual findings and legal analyses.[3] As discussed below, the Review Panel should reject the Officer's Reports,[4] and issue a Panel Report concluding that any award would be a gratuity and recommending no relief to the Claimants. Although the Final Report contains numerous errors, this brief focuses on the following issues.[5]

First, the Reports are not based on Claimant-specific evidence and lack any Claimant-specific analysis of liability or damages. The conclusions are instead based on the allegations of a small number of individuals, and the Officer's unsupported assumption of generalized harm. The Final Report compounds these problems by allowing as yet unnamed individuals to join as Claimants, and by certifying a new class action. As a result of these decisions, no one knows who the Claimants are, which Claimants the Officer believes may be entitled to equitable relief, or how much any individual Claimant is due. See discussion infra § V. The Review Panel should reject the Final Report, therefore, because it lacks information "sufficient to inform

---

[3] The Officer did not decide whether Claimants were entitled to relief under a legal claim. See id. ("That issue [whether the statute of limitations should be lifted] does not need resolution in this reference. . . ."). See 28 U.S.C. § 2509(c) (directing the Officer to determine the facts "bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy").

[4] The Officer issued a Final Report and several interim reports. See id. at 582 n.1 (incorporating the interim reports into the Final Report). Where appropriate, all of the Officer's reports are termed "Reports."

[5] Among other issues, the United States also disagrees with the Officer's calculation of damages, which is based, in part, on Claimants' submissions, submitted over the United States' objection after trial. The Officer's conclusion that the United States' sales of the Breckinridge Properties resulted in unjust enrichment is unsupported. In addition, the Officer's accusation that the "Government destroyed and/or misplaced many of the documents that would verify the proper amount of restitution owed to Claimants, even during the period that this reference was pending," Land Grantors VI, 81 Fed. Cl. at 583, is offered without citation or support, and is clearly erroneous.

Congress of the amount . . . due from the United States to the claimants individually." S. Res. 98.

Second, the Officer's conclusion that "the doctrine of laches is not relevant," Land Grantors v. United States, 64 Fed. Cl. 661, 716 (2005) ("Land Grantors I" or "First Interim Report"), is clearly erroneous. See discussion infra § VI. As discussed below, the Officer's findings relevant to this issue are either not supported by the documents cited or are inapplicable to the laches defense. On this basis alone, the Review Panel should recommend that any monetary award would be a gratuity.

Third, regarding Section 2(1) of S. 794, the Officer concluded that the "landowners entered into Contracts with the Government in 1942-1944 with the apparent understanding that they could repurchase their properties after World War II was concluded. . . ." Land Grantors I, 64 Fed. Cl. at 702. The Officer's finding is based on inadmissible hearsay statements, which were generated decades after the relevant events. These self-serving allegations are contradicted by thousands of pages of historical documents. The Review Panel should overrule the Officer's admission of these hearsay documents, see discussion infra § VII, and reject the Officer's conclusion about repurchase promises. See discussion infra § VIII.

Fourth, regarding Section 2(2) of S. 794, the Officer concluded that all landowners and all government agents mistakenly believed, at the time of the United States' acquisition, that there were no minerals underlying these properties. On this basis, the Officer concluded that the doctrine of mutual mistake applied, and recommended that Congress appropriate a multi-million dollar award for Claimants' behalf. See discussion infra §§ IX-X. The Review Panel should reject the Officer's conclusion because it is unsupported by the law and is based on clearly

erroneous factual findings.

A memorandum in support of these exceptions follows.

## II. Factual Background

### A. The United States' Acquisition of the Breckinridge Properties

Even prior to Pearl Harbor, the United States began preparations for possible war by constructing military camps for the training and housing of federal troops. Due to its inland location, level land suitable for training maneuvers, and access to rail, road and river transportation, western Kentucky was identified by the War Department in early 1941 as a suitable location for an Army training camp. See DX-182 at DOJ1817 (expert report of Dr. Johnson); DX-183 at DOJ2761 to -62 (expert report of Dr. Brigham). Planning and surveying for such a camp in Henderson, Union and Webster Counties, Kentucky (the "Tri-County Area") began in August 1941. See DX-182 at DOJ1817; DX-183 at DOJ2773. To build Camp Breckinridge, the United States acquired a total of 491 tracts of land – 365 by direct condemnation ("Condemned Tracts") and 126 by sale ("Purchased Tracts") – between 1942 and 1944 (collectively, these properties are hereinafter called the "Breckinridge Properties"). Most of the landowners used their properties for farming. Prior to the United States' acquisition, owners of 271 of the 491 Breckinridge Properties (55 percent) had entered into oil and gas leases with third parties; the United States also acquired these mineral leases. See DX-537 (summary document, showing 30 percent of the Purchased Tracts had a mineral lease at the time of acquisition); DX-204 (summary document, showing 61 percent of the Condemned Tracts had a mineral lease at the time of acquisition). For several tracts, the surface estate was owned by one individual and the minerals were owned by a different individual; in those cases, the United

States acquired both interests from the respective owners. See, e.g., JX-322 at CHI-020-E082-0017 to -18 (Final Judgment for Tract E-82, showing coal rights were separately owned and separately acquired). The per acre value paid by the United States for the Breckinridge Properties varied widely (from $10 per acre, to as high as $22,795 per acre), depending on the size, shape and characteristics of the individual tract. See DX-204; DX-537.

The Act of July 2, 1917, 40 Stat. 241 (codified as amended at 50 U.S.C. § 171) (repealed 1956) ("War Powers Act"), provided authority for the United States' acquisition of the Breckinridge Properties. See, e.g., JX-263A at CON1705 to -06. Proceedings under the War Powers Act began when the Secretary of War filed with the Federal District Court for the Western District of Kentucky ("District Court") a Petition in Condemnation, which identified the location of the properties the United States intended to acquire. See id. (sample Petition in Condemnation). The United States filed five Petitions in Condemnation between February 1942 and May 1944. See Attach. A. The Petitions in Condemnation were jurisdictional prerequisites to permit the District Court to hear any necessary further proceedings. See 6 Julius L. Sackman, Nichols on Eminent Domain § 26A.02[1] (rev. 3d ed. 2005).

The War Department's filings of the Petitions in Condemnation did not transfer ownership of the Breckinridge Properties to the United States. Either before – or sometimes after – the United States filed a Petition in Condemnation, government agents negotiated with landowners to secure an option agreement. See DX-183 at DOJ2777 to -78. With an option agreement, the United States paid for the right to purchase a property at a predetermined price within a specified period of time. The United States signed purchase options for 126 tracts of land. See id. These Purchased Tracts were, in the language of S. 794, "sold . . . under threat of

condemnation."

Owners of 365 Condemned Tracts declined to sign an option agreement, and the United States condemned these properties. See DX-204 (detailed information about the Condemned Tracts).[6] The War Powers Act did not prescribe the manner in which the United States might exercise its authority to condemn the properties identified in the Petitions in Condemnation if condemnation was necessary. In the case of Camp Breckinridge, the United States used the legal authority provided by the Declaration of Takings Act, 40 U.S.C. § 258a (current version at 40 U.S.C. § 3114 (2006)). See JX-206A (example). The United States invoked this authority by filing Declarations of Taking, which identified the specific tracts being condemned, and set forth the United States' estimate of compensation for each tract. See Attach. A (identifying the Declarations of Taking); JX-206A (example). At the same time it filed a Declaration of Taking, the United States deposited the just compensation for each Condemned Tract, based on the United States' appraisal, into the District Court's registry "for the use and benefit of the persons entitled thereto." JX-206A at CON0015. Title to these properties vested in the United States the moment the government filed a Declaration of Taking and deposited the just compensation. See 40 U.S.C. § 258a; 40 U.S.C. § 3114(b) (current version). The owner of a Condemned Tract could withdraw the full amount of the deposit immediately. See, e.g., United States v. Miller, 317 U.S. 369, 381 (1943); United States v. 53 1/4 Acres of Land, More or Less in Borough of Brooklyn, 176 F.2d 255, 258 (2d Cir. 1949). Once the United States filed a Declaration of Taking, the District Court, in subsequent judicial proceedings, ascertained the exact value of the

[6] Nine properties, whose owners signed option agreements but apparently refused to sell at the agreed-upon price, were acquired by condemnation. See DX-204.

land, and awarded the difference, if any, between the adjudicated value and the estimated amount the United States had deposited with the District Court, plus interest on the difference. See Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 5 (1984). At the time of the acquisition, interest on the difference was calculated at 6 percent simple interest.

## B. Documents Generated at or Near the Time of Acquisition

The trial record includes thousands of pages of sales and condemnation documents (the "Acquisition Documents"), correspondence to and from landowners, and newspaper articles, all generated at or near the time of the United States' acquisition of the Breckinridge Properties. In the entire historical record, there is no mention of repurchase promises and no mention of the United States' refusal to compensate landowners for subsurface minerals. A summary of this record is provided below.

### 1. The Acquisition Documents

#### i. The Documents Related to the Purchased Properties

The trial record contains thousands of pages of Acquisition Documents related to those Purchased Tracts that correlate to the claims raised by those individuals who had been identified as Claimants at the time of trial. See JX-538 to JX-614. These documents clearly and unambiguously show that the landowners intentionally conveyed, and the United States intentionally acquired, the full fee simple absolute in the Breckinridge Properties.

Nearly all of the Purchased Tract owners entered into option agreements with the United States. See, e.g., JX-541 at CHI-002-A015-0016 to -19 (representative example). The option agreement indicated the landowner's intent to convey to the United States "the land, with the buildings, improvements and equipment thereon and all rights and appurtenances thereto

[followed by a legal description].” Id. at CHI-002-A015-0016. The option agreements stated that the landowner agreed to convey the property “in fee simple, free from all encumbrances.” Id. at CHI-002-A015-0017.[7]

For each of the Purchase Tracts, a representative of the United States signed a Certificate of Inspection and Possession (“Certificate”) at the time of acquisition. The Certificate included several statements related to the United States’ inspection of the property, and often included the following language:

> That to the best of my information and belief after actual and diligent inquiry and physical inspection of said premises there is no evidence whatever of any vested or accrued water rights for mining, agricultural, manufacturing or other purposes . . . nor any exploration or operations whatever for the development of coal, oil, gas or other minerals on said lands. . . .

Id. at CHI-002-A015-0015.

Each landowner signed an Affidavit of Vendor (“Affidavit”) at the time of acquisition. Similar to the Certificate, the Affidavit generally included language related to ongoing mining operations. For Tract No. A-15, for example, the landowners stated, “[t]hat there are no explorations or rentals being paid whatever for the development of coal, oil, gas or other minerals on said lands [and] no exploration for oil, gas or minerals are being conducted on said premises at this time, and that there are no oil wells on said premises.” Id. at CHI-002-A015-0036. Some landowners redacted the above-quoted language when they signed the Affidavit, in order to fit the particular circumstances relevant to their properties. See JX-605 at CHI-046-E667-0024 (showing redacted language in Affidavit for Tract No. E-667, which had a mineral

---

[7] In addition, the landowner granted the “right of immediate occupancy and use of the land hereinabove described, for any purpose whatsoever, from and after acceptance by the United States of this offer, until such time as said land is conveyed to the United States by the [former owner] hereinabove provided.” JX-541 at CHI-002-A015-0018.

lease at the time of the United States' acquisition).

On the date of closing, the landowners conveyed a Warranty Deed to the United States, and signed a receipt. The Warranty Deed showed that the landowner sold "to [the United States], its successors and assigns forever, the following described real estate. . . ." JX-541 at CHI-002-A015-0009 to -10 (describing the conveyance as a "quit-claim" of "all of their right, title and interest, if any, in and to any and all of the property adjoining and abutting the above described property . . . TO HAVE AND TO HOLD . . . to the [United States], its successors and assigns forever, with a covenant of 'General Warranty'"). The receipt stated that the payment was "in full satisfaction and discharge of the interest of the undersigned in the premises conveyed." Id. at CHI-002-A015-0013.

**ii. The Documents Related to the Condemned Properties**

The trial record also includes thousands of pages of Acquisition Documents related to the Condemned Tracts. See JX-205 to JX-536-H. Once the United States filed a Declaration of Taking with respect to a particular Condemned Tract, the District Court appointed three independent appraisers (identified as "Commissioners") to reappraise the fee simple interest in the property. See, e.g., DX-615 at DOJ4794 (Order Appointing Commissioners for Civil No. 77); id. at DOJ4912 to -15 (Commissioners' report for value of "the land and any and all improvements thereon or interest therein" for Tract No. E-27). The United States always agreed to pay the higher of its own estimate and the independently appraised value. See Def.'s Post-Trial Mem. at Tab 4. Many landowners were represented by legal counsel during the condemnation proceedings, and several landowners filed exceptions to the Commissioners' report, and took their case to a jury trial. E.g., JX-514 at CON4118 (exceptions for Tract No. E-

626); id. at CON4128 to -31 (jury award for same tract).

Like the Acquisition Documents for the Purchased Tracts, the Acquisition Documents for the Condemned Tracts do not support a finding that any landowner received a repurchase promise or that the United States refused to compensate any landowner for his mineral rights. Rather, these documents show that the landowners knowingly conveyed their full fee simple interest, with no repurchase right or reservation retained. See id. at CON4137 to -38 (Final and Deficiency Judgment, stating that the land is "heretofore condemned for the use and benefit of the United States of America, and the fee simple absolute title thereto . . . was vested in the United States of America by Order and Preliminary Judgment of Condemnation heretofore entered," and ordering "the vesting of title as aforesaid in the United States of America be confirmed and all the right, title and interest of all other persons in or to said land is hereby divested.").

**2. Contemporaneous Correspondence**

The record is devoid of any evidence generated at or near the time of the United States' acquisition – no letter, no diary entry or calendar notation, no handwritten note, no confirmation letter from any of the several attorneys who represented landowners[8] – supporting Claimants' allegations. Out of the thousands of people effected by the Breckinridge acquisitions, there is not a single piece of paper generated at or near the time of acquisition that suggests any landowner received a promise that he could repurchase his property after the war, or that the United States refused to pay for mineral rights. Furthermore, there is no evidence that any

[8] The pleadings demonstrate that a majority of the condemnees hired the law firm of King and Flournoy for legal assistance in the condemnation efforts. King and Flournoy was a local firm, which had an expertise in oil and gas matters as well as real estate transactions. See DX-49.

landowner complained, at the end of the war, that he had sold his property pursuant to a verbal repurchase promise. See Trial Tr. at 172:8-15 (HEARING OFFICER: "Do we have any evidence in the record of letters from people to the government saying remember me, you told me the following, and now I'm back and I want to buy my land?" CLAIMANTS' COUNSEL: "Well, in the record right now, no, we don't have any letters. We do have people who obviously took that position in the sixties, but it has been taken down through the years.").[9]

Although there are no contemporaneous documents to support Claimants' allegations, there are several documents that contradict those allegations (and several other documents that explain how the rumors of repurchase promises likely came into being). For example, the record includes an April 1942 petition addressed to President Roosevelt, in which a group of landowners complained about the acquisition of their properties. See DX-69. The petition does not mention that any landowner received a repurchase promise or that the United States refused to pay for mineral rights. See id. The United States immediately investigated the protest, and concluded that the prices offered to the landowners were "liberal and in line with present economic conditions in the community." DX-71. President Roosevelt personally informed the landowners that if they did not want to accept the United States' offer, they were free to proceed through condemnation. See id. If Claimants' allegations were true, it is only logical that some mention would be made in that petition.

The few 1940-era letters in the record do not support the requirements set forth in S. 794. For example, one set of correspondence shows that the United States Attorney and an attorney

[9] Among the landowners were a Union County judge, the mayor of Morganfield, and several practicing attorneys. DX-182 at DOJ1870. Surely at least one of these individuals would have demanded legal documentation for an oral promise made by a government negotiator had such a promise been made.

representing two landowners discussed the handling of mineral leases on the landowners' properties, and demonstrates that the landowners had no expectation of repurchase. See DX-618 (landowners' attorney stating that at the time the landowners signed the option agreement, it was understood the owners would "convey to the Government a fee simple interest"); DX-634 (discussing handling of mineral lease on the property).

After the war, a few individuals inquired about the Breckinridge Properties; however, none of the inquiries mention anything about a repurchase promise. One former owner's letter, which was written in 1944, states that he "offered to let the Government use it for the duration [of the war], but they could not see it my way so I am now asking the Government for the same right of having the first option on this land." DX-91 (emphasis added). In June 1951, an attorney representing former owners, inquired as to his clients' rights to the property, but did not mention a repurchase promise. DX-149 at DOJ1507.[10] Similarly, a 1957 administrative protest to a proposed oil and gas lease does not mention any verbal repurchase promise, and instead states the former landowners merely hoped that "Congress will or should pass an act . . . that [they] be given a chance to repurchase [their land] from the Government." DX-158 at DOJ1527.

### 3. Historical Newspaper Articles

The record includes hundreds of contemporaneous newspaper articles about the land acquisitions. See DX-182, DX-183. These articles contain a great deal of information, detailing specific events, as well as community sentiment and local rumors. The newspaper articles do not contain even a single suggestion of any repurchase promise or a refusal by the United States to

[10] The attorney's inquiry seems based solely on the temporary priority scheme in place from 1944 to 1949. See DX-150 at DOJ1508 (response letter). As discussed below, in recent years, several heirs may have confused the temporary priority scheme with a perceived right to repurchase their properties. See discussion infra § II(C)(1).

pay for mineral rights. See Trial Tr. at 248:23-25 (Dr. Johnson stating no evidence of repurchase promises); id. at 249:1-4 (Dr. Johnson stating no suggestion of a refusal to pay for minerals); id. at 457:13-18 (Dr. Brigham stating no evidence of repurchase promises); id. at 457:19-23 (Dr. Brigham stating no evidence of refusal to pay for minerals).[11/] It is important to note that several articles did discuss the landowners' ability to repurchase their movable property (including residences) from the United States at a salvage price (10 percent of its appraised value).[12/] In recent years, former landowners and their heirs may have confused that right to repurchase movable property at a discount, with a perceived right to repurchase their property for 10 percent of its sales price.

### C. The United States' Sale of the Breckinridge Properties

#### 1. 1944 and 1949 Property Surplus Acts

Congress passed the Surplus Property Act of 1944, ch. 479, 58 Stat. 765 (originally codified at 50 U.S.C. App. §§ 1611-46 (Supp. IV 1941-1945)) (repealed 1949) ("1944 Act") to facilitate the disposal of unneeded surplus property that had been acquired by the War Department. See Bellamy v. United States, 7 Cl. Ct. 720, 721-23 (1985); Rex Trailer Co. v. United States, 350 U.S. 148, 149-50 (1956). Previously, the War Department could not dispose of property without Congressional authorization. See Act of Feb. 20, 1931, Pub. L. No. 692, 46 Stat. 1191 (formerly codified at 10 U.S.C. § 1354). The 1944 Act conferred on former property

[11/] Several historical newspaper articles openly discussed mineral leases on the Breckinridge Properties, recounting that "[t]he government did not want to have any property encumbered by leases and paid operators an amount equivalent to the sum the oil firms had invested in the property, according to reports." DX-183 at DOJ2082 (February 26, 1942 article).

[12/] See, e.g., DX-183 at DOJ2144 (August 6, 1942 article stating that "[p]reference will be given the former owners of the property" to repurchase buildings on 45 farms).

owners a temporary priority preference (after federal agencies and states) to repurchase their land when, and if, the United States declared the land surplus. See 1944 Act, § 23(d)(1)(A).

The priority system was not enacted until after the United States had acquired all of the Purchased Tracts and filed all of the Declarations of Taking. Hence, the 1944 Act was not in place during acquisitions of any Breckinridge Properties. In addition, Congress always intended that the 1944 Act's priority system would be a temporary gratuity – by its own terms, the priority system expired three years after the cessation of hostilities in World War II. See 1944 Act, § 38, 58 Stat. 765 ("Unless extended by law, this Act shall expire at the end of three years following the date of the cessation of hostilities in the present war."); Harrison v. Phillips, 185 F.Supp. 204, 207 (S.D. Tex. 1960), aff'd, 289 F.2d 927 (5th Cir. 1961) ("Congress intended to give no more than a temporary privilege of repurchase in the 1944 Act."). Congress expressly repealed virtually all of the 1944 Act, including the temporary priority scheme, when it enacted the Federal Property and Administrative Services Act of 1949, ch. 288, § 502(a)(1), 63 Stat. 377, 399 ("1949 Act"), and eliminated all priorities the 1944 Act had created after the set date of December 31, 1949. See Bellamy, 7 Cl. Ct. at 724; see also Supplemental Independent Offices Appropriation Act of 1949, 62 Stat. 1196, 1203 (1948) (reaffirming the limited nature of the priority gratuity by declaring that the 1944 Act would not apply "to property of the Government which has not been declared surplus under the terms of such Act as of the date of enactment hereof [February 28, 1949]").

There is a high likelihood that many heirs were confused by the 1944 Act, believing either that it gave former landowners compensable rights of repurchase or that landowners had relied on the priority scheme in selling their properties. There is no support for either of these

beliefs. Several courts, including the Court of Claims, have rejected claims based on the 1944 Act on the ground that the priority scheme was "in the nature of a gratuity." Mason v. United States, 169 F.Supp. 507, 510 (1959); Seiden v. Larson, 188 F.2d 661 (D.C. Cir. 1951), cert. denied, 341 U.S. 950 (1951) (1944 Act did not create "a statutory privilege protected by judicial remedies"); Highsmith v. SW Med. Found., 116 F.Supp. 958, 959 (D. C. Tex. 1953) (plaintiff's right to repurchase expired after the 1944 Act's priority system was repealed in 1949); Higginson v. United States, 384 F.2d 504, 506 (6th Cir. 1967) ("Obviously no right could accrue to plaintiff thereunder" because 1944 Act was repealed 13 years before Camp Breckinridge was declared surplus."), cert. denied, 390 U.S. 947 (1968). In addition, former landowners could not have relied on the 1944 Act's priority scheme because the 1944 Act was not in place during the United States' acquisition of the Breckinridge Properties, despite some individuals' apparent belief to the contrary.[13/]

**2. Sale of the Breckinridge Properties**

The General Services Administration ("GSA") declared the Breckinridge Properties to be surplus on February 7, 1963. See id. After transferring or selling some of the land to federal, state or local government agencies, GSA auctioned off the remaining acreage to the public between 1965 and 1969. See DX-182 at DOJ1862 to -65; DX-183 at DOJ2789. Because the 1944 Act was no longer in effect, former landowners were not accorded any priority right during

---

[13/] Even the drafters of S. 794 apparently believed that a "major reason" former landowners did not fight the condemnation appraisal in court "involved the Surplus Property Acts of 1939 and 1944." CX-269 at Ex. 3 (document page) 2 (emphasis added); see also 125 Cong. Rec. 166 (Nov. 27, 1979) at (unnumbered) 3 ("The Surplus Property Act of 1939 [gave] original land owners the first option to repurchase their property at a price no greater than the price paid by the government, less damages"). There was no 1939 Act, however. These faulty impressions appear to be based on nothing more than false memories about the 1944 Act.

the auction.

### D. Higginson Litigation

On April 15, 1965, Cyrus Higginson, a former owner, filed a class action lawsuit against the United States on behalf of himself and all other former landowners. See Higginson, 384 F.2d at 504. The Higginson lawsuit sought to recover the Breckinridge Properties pursuant to the 1944 Act and, in the alternative, sought just compensation under the "Little Tucker Act," 28 U.S.C. § 1346(a)(2). See id. at 506. This lawsuit – filed approximately twenty years after World War II ended – was the first time any former landowner attempted to reacquire a Breckinridge Property through the legal process, and it appears to be the first time any former landowner alleged that he had received a verbal repurchase promise. The Sixth Circuit affirmed the rejection of the Higginson plaintiffs' claims, stating the United States acquired the "fee simple title" to the Condemned Tracts, and the "government's title to the land acquired by negotiated purchases vested some 20-30 years ago. This title cannot now be disputed under any accepted property theory." Id.

## III. Procedural Background

### A. Pre-Trial Proceedings

The Senate transmitted S. 794 to this Court on October 19, 1993. On January 12, 1994, Claimants filed their initial complaint (Docket No. 2). The original Officer (Judge Merow) notified potential claimants of the filing and gave them an opportunity to join. See Order, dated Jan. 24, 1995 (Docket No. 22). Claimants filed a First Amended Complaint on September 22, 1995, listing 1,011 individuals who wished to participate in these proceedings (Docket No. 25). On the same date, Claimants filed a Motion to Certify a Class (Docket No. 26), which the

Officer denied in December 1997. See Order, dated Dec. 23, 1997 (Docket No. 42).

Claimants' First Amended Complaint, like Claimants' original complaint, alleged eight counts.[14] In November 1998, the Officer (1) dismissed Claims 2 and 5 in their entirety as well as the pertinent allegations of Claim 7; and (2) dismissed any individual whose claims related to a Condemned Tract. See Order, dated Nov. 24, 1998, at 9 (Docket No. 65) ("November 1998 Order"). Claimants requested a stay of proceedings on February 26, 1999, in order to determine which individuals remained in this litigation after the Officer's November 1998 Order, and to develop a settlement position (Docket No. 69). Claimants' counsel eventually determined that the remaining Claimants correlated to 85 different Purchased Tracts. See CX-66A. Claimants eventually developed their settlement position, but the parties were unable to resolve their differences of opinion. Judge Braden, who was appointed as Hearing Officer on August 15, 2003, conducted a trial with respect to those 85 Purchased Tracts on September 8-10 and November 22-23, 2004.

### B. The First Interim Report

After trial, the Officer asked the parties to submit documents related to the disposal of the Breckinridge Properties in the mid-1960s. The United States provided responsive documents to the Officer on March 7, 2005. (Docket No. 162). On March 23, 2005, the Officer requested additional information from the United States related to the amount the "Government was paid in

[14] The eight counts were: (1) Condemnation of Real Property Interests – Just Compensation Claim; (2) Condemnation of Real Property Interests – Alternative Claims; (3) Condemnation of Sub-surface Mineral Interests – Just Compensation Claim; (4) Condemnation of Sub-surface Mineral Interests – Due Process Claim; (5) Vested Right of Re-purchase – Due Process Claim; (6) Loss of Agricultural Products – Just Compensation Claim; (7) Loss of Agricultural Products – Due Process Claim; and (8) General Equity Claim. Claimants did not allege a claim of mutual mistake until 2005, more than a year after trial ended, following completion of post-trial briefing and the issuance of the First Interim Report.

1967 for coal rights on Tracts 1, 7A, and 7B." Land Grantors I, 64 Fed. Cl. at 695. The United States filed a motion to limit review to the trial record (Docket No. 164), which the Officer denied (Docket No. 165). The United States provided the requested information on March 31, 2005. (Docket No. 169).

The Officer issued the First Interim Report on April 1, 2005. See Land Grantors I, 64 Fed. Cl. at 664. Among other conclusions, Land Grantors I dismissed Counts 6 and 7 of the First Amended Complaint for failure to prosecute, and held that "Plaintiffs' constitutional claims are not ripe for adjudication." See id. at 717. The Officer also articulated a new basis for liability – mutual mistake – which was not mentioned in Claimants' First Amended Complaint, not briefed by the parties, and not litigated at trial. See Land Grantors v. United States, 69 Fed. Cl. 435, 437 n.1 (2005) ("Land Grantors II") ("As the Government correctly observed, 'the doctrine of mutual mistake was identified *sua sponte* by the Officer for the first time after post-trial briefing has been completed.'") (citation omitted). According to the Officer, the 1942-1944 sales Contracts[15] were void because they were based on a mutual mistake that "no coal, gas, oil, or other mineral deposits existed under the condemned properties that would support exploration or operations at the time of sale." Land Grantors I, 64 Fed. Cl. at 703.

The Officer also directed the parties to "show cause why the court should not enter a final judgment, pursuant to 28 U.S.C. § 1491(a)(1), and stay issuance of a Final Report, pursuant to S. 794." Id. at 718. The parties responded to the show cause order in October 2005. See Def.'s Resp. to the Ct.'s Show Cause Order (Docket No. 181); Pls.' Mem. on Order to Show Cause

[15] The Officer defined "Contracts" to be "an option for purchase of land; a certificate of inspection and possession; an affidavit of the vendor; a warranty deed; and a receipt for the United States Treasurer's check." Land Grantors I, 64 Fed. Cl. at 702 n.38.

Regarding Entry of Final Judgment (Docket No. 182). Among other arguments, the United States opposed the Officer's proposed conversion from a Congressional Reference matter to a Tucker Act claim because Claimants had never before alleged jurisdiction under 28 U.S.C. § 1491(a)(1), had never argued that any legal claim was timely, and had explicitly waived all legal claims. See, e.g., Pls.' Objections to the Def.'s Pre-Trial Filings (Docket No. 135) at 3 ("The Claimants will not seek to establish a 'legal claim' at trial."); Trial Tr. at 164:17 (Claimants' Counsel: "We do not have a legal claim in this case.").[16]

**C. The Final Report**

On October 3, 2005, approximately thirteen months after trial, Claimants – for the first time ever in this litigation – asserted jurisdiction under 28 U.S.C. § 1491, and alleged a new claim of mutual mistake. See Second Am. Compl. ¶¶ 32-40 (Docket No. 183). The United States opposed the filing. See Def.'s Opp'n to Filing of Claimants' Proposed Second Am. Compl., filed Oct. 18, 2005 (Docket No. 185). In December 2005, the Officer requested additional briefing on whether it should *sua sponte* reconsider the 1997 decision on class certification. (Docket No. 192). The United States opposed reconsideration. See Def.'s Resp. to Ct.'s Dec. 29, 2005 Order (Docket No. 194); see also Def.'s Mot. to Strike Mot. for Recons. (Docket No. 197); Def.'s Reply in Supp. of Def.'s Mot. to Strike (Docket No. 199); Def.'s Opp'n to Claimants' Mot. to Reconsider Class Cert. (Docket No. 207). In June 2006, the Officer reconsidered the 1997 decision, certified an opt-in class, and requested additional briefing on the form of class notice. (Docket No. 211). The parties submitted proposed notices in August 2006.

---

[16] The Officer erroneously stated that Claimants had pled a Tucker Act claim in their First Amended Complaint. See Land Grantors I, 64 Fed. Cl. at 717-18. Claimants did not allege a Tucker Act claim until 2005, after the Officer directed Claimants to do so.

See Def.'s Mot. to Approve Proposed Class Notice and Proposed Request to Join, dated Aug. 25, 2006 (Docket No. 214); Pls.' Status Report, dated Aug. 25, 2006 (Docket No. 213).

On December 14, 2006, the Officer issued a Second Interim Report, Memorandum Opinion, and Order, in which the Officer stated an intention to defer "final disposition in this case until the *en banc* decision in Kirkendall [v. Dep't of the Army] is issued and final." Land Grantors v. United States, 74 Fed. Cl. 518, 525 (2006) ("Land Grantors IV").[17] The Officer also directed the parties to consider whether this case could be resolved by mediation. See id. at 526; see also Order, dated Jan. 26, 2007 (Docket No. 217). The parties agreed to participate in mediation.

On February 28, 2007, the Officer *sua sponte* severed any "claims asserted under 28 U.S.C. § 1491" and assigned the severed claims a new docket number – Case No. 93-648-1L. See Order, dated Feb. 28, 2007 (Docket No. 225). The United States objected to the Officer's severance order. See Def.'s Objection to Ct.'s Feb. 28, 2007 Order (Docket No. 228). The Officer's severance order resulted in the creation of Land Grantors v. United States, No. 93-648-1L (Fed. Cl.), in which Plaintiffs alleged a Tucker Act claim, which was assigned to Judge Braden. Claimants withdrew from mediation on May 18, 2007. See Pls.' Notice of Withdrawal (Docket No. 231).

On July 31, 2007, the Officer issued a "Third Interim Report, Memorandum Opinion, and Order," which denied the United States' October 21, 2005 Opposition to the Filing of Claimants'

[17] The Officer explained that the Kirkendall case might be relevant because it dealt with "the doctrine of equitable estoppel," Land Grantors IV, 74 Fed. Cl. at 525, an issue the Officer believed might be important for an equitable tolling argument. Before the Officer raised the prospect of equitable tolling after trial, Claimants had conceded that any Tucker Act claim was untimely. See Trial Tr. at 166:19-20 (CLAIMANTS' COUNSEL: "The statute of limitations ran a long, long time ago.").

Proposed Second Amended Complaint, and permitted the United States to file a motion to dismiss Plaintiffs' Tucker Act claim. See Land Grantors v. United States, 77 Fed. Cl. 686, 687 (2007) ("Land Grantors V"). On October 1, 2007, the United States filed a Motion for Judgment on the Pleadings or, in the Alternative, Motion for Judgment on the Record (Docket No. 4 in Case No. 93-648-1L). Judge Braden dismissed Land Grantors v. United States, No. 93-648-1L (Fed. Cl.), for lack of jurisdiction on January 10, 2008 (Docket No. 8 in Case No. 93-648-1L).

On March 6, 2008, Claimants filed a Motion to Vacate the Officer's November 24, 1998 Order, which order had dismissed the claims related to the Condemned Tracts (Docket No. 240), and the United States opposed (Docket No. 241). The Officer issued the Final Report on April 18, 2008. Both parties filed timely Notices of Exception on May 20, 2008, pursuant to RCFC App. D, ¶ 7.

## IV. Applicable Legal Standards

### A. Standard of Review of a Hearing Officer's Report

"The findings and conclusions of the hearing officer shall be submitted by him . . . to the review panel for review by it pursuant to such rules as may be provided for the purpose. . . . The panel, by majority vote, shall adopt or modify the findings or the conclusions of the hearing officer." 28 U.S.C. § 2509(d) (2006). The Review Panel may set aside the Officer's findings if it finds them "clearly erroneous." See RCFC App. D, ¶ 8(d). "The hearing officer's legal conclusions are reviewed *de novo*." Kanehl v. United States, 40 Fed. Cl. 762, 766 (1998) (Cong. Ref.) (citing Merchants Nat'l Bank of Mobile v. United States, 7 Cl. Ct. 1, 9 (1984)).

As discussed below, the Officer's primary findings are not based on live witness testimony. Hence, the usual deference "given to the hearing officer to judge the credibility of

witnesses," RCFC App. D, ¶ 8(d), is inapplicable here.

**B. The Purpose and Effect of a Congressional Reference**

In congressional reference cases, either House of Congress refers a proposed private bill to this Court for an initial determination of the merits of the claim, but retains final authority over the ultimate appropriation. See Office of Personnel Mgmt. v. Richmond, 496 U.S. 414, 431 (1990). Mere passage of a reference is not an admission or determination of liability by Congress. See Blacklock v. United States, 208 U.S. 75, 85 (1908); Ford v. United States, 116 U.S. 213, 217-18 (1886). Rather, it is a mechanism, unique to the Court of Federal Claims, "designed to supply information so full and exact as to leave to the legislative body nothing to do but determine the justice of the complaint . . . as a legal or equitable demand against the United States." INSLAW, Inc. v. United States, 39 Fed. Cl. 307, 312 (1997) (Cong. Ref.) (citing Alleman v. United States, 43 Ct. Cl. 144, 150-51 (1908) (Cong. Ref.)), adopted by 40 Fed. Cl. 843 (1998).

The Final Report improperly assumed that S. 794 "recognized the basic injustice of the Government's actions. . . ." Land Grantors VI, 81 Fed. Cl. at 582. In fact, Congress generally refers a bill to this Court only when there is a serious question as to the merit of the claim. If the merit of the claim were obvious or the issues involved in it straightforward, Congress could simply pass private legislation; there would be no need to resort to the reference procedure. See Paul v. United States, 20 Cl. Ct. 236, 265, aff'd, 21 Cl. Ct. 758 (1990) (Cong. Ref.).

**C. General Rules Applicable in a Congressional Reference**

The Officer's principal responsibility is to "determine the facts" underlying the referred claim. 28 U.S.C. § 2509(c). A Officer is directed to

> proceed in accordance with the applicable rules to determine the facts, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitations should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy.

28 U.S.C. § 2509(c); see also Paul, 20 Cl. Ct. at 264. This Court's rules provide that the hearing officer "shall find the facts specially." RCFC App. D, ¶ 6.

Proceedings in congressional cases are conducted with the same rigor and under the same ground rules as those that govern suits on the Court's general jurisdiction docket. See Kerr-McGee Corp. v. United States, 36 Fed. Cl. 776, 781 (1996) (Cong. Ref.). Evidence "must be ascertained in strict conformity to the rules of judicial procedure from competent and admissible evidence taken by authority of law." West Virginia v. United States, 37 Ct. Cl. 201, 205 (1902) (Cong. Ref). All proceedings in a congressional reference case, including trials, must be in conformity with the Federal Rules of Evidence. See 28 U.S.C. § 2503(b) (2006); Benson v. United States, 141 Ct. Cl. 273, 277 (1958) (Cong. Ref.). "Counsel can not, by stipulation or otherwise, require a court to admit testimony, which under legal rules, is not admissible as evidence in a case." INSLAW, 39 Fed. Cl. at 314 (quoting Sac & Fox Indians of Iowa v. Sac & Fox Indians of Okla., 45 Ct. Cl. 287, 300 (1910), aff'd, 220 U.S. 481 (1911) (refusing to admit into evidence *ex parte* affidavits even though printed in the report of a congressional committee)). In short, the reference procedure allows a body of judicial character equipped with the necessary resources to provide a forum where, subject to procedural and evidentiary rules, the contending parties engage in an adversarial process designed to elicit the truth. See Widmayer v. United States, 42 Ct. Cl. 519, 523 (1907) (Cong. Ref.).

In addition to determining the facts, a Officer must "append to his findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a

gratuity, and the amount, if any, legally or equitably due from the United States to the claimant." 28 U.S.C. § 2509(c). "A legal claim arises when there is a violation of substantive law." Martin v. United States, 37 Fed. Cl. 86, 90 (1996) (Cong. Ref.). "Legal claim" as used in 28 U.S.C. § 2509(c) implies "no special meaning beyond the conventional understanding of that term: a claim based on the invasion of a legal right, that is 'one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege.'" Spalding & Son, Inc. v. United States, 28 Fed. Cl. 242, 247 (1993) (Cong. Ref.) (quoting Tenn. Elec. Power Co. v. Tenn. Valley Auth., 306 U.S. 118, 137-38 (1939)). To qualify as a legal claim, the claim must be viable in all respects, e.g., it may not be barred by the applicable statute of limitations or by some other sovereign immunity defense. See J.L. Simmons Co. v. United States, 60 Fed. Cl. 388, 394 (2004) (citing Kanehl, 40 Fed. Cl. at 771 and INSLAW, 39 Fed. Cl. at 327-29).

An equitable claim arises from "'an injury occasioned by Government fault' when there is 'no enforceable legal remedy – due, for example, to the bar of sovereign immunity or the running of the statute of limitations.'" J.L. Simmons Co., 60 Fed. Cl. at 394 (quoting Kerr-McGee Corp., 36 Fed. Cl. at 786); see also Banfi Products Corp. v. United States, 40 Fed. Cl. 107, 122 (1997), aff'd as modified, 41 Fed. Cl. 581 (1998) (Cong. Ref.) ("[A]n equitable claim, in comparison to a gratuity, must be grounded in positive law rather than in conscience, ethics or morals."). "To recover on an equitable claim, [a claimant] must show two things: that 'the government committed a negligent or wrongful act' and that 'this act caused damage to the claimant.'" J.L. Simmons Co., 60 Fed. Cl. at 394 (quoting Cal. Canners & Growers Assoc. v. United States, 9 Cl. Ct. 774, 785 (1986) (Cong. Ref.)). A negligent or wrongful action "entails

more than a mere error or questionable exercise of government discretion; rather, there must be some violation of a standard of conduct established by statute or regulation or a recognized rule of common law, and that violation must damage the claimant." Id. at 394 (stating further that a claimant must establish that "the government possessed a duty . . . , that the government breached that duty, and that the breach caused the [claimant] damage").

A gratuity arises from governmental action that violates only principles of ethics or morality. See id. at 395. The congressional reference statute does not contemplate that this Court will consider or report any amount due as a gratuity. See Banfi Products Corp., 40 Fed. Cl. at 121; Paul, 20 Ct. Cl. at 264. If relief would constitute a "mere gratuity," the Court should recommend that Congress deny relief. See Kanehl v. United States, 38 Fed. Cl. 89, 98 (1997).

## V. The Reports are Fundamentally Flawed Because they Lack Claimant-Specific Findings and are Based on Flawed Inductive Reasoning

The Senate instructed this Court to provide "such findings of fact and conclusions that are sufficient to inform Congress of the amount, if any, legally or equitably due from the United States to the claimants individually." S. Res. 98 (emphasis added). The Review Panel should reject the Reports because they lack any Claimant-specific findings with regards to liability or quantum of damages, and are instead based on faulty inductive reasoning. For example, although the Reports' liability analyses are based on documents specific to only a small number of tracts, the Officer concluded that all former landowners – including those who were not Claimants at the time of trial, and who have not yet joined this lawsuit – are entitled to a substantial monetary award. Hence, the Officer assumed, with no evidence, that no former landowners had unreasonably delayed in bringing suit, all former landowners received a repurchase promise, and that all former landowners and government agents believed at the time

of acquisition that there were no minerals underlying the Breckinridge Properties. In addition, rather then determining which Claimants had carried their burden of proof and then recommending individual Claimant-specific awards, the Officer recommended that Congress simply appropriate a multi-million dollar award, place it in the hands of an as-yet unidentified "Trust Officer," who will "resolve any disputes" that may arise and make Claimant-specific findings about entitlement and allocations. Land Grantors VI, 81 Fed. Cl. at 617. The Senate directed this Court to make such determinations, not a Trust Officer. This lack of any Claimant-specific findings or analyses renders the Final Report fundamentally flawed.

To make matters worse, no one – including Claimants' counsel – currently knows who Claimants are because the Final Report (a) vacated the November 1998 Order and (b) established a new class procedure, which would permit new individuals to join this matter, including (apparently) those who did not comply with the 1995 deadline. See id. at 614-16. The Officer's decision to vacate the November 1998 Order is inconsistent with the unambiguous terms of S. 794, which limited this matter to those former landowners who "sold their land . . . under threat of condemnation," not those landowners whose property was condemned. S. 794, Sec. 1. The Officer's decision to vacate the November 1998 Order is based on the clearly erroneous finding that the United States condemned all of the Breckinridge Properties: "the filing of the condemnation petitions alone materially affected the landowners' rights to the property." Land Grantors VI, 81 Fed. Cl. at 614-15. As discussed above, title to the Condemned Tracts passed to the United States only when the United States filed a Declaration of Taking and deposited the estimated compensation into the District Court's registry. See discussion supra § II(A). Those properties listed on the Declarations of Taking were condemned; those properties acquired

before that date were, in the plain language of S. 794, "sold . . . under threat of condemnation." The Officer's finding that there were some landowners "who sold their property after the [the United States filed] the Declarations of Taking," Land Grantors VI, 81 Fed. Cl. at 615, is incorrect because title to those properties passed to the United States the moment the United States filed the Declaration of Taking. The United States discussed these issues at length in the United States' Opposition to Claimants' Motion to Vacate, filed March 24, 2008 (Docket No. 241), and the United States incorporates that argument here.

In summary, since the Officer's findings are based on evidence relating to only a small number of tracts, the determination that all former landowners and their heirs are entitled to a substantial monetary award is based on an improper and unproven assumption that all landowners should be treated alike. Because the Final Report lacks any Claimant-specific factual findings with respect to liability or the quantum of an award, the Review Panel should reject the Final Report. Moreover, because the Officer's decision to vacate the November 1998 Order and certify a new class action is inconsistent with the terms of S. 794, the Review Panel should reject the Final Report.

## VI. The Hearing Officer's Conclusion that "the Doctrine of Laches is Inapplicable" is Clearly Erroneous

### A. The Review Panel Should Recommend No Recovery Based on the Doctrine of Laches

The Review Panel should review *de novo* the Officer's rejection of the United States' laches defense. Laches is applicable when a claimant's "neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." A.C. Aukerman Co. v.

R.L. Chaides Constr. Co., 960 F.2d 1020, 1028-29 (Fed. Cir. 1992). The period of delay is measured from the time the claimant knew or should have known about his claim to the date of the suit. Id. at 1032. Laches bars suit if there is "(1) unreasonable and unexcused delay by the claimant, and (2) prejudice to the other party, either economic prejudice or 'defense prejudice' – impairment of the ability to mount a defense. . . ." JANA, Inc. v. United States, 936 F.2d 1265, 1269 (Fed. Cir. 1991). Prejudice occurs when the defendant's ability to present a full and fair defense is impaired due to circumstances that become more likely with the passage of time, such as loss of records, destruction of evidence, fading of memories, and witness unavailability. See A.C. Aukerman Co., 960 F.2d at 1033. The doctrine of laches applies in congressional reference cases. See 28 U.S.C. § 2509(c) (directing the Officer to determine facts "related to delay or laches"); Kanehl, 38 Fed. Cl. at 105.

The United States acquired the Breckinridge Properties approximately 50 years before Claimants filed their complaint. The Officer determined that a claim of mutual mistake would have accrued at various times between 1957 and 1967, when the United States sold the Breckinridge Properties. See Land Grantors I, 64 Fed. Cl. at 710-11. Claimants' delay in filing suit, then, was no less than 37 years (1957 to 1994) for some claims and no less than 27 years (1967 to 1994) for other claims. In fact, since Claimants did not allege a claim of mutual mistake until October 2005, after the Officer issued the First Interim Report, Claimants delayed at least 48 years for some claims (1957 to 2005) and 38 years for other claims (1967 to 2005). This Court and the Court of Claims have sustained a laches defense in cases involving far shorter delays, including Congressional Reference matters. See Awtry v. United States, 684 F.2d 896, 898-99 (Ct. Cl. 1982) (delay of three and one-half years unreasonable); Mexican Intermodal

Equip., S.A. de C.V. v. United States, 61 Fed. Cl. 55, 71 (2004) (delay of four and one-half years unreasonable); Kanehl, 38 Fed. Cl. at 105 (delay of more than 13 years unreasonable); LaCoste v. United States, 9 Cl. Ct. 313, 315-16 (1986) (delay of more than five years unreasonable); Acuna v. United States, 1 Cl. Ct. 270, 280 (1982) (14-year delay between accrual of claim and introduction of congressional reference bill unreasonable).

Claimants have never offered an explanation for their failure to pursue a claim against the United States, and none is apparent. Apart from a handful of letters to media outlets and government officials from one individual, the record is devoid of any evidence suggesting diligent pursuit of a claim against the United States. Even that one individual's letter-writing campaign "does not by itself demonstrate diligent pursuit of a plaintiff's claim." Kanehl, 38 Fed. Cl. at 105 (upholding laches defense and finding that contacting person in Congress "in an attempt to bring a congressional reference action does not by itself demonstrate diligent pursuit of plaintiff's claim"). In addition, the fact that one landowner brought suit in 1965 in the Higginson litigation demonstrates that other landowners could have pursued their claims decades ago.

Claimants' delay in pursuing these claims prejudiced the United States' ability to defend this lawsuit in several ways. First, by the time this action was filed in 1994, original eyewitness testimony of the acquisition events, if available at all, was more than 50 years old. Such a vast time lapse makes it very likely that accounts were marred by faded memories. Second, Claimants' delay meant key witnesses (such as all government employees who were involved in the acquisition events) were unavailable for deposition or trial testimony. The unavailability of witnesses is especially prejudicial to the United States in this case, where the Officer's findings

are based on allegations that were generated decades after the relevant events, and which are contradicted by the written historical record. E.g., Eurell v. United States, 566 F.2d 1146, 1150 (Ct. Cl. 1977) (laches invoked where government's ability to defend itself was prejudiced by faded memories of key witnesses seven years after event giving rise to the claim). In this case, many of the Officer's key findings are based on affidavits, which Claimants did not give to the United States until after all the affiants had died. See Claimants' Resp. to Mot. in Limine to Exclude Affidavits at 9, dated Aug. 31, 2004 (Docket No. 136) (Claimants explaining that they did not provide "addresses for these Affiants. As we have repeated, they are deceased.").

Finally, documents that would have supported the United States' defense – such as the original appraisals – are no longer available, in all probability having been destroyed years ago in accordance with standard Army record retention policies. See Murphy v. United States, 222 Ct. Cl. 559, 563 (1980) (laches defense allowed due to 13-year delay, and because relevant documents were destroyed); Clavin W. Corman, Limitation of Actions § 3.3.2, 186-87 (1991) (stating that prejudice is shown in the context of the doctrine of laches by "loss of the evidence that would support the defendant's position [which can occur] by reason of the death of a witness or through loss of memory or records"). The doctrine of laches, therefore, precludes recovery in this matter.

### B. The Hearing Officer's Factual Findings Cited to Support a Conclusion that the Doctrine of Laches is Inapplicable Are Clearly Erroneous

The Officer agreed that Claimants' complaint was filed decades after the relevant events, but concluded "the doctrine of laches is inapplicable." Land Grantors I, 64 Fed. Cl. at 716.[18]

[18] The Final Report does not discuss laches. The First Interim Report stated laches was inapplicable based upon "the same reason[s] relevant to . . . the application of the equitable doctrine of tolling. . . ." Land Grantors I, 64 Fed. Cl. at 717.

The Officer's conclusion is based, in its entirety, on the following clearly erroneous findings:

**1. "Sometime in 1968, following the United States Supreme Court's denial of *certiorari* in the *Higginson* case, a group of landowners and/or their heirs formed the Breckinridge Land Committee ('the Committee') and turned to Congress to seek redress." Land Grantors I, 64 Fed. Cl. at 685.**

First, the Officer concluded that laches is inapplicable because a group of landowners formed the Committee in 1968. See id. However, the uncontroverted record shows that the Committee was formed in 1978, not 1968. See CX-34 at BLC 1370 ("In the late spring of 1978 several individuals with family ties to the land taken by the Federal Government for Camp Breckinridge, Kentucky, formed the Breckinridge Land Committee."). In support of a finding that the Committee was formed in 1968, the Officer provided the following citation: "Compare Higginson Dep. at 285, 304, 328; CX 267 (Murphy Dep.) at 13-14, 18, with CX 53." Land Grantors VI, 81 Fed. Cl. at 598. Those citations do not support the Officer's finding.[19]

Furthermore, the Committee is not a Claimant in this matter, and there is no basis to

[19] See Higginson Au Dep. at 285:11-13 ("Q: When had you started as chairperson of the [Committee]? A: From '78."). Pages 304 and 328 of Ms. Higginson Au's deposition do not include any dates or a discussion of the formation of the Committee. Pages 13 and 14 of Mr. Murphy's deposition transcript say nothing about the date the Committee was formed. See CX-267 at 13-14. Mr. Murphy explained that he was not involved in any activities related to the Breckinridge Properties until sometime in 1978. See id. at 11:10-14. CX-53 is a letter from GSA to Senator Marlow W. Cook, dated March 18, 1974. The letter responds to a letter written by Ms. Higginson Au, and says nothing about the formation of the Committee. See CX-53.

In a footnote following the 1968 date, the Officer added the following additional citation: "See, e.g., JX 58-59 (referencing letters from Ms. Higginson Au in 1976, 1978, and 1979 to Congressman Carroll Hubbard); Court Ex. 3A (referencing Congressman Gene Snyder forwarding letter of Ms. Higginson Au to Paul E. Goulding, Deputy Administrator, GSA)." Land Grantors VI, 81 Fed. Cl. at 598 n.14. JX-58 and JX-59 do not mention the Committee, and say nothing about when the Committee was formed. The letter identified as "Court Exhibit 3A" merely references a letter written by Ms. Higginson Au on October 2, 1978. It, too, does not support a 1968 date. The documents identified as "Court Exhibits" were not produced by either party during trial.

attribute creation of that organization (or any actions taken by that organization) to the efforts of any individual claimant to diligently pursue his or her rights. Further, even if the efforts of the Committee could be attributed to all Claimants, Claimants have never identified the members of the Committee, or described what, if any, efforts members of the Committee undertook to pursue these claims. It appears that a handful of Committee members engaged in a letter-writing campaign after 1978. Even if that effort could be attributed to all former landowners, such an effort would not "demonstrate diligent pursuit of a plaintiff's claim." Kanehl, 38 Fed. Cl. at 105.[20/]

**2. "The record evidences that numerous requests/petitions were made by the former landowners to repurchase their land after World War II ended." Land Grantors I, 64 Fed. Cl. at 713.**

Next, the Officer concluded that laches is inapplicable because former landowners attempted to repurchase their land after the end of World War II. See id. One would certainly expect "numerous requests/petitions" from former landowners to repurchase their land after World War II ended if landowners relied on repurchase promises when they sold their properties to the United States in the 1940s. There were several hundred former landowners, and if even a fraction of those former landowners had relied on repurchase promises, one would expect numerous repurchase demands in the record. That evidence, however, does not exist. See discussion supra § II.

[20/] Apparently offered in support of the laches decision, the Officer stated that the "first specific request for a Senate inquiry of this matter" was made to the General Services Administration ("GSA") by Senator Walter D. Huddleston on June 6, 1973. See Land Grantors VI, 81 Fed. Cl. at 598. According to the Officer, the "record does not reflect the result of the GSA inquiry." Id. This finding is incorrect. Senator Huddleston transmitted one individual's (Ms. Higginson Au's) request for information to the GSA in June 6, 1973. See CX-22. The GSA responded to Senator Huddleston, in full, on June 20, 1973. See CX-39. Senator Huddleston transmitted GSA's response to Ms. Higginson Au on July 2, 1973. See CX-40.

In support of this conclusion, the Officer lists eight documents. Land Grantors I, 64 Fed. Cl. at 713 n.52; see also Attach. B. Only one of those documents was written to (or by) a former owner (DX-92). The other seven letters, which were written to individuals whose names do not appear in connection with any of the Breckinridge Properties, are clearly irrelevant to the laches inquiry. See Attach. B. The sole exception – DX-92 – was written before the war ended, and merely responded to one former landowner's "interest in the repurchase of a tract of land. . . ." DX-92.[21/] These letters, therefore, do not show that any Claimant diligently pursued his claim, and the documents do not support the Officer's rejection of a laches defense.

**3. "The record also evidences that there was considerable confusion about what federal office was responsible for decisions about disposal of Camp Breckinridge that was caused by the Government." Land Grantors I, 64 Fed. Cl. at 713.**

The Officer next concluded that laches was inapplicable because there was "considerable confusion" about which federal agency would handle the disposal of the Breckinridge Properties. See id. The Officer cites six letters to support this finding, which raises, *sua sponte*, an issue that Claimants never alleged. See id. at 713 n.53; see also Attach. C. Only two of the six letters cited by the Officer were written to (or on behalf of) a former landowner or heir. See DX-92; DX-150. The other four letters, which appear to be written to people who were simply interested in acquiring a Breckinridge Property (not former landowners), are irrelevant to the possible application of laches. See Attach. C.

The two letters that were written to former landowners do not support the Officer's finding that there was "considerable confusion" about which federal agency would handle the

[21/] That former landowner did not receive a repurchase promise; instead, he complained (in a December 4, 1944 letter not cited by the Officer) that he had "offered to let the Government use it for the duration [of the war], but they could not see it my way. . . ." DX-91.

disposal of the Breckinridge Properties. For example, DX-92, written in December 1944, informed one landowner (Mr. McBride) about the temporary priority system established by the 1944 Act, but stated that the properties had not then been surplused. See DX-92. The information related in that letter is accurate, and nothing in the letter indicates any confusion about what federal offices would be responsible for disposal decisions. To the extent the Officer's concern is based on the fact that this letter did not mention the GSA, that concern is without merit; GSA was not established until 1949, well after DX-92 was sent to Mr. McBride. See 40 U.S.C. § 301 (2006) (originally enacted 40 U.S.C. § 751(a), 63 Stat. 379).

The Officer's truncated quotation of DX-150, a July 5, 1971 letter, is offered as proof that the United States informed the recipient (Mr. King) that he should contact the Corps of Engineers' District Office to discuss his clients' interest in purchasing certain properties. Land Grantors I, 64 Fed. Cl. at 713 n.53. In fact, in a paragraph of DX-150 not cited in the Reports, the United States actually informed Mr. King that none of the property had been declared surplus, but that the GSA would have authority over disposition once the properties were declared excess. See DX-150 at DOJ1508-09 (also informing Mr. King that the 1949 Act eliminated the temporary priority scheme established by the 1944 Act). There is, therefore, no evidence that any former landowner or heir was confused about any aspect of the disposal events.

**4. "The record evidences no public notice or local news article[s] about the 1957 lease to Felmont Oil or [the] 1959 lease to Kingwood Oil at the time they were entered." Land Grantors I, 64 Fed. Cl. at 714.**

The Officer concluded that laches is inapplicable because the parties did not present evidence about public notice of two proposed oil leases during trial. The Officer's finding is irrelevant to the possible application of the doctrine of laches. It is undisputed that the two individuals on whose former properties these oil leases were proposed had prior notice of the proposed leasing arrangement. Both former landowners filed formal protests of the two leases prior to the signing of those leases. See DX-158. The Department of the Interior dismissed the former landowners' protest after review, and the former landowners did not file an appeal, or pursue further legal recourse. See DX-40. The former landowners, therefore, had prior notice of the proposed leasing arrangement, and the Officer's finding is irrelevant to the application of laches.

**5. "Landowners living in the Henderson, Union, and Webster County areas may have assumed, albeit erroneously, that sufficient efforts were made to preserve their legal rights to benefit from the doctrine of equitable tolling by the filing of the Higginson complaint." Land Grantors I, 64 Fed. Cl. at 715.**

Next, the Officer concluded that laches is inapplicable because some landowners might have been confused about the Higginson litigation. The Officer's finding is not based on any evidence. Claimants never alleged that any individual had such a belief about the Higginson lawsuit, and Claimants did not present any evidence in support of such an allegation. Even if Claimants had presented evidence that certain former landowners were confused, such confusion would have ended when that case concluded in 1968 (26 years before Claimants filed a complaint, and 37 years before Claimants alleged a claim of mutual mistake) without Claimants

obtaining any relief. This finding, then, is irrelevant to the application of laches.

**6. "Plaintiffs did not have the ability to compel the Government to obtain and release information about the 1957 and 1959 leases and 1965 sales" because the "Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, ("FOIA") was not enacted until 1966." Land Grantors I, 64 Fed. Cl. at 715.**

Finally, the Officer cited the 1966 passage of FOIA as "[o]ne additional important point [that] needs to be made." Id. The Officer's finding is irrelevant to the application of the doctrine of laches, as it does not excuse Claimants' extraordinary delay after 1966. In addition, the supposedly-missing evidence that could have been gained by a FOIA request – "information about the 1957 and 1959 leases and 1965 sales" events, id. – is irrelevant to a claim of mutual mistake or the issues involved in this Congressional Reference matter (the focus of which should be the events at the time of the United States' acquisition of the Breckinridge Properties, not the later disposal of those properties).

In summary, Claimants' unexplained and unreasonable decades-long delay prejudiced the United States' ability to defend this matter. As a result of Claimants' delay, key witnesses were not available for deposition or cross examination, and key documents were not available for analysis. The Officer's conclusion that laches does not apply to this reference is not supported by the record. The Review Panel should recommend, therefore, that Claimants' delay in pursuing their claims bars relief under this Congressional Reference.

## VII. The Hearing Officer's Admission of, and Reliance on, Hearsay Evidence is Clearly Erroneous

The Reports' primary findings are based on several affidavits, which the Officer admitted after trial, with no authentication or foundational support. See id. at 700 n.36 (listing 49 affidavits to support allegation about repurchase promises); id. at 706 n.44 (listing 39 affidavits

to support allegation about mutual mistake). The Officer's admission of, and reliance on, these documents is clearly erroneous. The Review Panel should review the admissibility of these documents *de novo*, and not consider these affidavits in its Panel Report.[22]

**A. Admission of the Affidavits After Trial Without Foundation is Erroneous**

The affidavits upon which the Officer relied were apparently signed in 1979, approximately 38 years after the United States acquired the Breckinridge Properties. Most of the affiants signed a pre-prepared form document, which included a leading question about repurchase promises. See Attach. D (listing affidavits, and showing that many form affidavits asked "Did the government say you could purchase your farm back after the war, having first chance?"). Most affiants appear to be heirs, not former landowners, and most had no first-hand knowledge of the relevant events. Claimants' counsel provided these affidavits to the United States in March 2004, twelve years after the complaint was filed. See Def.'s Mot. in Limine to Exclude Pls.' Ex. No. 122-233 at Exs. 1-2, dated Aug. 13, 2004 (Docket 128). When Claimants finally gave these documents to the United States, all the affiants were deceased. See Claimants' Resp. to Mot. in Limine to Exclude Affidavits at 9, dated Aug. 31, 2004 (Docket No. 136) (Claimants explaining that they did not provide "addresses for these Affiants. As we have repeated, they are deceased.").

Claimants listed these affidavits in their pre-trial exhibit list, and the United States filed a

[22] In addition, the Officer admitted several deposition transcripts and discovery responses, over the United States' objection, in order to support certain conclusions. See id. at 700 n.36; id. at 706 n.44. Like the affidavits, these deposition transcripts and discovery responses are rife with hearsay, and should not be considered in the Panel Report.

motion in limine to exclude those documents.[23] During the pre-trial conference, the Officer stated she would be inclined to allow the affidavits into the record "for review by the appellate bodies," but "I don't think that it would be an appropriate position for me, as a matter of law, to put a lot of reliance on them." Pre-Trial Tr. at 12-13 (stating further, "They are old and I don't know anything about the circumstances about how they were created or whatever.").

During trial, Claimants did not present any witness to provide an evidentiary foundation for the affidavits, and Claimants never sought to introduce the affidavits into the record. Claimants did discuss one affidavit – signed by Mr. Towles in 1979, who claimed to be a former government employee – but the only trial testimony presented was from the United States' expert historian, who found the document untrustworthy. See Trial Tr. at 422:17-18 ("I just don't believe those memories that old.").[24] The Officer immediately indicated her agreement:

> In the pretrial conference I explained to you I would allow all of these affidavits

[23] See Def.'s Mot. in Limine to Exclude Pls.' Ex. No. 122-233, dated Aug. 13, 2004 (Docket 128). Claimants opposed (Docket No. 136).

[24] Although not cited by the Officer, one witness – Kevin Murphy – discussed the preparation of the above-mentioned affidavit (CX-122, signed by Mr. Towles) during his 2004 deposition. Mr. Murphy could not recall how many times he had met with Mr. Towles, CX-267 at 67:23 to 68:4, or any details about their conversation, id. at 151:9 to 167:20. Mr. Murphy did not know who drafted the affidavit that Mr. Towles signed, or key circumstances surrounding the signing of the document. See id. at 148:4 to 158:12. Mr. Murphy agreed that the affidavit lacked factual detail, and he wished that it included additional information. See id. at 160:17 to 162:8. Mr. Murphy stated that it was "conceivable" that "stories of repurchase promises [had] just taken on a life of their own." Id. at 168:23 to 169:16.

Mr. Towles, who would have been 76 years old in 1979, was not a federal employee when he apparently signed CX-122. In fact, Mr. Towles quit his job with the federal government in 1944, in a sharply worded resignation letter, apparently in protest over an unwanted transfer or a raise that he did not receive, see CX-262 at PER1764-65. There was, therefore, a strong potential for bias. The affidavit does not mention how many former landowners Mr. Towles allegedly talked to, or the name of any specific landowner. Mr. Towles' name only appears in the Acquisition Documents of four of the 85 Purchased Tracts, and none of those documents suggest repurchase promises were made.

> to come in, but the Court would not give any reliance on any of these documents for the same reason as this gentleman [stated]. I have no way of knowing what the circumstances were of how these documents were created. We simply don't find that this is necessarily going to be useful or credible evidence.

Id. at 422:22 to 423:4 (emphasis added); id. at 423:15-16 ("I find this to be very tentative and unreliable information"). In a post-trial motion, Claimants moved the introduction of 57 affidavits, without authentication or foundational support, and the United States opposed.[25]

In the First Interim Report, the Officer acknowledged that the affidavits "are hearsay and generally are not admissible as evidence," and stated that "[a]lthough most of the affiants appeared to understand the significance of their sworn statements, some did appear confused." Land Grantors I, 64 Fed. Cl. at 702 n.36. Despite these misgivings, the Officer admitted the documents under Federal Rule of Evidence 807, which permits admission of hearsay evidence when (A) the statement is offered as evidence of a material fact; (B) the statement is "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts"; and (C) the "general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence." Fed. R. Evid. 807. The Officer's admission of these documents under this rule is clear error.

First, the affidavits are not "more probative on the point for which [they are] offered," Fed. R. Evid. 807(B), than the thousands of pages of documents generated at the time of acquisition. The Officer, Claimants' counsel, the United States, and a testifying expert historian agreed that the written record generated at or near the time of acquisition was the best available evidence of the parties' intentions. See Trial Tr. at 680:10-12 ("THE COURT: Court documents

[25] See Order Regarding Final Evidentiary Exhibits, dated Mar. 30, 2005 (Docket No. 170); See Def.'s Resp. to Claimants' Mot. Regarding Trial Exs., dated Dec. 10, 2004 (Docket No. 150).

obviously are the best evidence that we have; MR. PITT: Yes."); id. at 208:20 to 209:2 (Dr. Leland Johnson, qualified as an expert historian, stating that the most credible and reliable documents are those written documents created "when the land acquisition and construction was going on"). The written historical record is the most probative evidence for the issues relevant to this matter, and are far more probative than self-serving affidavits generated (1) decades after the relevant events (2) in an effort to obtain a monetary award (3) by individuals who have little, or no, first-hand knowledge of the relevant events.

In addition, the general purpose of the rules and the interests of justice are not well-served by the admission of these hearsay statements. Fed. R. Evid. 807(C). The United States had no opportunity to depose or cross-examine any of the witnesses who signed these affidavits, the allegations contained in the affidavits are contradicted by all admissible documents, and most statements included in these documents are nothing more than repetition of unsupported rumor. At base, these documents amount to nothing more than hearsay statements corroborated only by other hearsay evidence. This type of hearsay bootstrapping is improper. See Idaho v. Wright, 497 U.S. 805, 823 (1990) (rejecting the argument that corroborated hearsay is admissible in a criminal matter because "the use of corroborating evidence to support a hearsay statement's 'particularized guarantees of trustworthiness' would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial. . . ."); Peters v. United States, 408 F.2d 719, 738 (Ct. Cl. 1969) ("[H]earsay cannot corroborate hearsay. [That] is merely hearsay on hearsay, and multiple hearsay is no more competent than single hearsay. Adding hearsay to hearsay is like adding zero to zero which still equals zero. It could be said that hearsay on hearsay is nil because legally it is hearsay still.") (emphasis added).

**B. The Hearing Officer's Reasons for Admission Should Not Be Upheld**

The Officer justified admission of these documents under Federal Rule of Evidence 807 for two reasons. First, the Officer believed the documents admissible because the United States "received the affidavits in March 2004 and had sufficient notice in advance of trial. . . ." Land Grantors I, 64 Fed. Cl. at 700 n.36. This justification disregards the fact that Claimants waited 25 years after the affidavits were signed (and 15 years after Claimants filed their complaint) before they provided the documents to the undersigned counsel shortly before trial. By the time Claimants finally gave the affidavits to the United States, all the affiants were deceased. Solely as a result of Claimants' delay, the United States had no ability to depose any of the affiants to assess the basis of their statements. See Fed. R. Evid. 807 (statement is not admissible under rule unless the proponent provides the other party a "fair opportunity to prepare to meet [the evidence]").

Second, the Officer concluded that "the trustworthiness of the affidavits is demonstrated by the totality of the circumstances under which they were executed, i.e., not for litigation, but to persuade members of Congress to pass legislation to compensate the former landowners or their heirs for losses arising from the condemnation of their property in 1942-1944." Land Grantors I, 64 Fed. Cl. at 700 n.36. Even assuming the Officer's statement is correct (there is no basis to support the assumption), the distinction is a difference without significance: if the affidavits were executed in an effort to recover a monetary award from Congress, there is a clear potential for bias, just as there would be if the affidavits were executed in an effort to recover a monetary award through litigation.

Moreover, the Officer's conclusion that the affidavits were "credible and reliable," id., is

inconsistent with the Officer's statement during trial that the affidavits were "very tentative and unreliable information." Trial Tr. at 423:15-16. Despite the lack of any foundational evidence, the Officer concluded, after trial, which individual affidavits, of the total group of affidavits Claimants had submitted, were "credible and reliable." Land Grantors I, 64 Fed. Cl. at 700 n.36 ("Hearing Officer has cited or relied herein only the affidavits the [Officer] considered credible and reliable"). Given that Claimants did not offer any foundation or testimony to authenticate these affidavits, the Officer had no basis to reach such a decision.

In addition, the 49 affidavits the Officer deemed to be "credible and reliable" raise serious concerns. A listing of the more serious concerns is attached as Attachment D. Most affiants were apparently given a form affidavit, with leading questions such as "Did the government say you could purchase your farm back after the war, having first chance?" Nine affiants answered with a single word – "Yes." See Attach. D. A one-word answer to a leading question given under unknown circumstances is not the type of hearsay evidence Federal Rule of Evidence 807 is intended to allow. See Shu-Hui Chen v. Bouchard, 347 F.3d 1299, 1308 n.3 (Fed. Cir. 2003) (proponent's failure to offer any evidence of the "circumstantial guarantees of trustworthiness" meant documents did not fall within the Fed. R. Evid. 807 exception); Cent. Freight Lines, Inc. v. N.L.R.B., 653 F.2d 1023, 1026 (5th Cir. 1981) (in order for rule to apply to an extra-judicial statement, there must be "circumstantial guarantees of trustworthiness equivalent to those listed in [Fed. R. Evid.] 804(b)(1)-(4)"). Other affiants appear to repeat rumors or, at most, repeat hearsay statements allegedly made to the affiant at some unknown time and place, in some unknown setting. See Attach. D.

Some affidavits raise additional concerns. For example, as shown in Attachment D,

some affidavits are signed by different people on different dates, but curiously, contain nearly identical narrative text. Further, it is not possible to correlate several affidavits with any particular Breckinridge Property. Moreover, some affidavits appear to include different handwritings for different answers; some are incomplete; some are not notarized; some contain inconsistent dates; some contain erroneous information. Perhaps most troubling, many affiants admit they have no personal knowledge of the relevant events. See id.

For these reasons, the Review Panel should reject the Officer's finding that these documents are "credible and reliable," and not consider the documents in preparing the Panel Report. See Spezzaferro v. F.A.A., 807 F.2d 169, 173 n.2 (Fed. Cir. 1986) ("The only 'evidence' offered . . . was the affidavit of the petitioners' attorney which was based on hearsay, double hearsay, rumor, innuendo, and self-serving statements without probative value. The affidavit is a textbook example of the reasons justifying the existence of the hearsay rule.").

## VIII. The Hearing Officer's Conclusion that "Many" Landowners Were Promised a "Priority to Repurchase Land Sold by Them if Sold by the United States Government" is Clearly Erroneous

### A. The Hearing Officer's Finding Cannot be Based on the Deposition Transcripts

The Officer cited eleven deposition transcripts in support of a finding that "many" former landowners entered into the Contracts with the "apparent understanding that they could repurchase their properties after World War II was concluded. . . ." Land Grantors I, 64 Fed. Cl. at 700 n.35. The deponents' testimony about repurchase promises, which was offered chiefly in response to leading questions from Claimants' counsel, are unreliable. A table, describing unique problems with each deposition transcript, is attached as Attachment E.

The depositions were taken in 1995, more than fifty years after the United States'

acquisition of the Breckinridge Properties. None of the deponents could name a government employee who allegedly told a former landowner of a right to repurchase his or her property at the time of acquisition.[26] One deponent testified about a conversation between his aunt and an unnamed government agent, which the deponent did not overhear but merely told about later (CX-268); another deponent testified only that landowners hoped to repurchase their properties, and stated that he had no idea how any former owner came to understand that they had a repurchase right (CX-269). One deponent stated he was told about repurchase rights at some point between 1943 and 1947, possibly after passage of the 1944 Act with respect to a planned expansion of Camp Breckinridge (which never occurred) (CX-271). Another deponent testified, erroneously, that the repurchase promise "was first in the contract, wasn't it? Didn't they vote that over, after the Camp was on standby basis, that the original owners had no right to the first priority?" Tilley Dep. at 35:1-4. Two deponents testified that former landowners had the right to repurchase their land for a fraction of the price they received from the United States (CX-270 and CX-275), apparently confusing the landowners' right to repurchase their movable properties with the idea that landowners had the right to repurchase their land after the war. At most, the deposition testimony amounted to vague and self-serving allegations of promises, none of which are supported by the written record.

**B. The Hearing Officer's Finding Cannot be Based on the Discovery Responses**

The Officer also cited eleven discovery responses, signed by heirs (not former landowners) in 2004, approximately sixty-three years after the date of acquisition. See Land

[26] The First Interim Report stated that one deponent – Mr. Newman – had testified that "a Mr. Meyers from Ohio told [Mr. Newman's] father" that he could repurchase his property. Land Grantors I, 64 Fed. Cl. at 700 n.35. That is incorrect. Mr. Newman testified, "I don't imagine Meyers could have told him [about the repurchase right]." CX-272 at 9:6-9.

Grantors I, 64 Fed. Cl. at 700-01 n.37. A table, describing unique problems with each discovery response, is attached as Attachment F. All of the responses are based on hearsay (possibly multiple levels of hearsay), and simply repeat rumors that verbal promises were made (one response merely states his understanding is based on "rumor" (DX-692 at 8)). Although three of the responses identify the source of their hearsay statements (family members), the others do not. The Officer does not discuss the hearsay problem presented by these documents. Even if these documents are admissible, they are merely unsupported allegations, not reliable evidence.[27]

### C. The Hearing Officer's Finding Cannot be Based on the Affidavits

For the reasons discussed above, the forty-nine affidavits identified in footnote 36 of the First Interim Report are not credible evidence. Rather, the affidavits are nothing more than mere allegations, which are not supported by any circumstantial guarantees of trustworthiness.

### D. Conclusion

The Officer's finding that many former owners entered into Contracts with the apparent understanding that they would be entitled to repurchase their property after World War II is based on a handful of hearsay statements generated under largely unknown circumstances decades after the relevant events. The Officer's finding is not supported by any of the hundreds of documents created at the time of the United States' acquisition, which include no suggestion that government agents made repurchase promises. See discussion supra § II(B). None of these landowners complained about a breach of the alleged promise after the war, apparently first raising a complaint in 1979, when most signed a prepared form affidavit, with leading questions.

[27] As with the two deponents, one discovery response apparently confused the right to repurchase movable properties at 10 percent of their value with the alleged right to repurchase the land after the war (DX-677 at 8).

Apart from watching pre-recorded videotape depositions of certain witnesses (only one of whom had a claim corresponding to a Purchased Tract), the Officer's evaluation of this evidence was not informed by live testimony. Accordingly, the Review Panel should not accord the normal "due regard" to the Officer's findings because the Officer had no opportunity to "to judge the credibility of [the] witnesses." RCFC App. D, ¶ 8(d).

The Officer concluded only that "many" landowners had an understanding that they could repurchase their property after the war. Land Grantors I, 64 Fed. Cl. at 702. However, the United States acquired nearly 500 separate Breckinridge Properties, almost certainly affecting several thousand individuals. The Officer's finding is based on eleven depositions; eleven discovery responses; and forty-nine affidavits. Even if the allegation in each document is accepted as true, the Officer's finding is based on, at most, the allegations of 72 individuals (approximately 7 percent of the 1,011 individuals who joined this lawsuit in 1995).[28/] The Officer's decision to treat these few unsupported hearsay allegations as an established fact for all former landowners cannot be supported.

A final point must be made. The Final Report, in contrast to the First Interim Report, concludes that "the record evidences that misrepresentations made by Government agents in negotiating the 1942-44 contracts were a factor in Claimants' decision to sell, without further inquiry." Land Grantors VI, 81 Fed. Cl. at 609 (emphasis added) (citing Land Grantors I, 64 Fed. Cl. at 702). The only citation offered for the intentional "misrepresentation" finding is the conclusion in the First Interim Report that many landowners entered into the Contracts "with the

[28/] These individuals' claims relate to approximately 26 different Purchased Tracts (approximately 30 percent of the 85 Purchased Tracts relevant at trial) and 36 different Condemned Tracts (approximately 10 percent of the 395 Breckinridge Properties that the United States condemned). See Attach. G.

apparent understanding that they could repurchase their properties after World War II was concluded. . . .” Land Grantors I, 64 Fed. Cl. at 702. The statement that government agents misrepresented facts is not supported by the evidence or the First Interim Report, and the Review Panel should reject the clearly erroneous finding. See Sea-Gate, Inc. v. United States, 4 Cl. Ct. 25, 35 (1983) (rejecting equitable claim in a congressional reference matter because claimant failed to show that “agents of the government made any statements to them on which they relied, much less clear and convincing evidence that fraudulent misrepresentations were made”) (citation omitted).

## IX. The Hearing Officer’s Conclusion that the Landowners Were “Paid Less than Reasonable Value Due in Part to the Refusal of the United States Government to Compensate the Owners for Mineral, Oil and Gas Rights” is Clearly Erroneous

### A. The Hearing Officer Disregarded the Extensive Expert Testimony that Proved Claimants Were Not Paid Less than Reasonable Value

The procedural background of this matter is unusual. At trial, Claimants consisted only of the heirs of 85 different Purchased Tracts. The Final Report, however, concluded that all former landowners – including new, as yet unnamed, individuals who are allegedly related to the former owners of Condemned Tracts – are entitled to a multi-million dollar award. Prior to trial, however, both parties understood that Claimants represented only 85 Purchased Tracts. To allow the Officer an opportunity to evaluate whether the former landowners of those 85 tracts were paid “less than reasonable value,” S. 794, both parties presented extensive expert trial testimony comparing the amounts paid to the owners of the Purchased Tracts with the amounts paid to the owners of the Condemned Tracts. Under one such analysis, the parties assumed the owners of the Condemned Tracts received fair compensation; the question posed was whether the owners of the Purchased Tracts were similarly compensated. See CX-66A (showing

Claimants' estimated underpayment of $61,000 for all Claimants' tracts, based on this theory).

The United States submitted the testimony of three experts (Dr. James T. McClave, John D. Dorchester, Jr., MAI, and Mary Sitton) in support of its argument. See DX-650; DX-651; DX-652. This expert testimony – which utilized historic aerial photographs, well-accepted appraisal principles, and comprehensive statistical analyses – conclusively demonstrated that the United States paid reasonable value for Claimants' properties. Moreover, the United States' expert testimony demonstrated that Claimants' expert's assumptions, analyses, and conclusions were significantly flawed. See, e.g., DX-651 at 19 (Mr. Dorchester stating that Claimants' expert witness analysis is fundamentally flawed, *inter alia*, because it "did not consider the individual property variability of the tracts acquired for use in establishing Camp Breckinridge"); DX-650 at 4 (Dr. McClave explaining that Plaintiffs' expert's analyses were flawed and unreliable). Claimants waived their right to cross examine the United States' experts and presented no rebuttal testimony at trial.[29/] Although the Reports do not discuss this expert testimony, the United States' experts' testimony was largely uncontested, and should, therefore, be accorded significant weight by the Review Panel. See Ridgely's Estate v. United States, 180 Ct. Cl. 1220, 1232 (1967).

Despite having published several lengthy Reports, the Officer has never discussed this expert evidence. The name "McClave" does not appear in any of the Officer's decisions, and the names "Dorchester" and "Sitton" appear once apiece – in a footnote intended only to show when government counsel retained those two experts. The Reports' disregard of most of the expert

[29/] Claimants filed a new expert report after trial, to which the United States objected (Docket No. 147). The Officer denied the United States' objection "as moot," apparently concluding that all of the expert testimony presented was only related to a constitutional claim, which the Officer inexplicably concluded was "not ripe for adjudication." Land Grantors I, 64 Fed. Cl. at 717.

evidence presented at trial – including the vast majority of Claimants' case-in-chief and the United States' defense – is highly unusual.

Given that the Reports do not acknowledge this evidence, a comprehensive discussion of the United States' experts' testimony would simply repeat the arguments already in the United States' earlier briefs. For this reason, the United States respectfully refers the Review Panel to the United States' Post-Trial Memorandum, for a discussion of the expert testimony presented. See Def.'s Post-Trial Mem. at 128-59 (stating, at page 133, that "even if the Court believes that this comparison [between the average price paid for the Purchased Tracts and the Condemned Tracts] makes sense and that the difference is statistically significant, there is no basis for the Court to conclude that the price differential evidences improper government actions rather than some innocuous explanation").

**B. The Hearing Officer's Finding that the Former Landowners Did Not Receive Reasonable Value for the Breckinridge Properties is Clearly Erroneous**

At the core of the Officer's finding that the landowners were paid less than reasonable value is the fact that the United States received more money for the Breckinridge Properties in the late 1960s than it paid for those same properties in the early 1940s. See Land Grantors VI, 81 Fed. Cl. at 605 (evidence of mutual mistake is "most vividly evidenced by the" higher sales price); id. at 606 (Claimants should not bear the risk of mistake due to higher sales price). It is important to note that Claimants' counsel conceded that "We've now found from discovery that the minerals were paid for," meaning that Claimants conceded that they could not satisfy the terms of S. 794, Sec. 2(2). In addition, as discussed below, the Review Panel should reject the Officer's unsupported assumption that an increased sales price decades later supports entitlement to an equitable claim.

Fair market value is determined on the date of acquisition based on the facts then available in the market place, not unknown future sales. See, e.g., Cayuga Indian Nation of N.Y. v. Pataki, 83 F.Supp.2d 318, 326 (N.D.N.Y. 2000) ("Obviously, sales which post-date the subject sale are not known or even knowable to the parties at the time of sale, and hence cannot be taken into account by them in determining sales price."); United States v. Sowards, 370 F.2d 87, 89 (10th Cir. 1966) (explaining that "the best evidence of market value is found in sales of comparable property within a reasonable time before taking") (emphasis added). As the United States' expert appraiser testified,[30] appraisers must identify a specific date of valuation and "the market value appraisal applies only as of that date." DX-651 at 33-34 ("What happens in the future cannot be known with certainty as of the effective date of value and 20-20 hindsight is neither a tool for buyers and sellers nor for appraisers.").

The record shows that land prices in the area were depressed at the time of the United States' acquisition. See Trial Tr. at 219:12-17 (land prices in Union County decreased by one-third from 1925 to 1940); DX-182 at DOJ1810 (same). In a 1940 agricultural census conducted by the Census Bureau, farmers valued their own properties, on average, at $45 per acre in Henderson County, $42 per acre in Union County, and $25 per acre in Webster County. Trial Tr. at 461:18-21; DX-183 at DOJ2765 to -66, -90. Despite the depressed land values at the time of the acquisition, the evidence shows that the United States paid reasonable value for the Breckinridge Properties – approximately two to three times the average per-acre value reported

[30] The United States' expert appraiser, John D. Dorchester, Jr., was the Past President of the Appraisal Institute and past chair of the Untied Nation Committee of International Valuation Standards. Dr. McClave, Ph.D., the United States' expert statistician, is the author of six textbooks and has over thirty years of experience in the area of econometrics, the study of statistical and mathematical methods to economic issues.

in the 1940 agricultural census. See Trial Tr. at 460:21-461:21; DX-183 at DOJ2765 to -66, -90; DX-182 at DOJ1813. Moreover, the United States' experts demonstrated at trial that the United States' appraised values for the Condemned Tracts were equal to, or greater than, the appraised values estimated by the District Court's appointed Commissioners. See Trial Tr. at 252:13-21 (testimony of Dr. Johnson); Def.'s Post-Trial Mem. at Tab 4 (showing comparison for 126 Condemned Tracts).

The higher 1960s-era prices likely resulted from a variety of factors. As Claimants themselves argued "[t]he major source of the capital appreciation [from 1942 to 1966] was the much greater value of mineral rights in 1966 than in 1942, reflecting increased demand not only for oil and gas but also for coal." Pls.' Pre-Trial Mem. at 12 (emphasis added). Both parties appeared to agree that the increased demand (and, therefore, value) from 1940 to 1965 was unknowable at the time of acquisition. See Trial Tr. at 43:15-21 (Claimants' expert witness stating that the "enrichment" received at the sale of these properties was "certainly not anticipated when [the United States] bought the property"). The 1960s sales prices were unknowable in the early 1940s because no one could have predicted how oil and gas consumption in the United States would increase during World War II, and then soar in the postwar years as the U.S. economy boomed. See DX-183 at DOJ2787 ("The nationwide demand for oil increased dramatically during and after World War II."); id. at DOJ3001 to -07 (January 1942 report suggesting market conditions was depressing the oil industry in Kentucky because "only companies operating a large number of wells can exist under present price of crude"); Daniel Yergin, The Prize: The Epic Quest for Oil, Money & Power 382, 409 (1991) ("At the peaks, the American Forces in Europe used one hundred times more gasoline than in World War

I. . . . In 1945, 26 million cars were in service; by 1950, 40 million. Virtually no one in the oil industry was prepared for the explosion of demand for all oil products.”).

Moreover, it is beyond dispute that the parties could not have predicted in the early 1940s that a bidding war would artificially drive up auction prices in the late 1960s. See Allied Chem. Corp. v. Union County Bd. of Supervisors, 511 S.W.2d 196, 197 (Ky. Ct. App. 1974) (“quantities of oil were less than anticipated by the purchasers; [and] the bids were highly speculative; and that the sale price was excessive. . . .”) (emphasis added). In addition, the United States sold the Breckinridge Properties in much larger tracts in the 1960s than the United States had acquired in the 1940s, a fact that made mineral and surface development more attractive, and likely contributed to the increased value of the properties.

The Officer’s finding that the United States paid less than reasonable value of the Breckinridge Properties does not account for these factors, and instead assumes, without credible evidence, that an increase in sales price 25 years later proved entitlement to an equitable claim. The Review Panel should reject the Officer’s unsupported assumption.

## X. The Hearing Officer’s Application of the Doctrine of Mutual Mistake is Clearly Erroneous

Rather than address the parties’ expert evidence, the Officer concluded, *sua sponte* after trial, that all of the landowners and agents of the United States entered into the Contracts with the mistaken belief that “no coal, gas, oil, or other mineral deposits existed under the condemned properties that would support exploration or operation at the time of sale.” Land Grantors VI, 81 Fed. Cl. at 602.[31]

[31] In the discussion of “standing,” the Officer articulated a significantly different type of mistake: “Claimants alleged ‘legally protected interests’ in coal, gas, oil, and other mineral rights, that were mistakenly subject to the [C]ontracts . . . and subsequently invaded by lease and sale of that

Mutual mistake is sometimes cited as grounds to reform a contract in order to "make a defective writing conform to the agreement of the parties upon which there was a meeting of the minds." Emerald Maint., Inc. v. United States, 925 F.2d 1425, 1429 (Fed. Cir. 1991). Reformation of a written agreement on the ground of mutual mistake is an "extraordinary remedy," and is available only when a plaintiff proves: "(1) the parties to the contract were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party seeking reformation." Nat'l Austl. Bank v. United States, 452 F.3d 1321, 1329 (Fed. Cir. 2006) (quoting Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990)); see also Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994); Restatement (Second) of Contracts § 152 (1981) ("Restatement"). The burden of proof is born by the party attacking the validity of the contract, and he must present "clear and convincing evidence" of each element before mutual mistake can be found. See Nat'l Austl. Bank, 452 F.3d at 1329; Philippine Sugar Estates Dev. Co. v. Gov't of Philippine Islands, 247 U.S. 358, 391 (1918) (reformation will not be granted "unless the proof of mutual mistake be of the clearest and most satisfactory character"); Restatement § 155 cmt. c (1981) (stating that the law of contract typically "requires the trier of the facts to be satisfied by 'clear and convincing evidence' before reformation is granted").

As discussed below, the Officer's application of the doctrine of mutual mistake is clearly

---

property." Land Grantors VI, 81 Fed. Cl. at 601 (emphasis added). Unlike the rest of the Final Report (and in contrast to the earlier Reports), this sentence suggests that perhaps the landowners mistakenly sold their mineral rights to the United States. There is no support for the finding, and the rest of the Final Report does not attempt to support that finding. We assume the statement is a typographical error.

erroneous because (1) Claimants' delay in pursuing their rights prevents application of the doctrine; (2) the doctrine is legally inapplicable under these circumstances; and (3) the Officer's findings with respect to each of the four elements of mutual mistake are based on clearly erroneous inferences, which are not supported by the existing record. Moreover, the Officer's application of the doctrine of mutual mistake is not responsive to the terms of S. 794.

**A. Claimants' Right to Avoid the Contracts Are Barred for Failure to Act Within a Reasonable Time**

In Grymes v. Sanders, 93 U.S. 55 (1876), the Supreme Court held that "[w]here a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. . . . Delay and vacillation are fatal to the right which had before subsisted." Id. at 62 (emphasis added). Regardless of the merits of their allegations, Claimants may not invoke the doctrine of mutual mistake due to their failure to act within a reasonable time after they became aware of the relevant facts.

As discussed above, the Officer determined that a claim of mutual mistake accrued at various times between 1957 and 1967, when the United States sold the mineral rights. See Land Grantors I, 64 Fed. Cl. at 710-11. However, only one individual (Mr. Cyrus Higginson) filed a lawsuit or lodged a formal protest or complaint with a government agency within a reasonable time period and he did not articulate a claim of mutual mistake. The Higginson lawsuit ended in 1968, and Claimants did not allege a claim of mutual mistake until 2005, decades after the alleged "discovery" of minerals. Claimants' unexcused and unreasonable delay in pursuing their claims cannot qualify as an "at once" announcement. Grymes, 93 U.S. at 62. Claimants' failure to act within a reasonable period of time bars application of the doctrine of mutual mistake.

**B. Subsequent Discovery of Commercially Valuable Mineral Deposits Cannot Retroactively Create a Mistake of Fact**

As discussed below, the record does not support the Officer's finding that any landowner or any government agent signed a Contract in the 1940s with the mistaken belief that there were no subsurface minerals under the Breckinridge Properties. See discussion infra § X(C). Even if such evidence existed, a mistake about the existence of minerals cannot support application of the doctrine of mutual mistake. The quantity of minerals underlying a particular property is often speculative. For this reason, the "[s]ubsequent discovery of commercially valuable [mineral] deposits, or new discoveries making formerly noncommercial deposits profitable to mine, would not retroactively create a mistake of fact." Haag v. State Bd. of Univ. & Sch. Lands, 219 N.W.2d 121, 127 (N.D. 1974); accord Restatement § 154, cmt. a. As the Supreme Court concluded in Colorado Coal & Iron Co. v. United States, 123 U.S. 307 (1887),

> A change in the conditions occurring subsequently to the sale, whereby new discoveries are made, or by means whereof it may become profitable to work the veins as mines, cannot affect the title as it passed at the time of sale. The question must be determined according to the facts in existence at the time of the sale.

Id. at 328 (emphasis added); Baker v. Penn Mutual Life Ins. Co., 788 F.2d 650, 662 (10th Cir. 1986) ("Neither disappointed expectations as to future events nor mistakes in judgment or belief in that regard state any claim for relief based upon mutual mistake.").

These principles are based on the well-settled view that "'[a] party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined [under the doctrine of mutual mistake of fact ]." Dairyland, 16 F.3d at 1202-03 (alternation in original) (quoting Restatement § 151 cmt. a) (concluding that "[t]he availability of commercial reprocessing in the future cannot constitute an existing fact at the time of the 1973

sale contract"); see also Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 54 (2000) ("A mutual mistake in prophecy or opinion may not be taken as a ground for rescission where such mistake becomes evident through the passage of time.") (quoting United States v. Garland, 122 F.2d 118, 122 (1941)). As the Federal Circuit stated in Dairyland, "there is uniformity among the circuit courts of appeals and the commentators that mutual mistake of fact cannot lie against a future event." 16 F.3d at 1203 (emphasis added).

The Officer's conclusion directly conflicts with these principles. See Land Grantors I, 64 Fed. Cl. at 709 ("the facts on which a claim of mutual mistake [are based] did not occur until many years later"). Although phrased in terms of whether the parties were aware of the existence of minerals, the only real "mistake" the parties made was in failing to accurately predict that the sales prices in the 1960s would exceed the sales prices in the 1940s. That kind of "mistake" – a failure to accurately predict the future – is not cognizable under the doctrine of mutual mistake for the reasons stated above. Were the legal standards as the Officer suggested, France would have the right to challenge the selling price of the Louisiana Purchase, and Russia the right to challenge the selling price of Alaska.

In short, the Review Panel should reject the Final Report because post-transaction discovery of commercially-valuable minerals (even if supported by the record) cannot retroactively create a mutual mistake.

### C. The Hearing Officer's Finding that the Parties Entered the Sales Contracts With a Mutual Mistake About the Existence of Minerals is Clearly Erroneous

Even if there is a legal basis for a claim of mutual mistake, there is no factual basis on this record. The Officer's conclusion that all landowners (and all government agents) mistakenly

believed that there were no minerals under the Breckinridge Properties is clearly erroneous, and inconsistent with Claimants' own argument.[32] In addition, the Officer's finding that there was a "subsequent discovery of [subsurface minerals]" after the United States' acquisition, Land Grantors VI, 81 Fed. Cl. at 607, is incorrect. At most, the evidence suggests that although former landowners were likely aware of the existence of subsurface minerals, some former landowners were not actively mining those minerals at the time of the United States' acquisition. There is no basis, however, to equate an absence of commercial development with a conclusion that the parties shared a mutual mistake about the existence of those subsurface minerals.

### 1. The Hearing Officer's Finding that the Parties Were Mutually Mistaken is Not Supported by the Record

The Officer's conclusion that all former landowners and government agents mistakenly believed there were no minerals underlying the Breckinridge Properties at the time of the United States' acquisition is based, in its entirety, on the following clearly erroneous findings:

[32] Claimants' concession that the United States paid for minerals, see Trial Tr. at 198:12-13, means that the parties did not mistakenly believe there were no minerals under the Breckinridge Properties. Before the Officer issued the First Interim Report, Claimants never alleged that the former owners mistakenly believed there were no minerals. Rather, Claimants alleged that "[a]t and prior to the time of the appraisal and condemnation of the real properties, the aforementioned sub-surface minerals, including gas, oil and/or coal, were being extracted from some of the real properties as well as surrounding properties." First Am. Compl. ¶ 69; Second Am. Compl. ¶ 92 (same). In their Post-Trial Memorandum, Claimants argued that coal had been mined in the immediate area since before the Civil War, and that oil and gas drilling was well underway before these properties were sold to the United States. See Claimants' Post-Trial Mem. at 2; see also CX-11 at BLC1241 to -42 (stating that the landowners "had also become aware of the possibility of additional, and much easier, income from their land – mineral royalties from coal and oil," and discussing drilling activities "dating back as far as 1922, which consistently reveal seams of No. 9 and No. 11 coal"). It was Claimants' position that the parties knew about the minerals, but that the United States had "'over-condemned' beyond any legitimate public purpose when it took the un-needed subsurface mineral rights." Pls.' Post-Trial Mem. at 32; Trial Tr. at 43:15-21 (Plaintiffs' expert stating that the United States did not need to acquire the minerals).

**i. The United States' Historians' Expert Reports**

The United States submitted reports from Dr. Jay Brigham and Dr. Leland Johnson, two historians, who had located and reviewed historical documents (DX-183 and DX-182). The Officer cites both reports to support a conclusion that the parties mistakenly believed there were no minerals under the Breckinridge Properties. See Land Grantors I, 64 Fed. Cl. at 703-04. The several pages of Dr. Brigham's testimony cited by the Officer contradict, rather than support, a conclusion that the parties shared a mutual mistake about the existence of subsurface minerals. Dr. Brigham's report shows that coal mining in the Breckinridge area began before the Civil War, and that by 1940, "the Maginnis Coal Company operated a mine that produced coal for the domestic market." DX-183 at DOJ2767. Dr. Brigham's report cited historical data relating to active nearby coal mines in 1941, before these properties were acquired. See id. at DOJ2768. Dr. Brigham also reported that oil had already been discovered in the area at the time of acquisition, and western Kentucky produced more than three million barrels of oil in 1940. See id. at DOJ2769. Although Dr. Brigham believed the extent of the minerals were likely not fully understood in the early 1940s, Dr. Brigham's report does not support the Officer's finding that any party mistakenly believed there were no minerals underlying the Breckinridge Properties.[33]

The Officer cited Dr. Johnson's testimony to show that an oil well was drilled in May 1943 on a farm 2.5 miles west of Morganfield. See Land Grantors VI, 81 Fed. Cl. at 602 n.16.

---

[33] See also DX-185 at DOJ3642 (expert report of Mr. Dorchester, MAI, the United States' appraiser, that "the section of Kentucky in which Camp Breckinridge was located was an area with known coal, and oil and gas reserves").

This fact does not support any conclusion about a shared mistake.[34]

**ii. The Acquisition Documents**

The Officer supported the finding of a mutual mistake by stating "[t]he purchase options issued by the Government evidence this 'basic assumption,' since they specifically excluded 'all oil and gas leases of record that are still in force, also except all coal and mineral rights heretofore conveyed if any.'" Id. at 603. The quoted language reflects the unsurprising fact that the landowners did not intend to (and could not) convey to the United States mineral leases or mineral rights that the landowners had already conveyed to third parties. Nothing about these agreements suggests that the parties believed that there were no minerals under the ground, and there is no basis to infer that any individual had such a belief based on these documents. Instead, since these documents included language about mineral leases and mineral rights, these documents suggest the parties considered subsurface minerals at the time of acquisition, and, therefore, contradict the Officer's finding.

The Officer also relied on a Certificate for Tract A-15, which documented that the government agent could find no evidence of changes in the property in the last several months,

---

[34] At footnote 18 of the Final Report, the Officer states that since "much of the evidence adduced at trial as to mutual mistake was introduced by the Government's expert witnesses," Land Grantors VI, 81 Fed. Cl. at 605 n.18 (citing Dr. Brigham's and Dr. Johnson's expert reports), the parties had tried a claim of mutual mistake by implicit consent. The United States strenuously disagrees – as discussed above, these experts did not introduce evidence of a mutual mistake. Moreover, the parties did not implicitly litigate a claim of mutual mistake. The February 20, 2004 transcript cited in footnote 18, for example, concerned procedural issues and a discussion of the comparison of the Purchased Tracts and the Condemned Tracts. There was no discussion of mutual mistake, as suggested by the citation in footnote 18. Instead, as the Officer noted, the Officer itself raised a claim of mutual mistake, *sua sponte*, after trial. See Land Grantors II, 69 Fed. Cl. at 437 n.1 ("As the Government correctly observed, 'the doctrine of mutual mistake was identified *sua sponte* by the [Officer] for the first time after post-trial briefing has been completed.'").

no outstanding mortgages, and that "no evidence whatever of any . . . exploration or operations whatever for the development of coal, oil, gas or other minerals on said lands. . . ." Land Grantors VI, 81 Fed. Cl. at 603 (quoting JX-541 at CHI-002-A015-0015). Similarly, the Affidavit of Vendor, which was signed by the landowner, often related that the landowner had not entered into any new contracts affecting the land and had not undertaken exploration or received rentals "for the development of coal, oil, gas or other minerals" on the land. JX-541 at CHI-002-A015-0036. These Certificates and Affidavits (which exist only with respect to the Purchased Tracts, not the Condemned Tracts) simply show that the landowners had no mineral leases and/or were not actively mining their properties at the time of the United States' acquisitions. Several Affidavits redacted the quoted language, indicating that there were leases or active mineral development at the time of the United States' acquisition. See, e.g., JX-605 at CHI-046-E667-0024 (showing redacted language for Tract No. E-667). These documents do not suggest anything at all about either parties' belief about the existence of subsurface minerals, and do not, therefore, support the Officer's finding.

**iii. Thirty-Nine Affidavits Signed by Heirs in 1979**

The Officer also relied on thirty-nine affidavits, all of which were signed in 1979. See Land Grantors VI, 81 Fed. Cl. at 603 n.17. Even if these affidavits were admissible or supported by some foundational evidence (which they are not), the affiants did not even allege that the parties were mutually mistaken at the time of the United States' acquisition. At most, these affidavits suggest that the landowners were aware of possible oil deposits, but had not commercially developed those minerals before the United States' acquisition (the affidavits speak to oil, not gas or coal). As shown in Attachment H, approximately 82 percent of the total

number of affidavits cited stated that the former landowners had either leased their oil and gas rights and/or were aware that there were nearby pumping oil wells at the time of the United States' acquisition.[35/] These affiants do not allege (nor could they reasonably argue) that the former owners believed there were no minerals underlying these properties. The remaining affiants merely stated that the oil rights were not leased in 1942 and that there were no pumping oil wells nearby at the time of the acquisition. See Attach. H. Even if the affidavits were correct, the statements do not support the Officer's finding that the landowners had a certain belief about the minerals underlying the Breckinridge Properties.

**iv. Five Deposition Transcripts of Former Landowners**

The Officer also relied on five deposition transcripts of former landowners, taken in 1995, approximately 54 years after the relevant events. See Land Grantors VI, 81 Fed. Cl. at 603 n.17. As shown in Attachment I, these transcripts show that the former landowners consciously considered the possibility of subsurface minerals at the time of acquisition. See CX-270 at 30-35 (deponent states that the former landowners' attorney, who represented the former landowners during the acquisition, communicated with the United States Attorney about minerals and the handling of mineral leases); CX-273 at 17 (deponent states that the former landowners were aware of nearby oil wells pumping at the time of acquisition); CX-275 at 14 (deponent states that at the time of acquisition "we could reserve the coal and oil rights); CX-276 at 32-33 (deponent

[35/] Thirteen of the affiants believed the oil rights related to their ancestor's tract had been leased to third parties and that pumping oil wells were located near their farms prior to the United States' acquisition; an additional fourteen affiants believed that the oil rights had been leased before the United States' acquisition, or that pumping oil wells were located near the farm before the United States' acquisition. Five of the remaining affiants incorrectly believed that their ancestors had not entered into oil leases – in fact, the former landowner on the tracts corresponding to these affidavits had leased their oil and gas rights before 1942. See Attach. H.

states the minerals were leased to third parties and that the oil company had drilled test hole before she vacated the property); Tilley Dep. at 31-32 (deponent states that landowners were aware of minerals at the time of acquisition). These transcripts do not support the Officer's finding that the parties wrongly assumed that there were no minerals underlying these properties at the time of acquisition.

**v. Four Interrogatory Responses**

The Officer cites four answers to interrogatories (involving three different tracts of land) for the proposition that former landowners had not actively mined the minerals prior to the United States' acquisition. Land Grantors VI, 81 Fed. Cl. at 603 n.17; see also Attach. J. As above, even if it was true that these former landowners were not actively engaged in mining operations, these documents neither allege the existence of a mutual mistake nor support a conclusion about a shared mistake.

**vi. Mineral Lease Acquisitions**

The Officer also supported a finding of mutual mistake by noting that, "where the Government was aware of *even the potential for coal, gas, oil, or mineral deposits* . . . the lessees were paid for the leases or an agreement was negotiated whereby the lessees could resume activities after the war." Land Grantors VI, 81 Fed. Cl. at 605 n.18. It is undisputed that the United States acquired all mineral leases on the Breckinridge Properties, not just those where the United States was "aware" of the potential for minerals. That fact does not support a finding that the parties shared a mistake about the existence of subsurface minerals. Instead, the fact that more than half of the former owners had leased their mineral interests to third parties prior to the United States' acquisition is a compelling reason why the Review Panel should reject the Final

Report.

In summary, the Officer's finding is based on an unsupported inference that a lack of active mining operations is equivalent to a mistaken belief (on the part of all government agents and all former landowners) that there were no subsurface minerals underlying the Breckinridge Properties. The mere fact that a landowner was not actively extracting minerals from his property is irrelevant to whether he thought there were minerals underlying the property. Since most of these landowners had leased some of their mineral interests to third parties, the lack of active mining operations was the result of a decision by those third parties (whose decisions were driven, no doubt, by market conditions), not any belief or non-belief of the landowners or the United States. This record does not approach the "clear and convincing" standard necessary to prove mutual mistake, Nat'l Austl. Bank, 452 F.3d at 1329, and the Officer's finding, therefore, cannot be supported.[36/] See also Restatement § 155 cmt. c ("Care is all the more necessary when the asserted mistake relates to a writing, because the law of contracts, as is indicated by the parol evidence rule and the Statute of Frauds, attaches great weight to the written expression of an agreement. This is commonly summarized in a standard that requires the trier of the facts to be satisfied by 'clear and convincing evidence.'").

**2. The Hearing Officer's Finding About a Subsequent Discovery of Minerals is Not Supported by the Record**

Because there was no "mistake" about the possible existence of subsurface minerals, there is also no evidence to support the Officer's finding that the parties discovered subsurface

[36/] In addition, it is important to recognize that the Officer's finding relates to a small handful of Breckinridge Properties: the affidavits, deposition transcripts and discovery documents cited by the Officer relate to approximately 18 different Purchased Tracts (21 percent of the 85 Purchased Tracts represented at trial) and 29 different Condemned Tracts (7 percent of the Condemned Tracts). See Attach. K.

minerals after the United States' acquisition (or that the parties recognized their mistake at some later date). The Officer concluded that the United States "discovered" significant oil and gas reserves under the Breckinridge Properties in either 1951, 1954 or 1956 (the Officer does not make any finding with respect to a subsequent "discovery" of coal). The record does not support any of these dates. The First Interim Report stated by "June 19, 1951, the Department of Defense ('DOD') became aware that substantial gas and oil reserves may be located under the condemned properties. . . ." Land Grantors I, 64 Fed. Cl. at 664. In support, the Officer relied upon the United States' June 9, 2004 discovery response to Claimants' Request for Admission Number 27. See id. at 664 n.2. That request for admission, however, merely asked the United States to admit "that on or about June 19, 1951, the United States Department of the Army transferred all oil and gas rights on the Property to the Department of the Interior." That request for admission says nothing about the discovery of "substantial gas and oil reserves" and does not support the Officer's finding.

The Officer drops the 1951 date from the Final Report, and instead find minerals were discovered in 1954 and/or 1956. In support of those dates of "discovery," the Officer states that Department of the Interior's ("DOI's") Office of Geological Survey "identified potentially significant oil and gas deposits under the Camp Breckinridge lands" in May 1954. Land Grantors VI, 81 Fed. Cl. at 589. In support, the Officer relied upon DX-40 at DOJ0311, a copy of DOI's 1957 dismissal of a protest against the issuance of an oil and gas lease for a 190-acre tract, which had been filed by two former owners. Page DOJ0311 of that document references a 1954 investigation undertaken by the Geological Survey, which states the following:

> Investigation of the drainage situation by the Geological Survey of this Department in May 1954 disclosed that the threat of drainage from oil wells in the

> South Morganfield oil field had been diminished to a considerable extent, if not entirely eliminated. Consequently, further action on this matter was then suspended pending completion of a study by the Army of its need for the land for military purposes.

DX-40 at DOJ0311. The document then explains that in August 1956, the Geological Survey reported that 14 off-base wells had been completed and were then in operation. See id. Without stating anything about a discovery of oil or gas reserves underneath the Breckinridge Properties, the report states that "[i]n order to protect the United States against loss by reason of the drainage of the oil and gas deposits occurring from the Camp Breckinridge lands, the tract of 190 acres on the east boundary of the camp was offered for leasing on March 20, 1957." Id. These documents do not evidence a "discovery" of oil and gas in 1954 (or 1956) – rather, the document shows only that DOI became concerned in 1956 that off-base oil prospecting might result in drainage. Because DOI had "the legal obligation to take such measures as may be necessary to protect the interests of the United States from loss," id., it leased out the oil and gas interests underlying the land.

The Officer cites no other documents to support the finding that there was a subsequent discovery of oil and gas (and no findings at all about coal). There is, therefore, no evidence of a "subsequent discovery" of minerals, and the Officer's finding should be rejected. Simply stated, even if the parties had a certain belief or non-belief about the existence or quantity of mineral deposits at the time of acquisition of the Breckinridge Properties, there is no evidence that those beliefs were later determined to have been erroneous.

**D. The Hearing Officer's Finding that the Parties' Mistaken Belief Constituted a "Basic Assumption" Underlying the Contracts is Clearly Erroneous**

Mutual mistake only applies if there is clear and convincing evidence that the shared

mistake "constituted a basic assumption underlying the contract." Dairyland, 16 F.3d at 1202 (citation omitted). Assumptions are "basic" only if a change to that term renders impracticable one party's performance or one party's primary purpose of contracting becomes substantially frustrated. See Restatement § 152 cmt. b ("The term 'basic assumption' has the same meaning here as it does . . . in connection with impractibility (§§ 261, 266(1)) and frustration (§§ 265, 266(2))," and stating further that "mistakes as to market conditions or financial ability do not justify avoidance under the rules governing mistake."). For example, a court found that a zoning law was not a "basic assumption" underlying a contract because while a change in zoning from residential to commercial uses may have increased the value of the property sold, plaintiff "failed to show that the mutual intention of the parties to sell and buy residential property was frustrated by the mistake that the property could also be used for a commercial purpose." Pendelton v. Witcoski, 836 So.2d 1025, 1029 (Fla. Dist. Ct. App. 2002). Therefore, mutual mistake was inapplicable because "the property's altered use had no effect whatsoever on the benefit for which each party bargained." Id.

In this case, the sole purpose of the Contracts was the transfer of the fee simple interests from the landowners to the United States. Even if there was a later discovery of subsurface minerals, which there was not, there is no basis to conclude that the subsequent discovery frustrated the purpose of the Contracts or rendered either party's performance impracticable.

**E. The Hearing Officer's Unsupported Statement that the Parties' Mistaken Belief Had a "Material Effect" on the Agreed Exchange of Performance is Clearly Erroneous**

Mutual mistake only applies if the mistake had a "material effect" on the agreed exchange of performance. See Restatement § 152 cmt. a ("Relief is only appropriate in

situations where a mistake of both parties has such a material effect on the agreed exchange of performances as to upset the very basis for the contract."). Even if there was a mistake about the existence of minerals, that mistake did not have a material effect on the parties' bargain because the United States acquired, and the landowners sold, the full fee simple interest in the properties, as both parties intended.

The Officer's conclusion that a mistake about the existence of minerals had a material effect on the agreed exchange of performance is based solely on the Officer's inaccurate statement that "the financial benefit that the Government received from these assets far exceeded what was bargained for, *i.e.*, the use of the land for Camp Breckinridge. . . ." Land Grantors VI, 81 Fed. Cl. at 605. The finding is contradicted by thousands of pages of documents, which show definitively that the landowners sold, and the United States bought, the full fee simple interest in each of the Breckinridge Properties and not just use of the surface interest. See discussion supra § II(B)(1). The Officer's conclusion is also contradicted by the United States Court of Appeals for the Sixth Circuit,[37] the original Officer's earlier findings,[38] and Claimants' own position at

[37] Higginson v. United States, 384 F.2d 504, 507 (6th Cir. 1967), cert. denied, 390 U.S. 947 (1968) ("In the instant case the declarations provided that 'The estate taken for said public uses is in full fee simple title, subject however to existing easements for public utilities, for public railroads, and for pipelines.' Thus, if valid title passed to the United States, it received full fee title except for the specified easements."); id. at 506 ("The government's title to the land acquired by negotiated purchases vested some 20-30 years ago. This title cannot now be disputed under any accepted property theory.").

[38] Court Order, dated Nov. 24, 1998 at 8 ("[S. 794] presumes that a sale in fee simple occurred and directs the court to determine if claimants are entitled to additional compensation for claims 'arising out of such sale.' Accordingly, claimants' challenge to the title acquired by the government, and their corresponding attack on the government's sale of the Camp Breckinridge Properties, are dismissed as beyond the scope of the S. 794.")

trial.[39] The "agreed exchange of performance" was the conveyance of the fee simple absolute interest from the landowner to the United States. The fact that the subsurface minerals were sold for more money in the late 1960s did not materially effect the parties' bargain, because the parties had already completed their transaction 25 years earlier. See Wood v. Boynton, 25 N.W. 42, 45 (Wis. 1885) (absent "fraud or warranty, the value of the property sold, as compared with the price paid, is no ground for a rescission of a sale").

### F. Even Assuming the Parties Were Mistaken About the Existence of Minerals, the Hearing Officer's Conclusion that the Claimants Should Not Bear the Risk of Any Mutual Mistake is Clearly Erroneous

Mutual mistake applies only if the contract did not put the risk of the mistake on the party seeking reformation. See Restatement § 152. As a general matter, the doctrine of mutual mistake does not protect the seller of land if he sells the property for less than it is worth. See 7 Corbin on Contracts § 28.35 at 180 (stating that a mistaken estimate of market value is "[p]ractically never" the type of mistake that would justify avoidance of a contract); Frona M. Powell, Mistake of Fact in the Sale of Real Property, 40 Drake L. Rev. 91, 110 (1990/1991) (stating that the law "generally does not protect the seller from loss if he sells the property for less than it is worth"). This is because a seller's ownership of property presumably creates knowledge about the property, placing the seller in a better position than the purchaser to know the relevant facts, and the burden should rest on the party most likely to know those facts. See id. (citing Palumbo v. Ewing, 540 F. Supp. 388, 393 (D. Del. 1982)); see also Restatement § 154, cmt. c (mistaken party who is aware when he made the contract that his knowledge was limited with respect to the facts to which the mistake relates bears the risk of the mistake).

[39] Trial Tr. at 198:12-13 (CLAIMANTS' COUNSEL: "We've now found from discovery that the minerals were paid for.").

For this reason, the Restatement specifically allocates the risk of mistake to the seller of farm land that is later discovered to contain valuable mineral deposits:

> [I]t is commonly understood that the seller of farm land generally cannot avoid the contract of sale upon later discovery by both parties that the land contains valuable mineral deposits, even though the price was negotiated on the basic assumption that the land was suitable only for farming and the effect on the agreed exchange of performances is material. In such a case a court will ordinarily allocate the risk of the mistake to the seller, so that he is under a duty to perform regardless of the mistake.

Restatement § 154, cmt. a; see also 2 E. Allan Farnsworth, Farnsworth on Contracts § 9.3 at 608 (3d ed. 2004) ("Suppose an owner of farm land discovers, after making a contract for its sale, that the land contains mineral deposits that make it much more valuable than either party has supposed. As a general rule, the owner cannot avoid the contract on the ground that both parties were mistaken in assuming, when they fixed the sale price, that the land was suitable only for farming.").

The Officer reaches a decision contrary to these general principles based on consideration of three of five factors articulated in Finch v. Carlton, 524 P.2d 898 (Wash. 1974), a case that did not involve a land transaction or a mistake about the existence of subsurface minerals; did not involve a claim of mutual mistake; and which has been explicitly limited to its facts in subsequent decisions. See Bennett v. Shinoda Floral, Inc., 739 P.2d 648, 652 (Wash. 1987) (declining to apply the Finch holding in a mutual mistake context, stating "Finch must be limited to its facts"). The Officer's creation of a new three-part Finch-based test has no legal basis.

Even if the Officer's new Finch-based test had some legal basis, the Review Panel should reject the Officer's application of this new test. The Officer first concluded that Claimants should not bear the risk of mistake due to an inequality of the parties' bargaining positions and

the haste of acquisition: the "Government required that the landowners vacate the premises under very short notice," meaning that landowners were unable to "seek a neutral professional assessment of the potential for coal, gas, oil, and other minerals on [the] property. . . ." Land Grantors VI, 81 Fed. Cl. at 608. The finding is erroneous. In several instances, the former landowners owned these properties for decades prior to the United States' acquisition. See, e.g., JX-554 at CHI-016-E040-0020 (stating that the landowner for Tract No. E-40 had owned that property for 24 years prior to the United States' acquisition). The landowners knew the physical attributes of their properties as well as, or better than, the United States' appraisers. Moreover, a majority of former landowners declined the United States' initial appraisal, and opted to proceed through condemnation. Those former landowners often retained legal counsel, filed exceptions to the United States' estimated value, submitted their own appraisal report, and proceeded through a jury trial. If the former landowners disagreed with the jury's assessed award, they could have appealed the jury's decision. Nothing prevented these Claimants from engaging in exactly the type of assessment the Officer contemplates, and which was preformed by a majority of their neighbors. See also DX-71 (May 1942 letter to former landowners from President Roosevelt stating, "no citizen is required to given an option to the Government at a price that does not meet with his or her approval," and suggesting landowners who disagree with the appraised value could proceed through condemnation).

The Final Report also suggests, for the first time, that the United States might have known something more than Claimants about the existence of minerals at the time of acquisition: "[T]he former Claimants were in no position to challenge the Government, which already had access to geologists and engineers with superior knowledge about the site." Land Grantors VI,

81 Fed. Cl. at 607 (emphasis added). The Officer provides no citation for the suggestion that any geologist or engineer associated with the United States had "superior knowledge" about subsurface minerals, and the United States is not aware of any such evidence. The Officer's finding, which is offered to bolster a conclusion about inequitable bargaining positions, is, therefore, without evidentiary support.

Next, the Officer concluded that the second Finch-based factor – "the amount of consideration" – shows that Claimants should not bear the risk of mistake because the amount of consideration paid to Claimants for their property "was not in parity with the significant financial gain that the Government received after the discovery of [mineral] deposits." Land Grantors VI, 81 Fed. Cl. at 607. The Officer distorts its own Finch-based test; the Finch court stated only that a court should consider whether "adequate consideration" was given, when determining whether to apply the terms of a release. Consideration is adequate under this test "unless the consideration is so inadequate as to be constructively fraudulent." Columbia Basin Fitness Club v. TC Investments, 98 Wash. App. 1018, 1999 WL 1080343, at *7 (Wash. Ct. App. 1999) (citing Finch and stating further that a "bad bargain" does not rise to inadequate consideration). The consideration provided to the former landowners was fair and consistent with (or higher than) prevailing land prices at the time. As discussed above, the fact that these properties sold for more money in the late 1960s does not mean that the United States paid less than reasonable value 25 years earlier.

Finally, adding a new factor not articulated in Finch, the Officer concluded that Claimants should not bear the risk of mistake because the Contracts did not expressly require the

former landowners to assume such a risk. See Land Grantors VI, 81 Fed. Cl. at 608.[40] The Review Panel should reject this finding as well. The acquisition documents show that the former landowners contemplated the possible existence of subsurface minerals at the time of sale – the fact that the Acquisition Documents included language about active mineral operations, for example, shows that the parties consciously considered the issue. In addition, more than half of the landowners had entered into mineral leases prior to the United States' acquisition. Even if the parties lacked perfect knowledge about the extent of subsurface minerals, the landowners opted to "sell and convey to [the United States] its successors and assigns forever," and expressly noted that the United States would hold the Breckinridge Properties "forever, with a covenant of 'General Warranty.'" JX-554 at CHI-016-E040-0006 to 0007 (emphasis added). When the former landowners signed the receipt for their payment from the United States, they acknowledged that the sum was received "in full satisfaction and discharge of the interest of the undersigned in the premises conveyed." Id. at CHI-016-E040-0010. The former landowners expressly gave up all of their rights to these properties and consequently assumed the risk of the later discovery of commercially-valuable minerals. See Land Grantors VI, 81 Fed. Cl. at 606-07 (acknowledging, and citing cases for the proposition, that when parties contract knowing that they lack perfect knowledge on a particular subject, "the risk of loss [is] placed on the party that

[40] The only case the Officer cites to support this argument is Flippin Materials Co. v. United States, 160 Ct. Cl. 357, 312 F.2d 408 (1963), see Land Grantors VI, 81 Fed. Cl. at 608, a decision that supports the United States' position. In that case, the Court of Claims rejected a contractor's mutual mistake claim related to a contract to excavate rock from a government-owned mountain. When the contractor found more clay-contaminated rock than it expected, the contractor sought to avoid the contract. See Flippin Materials, 312 F.2d at 411. Because the contract lacked the "usual changed conditions clause," the court concluded that the contractor bore the risk of the mistake. See id. at 415-16. Similarly, these Contracts do not include a "changed conditions clause," but instead explicitly show that the United States acquired the full fee simple "forever."

failed to make a reasonable inquiry”).

The Officer concluded this analysis by stating that Claimants should not bear the risk of mistake because “Government agents represented that they had no knowledge that coal, gas, oil, or other mineral rights were present on the properties in 1942-1944.” Id. at 608 (citing only JX-541 at CHI-002-A015-0015, the Certificate for Tract No. A-15). The Certificate does not stand for the proposition for which it is offered. Rather, as with many similar Certificates, the Government agents merely confirmed that on the day of their inspection, there was no “exploration or operations whatever for the development of coal, oil, gas, or other minerals on said lands. . . .” JX-541 at CHI-002-A015-0015. The document says nothing about knowledge of subsurface minerals, and the document cannot reasonably be construed to be a representation by any government agent that “they had no knowledge,” Land Grantors VI, 81 Fed. Cl. at 608, of the existence of minerals on the property.

Based on the discussion above, the Review Panel should reject the Officer’s finding that Claimants should not bear the risk of mistake.

**G. The Doctrine of Mutual Mistake is Not Responsive to the Terms of S. 794**

As discussed above, Claimants are entitled to relief under S. 794 only if they can show that they were promised that they would be given a priority to repurchase land and if they were paid less than reasonable value due in part to the refusal of the United States to compensate them for mineral rights. S. 794, Sec. 2. The report to Congress is limited by the terms of the referenced bill. For example, in Hulsey v. United States, the Senate referred to this Court a bill to compensate Mr. Hulsey for polymyositis, an illness allegedly resulting from having been administered an inoculation in a government-sponsored program for swine flu. 6 Cl. Ct. 593,

594 (1984) (Cong. Ref.). Mr. Hulsey's complaint alleged that he suffered from polymyositis and Guillian Barre syndrome. Based on the terms of the referenced bill, the Hearing Officer concluded that a claim based on any illness other than polymyositis was beyond the scope of the reference. See id. at 595-96. Similarly, S. 794 sets forth the explicit elements Claimants must prove – the Officer's application of the doctrine of mutual mistake is not responsive to these express terms, and the Officer's findings, therefore, are beyond the scope of the Court's jurisdiction. See also Hart v. United States, 58 Ct. Cl. 518, 538 (1923) (Cong. Ref.) ("We may not extend the inquiry beyond what the bill expressly describes as the alleged items of loss."). Consequently, the Review Panel should reject the Final Report.

**XI. Conclusion**

For the reasons discussed above, the Review Panel should reject the Final Report, and issue a Panel Report recommending that any award would be a gratuity. First, the Final Report is fundamentally flawed because it lacks any Claimant-specific analysis of liability or damages, and does not include particularized findings related to any individual Claimant. A recommendation that Congress simply appropriate a multi-million dollar award to unnamed, and unknowable, individuals who did not participate in these trial proceedings or submit evidence in support of their claims, is contrary to the Senate's explicit directions, and should be rejected.

On the merits, the Final Report is based on unsupported inferences, erroneous factual findings, and faulty legal analyses with respect to all of its major conclusions, including (a) laches; (b) whether any former landowner was promised that he "would be given priority to repurchase" his former land; and (c) whether any former landowner was paid less than reasonable value "due in part to the refusal of the United States Government to compensate the

owners for mineral, oil and gas rights." S. 794, Sec. 2. Numerous critical findings are not supported by the citation offered; many other findings are supported by nothing more than self-serving, incompetent, and decades old hearsay allegations, which are contradicted by thousands of pages of documents generated at or near the time of the relevant events.

The extensive trial record does not support an equitable or legal claim – Claimants failed to show that any former landowner was given a priority to repurchase the land at the end of the war or that the United States paid less than reasonable value "due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights." S. 794. The Review Panel should, therefore, reject the Final Report, and issue a Panel Report recommending that any monetary award would be a mere gratuity.

Respectfully submitted this 17th day of July, 2008,

RONALD J. TENPAS
Assistant Attorney General

_s/ William J Shapiro__________
WILLIAM SHAPIRO
United States Department of Justice
Environment and Natural Resources Division
501 I Street
Suite 9-700
Sacramento, CA 95814
(916) 930-2207 (phone)
(916) 930-2210 (fax)

Of Counsel:
Martin Cohen
Dale Holmes
Stephen J. Allison
U.S. Army Corps of Engineers