**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| LAND GRANTORS IN HENDERSON, UNION, AND WEBSTER COUNTIES, KENTUCKY AND THEIR HEIRS | ) | |
| Claimants, | ) | No. 93-648X |
| v. | ) | Judge Charles F. Lettow, Presiding Officer Senior Judges Lawrence S. Margolis and Loren A. Smith, Review Panel |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**CLAIMANTS' OPENING BRIEF IN SUPPORT OF EXCEPTIONS**

Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW
1350 Connecticut Avenue, N.W.
Suite 410
Washington, D.C. 20036
(202) 822-6760

Counsel for Claimants

July 17, 2008

Of Counsel:

M. Stephen Pitt
Merrill S. Schell
Jean W. Bird
WYATT, TARRANT & COMBS, LLP
500 W. Jefferson Street
Suite 2800
Louisville, KY 40202-2898
(502) 562-7372

**Table of Contents**

Introduction…………………………………………………………………….........1

Factual Background…………………………………………………………………….2

Procedural Background………………………………………………….....................2

Standard of Review…………………………………………………………….........3

Argument……………………………………………………………………………….5

I. The Report to Congress Should Clarify that Interest on the Proceeds of the Mineral Sales Is a Necessary Element of Full Restitution………..5

A. Restitution Requires that the Government Disgorge Interest as well as Principle……………………………………………...………..6

B. Simple Interest Amounts to At Least $91,709,844.54….……………..9

C. Compound Interest Exceeds $441 million……….…………………..10

D. Just Compensation……………………………………………...11

II. The Hearing Officer Erred by Not Including the Owners of all 35,684.99 Acres as Claimants Entitled to Relief……………………...…13

A. The Hearing Officer Erred in Excluding Individuals Whose Property Was Valued by a Jury.……………………………………..15

B. The Review Panel Should Clarify that a Vendor Affidavit Is Not Required to Recover in this Case……………………………………18

III. Claimants Should Be Compensated for the Years 1964-1983 for Which the Government is Unable to Produce Records of its Royalty Receipts for Tracts 7A and 7B………………………………………...19

Conclusion……………………………………………………………………….…29

# TABLE OF AUTHORITIES

**Cases**

*American Creameries Co. v. Armour Co.*, 271 P. 896 (Wash. 1928)……………………16

*American Savings Bank, F.A. v. United States*, 74 Fed. Cl. 756 (2006)…………………11

*Bowles v. United States*, 31 Fed. Cl. 37 (1994)……………………………………….11

*Burkhardt v. United States*, 113 Ct. Cl. 115 (1945)…………………………………...14

*California Canners & Growers Ass'n v. United States*, 9 Cl. Ct. 774 (1986)…………….4

*Cal. Marine Cleaning Inc. v. Untied States*, 43 Fed. Cl. 724 (1999)…………………….28

*CCA Associates v. United States*, 75 Fed. Cl. 170 (2007)……………………………….13

*Com. Of Internal Revenue v. Kieselbach*, 127 F.2d 359 (3rd Cir. 1942)…………………16

*Exxon Corp. v. United States*, 45 Fed. Cl. 581 (1999)………………………………25, 28

*Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374 (Fed. Cir. 2001)…………6

*Hawaiian Gas Products v. Com. of Internal Revenue*, 126 F.2d 4 (9th Cir. 1942)………16

*Hickman v. United States*, 135 Ct. Cl. 380 (1956)……………………………………14

*Hope v. United States*, 23 Cl. Ct. 776 (1991)…………………………………………16

*Houser v. United States*, 12 Cl. Ct. 454 (1987)……………………………………..…16

*In Re Matters of Softsearch Holdings, Inc.*, 124 F.T.C. 54 (1997)………………………25

*ITT Corp. v. United States*, 17 Cl. Ct. 199 (1989)…………………………………..……11

*J.A. Zachariassen & Co. v. United States*, 136 Ct. Cl. 63 (1956)…………………..……14

*J.L. Simmons Co., Inc. v. United States*, 60 Fed. Cl. 388 (2004)…………………...……..4

*Jones v. Ill. Dept. of Rehab. Svcs.*, 689 F.2d 274 (7th Cir. 1982)…………………...…….28

*Joseph Piccard's Sons Co. v. United States*, 209 Ct. Cl. 643 (1976)……………………26

*Kochendorfer v. United States*, 193 Ct. Cl. 1045 (1970)…………………………...5, 14

*Land Grantors v. United States*, 64 Fed. Cl. 661 (2005) (*Land Grantors I)*…………...2, 3

*Land Grantors v. United States*, 74 Fed. Cl. 518 (2006) (*Land Grantors IV)*…………….3

*Land Grantors v. United States*, 81 Fed. Cl. 580 (2008) (Land Grantors VI)……….*..ibid.*

*Landmark Land Co. v. Federal Deposit Insurance Corp.*,
256 F.3d 1365 (Fed. Cir. 2001)………………………………………………………7

*Land v. United States*, 29 Fed. Cl. 744 (1993)……………………………………..…5

*Land v. United States*, 37 Fed. Cl. 231 (1997)………………………………………3, 4

*Merchants National Bank of Mobile v. United States*, 7 Ct. Cl. 1 (1984)………………...4

*Milmark Services, Inc. v. United States*, 731 F.2d 855 (1984)………………………....4

*Pedrottic v. Marin County*, 152 F.2d 829 (9th Cir. 1946)…………………..……………16

*Piccadilly Cafeterias, Inc. v. United States*, 36 Fed. Cl. 330 (1996)……….…………17

*Sale Engineering and Construction Corp. v. United States*, 2 Cl. Ct. 803 (1983)………26

*Spalding and Son, Inc. v. United States*, 24 Cl. Ct. 112 (1991)…………………………...4

*Specialty Assembly and Packaging Co. v. United States*, 174 Ct. Cl. 153 (1966)……….26

*Tulare Lake Basin Water Storage District v. United States*, 61 Fed. Cl. 624 (2004)……11

*United States v. $277,000 U.S. Currency*, 69 F.3d 1491 (9th Cir. 1995)……………….8, 9

*United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491 (6th Cir. 1998)……………9

*United States v. Certain Parcels of Land in Loyalstock Tp., Lycoming County, Pa.*,
51 F.Supp. 811 (M.D. Pa. 1943)……………………………………………………16

*Western Contracting Corp. v. United States*, 144 Ct. Cl. 318 (1958)…………………...26

*White Sand Ranchers of New Mexico v. United States*, 14 Cl. Ct. 559 (1988)……………5

*Whitney Benefits, Inc. v. United States*, 30 Fed. Cl. 411 (1994)…………………11, 12, 13

*W.R.B. Corp. v. United States*, 183 Ct. Cl. 409 (1968)…………………………...………26

**Statutes**

28 U.S.C. §2509……………………………………………………………...……4

40 U.S.C. §3114…………………………………………………………………….11

**Other**

27 AM. JUR. 2D Eminent Dom. §826…………………………………………...…16

Dan B. Dobbs, Law of Remedies: damages – equity – restitution §3.6(2)
(2d. ed. 1993)……………………………………………………………………....7

FARNSWORTH §12.1……………………………………………………………..6

Restatement (First) of Restitution, § 1 (1937)……………………………………….5

Restatement (First) of Restitution, §157(1937)…………………………………...7

S. 794, 103rd Cong. §1 (1993)………………………………………………..14, 15

S. 794, 103rd Cong. §2 (1993)……………………………………………………14

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

LAND GRANTORS IN HENDERSON, UNION, AND WEBSTER COUNTIES, KENTUCKY AND THEIR HEIRS

Claimants,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 93-648X

Judge Charles F. Lettow, Presiding Officer
Senior Judges Lawrence S. Margolis and Loren A. Smith, Review Panel

**CLAIMANTS' OPENING MEMORANDUM IN SUPPORT OF EXCEPTIONS**

This Congressional Reference arises from the Government's World War II acquisition of 35,684.99 acres of Claimants' farm land for an Army training camp in which the oil, gas, and coal rights were completely overlooked, unjustly enriching the Government by many millions of dollars. Claimants support the Hearing Officer's Findings of Fact and Conclusions of Law, and present exceptions only for the following points:

> In the wartime acquisition of 35,684.99 acres of land for Camp Breckinridge, the government mistakenly acquired Claimants' significant mineral interests without paying for those interests. The Government also failed to honor its (unauthorized) promise to sell the land back to the owners after the land was no longer needed.
>
> (1) Should the Government be required to disgorge the full value of benefits that it has received, including interest, for all 35,684.99 acres?
> (2) Should all former owners be entitled to relief, including those who no longer have a vendor affidavit and those whose property was valued by a jury?

Claimants submit that since the Government acquired all 35,684.99 acres during the same time period and under the same circumstances and with the same, albeit

unauthorized, promise to buy back the land, all of the former owners should be included as Claimants. Claimants further submit that the Government should be required to disgorge all of the benefits that it has received and retained—specifically, the many millions of dollars which the government received for the oil, gas, and coal beneath the land, including 40 years of avoided interest on the public debt. Finally, Claimants submit that the evidence sufficiently supports the conclusion that the royalty payments the Government received on tracts 7A and B should be included in the restitution award.

**Factual Background**

The facts underlying this Congressional Reference provide compelling support for the equitable relief from the parties' mutual mistake that has unjustly benefitted the Government to the Claimants' detriment as is detailed in the Hearing Officer's Final Report and the record. Claimants adopt the Hearing Officer's Factual Findings as their Factual Statement.[1]

**Procedural Background**

A complaint in this case was filed in 1994.[2] After years of failed negotiations, on September 8–10, 2004 and November 23, 2004, the Hearing Officer held an evidentiary hearing. As a result, the Hearing Officer found and concluded that:

> [D]espite the unavailability of first-hand witnesses due to death or ill-health and the Government's claim that it no longer possessed a substantial number of relevant documents, the court held that the documents that were introduced at trial or in the public domain, as well as the testimony of the Government's experts, established by a preponderance of the evidence that the 1942-1944 contracts were based on a mutual mistake that no coal, gas, oil, or other mineral deposits existed

[1] *Land Grantors v. United States*, 64 Fed. Cl. 661, 666-85 (2005) (*Land Grantors I*); *Land Grantors v. United States*, 81 Fed. Cl. 580, 584-99 (2008) (*Land Grantors VI*).
[2] *Land Grantors I*, 64 Fed. Cl. at 685–86.

under the condemned properties that would support exploration or operation.[3]

After the evidentiary hearing, and painstaking review of the voluminous record, on April 1, 2005, the Hearing Officer issued an Interim Report, finding that the transactions entered into between the government and landowners between 1942 and 1944 for land condemned for use as Camp Breckinridge were based on the mutual mistake that no significant coal, gas, oil, and other mineral deposits existed under the condemned property.[4] As a result, The Hearing Officer concluded that Claimants were entitled to equitable relief, restitution of the value of the mineral rights from the Government.[5]

After subsequent litigation regarding later dismissed Tucker Act claims, issuance of a Second Interim Report, and a failed mediation, the Hearing Officer issued her Final Report and Memorandum Opinion Regarding S. 794 on April 18, 2008.[6]

**Standard of Review**

"The relationship of the hearing officer to the review panel is comparable to that between a district court judge and a court of appeals. The standard of review applicable to legal questions employed by courts of appeal when reviewing district court decisions is one of *de novo* review."[7]

Factual findings are reviewed under the clearly erroneous standard set forth in RCFC Appendix D ¶ 8, which provides that "[t]he hearing officer's findings shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the

---

[3] *Land Grantors v. United States*, 74 Fed. Cl. 518, 521 (2006) (*Land Grantors IV*), citing *Land Grantors I*, 64 Fed. Cl. at 703-708.
[4] *Land Grantors I,* 64 Fed. Cl. at 703.
[5] *Id.* at 708-09.
[6] *Land Grantors VI,* 81 Fed. Cl. 580 (2008).
[7] *Land v. United States*, 37 Fed. Cl. 231, 233 (1997).

hearing officer to judge the credibility of witnesses." A finding is "clearly erroneous" when the reviewing court "on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[8] Further, the review panel gives great weight to the findings made by the hearing officer and the inferences he drew from the evidence of record.[9]

On review, this Panel need not rigidly apply legal standards but should instead base its analysis "on an *ad hoc* examination of the facts to determine whether the defendant assumed some sort of obligation requiring recognition, even though that obligation is not enforceable, for whatever reason, in a court of law."[10]

"Equitable" claims in Congressional Reference cases "arise from an 'injury occasioned by government fault' when there is no enforceable legal remedy -- due, for example, to the bar of sovereign immunity or the running of the statute of limitations."[11] In order to establish an equitable claim, the claimant must show that: (1) "the government committed a negligent or wrongful act;" and (2) "this act caused damage to the claimant."[12]

While an equitable claim, like a legal claim, may be founded on the Constitution, a statute, a regulation, or a common law principle, such legal bases are not necessary to support relief in equity. Nevertheless, most equitable claims are generally based on traditional principles, in which the standard to be applied are those that govern the

[8] *Land v. United States*, 37 Fed. Cl. 231, 233 (1997), *quoting Milmark Services, Inc. v. United States*, 731 F.2d 855, 857 (Fed. Cir. 1984).
[9] *Merchants National Bank of Mobile v. United States*, 7 Ct. Cl. 1, 8-9 (1984).
[10] *Spalding and Son, Inc. v. United States*, 24 Cl. Ct. 112, 132 (1991).
[11] *J.L. Simmons Co., Inc. v. United States*, 60 Fed. Cl. 388, 394 (2004); *See also* 28 U.S.C. § 2509(c) (1992).
[12] *California Canners & Growers Ass'n. v. United States*, 9 Cl. Ct. 774, 785 (1986).

subject are of the law generally bearing on the claim.[13] In judging whether there is an equitable claim, the Review Panel need not rigidly apply legal guidelines. Rather, the particular facts may be examined to determine whether the claimants suffered an invasion of rights for which compensation is due.[14]

**ARGUMENT**

**I. The Report to Congress Should Clarify that Interest on the Proceeds of the Mineral Sales Is a Necessary Element of Full Restitution**

Although the Hearing Officer's report strongly implies that full restitution in this case requires that the government disgorge both the actual proceeds of the mineral sales (which she calculates at $34, 303, 908.42) and reasonable interest (which she calculates at $91,709,844.54) on that sum for the forty-odd years during which the government has retained it, her report does not explicitly say so. Claimants therefore request that this Panel clarify for Congress that full restitution to Claimants includes both proceeds and interest, and state the precise amount as calculated by this Court.

As the Hearing Officer recognized, the purpose of restitution in this case is to avoid unjust enrichment of the government, and to place Claimants in the position they would have occupied had the contract not been made:

> A "person who has been unjustly enriched at the expense of another is required to make restitution." A "person who has been unjustly enriched at the expense of another is required to make restitution."[15]
>
> The attempt is to put the party in breach back in the position in which that party would have been had the contract not been made. The party in

[13] *See, e.g., Kochendorfer v. United States*, 193 Ct. Cl. 1045, 1056 (1970) ("[t]o ascertain the proper standard for fixing liability [on an equitable claim], it is helpful to take account of the principles governing the particular area of law bearing on the claims.").
[14] *Land v. United States*, 29 Fed. Cl. 744, 752 (1993), *citing White Sand Ranchers of New Mexico v. United States*, 14 Cl. Ct. 559, 570 (1988).
[15] Restatement (First) of Restitution, § 1 (1937).

> breach is required to disgorge what that party has received in money. . . . The interest of the injured party that is measured in this way is called the restitution interest.[16]

What the court is measuring as restitution in this case is the full benefit which the government received from its sale of Claimants' coal, oil, and gas interests. In this reference, restitution should be measured by the Government's enrichment from the sale of coal, gas, oil, or mineral rights on the Claimants' properties because, as previously determined, the risk of the mistake should not be borne by Claimants.

To ascertain the amount of restitution due to Claimants, the court must, therefore, first determine the full value of the benefit which the government received so that it may be restored to Claimants:

> Restitution is sometimes described in terms of taking from the breaching party any benefits he received from the contract and returning them to the non-breaching party. See Restatement (Second) of Contracts § 344(c) ("[The judicial remedies serve to protect the promisee's restitution] interest in having restored to him any benefit that he has conferred on the other party."). That requires determining what benefit from the contract the breaching party has received, and restoring that to the nonbreaching party.[17]

**A. Restitution Requires that the Government Disgorge Interest as well as Principle**

This restitution of money must also include the interest earned on the principal amount:

> Whenever the defendant holds money or property that belongs in good conscience to the plaintiff, and the objective of the court is to force disgorgement of his

[16] *Land Grantors VI,* 81 Fed. Cl. 580, 608 (2008), *quoting* FARNSWORTH §12.1 at 154-55.
[17] *Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374, 1380-81 (Fed. Cir. 2001).

> unjust enrichment, interest upon the funds or property so held may be necessary to force complete restitution.[18]

The Restatement (First) of Restitution underscores that the full use value of the subject matter (in this case, interest on the funds which the government retained) must be included to make full restitution:

> A person under a duty to another to make restitution of property received by him or of its value is under a duty to account for the direct product of the subject matter received while in his possession.[19]

As the comment to that section states: "In all cases the person entitled is fully restored to his original position only if compensation is made for the use of the subject matter for the period during which he was deprived."[20]

The Federal Circuit has relied on this Restatement provision in cases such as *Landmark Land Co. v. United States*, explaining that "[t]he remedy of restitution may include compensation for lost use value where necessary to restore the plaintiff to its status quo ante by providing compensation for the use of the subject matter for the period during which [it] was deprived."[21]

Other circuits have come to the same conclusion. In *United States v. $277,000 U.S. Currency*, the Ninth Circuit rejected the government's sovereign immunity argument, affirming an award of interest on forfeited currency which was deposited in the Treasury and later returned to its rightful owner, holding that "[t] here is no element here of forcing the government to pay for damage it has done, only that it must disgorge benefits that it has actually and calculably received from an asset that it has been holding

---

[18] Dan B. Dobbs, Law of remedies: damages – equity – restitution §3.6(2) (2d ed. 1993).
[19] Restatement (First) of Restitution, § 157(1)(a) (1937).
[20] Restatement (First) of Restitution, § 157(1)(a) cmt. a (1937).
[21] *Landmark Land Co. v. Federal Deposit Insurance Corp.*, 256 F.3d 1365, 1374 (Fed. Cir. 2001).

improperly . . . ."[22] The court also rejected the government's argument that deposits in the Treasury do not earn interest, explaining that those funds directly reduce the government's borrowing needs, thus saving the government interest which it would otherwise have had to pay on Treasury debt:

> Although government money, in a conceptual sense, may be segregated into various funds, such as the Highway Trust Fund or the Airport Improvements Fund, from the point of view of government financial management, all financial assets in the hands of the government are a means by which the government does not have to borrow equivalent funds.[23]

As the Ninth Circuit explained, the federal deficit is financed, in part, by non-interest bearing balances held by the Treasury, quoting from the *Budget for Fiscal Year 1983*, states that "[s]ince trust fund surpluses for the most part have [not been] held as cash assets, . . . the deficit . . . must be financed primarily by selling Federal debt." [24] The Ninth Circuit further noted that the federal budget also states that "[c]ertain accounts outside the budget, known as deposit funds, are established to record amounts held in suspense temporarily. . . . Such transactions affect Treasury's cash balances even though they are not a part of the budget. To the extent that deposit fund balances are not invested, changes in the accounts are treated as a means of financing."[25]

This avoided interest on the public debt, the Ninth Circuit held, must be disgorged as part of the *res*, and returned to the rightful owner: to the extent the funds were deposited in the Treasury as of June 1987, those funds should be considered as constructively earning interest at the government's alternative borrowing rate at all times

---

[22] 69 F.3d 1491, 1498 (9th Cir. 1995).
[23] *Id.* at 1495.
[24] *Id. quoting Budget for Fiscal Year 1983* at 6-26.
[25] *Id. quoting Budget for Fiscal Year 1983* at 7-16.

from then until the rendering of judgment in this case. Such amounts, become part of the *res*, to be returned with the *res* to the claimant.[26]

The Sixth Circuit came to the same conclusion in *United States v. $515,060.42 in U.S. Currency*, explaining that where the government obtains a tangible benefit from the principle, it has to return the monetary value of that benefit when it disgorges the underlying principle:

> If the Government seized, for example, a pregnant cow and, after the cow gave birth, the Government was found not to be entitled to the cow, it would hardly be fitting that the Government return the cow but not the calf. The Government obtained tangible and calculable financial benefit from the retention of the seized funds at issue. Such financial benefit is constructively part of the *res*, and that monetary amount must also be returned as an aspect of the seized *res.* We conclude that when property is returned to an owner from the statutory forfeiture funds in the United States Treasury which bear no interest, the seized funds should be treated as constructively earning interest at the Government's alternative borrowing rate at all times until the rendering of judgment. Such amounts become part of the *res*, to be returned with the *res* to claimants.[27]

**B. Simple Interest Amounts to At Least $91,709,844.54**

The Hearing Officer correctly calculated that the simple interest on the proceeds of Claimants' mineral interests exceeds $91 million:

> the Government has avoided paying at least an additional $91,709,844.54 in interest on the national debt as a consequence of having the benefit of these revenues.[28]

This figure somewhat understates the actual benefit to the government because it is limited to the time period 1965-2007,[29] and thus does not include interest accrued either prior to 1965 or after the date of her report. Moreover, because the government

---

[26] *Id.* at 1496.
[27] 152 F.3d 491, 505 (6th Cir. 1998) (footnotes and citations omitted).
[28] *Land Grantors VI*, 81 Fed. Cl. 580, 613 (2008).
[29] *Id.* at 613 n.39.

either destroyed or failed to produce relevant documents, the Hearing Officer was simply unable to calculate the amounts the government received for some of the minerals:

> In considering this recommendation, Congress should be mindful that the entire amount of revenue that the Government received for the lease and sale of these rights is unknown, because the Government failed to produce or destroyed relevant documents that would verify the correct amount.[30]

Thus, as of the date of the Hearing Officer's report, the minimum benefit to the government exceeded $126 million. The $34,303,908.42 represents only 27 percent of the total benefit ($126,013,824.96) actually received by the Government. Equity thus requires that the government disgorge at least $126,013,824.96, plus interest from April 18, 2008-- the total benefit received by the government-- as restitution to Claimants.

**C. Compound Interest Exceeds $441 million**

The Hearing Officer's report may be said to understate the benefit to the Government in one important respect: it uses a simple rather than a compound interest calculation, allowing the government to retain the "interest on the interest." As Claimants' Expert witness, Dr. Charles Haywood, calculated (using the somewhat lesser principal amount of $32,879,240, rather than the $34,303,908.42 determined by the Hearing officer), the avoided interest when compounded using standard government borrowing rates, came to over $441.3 million[31] as of September 2005:

> The amounts for avoided interest in paragraphs 7 and 8 above are at "simple interest." Such approach rests on an assumption that the Government would not have had to borrow funds to make the annual interest payments on the additional $32,879,240 of debt it would have incurred in 1966 except for the cash infusion from the Camp Breckinridge mineral rights. If, on the other hand, it is assumed that the Government

[30] *Id.* at 616.

[31] Using the principal amount of $34,303,908.42 and extending this interest calculation through 2007 yields a total compound interest figure of $464,952.686.

> would have additionally borrowed funds to make the interest payments, such payment of "interest on interest" would argue for using a compound-interest approach to calculate total interest avoidance. The total of avoided interest would then be $441.3 million…[32]

Congress has adopted precisely this compound interest calculation in the Declaration of Taking Act[33] to determine the amount due for property it condemns, and the Federal Circuit has compounded interest in calculating government offsets in *Winstar* cases.[34] The Court has also compounded interest in patent appropriation cases,[35] and in taking cases.[36]

**D. Just Compensation**

Prior decisions of this Court in taking cases regarding the compounding of interest strongly suggest that compound, rather than simple, interest is the preferred method of calculating the benefit conferred on the government when payment (or re-payment) is delayed. In takings cases, as in restitution cases, the goal is to achieve an approximately neutral effect from the delay in payment:

> If the amount of just compensation for delay in payment is properly set, the effect of any delay in payment should be approximately neutral with respect to both parties. . . . [T]he benefit accruing to defendant through the delay in payment should be approximately cancelled by the amount payable because of the delay. The imposition of a fair rate of interest on defendant as part of an award of just compensation should not be viewed as a penalty for a wrongful delay of payment.[37]

---

[32] Sept. 29, 2005 Haywood Aff. ¶ 8.
[33] *See* 40 U.S.C. §3114 (2002).
[34] *American Savings Bank, F.A. v. United States,* 74 Fed. Cl. 756, 760 (2006)("Thus, in applying eight years of compounding interest to the $167 million, the result would be $138,194,000 in interest.").
[35] *ITT Corp. v. United States,* 17 Cl. Ct. 199, 240 (1989)("Simple interest cannot put the property owner 'in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation,' because it undervalues the worth of the [property].").
[36] *See, e.g., Tulare Lake Basin Water Storage District v. United States,* 61 Fed. Cl. 624 (2004); *Whitney Benefits, Inc. v. United States,* 30 Fed. Cl. 411 (1994); *Bowles v. United States,* 31 Fed. Cl. 37 (1994).
[37] *Tulare Lake Basin Water Storage District v. United States*, 61 Fed. Cl. 624, 630 (2004).

The seminal case on this issue is *Whitney Benefits, Inc. v. United States.*[38] In that case the Government took a tract of land with minable coal and delayed payment for that taking for 12 years. The Government argued for an award of simple interest; the landowner for compounded interest. The Court deemed the coal-laden land to be "income producing" and "commercial" because its value was "measured by its ability to produce income," and "a reasonable purchaser would have paid in excess of $60 million for the property because of its value as a coal mine."[39] Accordingly, the Court held that compounded interest was required; it reasoned that the "income-producing" property "would generate an income stream that would be available for continual reinvestment, at compound rates. Just compensation requires the payment of compound interest to replace the investment opportunities plaintiff lost when the government took their property."[40]

The Court found the Government's 12-year delay to be "significant," which likewise compelled compounded interest:

> Simple interest cannot put the property owner 'in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation,' because it undervalues the worth of the property. . . . [B]ecause of the long delay since the date of taking in this case, the award of compound interest is not only proper, but its denial would effectively undercut the protections of the fifth amendment to our Constitution.[41]

The Court also noted that the Declaration of Takings Act, which did not control in that case, nevertheless "indicate[d] the congressional policy of adequately compensating takings" by requiring compounded interest in takings proceedings arising under that Act.

---

[38] 30 Fed. Cl. 411 (1994).
[39] Id. at 415.
[40] Id. at 416.
[41] *Id.* at 415.

The Court found that "it would be inequitable, and illogical, to award less than compound interest where the government has taken property and not paid for it, while requiring the payment of compound interest in formal eminent domain proceedings" brought under the Act.[42]

Accordingly, the Court compensated the landowners with (1) the value of the land at the date of the taking, and (2) interest thereon, compounded annually, from the date of the taking until the date of the payment.[43]

Significantly, in this case the Government itself has urged the Hearing Officer to calculate delay compensation using the default interest rate set forth in the Declaration of Takings Act:

> The rate is most appropriate given that it is the rate established by Congress for awarding interest in direct condemnation cases, which have been recognized as having the identical compensation calculus as inverse condemnation claims.[44]

The Hearing Officer heeded this suggestion and calculated the post-1965 delay using this default takings rate.[45] Claimants agree with the Hearing Officer's use of this rate – at least as the minimum amount of delay compensation that may be appropriate. Claimants question only that it was not compounded

## II. The Hearing Officer Erred by not Including the Owners of all 35,684.99 Acres as Claimants Entitled to Relief

[42] *Id.* at 416.
[43] *Id.* at 416-17. *See also CCA Associates v. United States*, 75 Fed. Cl. 170, 205 (2007) ("compounding is necessary to satisfy the mandate of the Takings Clause" where the property taken was income-producing and there was a 10-year delay in compensation).
[44] Government's Pretrial Brief at 68.
[45] *Land Grantors VI*, 81 Fed. Cl. 580, 617 n. 39 (2008).

Section 1 of S. 794 authorizes the Government to pay money to all individuals (or their heirs) who have claims against the United States arising out of the acquisition of their land for Camp Breckinridge:

> The Secretary of the Treasury is authorized and directed to pay, out of money not otherwise appropriated, to the individuals (and in any case in which such individual is deceased, the heirs of such individual) who sold their land in Henderson, Union, and Webster Counties, Kentucky, to the United States Government under threat of condemnation in order to provide the 35,684.99 acres necessary for the military training camp known as Camp Breckinridge, the sum of $_____, such sum being in full satisfaction of all claims by such individuals against the United States arising out of such sale.[46]

In Section 2, Congress explicitly identified which individuals are entitled to relief under this provision:

> The individuals described in Section 1 assert that they were—
>
> (1) promised they would be given priority to repurchase land sold by them if sold by the United States Government; and
> (2) paid less than reasonable value due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights.[47]

---

[46] S. 794, 103rd Cong. §1 (1993), *quoted in Land Grantors VI,* 81 Fed. Cl. 580, 599 (2008).

[47] S. 794, 103rd Cong. §2 (1993), *quoted in Land Grantors VI,* 81 Fed. Cl. 580, 599 (2008). The Hearing Officer also concluded that Cyrus Higginson's heirs should be barred from recovery in this case because Mr. Higginson's Third Amended Complaint in an earlier-filed lawsuit alleged facts that could have supported a claim of mutual mistake. *Land Grantors VI,* 81 Fed. Cl. 580, 616 (2008). This exclusion is improper in a Congressional Reference case where res judicata has no application. *See, e.g., Kochendorfer v. United States*, 193 Ct.Cl. 1045, 1055 (1970); *J.A. Zachariassen & Co. v. United States*, 136 Ct.Cl. 63 (1956); *Hickman v. United States*, 135 Ct.Cl. 380 (1956); *Burkhardt v. United States*, 113 Ct.Cl. 115 (1945). In addition, the Hearing Officer mistakenly indicated that a 212.5 acre parcel of property owned by former Morganfield, Kentucky, Mayor, Waller Young, which was sold to the Government in 1943 for $26,711.86 and re-acquired at public auction in 1956 for $48,875.00, was "located almost in the middle of Camp Breckinridge." That property—Tract A-1—was immediately contiguous to Morganfield, just west of Mineral Tract 2. Because Mr. Young reacquired it in 1956, it was not included in the mineral tracts sold by the Government in 1965. Mr. Young, however, did own a separate 1,026.8 acre tract which was in the "middle" of the Camp, which he did not reacquire and which was included in the 1965 mineral sales. In order to avoid possible later confusion, Claimants request the Panel to correct the Hearing Officer's misstatement regarding the location of the 212.5 acre parcel.

### A. The Hearing Officer Erred in Excluding Individuals Whose Property Was Valued by a Jury

The Hearing Officer mistakenly concluded that only those individuals who signed a sales contract with the Government were entitled to restitution, and that those who allowed the jury to determine the sale price for their property were excluded from the Congressional Reference.[48] This conclusion, however, is at odds with the plain language and rationale of Section 2, which demonstrates Congress' intention to provide compensation for all individuals whom the Government promised priority to repurchase their land and who received less than fair value because they were not compensated for mineral rights—in short, the former owners of all 35,684.99 acres necessary to create the military training camp known as Camp Breckinridge. Because the Hearing Officer erroneously excluded about 25 percent of the original landowners, whose land made up "the 35,684.99 acres necessary for the military training camp known as Camp Breckinridge . . . ."[49] The result is an arbitrary distinction among Claimants, all of whose land was acquired for Camp Breckinridge at the same time and under the same circumstances.

By focusing on the word "sold," the Hearing Officer also completely read out "threat of condemnation" from the reference. One reasonable conclusion is that the word "sold" in the reference is itself intended to mean condemnation. Numerous courts refer to a condemnation as a forced sale: "Condemnation is an enforced sale, and the State

---

[49] S. 794, 103rd Cong. §1 (1993), *quoted in Land Grantors VI*, 81 Fed. Cl. 580, 599 (2008).

stands toward the owner as buyer toward seller."[50] This notion presumably underlies the well-accepted use of the "comparable sales approach" for determining the value of condemned property.[51]

The contents of the case files of the sixty-seven properties whose values were determined by juries evidence that the property transfers were sales. The files for virtually all of the properties contain deeds having the same pro-forma language, with the only differences being the individual property descriptions and names of the grantors. Each deed contains identical language of conveyance, *e.g.*, the "Deed of Conveyance" dated June 26, 1943, "by and between Lonnie Baird and his wife, Virgie Fellows Baird, by Peter B. Muir, as Special Master Commissioner" and the United States. This Deed, as with all the others, provides "[t]hat for a valuable consideration paid to the owners of the land hereinafter described, the receipt of which is hereby acknowledged…the court-appointed Commission conveys the property to the Government pursuant to the judgment entered after a jury trial."[52] The uniform language in the deeds is consistent with the well-settled case law characterizing properties conveyed to the Government through

---

[50] *See, e.g., Hope v. United States*, 23 Cl. Ct. 776, 779 (1991) (Plaintiffs characterizing condemnation as a "bargain sale"); *Pedrotti v. Marin County*, 152 F.2d 829, 831 (9th Cir. 1946) ("a transfer of property by eminent domain is a 'sale'"); *United States v. Certain Parcels of Land in Loyalstock Tp. Lycoming County, Pa.*, 51 F. Supp. 811, 812 (M.D. Pa. 1943) (taking through a statutory method "partakes all the incidents of a 'sale,' as that term is used. It is true that the transaction is an involuntary sale of the property but it is a sale nonetheless"); *Hawaiian Gas Products v. Com. of Internal Revenue*, 126 F.2d 4, 5 (9th Cir. 1942) ("a proceeding to condemn is, in substance, a proceeding to compel a sale by the owner to the petitioner"); *Com. of Internal Revenue v. Kieselbach*, 127 F.2d 359, 360-361 (3rd Cir. 1942) (the transfer of property through condemnation proceedings is classified as a "sale" as in the meaning of Sec. 117 of the Revenue Act of 1936); *American Creameries Co. v. Armour Co.*, 271 P. 896, 896 (Wash. 1928) ("a proceeding to condemn is, in substance, a proceeding to compel a sale by the owner to the petitioner"); *Jackson v. State*, 106 N.E. 758, 758 (N.Y. 1914)(Cardozo, J.); 27 AM. JUR. 2D Eminent Dom. §826 ("The view has been taken, however, that the condemnation proceedings are no more than a compulsory sale of all the owner's interest in the property.").

[51] *Houser v. United States*, 12 Cl. Ct. 454 (1987).

[52] *See* JX 212 CHI-002-A019-0011.

condemnation as being sales. The language used in the example deed is typical of a deed of conveyance, being "by and between" the landowners, Mr. and Mrs. Baird, and the Government, "for valuable consideration paid to the owners." The same is true in all the deeds the consideration of which was determined by the jury.

The hearing officer also adopted a far-too-restricted definition of "sold." S. 794 uses the word "sold" as modified by the phrase "in order to provide the 35,684.99 acres necessary for the military training camp known as Camp Breckinridge." This language does not exclude any landowner who owned land in the 35,684.99 acres necessary for Camp Breckinridge. If the word "sold" had instead been modified by the phrase "in order to provide some (or part) of the 35,684.99 acres," then an intent to limit the scope of possible claimants could be implied. But such limiting language is not in the Reference.[53]

In short, the purpose of S. 794 was to compensate all former landowners for the oil, gas, coal, and valuable minerals that the Government mistakenly failed to value and then later refused to resell back to the original owners, to the owners' detriment and the Government great benefit. The Reference was not intended to further compensate the landowners for their surface rights. Accordingly, the manner in which the landowners' surface rights were priced – whether by agreement or jury – is irrelevant to who should be a potential claimant in this case. That the Government took the oil, gas, coal, and

[53] To the extent that the statutory language is ambiguous, moreover, that ambiguity should be resolved by reference to legislative intent. *Piccadilly Cafeterias, Inc. v. United States*, 36 Fed. Cl. 330, 333 (1996). Senator Wendell Ford, who introduced S. 794 and was its chief proponent, has confirmed that the Reference was intended to include all Camp Breckinridge landowners: "I wrote and sponsored legislation in the United States Senate which was intended to allow a group of individuals the opportunity to have their day in court. There has been a great deal of speculation as to the scope of this legislation. . . . To be quite clear, my legislation was never intended to be limited to only those individuals who negotiated sales with the Federal Government." *Land Grantors VI*, 81 Fed. Cl. 580, 615 (2008).

minerals from all Camp Breckinridge landowners without reasonable compensation means that they should all be allowed to participate as Claimants in this case.

### B. The Review Panel Should Clarify that a Vendor Affidavit Is Not Required to Recover in this Case

Having concluded that an Affidavit of Vendor could easily be retrieved by persons having a claim, the Hearing Officer implies that in order to recover in this case, each Claimant will be required to present a Vendor Affidavit:

> [T]he evidence in this reference indicates that a Vendor Affidavit appears to have been executed as part of all the 1942-1944 contracts, so this requirement should impose no additional burden on Claimants.[54]

If presentation of a vendor affidavit is in fact a condition of recovery, it will arbitrarily and unfairly eliminate most Claimants's ability to recover. This is because most Vendor Affidavits no longer can be found, or no longer exist, if they ever existed. In fact, Vendor Affidavits have not been located for most files in evidence in this case. Some files are fairly complete, but others contain no more than a page or so of entries from the district court's civil order book.[55]

Apparently this misunderstanding arose in the context of the class certification. When considering the scope of the class that was certified in this case, the Hearing Officer apparently reviewed some tract files that included an Affidavit of Vendor and from that review assumed that all files contained the same document and, in turn, assumed that the Affidavits of Vendor could easily be retrieved by persons having a claim:

---

[54] *Land Grantors VI*, 81 Fed. Cl. 580, 616 (2008).
[55] *See, e.g.*, JX 218, CH1-003-A026-0014; JX 219, CH1-003-A027-0013.

> [T]he evidence in this reference indicates that a Vendor Affidavit appears to have been executed as part of all the 1942-1944 contracts, so this requirement should impose no additional burden on Claimants.[56]

The Hearing Officer appears to have relied on one exhibit, JX 541, as providing the basis for her understanding that all transactions included an Affidavit of Vendor and all files contained such an Affidavit.[57] In reality, however, the files were not maintained by the Government in any such organized fashion. Some files appear fairly complete, but others contain no more than a page or so of entries from the district court's civil order book.[58] In this equitable proceeding, the right to join the class and participate in an award should not turn on the Government's poor file maintenance.

In this equitable Congressional Reference proceeding, the right to an award should not turn on the Government's poor file maintenance. Likewise, an Affidavit of Vendor appears in the files of some landowners who signed option agreements with the Government. But, contrary to the Hearing Officer's conclusion that this document was necessary to every transaction, there is no such requirement in the Government's "Real Estate Manual" that governed all transactions.[59] Claimants therefore request that the Panel eliminate from the Report to Congress any suggestion that an Affidavit of Vendor be produced in order to obtain relief in this case.

## III. Claimants Should Be Compensated for the Years 1964-1983 for Which the Government is Unable to Produce Records of its Royalty Receipts for Tracts 7A and 7B

The Hearing Officer held that "[I]n this reference, restitution should be measured by the Government's enrichment from the sale of coal, gas, and or mineral rights on the

[56] *Land Grantors VI*, 81 Fed. Cl. 580, 616 (2008).
[57] *Land Grantors VI*, 81 Fed. Cl. 580, 616 (2008).
[58] *See, e.g.*, JX 218; 337; CH1-003-A026-0014; JX 219, CH1-003-A027-0013.
[59] *Land Grantors VI*, 81 Fed. Cl. 580, 616 (2008). *See also* DX 60; DX 647.

Claimants' properties."[60] Consistent with this determination, the Hearing Officer correctly determined that the Government's proceeds from its first mineral sales—the so-called "protective leases" on Mineral Tracts 7A and 7B—should be included in the computation of the total amount due to the Claimants.[61] These "protective leases" have been continuously producing oil from their inception in the late 1950's until the present day, and the Government's lessees have continuously paid royalties to it on that production. Despite these undisputed facts, the Hearing Officer limited the recommended amount of royalties payable to Claimants to only the amounts of royalties the Government admitted it had received.[62] The Hearing Officer did so despite the Government's admission that it had destroyed records for a large portion of the time involved.[63] Nevertheless, the Claimants presented estimates of royalty receipts for the nineteen missing years based on well-accepted published historical records. Consequently, Claimants except to the amount recommended by the Hearing Officer concerning Tract 7A and 7B and request that those amounts be increased by $884,414 combined for the period May 1, 1964 through August 31, 1983 and by $218,086 and $454,793, respectfully, for the period after August 31, 1983, plus appropriate delay compensation.

The first of these "protective leases" was entered into by the Government in 1957. It granted the right to Felmont Oil to drill for oil and gas on what later became known in

---

[60] *Id.* at 609.

[61] *Id*. at 609-610. Tracts 7A and 7B geographically are relatively small mineral tracts on the eastern boundary of the Camp. *See Land Grantors VI* at 597. Tract 7A included properties owned by only twelve landowners and Tract 7B by only two. Thus, the economic impact of excluding over $1.5 Million in royalties, as the Hearing Officer recommends, is enormous on these landowners.

[62] *Id*. at 611-612.

[63] *Id*. at 616.

1965 as Mineral Tract 7B.[64] In exchange, the Government was to receive "a royalty of 15 percent of the amount or value of production." The Hearing Officer correctly recognized and held that the Government's available records indicated that it had received $272,883.00 in royalties and a bonus of $432,236.00 for August 6, 1957 to April 30, 1964.[65] Recognizing that production was continuing, the Court ordered the Government after trial to determine the amounts it had received from these leases since April 30, 1964.[66] After what it claimed to be an adequate search, the Government finally informed the Court that it had no records at all for the period May 1, 1964 to August 31, 1983 because, the Government presumed, the records had been destroyed.[67] At that same time, the Government indicated that its "electronic records" for the subsequent period, September 1, 1983 to March of 2005, showed that the Government received $86,723.58 in "net royalties" attributable to the oil and gas lease of Mineral Tract 7B.[68] Significantly, the Government provided only this total cumulative figure of $86,723.58 and no year-by-year royalty or production data or hard copy print-outs of its "electronic records." The 1964-1983 receipts were not accounted for.[69]

The second "protective lease" was entered into in 1959.[70] It granted Kingwood Oil the right to drill for oil and gas on what became known in 1965 as Mineral Tract 7A, on the same 15% royalty terms as the lease on Mineral Tract 7B. As to Mineral Tract 7A, the Hearing Officer again correctly recognized that the Government's available

---

[64] *Id*. at 611.
[65] *Id.* at 609.
[66] *Id*. at 611.
[67] *Id*.

[68] *Id*.
[69] *Id*. at 612.
[70] *Id*.

records showed it had received $418,443.00 in royalties and $708,753.00 in bonuses attributable to Tract 7A, for the period January 19, 1960 to April 30, 1964.[71] As with Tract 7B, the Hearing Officer also ordered the Government to update its receipts from this Tract 7A.[72] The Government responded in the same fashion as it had responded with respect to Tract 7B, informing the Court that it had presumably destroyed any records for Tract 7A for the period May 1, 1964 to August 31, 1983, and that its "electronic records" showed a total of only $70,714.24 in "net royalties" for the subsequent period, September 1, 1983 to March of 2005.[73] Again, the government provided no breakdown of yearly royalty or production data or print-out of its "electronic records."

Because the Government's income data on Tracts 7A and 7B was admittedly incomplete, and showed no amount of income for over nineteen years, Claimants asked Dr. Charles Haywood, their economist at trial, to calculate an estimate of the Government's royalty receipts from May 1, 1964 forward.[74] From recognized and respected sources, Dr. Haywood obtained the production data for both leases, as well as the historical "posted price" of crude oil for the area. He then multiplied these two figures to arrive at the "amount or value" of oil and, as required by the leases, attributed 15% of that "amount or value" as the royalty estimated as received by the Government. Using this methodology, Dr. Haywood estimated that for the period May 1, 1964 to

[71] *Id.* at 609-610.
[72] *Id*. at 611.
[73] *Id.*

[74] See April 7, 2006 Affidavit of Dr. Charles Haywood, with attached Tables, filed with "Plaintiffs Motion for Leave to Respond to Court's December 15, 2005 Order," which was granted. Dr. Haywood is a former Dean of the College of Business and Economics and Professor of Economics and Finance at the University of Kentucky. He was qualified by the Hearing Officer as an expert on economics and finance at trial. *Land Grantors VI* at 611-612.

August 31, 1983 (the period for which the Government said it had no records at all), the Government had actually received a combined total of $884,414 in royalties on Tracts 7A and 7B. Also using that methodology, Dr. Haywood estimated that for the subsequent period September 1, 1983 to February 28, 2006 the Government received $218,086 and $454,793 in royalties on Tracts 7A and 7B, respectively. Unlike the Government, Dr. Haywood provided tables showing the actual reported oil production and pricing data on a year-by-year basis from the recognized sources he utilized.

The Final Report recommends that only the amounts the Government admits it has realized as royalties on Tracts 7A and 7B, *i.e.*, has records for, should be awarded to Claimants, with nothing awarded for the nineteen missing years. Specifically, the Hearing Officer recommended the following award as "undisputed revenues" from Tracts 7A and 7B:

**TRACT 7B – Felmont Oil**

August 6, 1957-April 30, 1964 $ 272,883.00 royalties plus $432,236.00 bonus

May 1, 1964-August 31, 1983 $ unknown

September 1983-March 2005 $ 86,723.58 royalties

**TRACT 7A – Kingwood Oil**

January 19, 1960-April 30, 1964 $ 418,443.00 royalties plus $708,253.00 bonus

May 1, 1964-August 31, 1983 $ unknown

September 1983-March 2005 $ 70,718.24 royalties[75]

[75] *Land Grantors VI*, 81 Fed. Cl. 580, 609-610 (2008).

There is nothing recommended for May 1, 1964 through August 31, 1983, although substantial production clearly took place.

Thus, the Hearing Officer excluded Dr. Haywood's estimates of additional Government royalty receipts for the period following May 1, 1964 forward. Although the Hearing Officer determined that Dr. Haywood's estimates were not "reasonably certain," none of the three bases relied upon is sufficient to support that determination.[76]

*First*, the Hearing Officer noted that "Dr. Haywood did not proffer copies of the sources from which he obtained the oil production data, which are not readily accessible to the Court."[77] Dr. Haywood stated in his Affidavit that the oil production data he utilized was from *Petroleum Information* and *PI/Dwights Plus IHS Energy*.[78] While Dr. Haywood did not provide copies of the pages from these publications from which he obtained the production data, he stated under oath in his Affidavit that the numbers were taken from these publications. That should have been sufficient, particularly since the Government's declarations, which were accepted, did not include copies of *any* supporting data. For that reason alone, it was clearly erroneous to reject Dr. Haywood's estimates as not being "reasonably certain" on this ground. Furthermore, the committee notes to Fed.R.Evid. 703 discuss the impracticality of experts being required to produce with their reports, *ab initio*, all source materials relied on.

Perhaps most significantly, this Court has recently recognized that *Petroleum Information/Dwights* is "a recognized source of oil and gas well data commonly used in

---

[76] *Id*. at 612.
[77] *Id*.

[78] *Id*.

the oil and gas industry."[79] Likewise, the United States Geological Survey frequently relies on this source for historical oil information.[80] Moreover, *Petroleum Information* and *Dwights* are the only sources of historical production data. This is apparent from the documentation associated with the Federal Trade Commission's proceedings in 1996 to block a proposed merger of *Petroleum Information* and *Dwights*, where the FTC specifically alleged that *Petroleum Information* and *Dwights* were "the only firms that have extensive multi-state collections of historical information on oil and gas".[81] Ultimately the FTC's challenge to the merger was resolved by a consent decree under which the merged entity would license its historical production data to third parties.[82] Thereafter, IHS Energy acquired the merged Petroleum Information/Dwights and now produces the database product known as *PI/Dwights Plus IHS Energy*, referred to in Dr. Haywood's Affidavit.[83] As Dr. Haywood indicated in his Affidavit, this data is available on the website of IHS Energy.[84]

*Second*, the Hearing Officer stated that "many of Dr. Haywood's royalty estimates are in direct conflict with the royalty amounts on file with the Government."[85]

---

[79] *Exxon Corp. v United States*, 45 Fed. Cl. 581, 627 n. 76 (1999).

[80] *See, e.g.*, "*Summary of Deep Oil and Gas Wells in the United States Through 1998*," Chapter B of "*Geological Studies of Deep National Gas Resources*," U.S. Geological Survey Digital Data Series 67. This report is readily available from the website of the U.S. Geological Survey at http://pubs.usgs.gov/dds/dds-067/CHB.

[81] *See In Re Matter of Softsearch Holdings, Inc.*, 124 F.T.C. 54, 56 (1997); http://www.ftc.gov/os/1997/18/c3750cmp.pdf.

[82] *Id.*

[83] *See* "Petroleum Information / Dwight Acquired by HIS", Alexanders Oil and Gas Connections, available at http://gasandoil.com/goc/company/cnn80709.htm.

[84] *See* http://energy.ihs.com. The IHS Energy website has monthly and annual production statistics for Tracts 7A and 7B from 1980 forward. Reports of that data can be downloaded for the modest sum of $10.50 for each Tract. In the IHS database Tract 7A is "Production ID SUM001003517" and Tract 7B is "Production ID SUM001003538."

[85] *Land Grantors VI*, 81 Fed. Cl. 580, 612(2008).

Significantly, in so stating, the Hearing Officer made no specific reference to Dr. Haywood's estimates for the period May 1, 1964 to August 31, 1983, the period for which the Government admitted that it had *no* records because the records presumably had been destroyed. Thus, the absence of any Government records made it impossible for Dr. Haywood's estimate for *that period* to "conflict" with the non-existent Government's records. Indeed, the absence of such records meant that the only manner in which to approach royalty receipts for this period was to estimate them. That is what Dr. Haywood did based upon manifestly reliable and, as the Government stated in the FTC proceedings, the "only," extant historical production records. Accordingly, it was clearly erroneous in these circumstances to not recommend an award of the missing royalties for the 1964 to 1983 time period as estimated by Dr. Haywood.[86]

The only period for which Dr. Haywood's estimates could have "conflicted" with the Government's numbers concerned the period after August 31, 1983. The Government contended that its "electronic records" showed a total of $70,714.24 for Tract 7A and a total of $86,723.58 for Tract 7B for that period. Significantly, both were described as "net royalties" without providing what was meant by that term. Moreover, as indicated previously, there was no breakdown by year nor was any print-out of the

---

[86] As the Hearing Officer noted, citing *Bluebonnet Sav. Bank F.S.B. v. United States*, 67 Fed. Cl. 231, 242-44 (2005), the Federal Circuit has held that a trial court may rely upon estimated damages under appropriate circumstances. *Land Grantors VI* at 612. "Jury Verdict" methodology is acceptable when it is not possible for a plaintiff to prove damages with mathematical precision and sufficient evidence is available for a court to come up with a fair approximation. *Specialty Assembly and Packaging Co. v. United States*, 355 F.2d 554, 572, 174 Ct. Cl. 153 (1966). "When plaintiff is prevented from specifically proving its damages for reasons beyond its control, …a court may use a 'jury verdict' to determine the amount of recovery if the evidence is sufficient for a fair and reasonable approximation." *Sale Engineering and Construction Corp. v. United States*, 2 Cl. Ct. 803, 808 (1983); *Joseph Piccard's Sons Co. v. United States*, 532 F.2d 739, 742, 209 Ct. Cl. 643 (1976); *W.R.B. Corp. v. United States*, 183 Ct. Cl. 409, 425 (1968); *Western Contracting Corp. v. United States*, 144 Ct. Cl. 318, 334 (1958).

"electronic records" provided. Accordingly, Dr. Haywood undertook to determine if the Government's total figures from its "electronic records" squared with the publicly reported production and pricing data. They did not. Using the same sources, he calculated that based upon reported production and pricing data the Government's royalties from Tracts 7A and 7B for September 1, 1983 to 2006 were estimated to be $218,086 and $454,793 respectively. Dr. Haywood provided tables showing the production and pricing data on a year-by-year basis. The Government never filed anything challenging the accuracy of Dr. Haywood's estimates of production, pricing or royalties received for this period.

In these circumstances it was clearly erroneous not to accept Dr. Haywood's estimate of royalties for the period September 1, 1983 to early 2006. Dr. Haywood's estimates were based on industry data published by organizations the FTC has recognized as being the *only sources* of historical information, and provided year-by-year historical production, pricing and royalty information. As such, it was far more reliable that the simple total figures for "net royalties" which was the sole data which the Government was able to provide from its "electronic records."

*Third*, the Hearing Officer also stated that Dr. Haywood's estimates did not meet the "reasonable estimate" test because Dr. Haywood's "testimony is beyond the scope of his expertise."[87] Yet the Government never made any such challenge to Dr. Haywood's estimates of the amount of royalties the Government received from Tracts 7A and 7B. Furthermore, when the Claimants moved, post-trial, to file Dr. Haywood's Affidavit on

[87] *Land Grantors VI*, 81 Fed. Cl. 580, 612(2008).

this subject, in response to the Court's December 15, 2005 call for additional information, the Court granted the motion and permitted its filing.

In any event, the Hearing Officer acknowledged that Dr. Haywood was the "former Dean of the College of Business and Economics and Professor of Economics and Finance of the University of Kentucky," and that he had been previously admitted to testify in this action as an "expert in economics and finance."[88] It is self-evident that the sort of analysis portrayed in Dr. Haywood's Affidavit on the Government's royalty receipts is the "stock-in-trade" of an expert in "economics and finance," especially one with the stellar background of Dr. Haywood. Furthermore, all of the data underlying the analysis is taken from unquestionable sources of production and pricing and only simple addition and multiplication applied to that data are involved. Indeed, since the published data on production and pricing are matters of which judicial notice may be taken,[89] the relative simplicity of the mathematics involved from that point forward do not even require that an expert be utilized to make the calculations. Consequently, it was clearly erroneous to reject Dr. Haywood's estimates on the ground that they were "beyond the scope of his expertise."

Accordingly, the Panel should revise the Final Report regarding the amounts attributable to royalties received by the Government on Tracts 7A and 7B to be consistent with the estimates presented by Dr. Haywood. This would amount to $884,414 plus

---

[88] *Id*. at 611-612.

[89] As indicated previously, this Court has held that *Petroleum Information/Dwights* is "a recognized source of oil and gas well data commonly used in the oil and gas industry." *Exxon Corp. v. United States*, 45 Fed. Cl. 581, 627 n.76 (1999). As such, the data it publishes is an appropriate subject for judicial notice. *See*, *Parker v. Brown*, 317 U.S. 341, 363 n.9 (1943); *Jones v. Ill. Dept. of Rehab. Svcs*., 689 F.2d 724, 728 (7th Cir. 1982); *Cal. Marine Cleaning, Inc. v. United States*, 43 Fed. Cl. 724, 734 (1999); Fed.R.Evid. 201. This is particularly appropriate since the Government in its FTC proceedings took the position that *Petroleum Information/Dwights* are the *only* sources of historical oil production data.

delay compensation for the period May 1, 1964 through August 31, 1983[90], and $672,879 plus delay compensation for the period September 1, 1983 to February 28, 2006.[91] At the very minimum, his estimates for the May 1, 1964 to August 31, 1983—the period for which the Government has no records of royalty receipts and for which there is no possible conflict with the Government's numbers—should be included. Furthermore, the Court should recommend to Congress that all future royalties attributable to mineral Tracts 7A and 7B received by the Government after that date of payment also be promptly paid over to the relatively small number of Claimants representing properties formerly owned in the two Tracts.[92]

**Conclusion**

For all of these reasons, Claimants urge the Review Panel to affirm and adopt the Final Report with Claimants' suggested exceptions, and submit it to the Chief Judge of this Court for his approval and transmittal to Congress.

---

[90] These amounts were determined by utilizing a simple interest formula using the one-year "constant maturity" Treasury rate for each year from May 1, 1964 to August 31, 1983 and for the periods after August 31, 1983.

[91] *See* April 7, 2006 Affidavit of Dr. Charles Haywood, Table at 9.

[92] Similarly, the Government remains the owner of the coal rights underlying mineral tracts 1, 7A, 7B and the "Minerals Reserved" area. The Hearing Officer did not specifically address this issue in the Final Report. The Panel should recommend to Congress that it take sufficient action to ensure that the proceeds of any future government sales or leases of these coal rights are paid to the appropriate Claimants.

Respectfully submitted,

_/s/ Nancie G. Marzulla_

Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW
1350 Connecticut Avenue, N.W. Suite 410
Washington, D.C. 20036
(202) 822-6760
(202) 822-6774 (facsimile)

Dated: July 17, 2008

Counsel for Claimants

Of Counsel:

M. Stephen Pitt
Merrill S. Schell
Jean W. Bird
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street, Suite 2800
Louisville, Kentucky 40202-2898
(502) 589-5235
(502) 589-0309 (facsimile)