**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LAND GRANTORS IN HENDERSON, UNION, AND WEBSTER COUNTIES, KENTUCKY AND THEIR HEIRS | |
| Claimants, | No. 93-648X |
| v. | Judge Charles F. Lettow, Presiding Officer<br>Senior Judges Lawrence S. Margolis and<br>Loren A. Smith, Review Panel |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

**CLAIMANTS' RESPONSE BRIEF TO EXCEPTIONS OF THE UNITED STATES**

Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW
1350 Connecticut Avenue, N.W.
Suite 410
Washington, D.C. 20036
(202) 822-6760

Counsel for Claimants

August 4, 2008

Of Counsel:

M. Stephen Pitt
Merrill S. Schell
Jean W. Bird
WYATT, TARRANT & COMBS, LLP
500 W. Jefferson Street
Suite 2800
Louisville, KY 40202-2898
(502) 562-7372

**Table of Contents**

TABLE OF AUTHORITIES……………………………………………………………...…ii

MEMORANDUM…………………………………………………………………………...1

Introduction……………………………………………………………………….........1

Argument………………………………………………………………………………….2

I. This panel should apply the clearly erroneous standard of review to the factual findings of the Hearing Officer…...............................................................2

II. The Hearing Officer's evidentiary rulings were not an abuse of discretion………...4

III. The Hearing Officer's conclusion that claimants are entitled to equitable relief is amply supported by the evidence……………………………………………...9

A. The Hearing Officer applied the correct rule: equitable claims include unjust enrichment, misrepresentation, and Government overreaching…………………………………………………….………..10

B. The Hearing Officer's finding that the Government's land acquisition agents promised the landowners that they could repurchase their land after the war was also not clearly erroneous…………………………………………………………….....11

C. The Hearing Officer's finding that the parties were unaware of the oil, gas, and coal deposits beneath the land was not clearly erroneous…………………………………………………………….…...17

IV. The Hearing Officer's recommended post-appropriation opt-in procedure for compensating qualified individual Claimants is consistent with the Congressional Reference…………………………………………………………..20

V. The Hearing Officer correctly determined that the Government had failed to sustain its burden of proving laches……………………………………………..23

Conclusion……………………………………………………………………………….28

## TABLE OF AUTHORITIES

**Cases**

*Ark-Mo Farms, Inc. v. United States*, 530 F.2d 1384 (Cl. Ct. 1976)……………….……8, 16

*Atlantic Works v. United States*, 46 Ct. Cl. 57 (1911)………………...…………………21

*Bank of New Hampshire v. United States D.N.H.*, 115 F.Supp.2d 214 (D.N.H.2000)……...……………………………………………………………………..24

*Barnes v. United States*, 68 Fed. Cl. 492 (2005)…………………………………………21

*Blacklock v. United States*, 208 U.S. 75 (1908)………………………………….......*ibid*

*Cal. Canners & Growers Ass'n v. United States*, 9 Cl.Ct. 774 (1986)…………………..10

*Chem-Nuclear Systems, Inc. v. Arivec Chemicals, Inc.*, 978 F.Supp. 1105 (N.D. Ga. 1997)…...…………………………………………………………………..24

*Doe v. U.S.*, 372 F.3d 1347 (Fed. Cir. 2004)…………………………………….....…4

*F.D.I.C. v. Walker*, 815 F.Supp. 987 (N.D. Tex., 1993)…………………………….…...24

*Federal Trade Commission v. Amy Travel Service, Inc.*, 875 F.2d 564 (7th Cir. 1989)………………………………………………………………………….8, 16

*Federal Trade Commission v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282 (D.Minn. 1985)…………………………………………………………………….....*ibid*

*Gay St. Corp. v. United States*, 130 Ct. Cl. 341, 127 F.Supp. 585 (1955)……………….11

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997)……………………………………..4

*Hart v. United States*, 58 Ct. Cl. 518 (1923)……………………………………………..21

*Hickman v. United States*, 135 Ct. Cl. 380 (1956)……………………………………….11

*Higginson v. United States*, 384 F.2d 504 (6th Cir.1967)……………………………...…24

*Hulsey v. United States*, 6 Cl. Ct. 593 (1984)……………………………………………21

*In re Cirrus Logic Securities Litigation*, 946 F.Supp. 1446 (N.D. Cal. 1996)……………7

*J.L. Simmons Company, Inc. v. United States*, 60 Fed. Cl. 388 (2004)………………….11

*Land Grantors v. United States (Land Grantors I),* 64 Fed. Cl. 661 (2005)………..*passim*

*Land Grantors v. United States (Land Grantors III),* 71 Fed. Cl. 614 (2006)………20, 22

*Land Grantors v. United States (Land Grantors VI),* 81 Fed. Cl. 580 (2008)……..*passim*

*Martinez v. United States*, 48 Fed. Cl. 851 (2001)……………………………………....23

*McQuown v. United States*, 199 Ct. Cl. 858 (Ct. Cl. 1972)…………………………...4, 27

*Merchants National Bank of Mobile v. United States*, 7 Ct. Cl. 1 (1984)……............3, 11

*Milmark Services, Inc. v. United States*, 731 F.2d 855 (Fed. Cir. 1984)………………….2

*Pan American World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 368 F.Supp. 1098 (S.D.N.Y. 1973)………..……………………………………………………….8, 16

*Paul v. United States*, 20 Cl. Ct. 236 (1990)…………………………………………….21

*PPG Industries, Inc. v. Celanese Polymer Specialties Co., Inc.*, 840 F.2d 1565 (6th Cir. 1988)……………………………………………………………………………..4

*Quality Mechanical Contractors, Inc. v. Moreland Corp.*, 19 F.Supp.2d 1169 (D.Nev. 1998)……………………………………………………………………....24

*Quinault Allottee Ass'n and Individual Allottees v. United States*, 453 F.2d 1272 (Ct. Cl. 1972)……………………………………………………………………21

*Shields v. Eli Lilly and Co.*, 1991 WL 134614 (N.D.C. 1991)……………………………7

*Silverstein v. Smith Barney, Inc.*, No. 96 Civ. 8892(JSM), 2002 WL 1343748 (S.D.N.Y. 2002)…………………………………………………………………….8, 15

*Spalding and Son, Inc. v. United States*, 24 Cl. Ct. 112 (1991)…………….………23-24, 27

*Sneeden v. United States*, 33 Fed.Cl. 303 (1995)…………………….…………………….…11

*United States v. Hall*, 165 F.3d 1095 (7th Cir. 1999)……………………………………...7

*United States v. Valdez-Soto*, 31 F.3d 1467 (9th Cir. 1994)……………………….…..7-8, 16

**Statutes**

28 U.S.C. §1492……………………………………………………………….…21

28 U.S.C. §2509………………………………………………………...…...*ibid*

**Rules**

Fed. R. Evid. 803…………………………………………..………………5-9, 13, 15-16

Fed. R. Evid. 804…………………………………………..……….….…5-8, 14-16

Fed. R. Evid. 807………………………………………………………… 5, 7-8, 15-16

Fed. R. Evid. 902…………………………………………………………………6

**Other**

S. 794, 103d Cong. (1993)……………………………………..……………..22, 26

S. Res. 98, 103d Cong. (1993)………………………………...……………20-22, 26

Wright & Miller, *Federal Practice and Procedure* § 2585 (1971)……………………….3

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LAND GRANTORS IN HENDERSON, UNION, AND WEBSTER COUNTIES, KENTUCKY AND THEIR HEIRS | |
| Claimants, | No. 93-648X |
| v. | Judge Charles F. Lettow, Presiding Officer<br>Senior Judges Lawrence S. Margolis and Loren A. Smith, Review Panel |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

**CLAIMANTS' RESPONSE BRIEF TO EXCEPTIONS OF THE UNITED STATES**

**Introduction**

In deciding whether to grant the Government's exceptions, this Review Panel need address only the following issue:

> An equitable claim in a Congressional Reference includes unjust enrichment and overreaching. The Hearing Officer found, after extensive review of testimony of original landowners and other eyewitnesses that the government was unjustly enriched by failing to value mineral rights and had overreached by promising to sell back the land after the war. Was the Hearing Officer clearly erroneous in finding that the Claimants have an equitable claim based on the government's unjust enrichment and overreaching?

This is a heavily factual case. And the whole theory of the right to equitable relief is fact-based. The Hearing Officer did an extensive review of the facts; she reviewed original documents, she watched video tapes of the depositions of the Claimants, read transcripts of witnesses' depositions, and conducted a trial. Much of the evidence that she relied on for her factual findings was introduced by the Government. Her factual findings are governed by the clearly erroneous rule.

Although the Government argues that that some of the evidence was hearsay, this argument fails because the evidence was not hearsay, the Government failed to object to it, and the evidence falls within the recognized hearsay exceptions such as state of mind, res gestae, admission of a party (Government's agent Towles), and general reliability where other evidence is unavailable. Even if the Review Panel were to conclude that the evidence is contradictory, this conclusion does not rise to the level of "clear error" as required to reverse the Hearing Officer's findings. Thus, the Government has failed to show that the Hearing Officer's findings are clearly erroneous.

Finally, the Government also has failed to show that the Claimants failed to diligently pursue their claims (laches). Therefore, this Review Panel should report to Congress that the Claimants have established an equitable claim and are entitled to relief in the sum of $34,303,908.42 together with appropriate interest.

Claimants also note that the Government has not excepted to the Hearing Officer's calculation of the appropriate amount of restitution, and has thus waived any such exception.

As previously noted, Claimants adopt the Hearing Officer's detailed statement of the facts of this case.

**Argument**

**I. This panel should apply the clearly erroneous standard of review to the factual findings of the Hearing Officer**

Under RCFC Appendix D ¶8, "[t]he hearing officer's findings shall not be set aside unless clearly erroneous." A finding is "clearly erroneous" when "the reviewing court is left with the definite and firm conviction that a mistake has been committed."[1] "Clearly erroneous" does not mean "that the review panel would have reached different factual conclusions had the

[1] *Milmark Services, Inc. v. United States*, 731 F.2d 855, 857 (Fed. Cir. 1984).

decision been [its] to make initially."[2] Rather "the review panel gives great weight to the findings made by the hearing officer and the inferences he drew from the evidence of record."[3] Further, "the panel must take that view of the evidence and the inferences deducible therefrom in a light which is most favorable to plaintiff."[4]

The Government takes a shotgun approach to this case, asserting exceptions to all of the Hearing Officer's significant factual findings as well as her conclusion that Claimants possess an equitable claim. Although the Government excepts to the Hearing Officer's factual findings that Government agents (without authority) promised that landowners could repurchase their land after the war, that the parties did not know that that beneath the land lay tens of millions of dollars worth of oil, gas, and coal, and that the Government overreached in its dealings with these landowners, what the Government fails to do is to demonstrate that these findings--and the Hearing Officer's ultimate conclusion that Claimants have an equitable claim--are clearly erroneous.

In this case the Government bears the heavy burden of proving that the Hearing Officer's findings are clearly erroneous.[5] The Government's argument that there was conflicting evidence that might have justified a contrary conclusion fails to meet that burden. In fact, it is the Hearing Officer's job to examine such conflicting evidence and draw factual conclusions from it--a job which the Hearing Officer in this case performed meticulously. As one review panel explained: "the hearing officer performed his duty in resolving this conflicting evidence and drawing the inferences flowing therefrom. This is what he is supposed to do."[6]

---

[2] *Merchants National Bank of Mobile v. United States*, 7 Ct. Cl. 1, 7 (1984).
[3] *Id.*
[4] *Id.*
[5] *Id.* (quoting Wright & Miller, *Federal Practice and Procedure* § 2585 at 729 (1971)).
[6] *Id.*

The Hearing Officer dug deeply into the voluminous record in this case. She examined numerous original documents, including contracts, affidavits, deposition transcripts and contemporaneous newspaper articles--most of which were introduced by the Government or at least without objection from it. She reviewed the video tapes of depositions in which the Government cross-examined elderly former landowners who were deceased or too feeble to attend trial, concluding that their testimony was generally credible.[7] Her factual findings, based as they were on this diligent sifting of the evidence, are amply supported and are not clearly erroneous.

**II. The Hearing Officer's evidentiary rulings were not an abuse of discretion**

The Government's broadside attack on the Hearing Officer's evidentiary rulings is both scattered and ineffective, for it is not the role of this Review Panel to second-guess every such ruling. To the contrary, decisions of trial courts (and thus Hearing Officers) as to evidentiary matters are given great deference and are to be second-guessed only in rare circumstances where there is a clear abuse of discretion.[8] Discretion is abused if "the record contains no basis on which the district court rationally could have made its decision or if the judicial action is arbitrary, fanciful or clearly unreasonable. . . .[W]here no reasonable man would take the view adopted by the district court."[9] Extreme deference to trial courts is particularly warranted in non-jury settings[10] such as congressional references, in which a knowledgeable and skilled Hearing Officer is clearly able to separate the evidentiary wheat from the chaff.

[7] *Land Grantors I*, 64 Fed. Cl. 661, 700 n.35 (2005).
[8] *See*, *General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ("We have held that abuse of discretion is the proper standard of review of a district court's evidentiary rulings." *Id.* at 141.).
[9] *PPG Industries, Inc. v. Celanese Polymer Specialties Co., Inc.*, 840 F.2d 1565, 1572 (6th Cir. 1988).
[10] *McQuown v. United States*, 199 Ct. Cl. 858 (Ct. Cl. 1972)(implied overruling on other grounds recognized in *Doe v. U.S.*, 372 F.3d 1347(Fed. Cir. 2004)(review panel in Congressional Reference case overruled objection to hearsay: "[a] large part of the purpose of the [hearsay] rule—the protection of jurors deemed impressionable—is lost in a trial conducted by a judge alone")).

In this case it is clear that the Hearing Officer devoted enormous time and individual attention to the numerous proffered affidavits, video-taped and transcribed depositions, interrogatory answers, and volumes of documentary evidence. The Hearing Officer described in detail the process in which she engaged and justified why those affidavits she relied upon are admissible and reliable. The Hearing Officer noted that the Government received the affidavits in March, 2004, was on sufficient notice the Claimants intended to rely on them, and had sufficient time to try and rebut them. "In fact, the Government's experts were retained, in part, to rebut these affidavits."[11]

The Hearing Officer conducted an extraordinarily detailed qualitative review of each tendered affidavit and, after doing so, relied on some, but not all, of them. ("Therefore, the court has cited or relied herein only on the affidavits the court considered credible and reliable.")[12] The fact that the Hearing Officer accepted some affidavits, while rejecting others, demonstrates the critical and painstaking analysis she gave them. Without repeating here the full detailed explanation and justification for the admissibility and reliability of each affidavit, the Hearing Officer declared them admissible under Fed. R. Evid. 807 and 804(b)(4). Try as it might, the Government simply cannot pierce the Hearing Officer's intense factual inquiry and conclusion that the affidavits satisfied both the "residual" exception contained in Fed. R. Evid. 807 and the Fed. R. Evid. 804(b)(4) exception, as well as the fact that they also satisfy Fed. R. Evid. 803(16),

---

[11] *See Land Grantors I*, 64 Fed. Cl. 661, 700 n. 36. The Government's lament at page 39 of its Brief that the affidavits were not formally admitted by the Hearing Officer until her Order of March 30, 2005 is disingenuous. As the Hearing Officer stated, the Government had been well aware of these exhibits for many months. In "Defendant's Response to Claimants' Motion Regarding Trial Exhibits," which the Government filed on or about December 10, 2004, the Government acknowledged that the Hearing Officer had declared the affidavits admissible during the September 1, 2004 pretrial conference. In fact, both sides continued to provide exhibits to the Hearing Officer long after the formal "live-witness" evidentiary hearing ended on November 23, 2004. The Government did so several times. *See, e.g.*, "Defendant's Submission of Supplemental Exhibit List," dated December 10, 2004, in which it submitted its Exhibits 615, 616-646, 647, 655, 666-668, and 669-701.

[12] *Land Grantors I*, 64 Fed. Cl. 661, 700 n.36.

803(20), and 902(8). The Hearing Officer's extraordinarily thorough analysis was correct and should be given the deference routinely afforded trial courts in such circumstances.

By way of a footnote on page 37 of its Brief, the Government also criticizes the Hearing Officer's admission of, and reliance on, numerous depositions of claimants, including several taken of original, now-deceased, landowners in 1995. As with the affidavits, the Hearing Officer described in substantial detail her in-depth review of each deposition and interrogatory answer.[13] As a result of this detailed review, the Hearing Officer determined the depositions were admissible under Fed. R. Evid. 804(b)(1) and that:

> The depositions proffered by Plaintiffs were taken in this proceeding and the Government participated and conducted cross examination in each. Therefore, the depositions are admissible since the deponents either were no longer alive or unavailable by reason of health or age. The court found that each deponent testified in a cogent and persuasive manner.[14]

The Government may not now argue that the now-deceased original landowners, whose depositions were taken in 1995 with leave granted by the former hearing officer in order to preserve their testimony, and which were admitted into evidence without objection by the Government, should not have been considered by the Hearing Officer.[15] Nor can the Government now object to specific deposition testimony as "hearsay" (which in most cases it is not), after the Government failed to object during the depositions. To the extent that any of the depositions, like the affidavits, contain some hearsay, the Hearing Officer, a trained and experienced jurist and legal practitioner, was capable of giving that testimony its due weight, particularly in this non-jury setting. In fact, the Hearing Officer was able to judge the credibility of the landowners from their video-taped testimony and found their testimony to be "cogent and persuasive."

---

[13] *Land Grantors I* at 700 n. 35.
[14] *Id*.
[15] Memorandum of Conference and Order, filed Dec. 16, 1994.

Because the facts giving rise to this Congressional Reference action occurred over 60 years ago, the Hearing Officer necessarily had to rely, to some extent, on the evidence contained in the several affidavits taken in the 1970s, as well as numerous contemporaneous publications. All but one of the original landowners, and both of the former Government agents, whose affidavits were offered into evidence are deceased. In circumstances such as are present in this case, the rules of evidence permit the introduction of such proof.

As the Hearing Officer noted, a statement not specifically covered by Fed. R. Evid. 803 or 804, but having equivalent circumstantial guarantees of trustworthiness, may be admitted under the "residual" rule, Fed. R. Evid. 807, if the court determines that (a) the statement is offered as evidence of a material fact; (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (c) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. The Hearing Officer found after her rigorous analysis that each of those criteria was met here. The trustworthiness of the affidavits is shown by the fact that they are corroborated by numerous other witnesses and the generally recognized history of the community, which one of the Government's own expert witnesses, Dr. Leland R. Johnson, corroborated: "although no written confirmation [of the promise] has been found in the legal documentation, the oral tradition was common among the landowners."[16] Courts often cite corroboration as an important factor in trustworthiness.[17] Furthermore, the materiality and probative nature of the affidavits is apparent. Finally, the fact that the affiants were no longer

---

[16] *See* DX 182 at 65.

[17] *See United States v. Valdez-Sota*, 31 F.3d 1467 (9th Cir. 1994), *cert. denied*, 514 U.S. 1113; *In re Cirrus Logic Securities Litigation*, 946 F.Supp. 1446, 1470 (N.D. Cal. 1996); *Shields v. Eli Lilly and Co.*, 1991 WL 134614 at *2 (N.D.C. 1991); *United States v. Hall*, 165 F.3d 1095, 1110-11 (7th Cir. 1999) *cert. denied,* 527 U.S. 1029.

available to testify in person added emphasis to their importance to the evidentiary fabric of the case. As this Court's predecessor court held:

> to the extent that evidence may not be admissible under [another hearsay exception], it is admitted pursuant to the residual discretion of a trial court in a non-jury case to admit into evidence hearsay found to be the best evidence reasonably available and to have assurances of accuracy and reliability.[18]

As the Hearing Officer found, the sheer number of affidavits in the present case, each generally, if not perfectly, consistent with the others, is a strong indication of overall trustworthiness. They are corroborative of each other. Further, they are based on the personal knowledge of the affiants provided under penalty of perjury. They also are analogous to the documents admitted under Fed. R. Evid. 807 in *Silverstein v. Smith Barney, Inc.*[19] As explained in *Silverstein v. Smith Barney, Inc.*, and as is obvious in Fed. R. Evid. 807 itself, the very purpose for the "residual" rule is to enable a court to admit evidence in a unique case where justice requires, even though it misses the technical criteria of other established hearsay exceptions.[20]

In addition to Fed. R. Evid. 804(b)(4) and 807, other evidentiary rules support the admissibility of the affidavits. Fed. R. Evid. 803(20), for example, also provides an exception to the general rule barring hearsay testimony in cases involving "reputation as to events of general history important to the community or state or nation in which located." Based on the underlying rationale of this hearsay exception, which the Government also used to its advantage, the affidavits were also properly admissible under Fed. R. Evid. 803(20).[21] Indeed, two

---

[18] *Ark-Mo Farms, Inc. v. United States*, 530 F.2d 1384, 1386-87 (Cl. Ct. 1976). Other courts agree. *See, e.g., United States v. Valdez-Soto*, 31 F.3d 1467, 1471 (9th Cir. 1994), *cert denied*, 514 U.S. 1113 ("[T]he trial judge has a fair degree of latitude in deciding whether to admit statements under [the residual exception].").
[19] No. 96 Civ. 8892(JSM), 2002 WL 1343748 (S.D.N.Y. 2002).
[20] *See also, Federal Trade Commission v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282, 1295 (D.Minn. 1985)(affidavits of consumers admitted due to interests of justice); *Federal Trade Commission v. Amy Travel Service, Inc.*, 875 F.2d 564, 576 (7th Cir. 1989) (affidavits admitted where it was deemed too "cumbersome and unreasonably expensive" to bring all witnesses in for live testimony). Under the unusual and compelling facts of this case, the Hearing Officer found that justice required their consideration.
[21] *See, e.g., Pan American World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 368 F.Supp. 1098, 1104 (S.D.N.Y. 1973).

Government expert witnesses, Drs. Jay L. Brigham and Leland R. Johnson, were put forward to do exactly that and their reports are necessarily replete with hearsay. The affidavits are also admissible under Fed. R. Evid. 803(16) ("statements in documents in existence twenty years or more the authenticity of which is established.")

Finally, the Government's conclusory arguments against the Hearing Officer's reliance upon discovery responses are wholly unavailing.[22] Although RCFC 33(c) specifically contemplates the use of interrogatory answers as allowed by the Federal Rules of Evidence, including at trial, the Government nonetheless contends that the discovery responses are inadmissible hearsay. This argument ignores that the discovery responses were used by the Government as its own exhibits for purposes of these proceedings. Having introduced the exhibits, and presumably used them for its own purposes and benefit, the Government may not now object to their use by the Hearing Officer.

In addition, as the Government acknowledges, several of the responses identify family members as being the source of the information contained in the responses.[23] Thus, these responses are admissible for the same reasons that the affidavits are admissible. The responses are thus admissible, contrary to the Government's argument, and the Hearing Officer properly considered them along with all of the other evidence.

## III. The Hearing Officer's conclusion that Claimants are entitled to equitable relief is amply supported by the evidence

The Hearing Officer's conclusion that Claimants have an equitable claim to the value of the oil, gas and coal, which the Government acquired from them without payment, finds overwhelming evidentiary support in the court record. The Government acquired the Claimants'

[22] Def. Br. at 44-45, *citing Land Grantors I*, 64 Fed. Cl. at 700-01 n.37.

[23] Def. Br at 45. *See* DX 677 (response to Interrogatory No. 8); DX 678 (response to Interrogatory No. 6); DX 679 (response to Interrogatory No. 6); DX 680 (response to Interrogatory No. 6); DX 694 (response to Interrogatory No. 6); DX 695 (response to Interrogatory No. 6).

farms in a feverish race to train new recruits for a woefully undermanned army, to fight a war whose fury had suddenly burst upon the United States with the bombing of Pearl Harbor on December 7, 1941. That Government land agents did not take the time to determine the potential for oil, gas and coal on Claimants' farms—and even that they gilded the lily by representing that Claimants could buy back their land after the war—may be explained by the exigency of supplying an army in wartime, but it does not detract from the basic inequity that Claimants were not paid for the minerals which the Government later sold for more than $34 million.

The Hearing Officer also correctly applied the rule that, in the context of a Congressional Reference, an equitable claim exists where Claimants have suffered a loss as a result of unjustified government action:

> Claimants are entitled to monetary relief from Congress arising out of an equitable claim, if the United States Court of Federal Claims determines that there has been "some unjustified governmental act that caused damage to the claimants."[24]

### A. The Hearing Officer applied the correct rule: equitable claims include unjust enrichment, misrepresentation, and Government overreaching

The Hearing Officer correctly stated that, in order for this Court to report to Congress that they have an equitable claim, the Claimants must prove that the Government committed a "wrongful or negligent act."[25] In the context of a Congressional Reference, the term "wrongful act" includes unjust enrichment, misrepresentation, and government overreaching,:

> What is wrongful or negligent action under this standard? As noted above, wrongful conduct carries with it an element of fault . . . . This occurs not only when a plaintiff has a claim under a statute that is otherwise barred by sovereign immunity, but also, for example, when the government acquires benefits through the overreaching of its agents, when government officials act outside the scope of

[24] *Land Grantors VI*, 81 Fed. Cl. 580, 601-02 (2008), c*iting Cal. Canners & Growers Ass'n v. United States,* 9 Cl.Ct. 774, 785 (1986).
[25] *Id.* at 602.

their authority, or when government actions have resulted in unjust enrichment.[26]

Similarly, unauthorized misrepresentation by Government agents, even when dealing with sophisticated companies, supports a favorable finding on an equitable claim in a Congressional Reference.[27]

Applying an analogous equitable principle, the Court of Claims has applied a just compensation analysis to a Congressional Reference case nearly identical to this one. In *Hickman v. United States*,[28] the Government condemned the claimants' land in Texas in 1942 for use as a World War II military training camp. The Government failed to pay claimants for the value of substantial gravel deposits on the property. A judicial condemnation suit was filed, a trial ensued, no consideration was given to the value of the gravel, and the landowners were awarded nothing for it. After the taking, the Government then mined the gravel and used it for road construction. A Congressional Reference followed to address the inequity of the Government's underpayment. Affirming the hearing officer, the review panel ultimately recommended that the "plaintiffs be paid the sum of $3,500, with interest . . . as a part of just compensation."[29]

**B. The Hearing Officer's finding that the government's land acquisition agents promised the landowners that they could repurchase their land after the war was over was also not clearly erroneous**

The Hearing Officer, after carefully weighing the documentary and testimonial evidence, emphatically stated that she

---

[26] *J.L. Simmons Company, Inc. v. United States,* 60 Fed. Cl. 388, 394 (2004) *citing Merch. Nat. Bank of Mobile v. United States,* 7 Cl.Ct. 1, 9 n. 6 (1984) (government official made promises of loan guarantees beyond what he was authorized to do); *Gay St. Corp. v. United States,* 130 Ct. Cl. 341, 127 F.Supp. 585, 590 (1955) (government contracted to pay plaintiff to make certain alterations to a building government leased from plaintiff; government enjoyed benefit of the alterations without making payment); and *Sneeden v. United States,* 33 Fed.Cl. 303, 309 (1995).

[27] *Merch. Nat. Bank of Mobile v. United States,* 7 Cl. Ct. 1, 9 n. 6 (1984) (government official made promises of loan guarantees beyond what he was authorized to do).

[28] 135 Ct. Cl. 380 (1956).

[29] *Id.*

> [has] absolutely no doubt that many of the landowners entered into contracts with the Government in 1942-1944 with the apparent understanding that they could repurchase their properties after World War II was concluded and, in some cases, at the same price the Government paid for it or at a discount.[30]

For example, she considered an affidavit of a former Government land acquisition agent, J. Sterling Towles, who stated under oath in 1979 that:

> government negotiators were instructed by their superiors that if the property owners questioned whether or not they would be able to repurchase the property they were to be told that they could have the first option to repurchase the property after the war.[31]

The Hearing Officer further quoted Mr. Towles as stating in his affidavit:

> [in] the performance of his duties as a government negotiator [he] was asked on several occasions by several of the landowners whether or not they would be allowed to repurchase the property after the war and that [he] answered them in the affirmative.[32]

The Hearing Officer also reviewed sworn affidavits signed by the former landowners themselves, who confirmed Mr. Towles' testimony. For example, one original land owner and her husband stated that they were told that, after the war, they would have the right to re-purchase their land for the same price the Government had paid them for it. Both stated that they

> were told by the Government Purchasing Agent that . . . when the land was no longer needed as an army camp, that they would have the first option to repurchase the land from the government at the same Eighty-seven Dollars and 50/100 ($87.50) per acre.[33]

---

[30] *Land Grantors I*, 64 Fed. Cl. 661, at 701-702 (2005). Accordingly, the Hearing Officer found that "[t]herefore, S. 794, Section 2(1), has been satisfied by a preponderance of the evidence." *Id.* at 702.

[31] *Id.* at 670 n. 11.

[32] *Id.* at 702 n. 39. *See also,* CX 123 (Apr. 4, 1979 Frederick Williams Aff.: One of the appraisers stated the "general feeling of all government employees at the time, appraisers and negotiators, that the landowners would have the right to repurchase the property taken from them as soon as the property was no longer needed by the government for the war efforts.").

[33] CX 142, March 12, 1979 Mrs. Benton O'Nan Aff. *See also,* CX 143 (Feb. 4, 1979 Albert Martin Aff.: "[W]e were told that we would get our land back in five years, also said we might get it back cheaper than we got, we held to that hope for a long time."); CX 167 (Sept. 21, 1978 Clifton E. Blue Aff.: "I was told the government wanted the land for military purposes only. We were told when the war was over we would get our land back at the same price paid less damages."); CX 170 (March 9, 1982 Elvis Stone Aff.: "The man in the office told me that when the war was over and the camp was no longer needed we could have the land back at a fair price [.]").

Other affiants were children of the original landowners who had been present during the negotiations and themselves heard Mr. Towles or some other Government land agent make the representation:

> affiant was present and heard government agents state to his father, W.T. Payne, that after he had sold the property to the government for the army camp that after the war he would be allowed a chance to buy the property back at close to the price paid for it by the government.[34]

Similar statements were made in depositions taken in this case, by witnesses who were cross-examined by Department of Justice lawyers.[35]

The Hearing Officer also relied on a historical local newspaper editorial from the time and correspondence to the Government recounting that the promise was made.[36] Such historical information is not only specifically admissible under Fed. R. Evid. 803(20), but is, as the Hearing Officer found, credible and trustworthy. In fact, much of the Government's proof at trial necessarily was based on the reports of its two retained historians, Dr. Brigham and Dr. Johnson. Significantly, Dr. Johnson confirmed in his report and testimony that the existence of

---

[34] CX 141, March 6, 1979 H.D. Payne, Sr. Aff. See also, CX 205 (March 2, 1979 Lloyd H. Woodring Aff.: "My dad, Ulliss (Woodring), and I sat with Pete West, the government negotiator, at the kitchen table negotiating the acceptance of the appraised value of the farm. Pete West, a friend of Dad, said 'you or your heirs will get the first choice to buy the land back at the same price less the damages. The government will only operate the camp four to six years.' "); CX 211 (Oct. 20, 1978 G.W. Cambron Aff.: "The affiant was present when the government land acquisition officer discussed with his late father the taking of his father's farm for Camp Breckinridge.... He also heard the land acquisition officer tell his father that he would be able to repurchase the farm after the war was over.").

[35] *Land Grantors I,* 64 Fed. Cl. at 702 n.39; 670 n. 11. *See, e.g.* CX 270 (Sept. 21, 2004 John E. Johnson Dep.) at 6-7 (Mr. Johnson's mother and father owned approximately 100 acres and Mr. Johnson's grandparents owned approximately 40 acres in Union County, all acquired by the Government in 1942.); *id.*at 11 (Mr. Johnson was 10 years old and with his father when a government representative stated: "Just think, after the war is over with, you'll be able to buy this at a fraction of the cost of what the government is paying you."); *id.* at 13 ("It was well-known throughout the community that, you know, they were going to get their farm back."); CX 273 (July 14, 1995 Mrs. Thomas Raymond (Lottie Mae) Lynn Dep.) at 10 (Mrs. Lynn and her deceased husband owned 45 acres (Tract E-647) in Webster County on which they lived and farmed.); *id.* at 10 (Mrs. Lynn testified that: "[T]hey come and told us what they'd give us for it. And they said we could have it back after the war was over. And so we didn't put up a big fuss because it was the government[.]"); *id.* at 17 ("Well, they promised to let us have it back when the war was over and they didn't even let us know they declared it surplus and put it up and sold it at auction.").

[36] *Land Grantors I,* 64 Fed. Cl. at 702 n.39.

the promise to landowners was a consistent thread woven through the fabric of the history of the Camp Breckinridge land takings.[37]

The Hearing Officer's admission into evidence of these depositions and affidavits was not an abuse of discretion, as the Government contends. To begin with, the Government did not object to the admission of the depositions of witnesses who were deceased or unavailable—as indeed it could not, as they were perfectly admissible under Fed. R. Evid. 804.[38]

Thus, the Hearing Officer properly relied on the Government's 1995 video-taped depositions of the few then-living original landowners, whom she described as being between 77-87 years of age at the time of their depositions,[39] and whom counsel for the Government vigorously cross-examined under Fed. R. Evid. 804(b)(1).

> The depositions proffered by Plaintiffs were taken in this proceeding and the Government participated and conducted cross examination in each. Therefore, the depositions are admissible since the deponents either were no longer alive or unavailable by reason of health or age. The court found that each deponent testified in a cogent and persuasive manner.[40]

As noted, the Hearing Officer conducted a detailed qualitative review of each affidavit and, after doing so, determined that some, but not all, of them were reliable. ("Therefore, the court has cited or relied herein only on the affidavits the court considered credible and reliable.")[41] The Hearing Officer's acceptance of some affidavits and rejection of others, demonstrates the thorough analysis she undertook. The Hearing Officer's conclusion that the

---

[37] DX 182 at 65, Johnson Report ("The oral tradition is common among landowners.").
[38] Government counsel, Mr. Oppenheimer, stated: "Your Honor, I should clarify my answer that the five videotapes of the witnesses that are now deceased, that was a motion in limine that Plaintiffs had raised and we responded to. There were certain elements of that that we objected to because they were based on hearsay. But, as a general matter, if the witnesses are unable to travel or are deceased, I think the rules provide that deposition transcripts could substitute for live testimony." Transcript of Davis Redirect at 693, *Land Grantors v. United States*, No. 93-648 (Sept. 10, 2004).
[39] *Land Grantors I*, 64 Fed. Cl. at 700 n. 35.
[40] *Land Grantors I*, 64 Fed. Cl. at 700 n. 35.
[41] *Id.* at 700 n. 36.

affidavits were admissible under Fed. R. Evid. 807 and 804(b)(4) was correct and should not be disturbed.

The original landowners, and both of the former Government agents, whose affidavits were offered into evidence are deceased.

In circumstances such as are present in this case, the rules of evidence permit the introduction of such proof. As noted, a statement not specifically covered by Fed. R. Evid. 803 or 804, but having equivalent circumstantial guarantees of trustworthiness, may be admitted under the "residual" rule, Fed. R. Evid. 807, if the court determines that (a) the statement is offered as evidence of a material fact; (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (c) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. The Hearing Officer correctly found that each of those criteria was met here. The trustworthiness of the affidavits is shown by the fact that they are corroborated by numerous other witnesses and the generally recognized history of the community, which one of the Government's own expert witnesses, Dr. Johnson, corroborated: "[a]lthough no written confirmation [of the promise] has been found in the legal documentation, the oral tradition was common among the landowners."[42] Courts often cite corroboration as an important factor in trustworthiness.[43] Furthermore, the materiality and probative nature of the affidavits is apparent. Finally, the fact that the affiants were no longer available to testify in person added emphasis to their importance to the evidentiary fabric of the case. As this Court's predecessor court held:

> [t]o the extent that evidence may not be admissible under [another hearsay exception], it is admitted pursuant to the residual discretion of a trial court in a

---

[42] *See* DX 182 at 65.
[43] *Silverstein v. Smith Barney, Inc.,* No. 96 Civ. 8892(JSM), 2002 WL 1343748 (S.D.N.Y. 2002).

> non-jury case to admit into evidence hearsay found to be the best evidence reasonably available and to have assurances of accuracy and reliability.[44]

As the Hearing Officer found, the sheer number of affidavits in the present case, each generally, if not perfectly, consistent with the others, is a strong indication of overall trustworthiness. They corroborate each other. Further, they are based on the personal knowledge of the affiants provided under penalty or perjury. They also are analogous to the documents admitted under Fed. R. Evid. 807. As explained in *Silverstein*, and as is obvious in Fed. R. Evid. 807 itself, the very purpose for the "residual" rule is to enable a court to admit evidence in a unique case where justice requires, even though it misses the technical criteria of other established hearsay exceptions.[45]

In addition to Fed. R. Evid. 804(b)(4) and 807, other evidentiary rules support the admissibility of the affidavits. Fed. R. Evid. 803(20), for example, also provides an exception to the general rule barring hearsay testimony in cases involving "reputation as to events of general history important to the community or state or nation in which located." Based on the underlying rationale of this hearsay exception, which the Government also used to its advantage, the affidavits were also properly admissible under Fed. R. Evid. 803(20).[46] Indeed, two Government expert witnesses, Drs. Jay L. Brigham and Leland R. Johnson, were put forward to do exactly that and their reports are necessarily replete with hearsay. The affidavits are also admissible under Fed. R. Evid. 803(16)("statements in documents in existence twenty years or more the authenticity of which is established").

---

[44] *Ark-Mo Farms, Inc. v. United States*, 530 F.2d 1384, 1386-87 (Cl. Ct. 1976). Other courts agree. *See, e.g.*, *United States v. Valdez-Soto*, 31 F.3d 1467, 1471 (9th Cir. 1994), *cert denied*, 514 U.S. 1113 ("the trial judge has a fair degree of latitude in deciding whether to admit statements under [the residual exception]."

[45] *See Federal Trade Commission v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282, 1295 (D.Minn. 1985)(affidavits of consumers admitted due to interests of justice); *Federal Trade Commission v. Amy Travel Service, Inc.*, 875 F.2d 564, 576 (7th Cir. 1989) (affidavits admitted where it was deemed too "cumbersome and unreasonably expensive" to bring all witnesses in for live testimony). Under the unusual and compelling facts of this case, the Hearing Officer found that justice required their consideration.

[46] *See, e.g.*, *Pan American World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 368 F.Supp. 1098, 1104 (S.D.N.Y. 1973).

### C. The Hearing Officer's finding that the parties were unaware of the oil, gas, and coal deposits beneath the land was not clearly erroneous

The Hearing Officer's finding that neither the Government nor the landowners knew of the mineral wealth which lay beneath the surface of their land is supported by many of the same depositions, affidavits, and historical documents described in the prior section III. B. of this brief. Moreover, it is hardly surprising that, with less than two weeks' notice to leave their homes and farms, the landowners did not employ petroleum and coal geologists to investigate the possibility of oil, gas or coal on their land; equally understandable is the Army's single-minded effort to assemble the land necessary to train soldiers for the war which had suddenly descended on our country. And, if the landowners would be allowed to simply re-purchase their family farms after the war, what need was there to do such an investigation?

The Hearing Officer supported her finding that

> [t]he "basic assumption" of fact on which the parties entered into contracts in 1942-1944 was that no coal, gas, oil, or other mineral deposits existed under the condemned properties that would support exploration or operation at the time of sale[47]

by extensive citation to mineral reports from the time of the sales:

> *[s]ee* DX 183 (Direct Testimony of Government's Expert Dr. Jay L. Brigham) at 15 (reporting that "geologists [in 1942-1943] were studying the region's oil resources, although actual drilling and production were minimal."); *see also id.* at 13-14 (reporting that in Willard Rouse Jillson, *The Geology of Union County* (1943), the existence of eight well-defined oil pools located on a map of Union County was noted, but none were within the boundaries of Camp Breckinridge; however, seven "dry holes" were identified); *Id.* at 14 (the Kentucky Oil and Gas Association 1942 Report described that: four wells in Webster County produced a total of 7,075 barrels annually or an average of 4.8 barrels a day; and 176 wells in Henderson County produced 358,408 barrels annually or an average 5.5 barrels per day); *Id.* at Ex. 15 at DOJ3006-07 (Kentucky Oil and Gas Association, *A Report on The Conditions of the Oil Industry in the State of Kentucky* (1942) at 10-11 submitted to Harold Ickes, Petroleum Coordinator for National Defense, and Leon Henderson, Administrator, Office of Price Administration); *Id.* at Ex. 82 (April 26, 1965 UNION COUNTY ADVOCATE reporting that "[a]t the time

[47] *Land Grantors VI*, 81 Fed. Cl. at 602.

(1941-1943) there had been little or no exploration of what was under the surface of the ground[.]"); *see also* DX 182 (Direct Testimony of Government's expert Dr. Johnson) at DOJ1853-54 (reporting that: Ashland Oil drilled a well in May 1943 on the C.T. Newman farm 2.5 miles west of Morganfield, that produced 102 barrels per day; a well was drilled on the Russelburg Farm in Hitesville 3 miles north of Waverly, producing 30 barrels per hour; and Henderson County produced 356,085 barrels in January 1943, but characterizing the production as "minuscule compared with the gushers of Texas and Oklahoma[.]").[48]

Government counsel also confirmed to the Hearing Officer that the properties had been valued for the highest and best use as farmland—not as land for the production of oil, gas and coal: "those properties were treated as having the highest and best use as agricultural, residential farmland. That's how they were evaluated. That's how they were valued."[49]

The February 7, 1942, War Department guidelines under which the Camp Breckenridge land was acquired emphasized that mineral lands were to be avoided and, where such lands were to be acquired, an explanation of the pertinent facts and circumstances:

> The expansion of the Army necessitates the acquisition of additional land for construction and training. In order that necessary acquisition may be accomplished in the most expeditious manner, the following policies are announced for the information and guidance of all concerned. . . . 4. Acquisition of land which necessitates the acquisition of mineral rights, the acquisition or relocation of utility lines, pipe lines, railroads, or major highways, will be avoided. Whenever the acquisition of land which requires further action of this nature is recommended, the request for acquisition will include a clear statement of the pertinent facts and circumstances.[50]

The record discloses no explanation of the facts and circumstances necessitating the acquisition of mineral rights for Camp Breckenridge, most probably because the Army did not think it was acquiring any such mineral rights.

As the Hearing Officer noted, in each sale Government officials affirmatively attested that there were no mineral operations on the land being acquired from Claimants:

[48] *Land Grantors VI*, 81 Fed. Cl. at 602 n.16.
[49] *Land Grantors I*, 64 Fed. Cl. at 691.
[50] Adjunct General's Office to Commanding Generals et al., Feb. 2, 1942, Records of the AGO, box 3919, *cited in* Brigham Report, DX 183 at 20-21.

> the Government required two negotiators from the Department of Real Estate to attest in a Certificate of Inspection and Possession for each condemned property that: to the best of my information and belief after diligent inquiry and physical inspection of said premises there is no evidence whatever of any ... exploration or operations whatever for the development of coal, oil, gas or other minerals on said lands[.][51]

Because landowners expected the Army to re-sell their land back after the war, and to use it during the war for training soldiers (not producing oil, gas, and coal), they saw no reason to explore for minerals in the two weeks or so during which they were required to move from their family farms and find new homes and land from which they could make a living. As the Army confirmed to Congressman Clements in 1946, when mineral exploration in the area began in earnest, the mineral interest should not be severed from the surface rights precisely because the Claimants held a prior right of re-purchase:

> [t]he Government is the owner and in possession of considerable land at each of these installations (Ohio River Ordnance Works and Camp Breckinridge, Kentucky). There has been considerable prospecting for oil in the two counties where these Government properties are located and there has been much speculation as to whether or not the Government would consider an oil lease to private interests on either or both of these installations. Under existing law [Surplus Property Act of 1944, as amended], should this land be disposed of to private interests, the former owner would be given preference and it is my judgment since there is a prospect of this occurring there should be no separation of the surface and mineral rights.[52]

Not until 1954, a full decade or more after the Government had acquired Claimants' land, was oil discovered: "[s]ometime in May 1954, DOI's Office of Geological Survey identified potentially significant oil and gas deposits present under the Camp Breckinridge lands."[53]

[51] *Land Grantors I*, 64 Fed. Cl. at 704.
[52] *Land Grantors VI*, 81 Fed. Cl. at 588-89.
[53] *Id*. at 589. *See* DX 40 at DOJ0311.

## IV. The Hearing Officer's recommended post-appropriation opt-in procedure for compensating qualified individual claimants is consistent with the Congressional Reference

Among the facts that this Court must find is the identity of the Claimants (original landowners and their heirs), which is a moving target as former generations give way to new. The Hearing Officer's decision to use this Court's class action rules as a means of identifying proper Claimants is not clearly erroneous, and should therefore be upheld. After finding that the landowners had not been paid reasonable compensation for their minerals due to the mistaken belief that no significant quantities of economically extractable minerals existed on the properties, the Hearing Officer devised a procedure that affords the potentially thousands of Claimants the best and most efficient opportunity to participate in any congressional award: the opt-in procedures set forth in RCFC 23, as authorized in the Court's Congressional Reference procedure, RCFC App. D-1.[54]

Following her thorough discussion in *Land Grantors III* of the desirability and feasibility of applying class procedures to this case, the Hearing Officer in *Land Grantors VI* recommended a reasonable and efficient post-appropriation procedure for those original landowners (only two remain) and their heirs-at-law to prove that they are entitled to participate in the disbursement of any appropriated funds.[55]

Being unable to attack the obvious justification for, and inherent efficiency in, the Hearing Officer's recommended procedure, or its availability under the relevant procedural rules, the Government is left to argue that the language of S. Res. 98 precludes the Hearing Officer's use of the tools provided by the rules of this Court, which are available under RCFC App. D-1

[54] *See Land Grantors III*, 71 Fed. Cl. 614, 626 (2006)("The RCFC, to the extent feasible, are to be applied in congressional reference cases.").
[55] *Land Grantors VI*, 81 Fed. Cl. at 617.

and RCFC 23 and are feasible and appropriate for large-claimant cases such as this.[56] The language in the Senate Resolution does not preclude the Court of Federal Claims from using all procedural tools at its disposal. Indeed, that is what 28 U.S.C. §§ 1492 and 2509 contemplate when matters are referred to the Court.[57] That is what the Hearing Officer did in this case.

Neither the Hearing Officer nor Review Panel is inextricably wedded to a hyper-technical construction of the language of either the proposed bill or the resolution transmitting it.[58] S. Res. 98 provides that the Chief Judge is to

> [p]roceed. . . in accordance with the provisions of sections 1492 and 2509 of title 28, United States Code, and report back to the Senate, at the earliest practicable date, giving such findings of fact and conclusions that are sufficient to inform Congress of the amount, if any, legally or equitably due from the United States to the claimants individually.[59]

The Government argues that by using the word "individually" the Senate was dictating that every possible Claimant must be named in the initial report to Congress with a dollar amount by his or her name or be forever barred. But the language of the S. Res. 98 does not support the weight placed on it by the Government. Rather, a hearing officer or review panel should interpret a transmittal resolution in a commonsense and practical fashion. The Court has established a procedure in RCFC App. D to administer Congressional Reference cases and App. D-1

---

[56] *See Quinault Allottee Ass'n and Individual Allottees v. United States*, 453 F.2d 1272 (Ct. Cl. 1972) (Rule 23-type procedure appropriate where Native American "allottees" exceeded one-thousand in number); *Barnes v. United States*, 68 Fed. Cl. 492, 495 (2005) ("The class in question…potentially numbers in the thousands . . . so numerous that joinder of all members is impractical.").

[57] 28 U.S.C. § 2509(b) expressly directs that in a congressional reference case the rules of this Court shall apply and that "[e]ach hearing officer and each review panel shall have the authority to do and perform any acts which may be necessary or proper for the efficient performance of their duties, . . ."

[58] *See Paul v. United States*, 20 Cl. Ct. 236 (1990), *aff'd*, 21 Cl. Ct. 758 (1990); *Atlantic Works v. United States*, 46 Ct. Cl. 57 (1911); *Blacklock v. United States*, 208 U.S. 75 (1908). The cases cited by the Government at pages 73-74 of its Brief are distinguishable. *Hulsey v. United States*, 6 Cl. Ct. 593 (1984)(holding that it is inappropriate for the hearing officer to consider a claim for vasculitis or Guillian Barre Syndrome when only polymysitis was set forth in the reference); *Hart v. United States*, 58 Ct. Cl. 518 (1923)(claimant sought to greatly expand the specific fact allegations set out in the bill). Both cases involved substantive departures from the bill and are far-removed factually from the instant case. Neither purports to say that a hearing officer cannot apply a reasonable interpretation on the language of a reference in order to fulfill its obvious goal.

[59] *Land Grantors VI*, 81 Fed. Cl. at 599.

incorporates the Court's other rules for use whenever feasible. And, as the Hearing Officer found, "[j]oinder in this case . . . is not only impracticable, but impossible. . . ."[60] Accordingly, the use of RCFC 23 is a reasonable approach in order to accomplish the goal of S. 794.[61] It does not clash with S. Res. 98 and, in fact, furthers the goal of efficiency set forth in 28 U.S.C. §2509(b). Otherwise, it would be an impracticable and unnecessary burden on the Hearing Officer and this Court to require each of potentially thousands of Claimants to line up single-file to have their *bona fides* determined by this Court before the report to Congress.

Given the compensatory policy and intent inherent in S. 794, including the obvious inherent goal of compensating as many deserving people as possible, the Hearing Officer used the procedural tools at her disposal; tools which will offer the best chance for as many Claimants as possible to be "individually" remunerated. By utilizing the procedures set out in *Land Grantors VI* at 617, and in the rules of this Court, the Hearing Officer did, in fact, comply with S.Res. 98.[62]

Although the Government argues that no one knows the identities of all the Claimants, that is almost always true in any multi-member class proceeding. The identities of all Claimants here will become known during the two-year opt-in period outlined in *Land Grantors VI* at 617. If some individuals presenting claims are not qualified as heirs or are bogus Claimants, the trustee or master can sort that out. Moreover, under the Hearing Officer's recommended framework, a final accounting to Congress by the trustee administering any distributions of appropriated sums would include the identities of "the persons to whom payments were made,"

[60] *See Land Grantors III,* 71 Fed. Cl. at 622.
[61] The evidentiary hearing was essentially handled as a class proceeding. During the July 22, 2004 pretrial conference, the Hearing Officer made it clear that she wanted to hear only a few "representative people" from any "different types or classes of Plaintiffs." Transcript at 11, 14-15. The Government did not object and that is how Claimants presented their case.
[62] As set forth in *Land Grantors VI* at 617 n. 40, and the calculations and tables referred to therein, the Hearing Officer adopted the method by which the mineral proceeds should be allocated to the former landowner properties within each separate Government "mineral tract."

thus satisfying any concern that Congress cares to be advised of the "claimants individually."[63] If all appropriated funds are not claimed and paid out during the two-year claim-assertion period—which is very likely, given the unique facts and number of years involved in this case—those unpaid funds will revert to the Treasury.[64]

Because the Final Report is consistent with the Congressional Reference statutes, this Court's rules, and the Senate Resolution, and provides the most reasonable and efficient means to compensate qualified Claimants individually, the Government's exception should be rejected.

## V. The Hearing Officer correctly determined that the Government had failed to sustain its burden of proving laches

To succeed in proving its affirmative defense of laches, the Government is required to prove three elements: (1) that each Claimant "delayed in pursuing its claim, (2) that the delay was both unreasonable and inexcusable, and (3) that the delay resulted in prejudice to the defendant."[65] The Hearing Officer correctly found that the Government failed to sustain its burden of proving this affirmative defense.[66]

First, the Government fails to identify any suit which the Claimants could have brought prior to this Congressional Reference. Suits for unjust enrichment, like this one, are barred by sovereign immunity in both the Court of Federal Claims[67] and the United States District

---

[63] *Land Grantors VI*, 81 Fed. Cl. at 617.
[64] *Id.*
[65] *Spalding and Son, Inc. v. United States*, 24 Cl. Ct. 112, 152 (1991)(report and recommendation were rejected by the Review Panel but not regarding the issue of laches).
[66] *Land Grantors I*, 64 Fed. Cl. at 716-17.
[67] *Martinez v. United States*, 48 Fed. Cl. 851 (2001).

Courts.[68] Where the Claimant does not have a meritorious legal claim to bring, his failure to sue will not support a laches defense.[69]

Second, Claimants did not unreasonably delay in apprising the Government of their claim. As the Hearing Officer found, Claimants began requesting return of their land soon after the war was over, and continued their campaign through a class action suit (dismissed for lack of jurisdiction)[70]and, ultimately, this Congressional Reference.[71]

On February 14, 1946, within months after VJ Day, Claimants' Congressman, Earle C. Clements, received a letter from the Chief Engineer for the Department of the Army, confirming Claimants' right to a preference to re-purchase their land should the Army decide to dispose of it: "[u]nder existing law [Surplus Property Act of 1944, as amended], should this land be disposed of to private interests, the former owner would be given preference and it is my judgment …there is a prospect of this occurring. . . ."[72]

On March 15, 1957, two former landowners of this property, together with several local officials, sent a letter of protest to DOI when they learned that DOI planned to lease a tract of 190 acres on the east boundary of Camp Breckinridge to two private companies.[73] The former land owners wrote to protest the proposed protective leases of oil "underlying the lands owned by us until same were condemned by the United States" and demand the right to

> receive our proportionate part of the royalty oil that is produced and sold from the lands formerly owned by us until taken from us by the Government for military purposes. . . .Will you kindly acknowledge the filing of this protest so that we

[68] *Bank of New Hampshire v. United States D.N.H.*, 115 F.Supp.2d 214, 219-220 (D.N.H. 2000); *Quality Mechanical Contractors, Inc. v. Moreland Corp.*, 19 F.Supp.2d 1169, 1174-1175 (D.Nev. 1998); *Chem-Nuclear Systems, Inc. v. Arivec Chemicals, Inc.*, 978 F.Supp. 1105, 1110 (N.D. Ga. 1997); *F.D.I.C. v. Walker*, 815 F.Supp. 987, 990 (N.D. Tex., 1993).
[69] *Spalding and Son, Inc. v. United States*, 24 Cl. Ct. at 152 (report and recommendation were rejected by the Review Panel but not regarding the issue of laches).
[70] *See Higginson v. United States*, 384 F.2d 504 (6th Cir.1967), *cert. denied*, 390 U.S. 947(1968).
[71] *Land Grantors I*, 64 Fed. Cl. at 665-666.
[72] *Land Grantors I*, 64 Fed. Cl. at 673.
[73] *Id.* at 664.

> may protect our rights in property that we believe when it ceases to be used for military purposes or is classified as excess or surplus land, that we should be given preference in repurchasing it from your Department or some other branch of the Government.[74]

Then, in December 1962, DOD declared Camp Breckinridge inactive and the land, together with the coal, gas, and other mineral rights, was transferred to the General Services Administration for disposal as surplus property.[75] After GSA sold the coal rights in 30,540 acres to the Tennessee Valley Authority for $7,410,000 and all of the gas, oil, and other mineral rights underneath the condemned properties to private companies for approximately $24,572,547.70, one former landowner filed suit in the United States District Court for the Western District of Kentucky, on behalf of himself and other former landowners. That suit was dismissed on jurisdictional grounds before a class was certified or any discovery could be taken.[76]

Sometime in 1968, following the United States Supreme Court's denial of *certiorari* in the *Higginson* case, a group of former landowners and/or their heirs formed the Breckinridge Land Committee and turned to Congress to seek redress.[77] The first specific request for a Senate inquiry of this matter appears to have been directed to the GSA by Senator Walter D. Huddleston on or about June 6, 1973.[78] Sometime in 1978, the Breckinridge Land Committee garnered the support of a non-profit environmental public interest organization, known as the Kentucky River Coalition (KRC). A journalism graduate from Eastern Kentucky University, with an interest in environmental issues, was assigned to interview former landowners and Government representatives and search for records that might support the former landowners' grievances.[79] KRC assisted in locating many of the former landowners who signed affidavits to preserve their

---

[74] DX 158 at DOJ1527-28.
[75] *Land Grantors I*, 64 Fed. Cl. at 665.
[76] *Id.*
[77] *Land Grantors I*, 64 Fed. Cl. at 665.
[78] *Id*. at 685.
[79] *See* CX 267 (Murphy Dep. at 9, 13, 15, 16, 17, 21, 22, 24).

knowledge of the 1942-1944 condemnations. The work product of KRC is reflected in an April 6, 1979 Report forwarded to Senator Wendell Ford, Senator Walter Huddleston, Congressman William H. Natcher, and Congressman Carroll Hubbard.[80]

In 1983, at the request of Senator Ford, Senator Grassley, then Chairman of the Administrative Practice and Procedure Subcommittee of the United States Senate, forwarded S. 1104, "[f]or the relief of the grantors of certain land in Henderson, Union, and Webster Counties, Kentucky" to the Senate Judiciary Committee.[81] The Department of the Army, however, opposed enactment of S. 1104 and no further congressional action took place at that time.[82] Subsequent efforts failed in 1989 and 1991.[83] On April 19, 1993, Senator Ford introduced S. 794, "a bill for the relief of land grantors in Henderson, Union, and Webster Counties, Kentucky, and their heirs."[84] On October 19, 1993, S. 794, together with S. Res. 98, 103d Cong. (1993), were reported out of the United States Senate.[85]

Under these circumstances and given their limited resources in dealing with the Government's bureaucracy, the Claimants cannot be charged with unreasonable delay in pursuing their claim via all of the available avenues.

Third, the Government failed to prove that it was prejudiced by any inaction of the Claimants. After all, it was the Government which possessed the Camp Breckenridge land acquisition records,[86] and had immediate access to all of the officials and records involved in the subsequent transfer of the land to the Interior Department and GSA to facilitate the Government's leasing program under which it received so many millions of dollars. From the

---

[80] *See* CX 11.
[81] *Land Grantors I,* 64 Fed. Cl. at 685.
[82] *See* JX 60 at DOJ 1584-88.
[83] *Land Grantors I,* 64 Fed. Cl. at 685.
[84] *See* S. 794, 103d Cong. (1993).
[85] *Id.*
[86] *Land Grantors I,* 64 Fed. Cl. at 715 n.54.

1940's, the Government had been on notice of Claimants' claims that they were entitled to re-purchase their land, and throughout the 1950's the Breckenridge Land Grantors continued to assert their rights to the oil, gas, and coal for which the Government had not paid them. The Government could have prepared affidavits of its officials, preserved its records, and even interviewed Claimants during these early days of the dispute, but apparently chose not to do so. That choice is not attributable to any act of Claimants, and thus will not support a laches defense.

This case is remarkably similar to the finding of the Hearing Officer in the *Spalding* Congressional Reference:

> [w]hile the BLM contends that it was prejudiced by the loss of relevant evidence, the retirement of crucial employees with knowledge of the facts, and by the faded memories of other BLM employees, we find that these problems were primarily the result of its own dilatory conduct and failure to preserve relevant evidence. That is to say, to the extent the defendant was prejudiced, it was not caused by or the result of any actions by Spalding.[87]

Finally, while the Government claims that original appraisals for the Camp may have been destroyed to its prejudice,[88] *defense* exhibits at trial included both a series of gross appraisals and documents reflecting the amounts offered to landowners.[89] The Government offers no explanation why those records were insufficient.[90] The fact that actual formal written appraisal documents, if any ever existed, may have been destroyed prejudiced the Claimants as much as the Government. The Claimants were hampered in pursuing written confirmation of the anecdotal oral history that the "appraisals," if any, constituted only "drive-by," slipshod work.[91]

---

[87] *Spalding and Son, Inc. v. United States*, 24 Cl. Ct. at 153-54 (report and recommendation were rejected by the Review Panel but not regarding the issue of laches).
[88] Def. Br. at 30.
[89] *See* JX 206A-D; JX 264 A-J; JX 485A-B; JX 504 A-C; JX 530D; JX 536A; DX 183, Brigham Report, Exhs. 39-44; DX 182, Johnson Report at DOJ 2393; and JX 10.
[90] See *McQuown v. United States*, 199 Ct. Cl. 858 (1972)(no prejudice shown where, although government records were destroyed, plaintiff's affidavit admissible to establish the amount of overtime).
[91] For example, one original owner testified that government agents merely walked around one room in her home and were quickly gone, leading to the conclusion that required methodology was not used in appraising the property. CX 276 at 15-16.

Further, even though the GSA and the Corps. of Engineers had ample notice that Claimants were pursuing relief, the Hearing Officer found that the agencies made no effort to preserve records.[92]

**Conclusion**

For all of these reasons, Claimants ask this Court to report to Congress that Claimants do have an equitable claim to the sum of $34,303,908.42, together with reasonable interest, because:

- The evidence supports the Hearing Officer's finding that the Claimants possess an equitable claim for the value of the oil, gas, and coal for which they were not paid.
- The evidence is reliable and admissible.
- The Government has not met its burden of showing that the Hearing Officer's findings were clearly erroneous.
- The Hearing Officer's finding that the Government had failed to prove laches is not clearly erroneous.
- The amount due Claimants is not an issue because the Government did not except to the Hearing Officer's report on this issue.

Respectfully submitted,

_s/ Nancie G. Marzulla_

Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW
1350 Connecticut Avenue, N.W.
Suite 410
Washington, D.C. 20036
(202) 822-6760
(202) 822-6774 (facsimile)

Dated: August 4, 2008

Counsel for Claimants

---

[92] *See Land Grantors I* at 716 (citing evidence provided by the United States showing that it disposed of records "potentially relevant to this case in 1975, 1977, 1979, 1980, 1983, 1990 and 1995).

Of Counsel:

M. Stephen Pitt
Merrill S. Schell
Jean W. Bird
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street, Suite 2800
Louisville, Kentucky 40202-2898
(502) 589-5235
(502) 589-0309 (facsimile)