**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| LAND GRANTORS IN HENDERSON, UNION and WEBSTER COUNTIES, KENTUCKY and THEIR HEIRS, | ) | No. 93-648X |
| Claimants, | ) | Judge Charles F. Lettow (Presiding Officer), Senior Judges Lawrence S. Margolis, Loren A. Smith, Review Panel |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE TO CLAIMANTS' OPENING BRIEF IN SUPPORT OF EXCEPTIONS**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** . . . . . . . . . . iii

**RESPONSE MEMORANDUM** . . . . . . . . . . 1

**I. Introduction** . . . . . . . . . . 1

**II. The Hearing Officer's Rejection of an Award of Interest is not Clearly Erroneous** . . . . . . . . . . 3

**III. The Panel Report Should Not Recommend any Monetary Award for Former Owners of Condemned Tracts** . . . . . . . . . . 8

**A. The Hearing Officer's Exclusion of Landowners Who Participated in Trial Proceedings is Not Clearly Erroneous** . . . . . . . . . . 10

**B. The Hearing Officer's Exclusion of Landowners Who Did Not Present Evidence of a Vendor Affidavit is Not Clearly Erroneous** . . . . . . . . . . 11

**IV. Although the Hearing Officer's Calculation of a Monetary Award is Fundamentally Flawed, her Rejection of Dr. Haywood's Untimely and Incompetent Affidavit is Not Clearly Erroneous** . . . . . . . . . . 13

**V. Conclusion** . . . . . . . . . . 18

# TABLE OF AUTHORITIES

## FEDERAL CASES


Beistline v. City of San Diego, 256 F.2d 421 (9th Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Benoit v. United States, 2001 WL 567737 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . . . . 6

Columbia First Bank, F.S.B. v. United States, 60 Fed. Cl. 97 (2004) . . . . . . . . . . . . . . . . . . . . . 16

Elterich v. City of Seal Isle City, 477 F.2d 289 (3d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . 9

Estate of Braude v. United States, 38 Fed. Cl. 476 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Grymes v. Sanders, 93 U.S. 55 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Hansen Bancorp, Inc. v. United States, 367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . 5

Land Grantors v. United States, 64 Fed. Cl. 661 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Land Grantors v. United States, 81 Fed. Cl. 580 (2008) . . . . . . . . . . . . . . . . . . . . . . . . *in passim*

Landmark Land Co. v. FDIC, 256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Larson v. United States, 274 F.3d 643 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Library of Cong. v. Shaw, 478 U.S. 310 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Smith v. Principi, 281 F.3d 1384 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-8

United States v. $515,060.42 in U.S. Currency, 152 F.3d 491 (6th Cir. 1998) . . . . . . . . . . . . . . . 7

United States v. $277,000 in U.S. Currency, 69 F.3d 1491 (9th Cir. 1995) . . . . . . . . . . . . . . . . . 7

United States v. N.Y. Rayon Importing Co., 329 U.S. 654 (1947) . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Thayer-West Point Hotel Co., 329 U.S. 585 (1947) . . . . . . . . . . . . . . . . . . . . . . 3

## FEDERAL STATUTES

Senate Bill 794, 103d Cong. (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Senate Bill 2563, 103d Cong. (1994) (proposed) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## RESPONSE MEMORANDUM

### I. Introduction

In accordance with the Review Panel's June 18, 2008 Scheduling Order (Docket No. 250), the United States hereby submits this response to Claimants' Opening Brief in Support of Exceptions, dated July 17, 2008 (Docket No. 252) ("Claimants' Opening Br."). As set forth in the United States' Opening Brief in Support of its Notice of Exception, dated July 17, 2008 (Docket No. 251) ("United States' Opening Br."), the Review Panel should reject the Hearing Officer's ("Officer's") Reports because (1) the Reports lack any claimant-specific findings, and fail to comply with the terms of Senate Bill 794, 103d Cong. (1993) ("S. 794"); (2) the Officer's conclusion that the doctrine of laches is inapplicable is clearly erroneous; (3) the Officer's conclusion that many landowners were promised a priority to repurchase their former properties is clearly erroneous; (4) the Officer's conclusion that landowners were paid less than reasonable value is clearly erroneous; and (5) the Officer's application of the doctrine of mutual mistake is clearly erroneous. Most of the findings set forth in the Reports are based on inadmissible hearsay evidence, which is directly contradicted by the voluminous historical record. Moreover, the legal theory upon which the Reports are based was identified by the Officer *sua sponte* after trial, and is not supported by the trial record. Therefore, the Review Panel should reject the Officer's Reports and issue a Panel Report recommending that any monetary award would be a mere gratuity.

If the Review Panel agrees with the United States' exceptions, Claimants' exceptions are rendered moot. On the other hand, if the Review Panel disagrees with the United States' exceptions, the Review Panel should reject Claimants' exceptions. First, Claimants argue that

the Officer's recommended award is erroneous because it does not include interest. Claimants are correct that the Officer's recommended award is fundamentally flawed. Like her liability analysis, the Officer's valuation analysis disregards the parties' trial arguments and most of the trial evidence, and is not supported by the law or the facts. See United States' Opening Br. at 49-52. However, the Officer's decision to not include an additional award for interest is not clearly erroneous. Therefore, the Review Panel should reject Claimants' exception with respect to interest. See discussion infra § II.

Second, Claimants argue that the Officer erred in (1) excluding former landowners who participated in jury trials during the condemnation proceedings, and (2) excluding former landowners who did not sign an Affidavit of Vendor during the United States' acquisition of the Breckinridge Properties. The Officer's conclusion that former owners of properties that were acquired by condemnation are entitled to a multi-million dollar award is clearly erroneous because those individuals (1) are not included within the scope of S. 794, (2) were not Claimants at the time of trial, and (3) did not submit any evidence in support of their claims. See United States' Opening Br. at 25-27. However, the Officer's decision to exclude former landowners who participated in jury trials, as well as those former landowners who did not sign an Affidavit of Vendor, is not clearly erroneous. See discussion infra § III.

Finally, Claimants argue that the Officer's recommended award should have included speculative royalty receipts allegedly generated on two oil leases (located on Tracts 7A and 7B). Claimants' evidence on this issue was both untimely and incompetent, and the Officer's rejection of that evidence is not clearly erroneous. See discussion infra § IV.

A memorandum discussing these points follows.

## II. The Hearing Officer's Rejection of an Award of Interest is not Clearly Erroneous

Having delayed approximately 50 years after the United States acquired the Breckinridge Properties before filing a claim against the United States, Claimants first argue that the Officer erred in not awarding them a multi-million dollar interest award. See Claimants' Opening Br. at 5-13. Claimants are correct that the Officer's calculation of a monetary award is clearly erroneous, but the Review Panel should reject Claimants' exception with regard to interest. Generally speaking, interest is not available absent an express Congressional statement to the contrary. See Library of Cong. v. Shaw, 478 U.S. 310, 314 (1986). Interest cannot be awarded on the basis of policy, United States v. N.Y. Rayon Importing Co., 329 U.S. 654, 658-59 (1947), or implied notions of just compensation, United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 588-90 (1947). See also Estate of Braude v. United States, 38 Fed. Cl. 476, 487 (1997) (Cong. Ref.) (interest not available in Congressional Reference matter unless "a statute waives the government's sovereign immunity against interest on the particular category of damages found"); Benoit v. United States, 2001 WL 567737 (2001) (Cong. Ref.) (rejecting award of interest in Congressional Reference matter because "any such additional compensation in favor of [claimants] would be preferential treatment not available to all other claimants" before the Court). S. 794 does not mention interest, and Claimants offer no reasonable argument to contradict the well-accepted rule discussed in Shaw. Accordingly, the Review Panel should reject Claimants' exception with regard to interest.

In addition, any recommended interest award (like any recommended principal amount) would reward Claimants for their unreasonable, decades-long delay in pursuing a claim against the United States. If Claimants had timely pursued a claim of mutual mistake, for example, the

parties' rights would have been resolved long ago, and Claimants would have mitigated any supposed loss. For this reason, and because an unreasonable delay impairs a fair liability analysis, a party who "desires to rescind [the contract] upon the ground of mistake or fraud . . . must, upon the discovery of the facts, at once announce his purpose, and adhere to it. . . . Delay and vacillation are fatal to the right which had before subsisted." Grymes v. Sanders, 93 U.S. 55, 62 (1876). Recommending a multi-million dollar award for interest would contradict this principle, and reward Claimants for their unreasonable delay.

Moreover, a recommended interest award, like the Officer's restitution award itself, is not justified on these facts. Claimants argue that the purpose of a restitution award is to "place Claimants in the position they would have occupied had the contract not been made." Claimants' Opening Br. at 5; see also Land Grantors v. United States, 81 Fed. Cl. 580, 608-09 (2008) ("Land Grantors VI" or "Final Report") (quoting Farnsworth § 12.1 at 154-55). However, an interest award would not put Claimants in "the position they would have occupied had the contract not been made," Claimants' Opening Br. at 5, for at least two reasons. First, if a former landowner did not enter into a voluntary sales contract ("Contract") – that is, if the Contract had not been made – the United States would have condemned the property.[1] For this reason, the Officer indicated at trial that any award should take into account the values that the former landowners might have received if they had not entered into a Contract, and instead proceeded through condemnation:

[1] See Trial Tr. at 171:19-23 (Claimants' Counsel: "Had [the voluntary sellers] not signed the option agreements and agreed to the appraised value, they would have still had their property taken, and they still would have had to have gone, to some extent, through the condemnation proceedings.").

> [T]he best evidence of [underpayment] is what you did earlier, which is where you compared the prices of the condemned properties. The properties went through condemnation versus the properties that, you know, were sold voluntarily. You take a look to see, you know, if hopefully if they were like-kind properties and which ones had mineral interest and which ones didn't. That's the best evidence of that.

Trial Tr. at 679:17-25. The extensive expert evidence comparing the price paid for the properties acquired by condemnation ("Condemned Tracts") and the price paid for the properties sold under threat of condemnation ("Purchased Tracts") showed that the United States paid reasonable value for the Breckinridge Properties. See United States' Opening Br. at 49. The Reports disregard this evidence (which was the only valuation evidence presented at trial), and are based instead on clearly erroneous liability and valuation theories that neither party articulated at trial. See id. An additional interest award would compound the Officer's errors. Simply stated, if a former landowner did not enter into a Contract and instead opted to proceed through condemnation, he would not have recovered a multi-million dollar interest award. Rather, he would have recovered the judicially-approved fair market value of his property, which, as shown at trial, was not significantly different than the United States' estimated values. See United States' Opening Br. at 51.

Second, an interest award would not put Claimants in "the position they would have occupied had the contract not been made," Claimants' Opening Br. at 5, because the former landowners would not have been able to sell the Breckinridge Properties for the amount received by the United States in the mid-1960s when it sold these properties. More than half of the former landowners had entered into mineral leases prior to the United States' acquisitions, and hence did not own their unencumbered mineral rights. See United States' Opening Br. at 72. Like the Officer's recommended award, an additional interest award would compensate these

former landowners millions of dollars for mineral interests that the former landowners did not even own, and, therefore, represents an unjustified windfall:

> While an award of restitution should seek to return the non-breaching party to as good of a position as it would have been in if the contract had never been entered into, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach."

Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1314 (Fed. Cir. 2004) (quoting Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003)). Accordingly, the facts do not support Claimants' position with respect to interest.[2]

Claimants' argument with respect to interest is also not justified by the scant caselaw discussed in Claimants' Opening Brief. First, Claimants cite Landmark Land Co. v. FDIC, a Winstar-related case, which did not involve a claim of mutual mistake. 256 F.3d 1365, 1369 (Fed. Cir. 2001) (cited in Claimants' Opening Br. at 7). Even if Landmark was remotely analogous to this case, which it is not, the Landmark court held only that the "purpose of restitution is to restore the plaintiff to its status quo ante" and that a restitution award "may include compensation for lost use value where necessary to restore the plaintiff to its status quo ante. . . ." See id. at 1373-74. Although Claimants quote this general language, they fail to note that the Federal Circuit denied Landmark's demand for interest, concluding that "Landmark has failed to point to any evidence to indicate that the court's finding was clearly erroneous." Id. Similarly, Claimants here fail to show any facts that would justify an award of interest, much

[2] In addition, even if the former landowners owned their unencumbered mineral rights, the former landowners would not have obtained the same sales price for those interests as the United States did in the mid 1960s because (1) an unexpected bidding war artificially drove up auction prices, and (2) the United States sold the Breckinridge Properties in much larger tracts, which likely made mineral and surface development more attractive to buyers. See id. at 52.

less any reasonable argument that the Officer's rejection of an interest award is clearly erroneous.

Claimants' heavy reliance on United States v. $515,060.42 in U.S. Currency, 152 F.3d 491 (6th Cir. 1998), and United States v. $277,000 in U.S. Currency, 69 F.3d 1491 (9th Cir. 1995), is also misplaced. See Claimants' Opening Br. at 7-9 (discussing these cases). These cases arose out of the United States' seizure of currency during civil forfeiture actions, not a claimed mutual mistake. In both cases, the question was whether the owner of the currency was entitled to interest after the forfeiture action was dismissed. The courts concluded that interest was available because "the interest was not really typical pre-judgment interest, but an aspect of the seized *res*, and thus the existing sovereignty bar to an award of pre-judgment interest did not enter the picture." $515,060.42 in U.S. Currency, 152 F.3d at 504; $277,000 in U.S. Currency, 69 F.3d at 1493. These cases did not involve an alleged mutual mistake or an award of restitution, and, therefore, are inapplicable in the instant matter. In addition, Claimants fail to mention that the conclusion reached in these cases is the minority view, which has been explicitly rejected by the Courts of Appeal for the First, Second, Seventh, Eighth, and Tenth Circuits (and possibly the Eleventh Circuit). See Larson v. United States, 274 F.3d 643, 645-48 (1st Cir. 2001) (concluding that interest is not allowed, and citing cases from various circuits).[3/] Claimants' argument that the Officer erred in not extending this outdated minority view to the

[3/] The Federal Circuit has acknowledged this split, but noted that the split is "of diminishing significance, as Congress has recently amended the forfeiture statute to allow prospectively the recovery of interest." Smith v. Principi, 281 F.3d 1384, 1388 n.2 (Fed. Cir. 2002).

instant case is unconvincing.[4]

Finally, it is important to note that since Claimants never articulated a claim of mutual mistake until after the Officer directed them to do so, approximately a year after trial, the parties never had the opportunity to brief these issues below. Claimants' suggestion that the United States conceded that Claimants were entitled to an interest award in a pre-trial filing, see Claimants' Opening Br. at 13, is inaccurate. The United States' discussion of interest was offered in response to a Fifth Amendment takings claim, which Claimants articulated in their First Amended Complaint, not a claim of mutual mistake, which Claimants did not raise until more than a year after trial had concluded.[5] See United States' Pre-Trial Br. at 62. Therefore, the United States has never conceded that Claimants are entitled to an award of interest.

## III. The Panel Report Should Not Recommend any Monetary Award for Former Owners of Condemned Tracts

Next, Claimants argue that the Officer erred in excluding (1) claims related to tracts, the

---

[4] Claimants' other citations are equally tenuous. At page 7 of their Opening Brief, for example, Claimants quote § 157 of the Restatement (First) of Restitution for the proposition that restitution requires compensation for the "use of the subject matter for the period during which he was deprived." However, that provision applies only "if the recipient was consciously tortious." Restatement (First) of Restitution, § 157 cmt. a (1937). Under the Officer's reasoning, that provision is inapplicable here, as liability is premised on a mutual mistake, not fraud or tortious activities. The Restatement states that if a recipient "was an innocent converter, he should fully compensate the other but, except for the direct product, should be entitled to incidental profits made from the use." Id. Accordingly, the Restatements do not support Claimants' position.

[5] See Smith, 281 F.3d at 1388 ("takings cases stand on a very different foundation [than other claims], as an award of interest in those cases is based on an interpretation of constitutional text ('just compensation') to which the requirement of an express waiver of sovereign immunity by Congress is not applicable"). Additionally, the United States' discussion was introduced with the caveat that the Officer "need only reach the question of interest, of course, if [Claimants] establish liability and some reasonable basis for a principal amount." United States' Pre-Trial Br. at 62.

value of which was determined by a jury; and (2) claims related to tracts for which Claimants did not produce a Vendor Affidavit. See Claimants' Opening Br. at 13-19. The Review Panel should reject Claimants' exceptions. This Congressional Reference is limited to those individuals "who sold their land . . . to the United States Government under threat of condemnation. . . ." S. 794. As Judge Merow, the former Officer, correctly concluded, the phrase "sold . . . under threat of condemnation" means exactly what it says – only those individuals who sold their property under a threat of condemnation have standing to participate; those whose property was condemned, do not. See Nov. 24, 1998 Order (Docket No. 65).[6/] Judge Braden's post-trial reconsideration of Judge Merow's order requires a strained reading of the word "sold," and results in the non sequitur that S. 794 was intended to cover individuals whose property was "condemned . . . under threat of condemnation." The Officer's conclusion is clearly erroneous because it is inconsistent with the plain terms of S. 794.[7/]

---

[6/] See also Elterich v. City of Seal Isle City, 477 F.2d 289, 290-91 (3d Cir. 1973) (differentiating between properties acquired by condemnation and by sale "under the threat of condemnation" and concluding that "those who sold under threat of condemnation" gave up their right to assert certain matters "at the sale they fully accepted"); Beistline v. City of San Diego, 256 F.2d 421, 423 (9th Cir. 1958).

[7/] Even if S. 794 was ambiguous, which it is not, the legislative history supports Judge Merow's conclusion that condemnees have no standing in this matter. See United States' Opp'n to Claimants' Mot. to Vacate at 19-20 (discussing proposed Senate Bill 2563, 103d Cong. (1994), a bill that would have included condemnees, but that was not passed by the Senate nor transmitted to this Court). Claimants' discussion of a letter authored by Senator Wendell Ford, see Claimants' Opening Br. at 17 n.53, is wholly inappropriate. Judge Merow struck that letter in 1998, and the Review Panel should accord the letter no weight in its analysis. See Order, dated Nov. 24, 1998 (Docket No. 64); see also Land Grantors VI, 81 Fed. Cl. at 615 n.38 ("The Government properly asserts that [Senator Ford's letter] is inadmissible.").

**A. The Hearing Officer's Exclusion of Landowners Who Participated in Trial Proceedings is Not Clearly Erroneous**

The Officer correctly concluded that "landowners who elected to have a jury determine their property's value nevertheless would be excluded under S. 794, because that property was not sold pursuant to a contract with the Government, but conveyed by judicial order." Land Grantors VI, 81 Fed. Cl. at 615. Although the Officer's exclusion of landowners who participated in jury trials is correct, the same reasoning applies with respect to all of the Condemned Tracts. See United States' Opp'n to Claimants' Mot. to Vacate. Consequently, the Review Panel should reject the Officer's clearly erroneous conclusion that a Condemned Tract was "sold . . . under threat of condemnation" as that phrase is used in S. 794. See id. (discussing this issue).

In support of Claimants' argument that the Officer should not have excluded individuals who participated in a jury trial, Claimants point to a Deed of Conveyance for Tract No. A-19. See Claimants' Opening Br. at 16. Tract No. A-19 is a Condemned Tract, the value of which was determined by a jury during condemnation proceedings. According to Claimants, the Officer should have concluded that Tract No. A-19 was "sold . . . under threat of condemnation," because the Deed of Conveyance provided that "for a valuable consideration paid to the owners of the land hereinafter described, the receipt of which is hereby acknowledged . . . the court-appointed Commission conveys the property to the Government pursuant to the judgment entered after a jury trial." Claimants' Opening Br. at 16 (citing JX-212 at CHI-002-A019-0011). Claimants' argument misapprehends the Deed of Conveyance, which was not signed by the former landowner, and, therefore, was not a sales contract. Rather, the Deed of Conveyance was signed by the Special Commissioner of the District Court, the United States Attorney, and the

presiding District Court Judge at the very end of the condemnation proceedings. See JX-212 at CHI-002-A019-0011 to -12. The former landowners did not sign the Deed of Conveyance because they did not own the property at that time – they lost any interest in the property the moment the United States filed a Declaration of Taking and deposited the just compensation in the registry of the District Court. See United States' Opening Br. at 6. Indeed, the Deed of Conveyance expressly recited that the property was acquired by condemnation, specifically identifying the civil action, and the court order by which the United States acquired title. See JX-212 at CHI-002-A019-0011; see also id. at -0023 (Final and Deficiency Judgment in Condemnation, stating that the land "was heretofore condemned" and the "fee simple absolute title thereto . . . was vested in the United States"). The Deed of Conveyance apparently served as a convenient mechanism for recording purposes, in order to demonstrate that the United States owned the full fee simple absolute in the property. See id. at CHI-002-A019-0005 (District Court ordering that Deed of Conveyance be recorded by the Clerk of the Union County Court). Claimants' argument that the Deed of Conveyance means that the Condemned Tracts were acquired by sale, and therefore included within the terms of S. 794, cannot be supported.

### B. The Hearing Officer's Exclusion of Landowners Who Did Not Present Evidence of a Vendor Affidavit is Not Clearly Erroneous

The Officer's findings supporting her conclusion about mutual mistake are clearly erroneous. See United States' Opening Br. at 56-73. However, if the Review Panel upholds the Officer's liability analysis, the Review Panel should affirm the Officer's exclusion of any landowner who did not produce a Vendor Affidavit at trial. See Land Grantors VI, 81 Fed. Cl. at

615. Although the Officer's interpretation of the Vendor Affidavit is fundamentally flawed,[8] the Officer identified the Vendor Affidavit as a primary document necessary to support a claim of mutual mistake. See, e.g., id. at 603 (quoting Vendor Affidavit for Tract No. A-15); Land Grantors v. United States, 64 Fed. Cl. 661, 702 n.38, 704 (2005) (quoting Vendor Affidavit and defining "Contracts" to include the Vendor Affidavit). Indeed, the Officer expressly stated that the Vendor Affidavit is an essential part of her liability finding. See Land Grantors VI, 81 Fed. Cl. at 616 ("Since Claimants' claim arises from a mutual mistake material to the 1942-1944 contracts, the Vendor Affidavit requirement is a necessary condition for class definition and notice.") (emphasis added).

Although Claimants do not challenge the importance of the Vendor Affidavit to the Officer's liability analysis, Claimants argue that the Review Panel should eliminate the Vendor Affidavit requirement from class membership because "most Vendor Affidavits no longer can be found, or no longer exist, if they ever existed." Claimants' Opening Br. at 18. Claimants, therefore, ask for an inconsistent ruling – Claimants ask the Review Panel to affirm the Officer's liability finding, an essential component of which is dependent on the Vendor Affidavit, but then ask the Review Panel to ignore that essential document when deciding who is entitled to a monetary award. Claimants cannot have it both ways.

Claimants' allegation that "Vendor Affidavits have not been located for most files in evidence in this case" is incorrect. Claimants' Opening Br. at 18. Acquisition Documents for all but six of the Purchased Tracts represented by Claimants at trial included a Vendor Affidavit, and the absence of any document in the record is most likely a product of Claimants' trial

---

[8] See United States' Opening Br. at 59-60.

strategy.[9] There is no support for Claimants' vague contention that the United States might be responsible for missing Vendor Affidavits due to alleged "poor file maintenance." Id. at 19. As Claimants are aware, the original Acquisition Documents are well-organized, and conveniently located at two Federal Record Centers. The parties had equal access to these documents, and attorneys for both sides viewed these documents jointly before trial. If the Vendor Affidavits ever existed, they are already in the trial record. The Review Panel should reject Claimants' bald and unsupported assertion about "poor file maintenance," id., and uphold the Vendor Affidavit requirement.

## IV. Although the Hearing Officer's Calculation of a Monetary Award is Fundamentally Flawed, her Rejection of Dr. Haywood's Untimely and Incompetent Affidavit is Not Clearly Erroneous

The Officer developed the quantum of a recommended monetary award (like her theory of liability) *sua sponte* after trial. The recommended award is inconsistent with both parties' trial positions, and not supported by trial evidence or legal principles. See, e.g., United States' Opening Br. at 47-52. Consequently, the Review Panel should reject the Officer's liability analysis and her calculation of a recommended monetary award. Claimants urge the Review Panel to affirm the Officer's award, but argue the Panel Report should add an additional $1,557,293 to the recommended award to compensate Claimants for supposed royalty amounts generated in connection with two oil leases located on Tracts 7A and 7B. See Claimants' Opening Br. at 20. As discussed below, the Review Panel should reject Claimants' exception.

---

[9] The language in the Vendor Affidavit that was deemed to be important by the Officer is redacted from approximately 20 of the Vendor Affidavits. See United States' Opening Br. at 60. Under the Officer's reasoning, any individual whose claim corresponds to a Vendor Affidavit with redacted language is not entitled to a monetary award.

Beginning in March 2005, several months after trial ended, the Officer transmitted document requests to that United States, requesting that the undersigned counsel supplement the record with additional documents associated with the sale of the Breckinridge Properties. The parties had not introduced these documents at trial, focusing instead on the United States' acquisition of the Breckinridge Properties, not the sale of those properties. On March 24, 2005, following several informal post-trial document requests from the Officer, the United States moved to limit review to the trial record (Docket No. 164). The Officer denied the United States' motion, and ordered the United States to produce several additional documents related to the sale of the Breckinridge Properties (Docket No. 165).

Among the responses the United States provided was the Declaration of Linda Lautigar, an Enforcement Specialist within the Department of the Interior, Minerals Management Service, Office of Enforcement ("MMS") (Docket No. 174). Ms. Lautigar explained that MMS' records showed that the United States received a total of $157,441.82 for Tracts 7A and 7B between September 1983 and March 2005 (approximately $7,300 per year, or $8 per acre per year). After conducting an extensive document review for earlier records, Ms. Lautigar later reported that any documents generated before 1983 were likely destroyed in accordance with MMS' normal document retention policies. See United States' Resp. to Court's Order, dated Dec. 23, 2005 (Docket No. 191). Therefore, there are exactly two reasons why these documents were not available at the time of trial: (1) the documents were irrelevant to Claimants' case-in-chief and the United States' defense; and (2) Claimants unreasonably delayed decades before bringing this

lawsuit.[10]

On April 25, 2006 – more than seventeen months after trial ended – Claimants submitted an untimely and incompetent responsive report. See Claimants' Mot. for Leave to Respond to Court's Dec. 15, 2005 Order, dated Apr. 25, 2006 (Docket No. 200) ("Claimants' Mot. for Leave"). The Officer admitted the report over the United States' objection. See United States' Mot. to Strike Claimants' Mot. for Leave, dated May 10, 2003 (Docket No. 205). The figures contained in Claimants' responsive report were prepared by Dr. Haywood, an individual whom Plaintiffs did not proffer as an expert on mineral issues, and the Officer did not accept as such. See Trial Tr. at 67:11-12. The report was based on Dr. Haywood's guess about how many barrels of oil were extracted from Tracts 7A and 7B during the years in question, as well as his estimate of "the annual average barrel price for oil in the Illinois Basin" during the years in question. Claimants' Mot. for Leave at Ex. C ¶ 11. Dr. Haywood guessed that the United States received $46,548 per year between 1964 and 1983, and $29,256 per year between 1983 and 2005 (approximately four times the amount shown in MMS' records during the later period).

The Officer rejected Dr. Haywood's estimates because Claimants failed to provide a sufficient basis for estimating damages with "reasonable certainty." See Land Grantors VI, 81 Fed. Cl. at 612 (quoting Columbia First Bank, F.S.B. v. United States, 60 Fed. Cl. 97, 106

[10] Painting the United States in as negative a light as possible, the Final Report stated that the "Government destroyed and/or misplaced many of the documents that would verify the proper amount of restitution owed to Claimants, even during the period that this reference was pending." Land Grantors VI, 81 Fed. Cl. at 582 (emphasis added). This statement is unsupportable. The supposed "missing" documents were likely destroyed in accordance with the MMS' normal document retention policy, apparently well before this matter was initiated. There is no evidence that any relevant document was "destroyed and/or misplaced . . . during the period that this reference was pending." Id.

(2004)). Claimants except to this finding on three grounds. First, Claimants argue the Officer should have accepted Dr. Haywood's estimates because his untimely report cited (but did not attach) two publications, and Ms. Lautigar's declaration did not. See Claimants' Opening Br. at 24. After preserving its objection to the Officer's highly unusual post-trial document request to support a claim of mutual mistake that the Officer raised *sua sponte* after trial, the United States obtained and provided the information the Officer ordered. If the Officer was not satisfied with Ms. Lautigar's response, one must assume the Officer would have requested additional information. Instead, the Officer told the parties (by email) that "I do not require any additional briefing or submissions from the parties unless it is requested by me." Attachment L (Email from Scott Freling to William Shapiro, dated Apr. 25, 2006).[11] The United States' compliance with the Officer's orders does not mean Dr. Haywood's unsupported estimates about royalty receipts have any basis in reality.[12]

Second, Claimants argue that the Officer should have accepted Dr. Haywood's estimates because his estimates for certain years (1964-1983) do not conflict with MMS' own records. Dr. Haywood's unsupported figures for certain years (1983-2005) are many times higher than the amounts reported in the MMS' records. Hence, all of Dr. Haywood's analyses and conclusions are highly suspect. Moreover, a lack of conflict with existing data does not mean that Dr. Haywood's estimate provides a "sufficient basis . . . for estimating [damages] with reasonable certainty." Columbia First Bank, 60 Fed. Cl. at 106. If a lack of conflict with existing

---

[11] Attachments A through K are appended to the United States' Opening Brief.

[12] Claimants' attempt at page 24-25 of their Opening Brief to introduce new material to support Dr. Haywood's estimate is untimely and inappropriate in this review process.

documents demonstrated "reasonable certainty," id., the Court would have to accept any estimate of damage, no matter how unreasonable. Dr. Haywood's opinions are inadequate and incompetent, and Claimants' exception should be rejected.[13]

Third, Claimants argue that the Officer's conclusion that Dr. Haywood's estimates were "beyond the scope of his expertise," Land Grantors VI, 81 Fed. Cl. at 613, is erroneous because "the Government never made any such challenge to Dr. Haywood's estimates of the amount of royalties the Government received from Tracts 7A and 7B." Claimants' Opening Br. at 27. Claimants' statement is incorrect – the United States argued explicitly that Dr. Haywood's "new affidavits pertain to areas of expertise far outside the limited area of expertise for which he was identified or qualified at trial." United States' Memo. in Supp. of Mot. to Strike at 11.[14] Claimants' opposition to the United States' motion to strike did not respond to the United States' argument about the scope of Dr. Haywood's expertise. See United States' Reply in Supp. of Mot. to Strike at 6, dated June 12, 2006 (Docket No. 210). Therefore, it was Claimants who waived this issue below, not the United States. The Officer's conclusion that Dr. Haywood's testimony should be limited to the area of study in which he was proffered as an expert is not reversible error.

---

[13] Claimants also contend that the Officer's findings are clearly erroneous because Ms. Lautigar did not define "net royalties" in her declaration. The Officer never requested clarification of that term, and although Claimants are apparently confused about the meaning of "net royalties," the Officer apparently was not.

[14] The United States also argued that (1) Claimants' late submission violated Rules 26 and 37 of the Rules of the Court of Federal Claims; (2) Claimants' evidence was irrelevant to the liability and valuation theories Claimants pursued at trial; (3) Claimants had never before identified Mr. Mattingly, who submitted a new report upon which Dr. Haywood's untimely report relied; and (4) the new evidence was irrelevant to the claims that were before the Officer. See id.

## V. Conclusion

For the reasons discussed in the United States' Opening Brief and above, the Review Panel should reject the Officer's Final Report. Claimants failed to show that any former landowner was given a priority to repurchase a Breckinridge Property or that the United States paid less than reasonable value "due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights." S. 794. Therefore, Claimants' exceptions are moot. To the extent the Review Panel finds it necessary to consider Claimants' exceptions, the Panel should reject Claimants' arguments for the reasons discussed above.

Respectfully submitted this 4th day of August 2008,

RONALD J. TENPAS
Assistant Attorney General

_s/ William J Shapiro__________
WILLIAM SHAPIRO
United States Department of Justice
Environment and Natural Resources Division
501 I Street
Suite 9-700
Sacramento, CA 95814
(916) 930-2207 (phone)
(916) 930-2210 (fax)

<u>Of Counsel:</u>
Martin Cohen
Dale Holmes
Stephen J. Allison
U.S. Army Corps of Engineers

**Shapiro, William (ENRD)**

**From:** Scott_Freling@ao.uscourts.gov
**Sent:** Tuesday, April 25, 2006 12:39 PM
**To:** Shapiro, William (ENRD); mspitt@wyattfirm.com; Nancie@Marzulla.com
**Subject:** Fw: Land Grantors

Counsel,

Judge Braden asked that I forward the following e-mail to the parties.

Scott A. Freling
Law Clerk to the Honorable Susan G. Braden
United States Court of Federal Claims
Telephone: (202) 357-6518
Facsimile: (202) 357-6522

-----Forwarded by Scott Freling/DCA/CFC/USCOURTS on 04/25/2006 03:35PM -----

> Scott,
>
> Please advise the parties in *Land Grantors* that I will grant the Plaintiffs' Motion to Supplement the Record. The Government may file its Opposition as a Motion to Reconsider. As you know, I had hoped to issue the opinion on the Motion for Certification this month, but that will not be possible in light of the work needed to issue opinions in a patent infringement case, a bid protest case, and a government contracting case -- all of which had priority over *Land Grantors* based on the briefings.
>
> Please advise the parties that I intend to issue the certification decision in May and follow with a Final Decision in June. I do not require any additional briefing or submissions from the parties unless it is requested by me.
>
> Thanks,
> JB

Attachment L to United States' Response Brief