**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| LAND GRANTORS IN HENDERSON, UNION, AND WEBSTER COUNTIES, KENTUCKY AND THEIR HEIRS | ) | |
| Claimants, | ) | No. 93-648X |
| v. | ) | Judge Charles F. Lettow, Presiding Officer<br>Senior Judges Lawrence S. Margolis and<br>Loren A. Smith, Review Panel |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**CLAIMANTS' REPLY BRIEF ON CLAIMANTS' EXCEPTIONS**

Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW
1350 Connecticut Avenue, N.W.
Suite 410
Washington, DC 20036
(202) 822-6760

Counsel for Claimants

August 14, 2008

OF COUNSEL:

M. Stephen Pitt
Merrill S. Schell
Jean W. Bird
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street
Suite 2800
Louisville, KY 40202-2898
(502) 562-7372

Table of Contents

TABLE OF AUTHORITIES……………………………………………………...…ii

MEMORANDUM……………………………………………………………………...1

Introduction…………………………………………………………………..........1

Argument.…………………………………………………………………………2

I. The sum due Claimants is in excess of $126 million...............................................2

II. All landowners whose properties were acquired for Camp Breckinridge, regardless of whether value was determined by negotiation or a jury, are covered by S.794…………...……………………………………………….….....6

III. The report to Congress should clarify that every Claimant need not produce the original "Vendor Affidavit" in order to participate in the recovery…………….9

IV. The Hearing Officer's rejection of Claimants' estimates of royalty receipts attributable to mineral tracts 7a and 7b was clearly erroneous……………...……..10

Conclusion…………………………………………………………………………13

# TABLE OF AUTHORITIES

**Cases**

*Exxon Corp. v. United States*, 45 Fed. Cl. 581 (1999)……………..……………………..12

*Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374 (Fed. Cir. 2001)……….3, 5

*Land Grantors v. United States (Land Grantors I),* 64 Fed. Cl. 661 (2005)………..*passim*

*Land Grantors v. United States (Land Grantors VI),* 81 Fed. Cl. 580 (2008)……...*passim*

*United States v. Miller*, 317 U.S. 369 (1943)………………………………………………..7

**Rules**

Fed. R. Evid. 703………………………………………..………………………..…11

**Other**

DAN B. DOBBS, LAW OF REMEDIES: DAMAGES – EQUITY – RESTITUTION §3.6(2) (2d ed. 1993)……………………………………………………………………………5

Restatement (Second) of Contracts § 344(c)……………..……………………………..3, 5

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LAND GRANTORS IN HENDERSON, UNION, AND WEBSTER COUNTIES, KENTUCKY AND THEIR HEIRS<br><br>Claimants,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 93-648X<br><br>Judge Charles F. Lettow, Presiding Officer<br>Senior Judges Lawrence S. Margolis and<br>Loren A. Smith, Review Panel |

**CLAIMANTS' REPLY BRIEF ON CLAIMANTS' EXCEPTIONS**

## Introduction

The Hearing Officer's Reports contain a detailed and thoughtful recounting of the unfortunate events that led to the Government's acquisition of Claimants' oil, gas, and coal rights without payment, and the Government's subsequent unjust enrichment from those rights amounting to somewhere between $126 million (using simple interest Treasury bill rates) and $441 million (using compound interest). As requested by Congress, the Hearing Officer reports the factual findings that (1) Government agents represented that Claimants could re-purchase their land after the war was over, and (2) Claimants were not paid for the oil, gas, and coal beneath their land because neither party knew the minerals were there. The Government fails to demonstrate that either of these factual findings is clearly erroneous. The Government also failed to except from the Hearing Officer's calculation of the amount that the Government received from these minerals, and has therefore waived any such claim. Claimants endorse the Hearing

Officer's report, requesting only a few clarifications and amendments as this Panel sends its report to Congress.

**Argument**

**I. The sum due Claimants is in excess of $126 million**

Claimants' first exception is a request for clarification of the amount that this Panel will report to Congress as the sum due Claimants in restitution and not, as the Government mischaracterizes it, an argument that "the Officer's recommended award is erroneous because it does not include interest."[1] As Claimants stated in their opening brief:

> Although the Hearing Officer's report strongly implies that full restitution in this case requires that the government disgorge both the actual proceeds of the mineral sales (which she calculates at $34, 303, 908.42) and reasonable interest (which she calculates at $91,709,844.54) on that sum for the forty-odd years during which the government has retained it, her report does not explicitly say so. Claimants therefore request that this Panel clarify for Congress that full restitution to Claimants includes both proceeds and interest, and state the precise amount as calculated by this Court.[2]

Importantly, the Government does not challenge the Hearing Officer's factual finding that the Government's total benefit from sale of Claimants' oil, gas, and coal is more than $126 million, and that the proceeds received from sale represent only 27 percent of that total benefit: "[t]he $34,303,980.42 represents only 27 percent of the total benefit ($126,013,824.96) actually received by the Government."[3]

---

[1] Gov. Resp. Br. at 2.
[2] Cl. Open. Br. at 5.
[3] *Land Grantors VI*, 81 Fed. Cl. 550, 616-617 (2008).

Nor does the Government challenge the legal principle that restitution requires that the Government disgorge the full benefit it received from the transaction, and not just a portion of that benefit: "[r]estitution is sometimes described in terms of taking from the breaching party any benefits he received from the contract and returning them to the non-breaching party."[4] This requires determining what benefit from the contract the breaching party has received, and restoring that to the nonbreaching party.

Rather, the Government falls back on the general principle that awards of interest, like all damage awards, are allowable only where Congress has waived sovereign immunity.[5] What the Government's argument fails to recognize, however, is that restitution is not a damage award but an equitable remedy, and that the disgorgement of all benefits received by the Government is an integral part of this remedy. The Government cites no case holding that sovereign immunity protects the Government from disgorging all of the profit it received from sale of Claimants' minerals, and nothing in this Congressional Reference prohibits this Panel from reporting to Congress the full amount of unjust enrichment that the Government has received from sale of Claimants' oil, gas, and coal.

Next, the Government argues that Claimants should have filed suit earlier, so that the Government's benefit would have been less and the disgorgement amount commensurately smaller. This argument fails for two reasons:

---

[4] *Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374, 1380-81 (Fed. Cir. 2001). *See* Restatement (Second) of Contracts § 344(c) ("[The judicial remedies serve to protect the promisee's restitution] interest in having restored to him any benefit that he has conferred on the other party.").

[5] *See* Gov. Resp. Br. at 3.

(1) The facts of this case do not support this argument; the Hearing Officer found that Claimants did not unreasonably delay in bringing this claim[6] (nor could Claimants have brought a claim for unjust enrichment in this Court or any district court),[7] and

(2) The argument is beside the point because the Government did, in fact, receive the benefit.

The Government cites no case holding that the restitution remedy requires the defendant to disgorge only part of the benefit of the transaction, and no logical principle seems to allow a defendant to retain part of its unjust enrichment on the plea that the claim should have been brought sooner.

But, the Government argues, it was able to get more money for these minerals than Claimants could have.[8] There is, of course, no evidence to support this assertion. Even if it were true, however, it fails to defeat Claimants' entitlement to full restitution since the goal of restitution based on unjust enrichment is disgorgement of all profits received by the defendant from use of the property or funds--whether larger or smaller than the rightful owner could have obtained--since the focus is on the total benefit actually obtained by the defendant. As the Hearing Officer stated, the goal of restitution

> is not the enforcement of a promise, but an entirely distinct goal--the prevention of unjust enrichment. The focus is on the party in breach rather than on the injured party, and the attempt is to put the party in breach back in the position in which that party would have been had the contract not been made. The party in breach is required to disgorge what that party has received in money. . . . The interest of the injured party that is measured in this way is called the restitution interest.[9]

---

[6] *Land Grantors I*, 64 Fed. Cl. 661, 717 (2005).
[7] Cl. Resp. Br. at 23–24.
[8] Gov. Resp. Br. at 5.
[9] *Land Grantors I*, 64 Fed. Cl. at 708.

The Government further argues that had Claimants refused to sell it would have simply condemned Claimants' property and still not paid them for their minerals.[10] This argument, of course, misses the point of this Congressional Reference, which is to determine whether Claimants were paid for their mineral rights and if they were not, to ascertain the amount justly due to them from the Government. This argument also again fails to recognize that the focus of restitution is on requiring the defendant to disgorge all benefits received from the transaction,[11] and not on some alternative course that the defendant could have taken but did not.

In sum, the Government offers no cogent reason why restitution in this case should not include both the sums it received for sale of the minerals and the benefit the Government received from avoided interest on the national debt that would otherwise have been paid on those sums. Nor does the Government explain how the Hearing Officer's finding that "the Government has avoided paying at least an additional $91,709,844.54 in interest on the national debt as a consequence of having the benefit of these revenues" is clearly erroneous. Accordingly, in reporting to Congress, this Panel should clarify that the total due Claimants in restitution for their oil, gas, and coal is at least $126,013,824.96.

---

[10] Gov. Resp. Br. at 4-5.

[11] *Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374, 1380-81 (Fed. Cir. 2001). *See* Restatement (Second) of Contracts § 344(c) ("[The judicial remedies serve to protect the promisee's restitution] interest in having restored to him any benefit that he has conferred on the other party."); DAN B. DOBBS, LAW OF REMEDIES: DAMAGES – EQUITY – RESTITUTION §3.6(2) (2d ed. 1993) ("Suppose a corporate insider, a fiduciary, "borrows" company funds to make an investment for his own account. The investment proves profitable, the insider returns the "borrowed" money intact and keeps the profits he made with it. If the corporation would not have invested the money or earned interest on it in any event, it can be said that the corporation had no losses on the transaction. However, the insider received unjust gains by use of the company's money. The law requires the insider to make restitution of those gains, that is to disgorge them and pay them to the company.").

## II. All landowners whose properties were acquired for Camp Breckinridge, regardless of whether value was determined by negotiation or a jury, are covered by S. 794

After trial and a meticulous examination of the record, the Hearing Officer determined "that the record in this case establishes that both premises of S. 794 have been met."[12] Specifically, she found that government agents had (without authority) promised former landowners that they could repurchase their land after the war,[13] and "the parties to the contract were mistaken in their belief that no coal, gas, oil, or other mineral deposits existed in 1942-1944 under the condemned properties that would support exploration or operation."[14]

Although she recognized "that the intent of the principal proponent of S. 794 was to include landowners who proceeded to jury proceedings,"[15] to determine the value of their land, as well as those who did not, the Hearing Officer felt constrained by the language of the Congressional Reference to deny relief to those who availed themselves of the jury proceeding:

> The plain language of S. 794, however, limits the scope of the reference to claims from landowners who sold their property to the Government, and does not include claims of landowners whose property was acquired through jury proceedings.[16]

The flaw in her logic--a flaw embraced by the Government--is that the jury proceeding was not a method of acquiring Claimants' property, but merely an alternative

[12] *Land Grantors I*, 64 Fed. Cl. 661, 697 (2005).
[13] *Id.*
[14] *Land Grantors VI*, 81 Fed. Cl. 580, 605 (2008).
[15] *Id.* at 615.
[16] *Id.*

method of setting the price to be paid. Indeed, as the Hearing Officer also found, once these properties were condemned, the owners either could voluntarily negotiate a sale price and contract with federal agents or demand a jury trial to determine the amount of "just compensation" that the Government should pay for the appropriation of their land.[17] As the Government's own evidence showed, former landowners were typically given only days notice to vacate their farms, and to either accept the Government's offered price or request a review by a jury:

> Farmers who are not satisfied with land prices will have the opportunity to appeal their case but will have to move from their homes during the litigation period. Part of the purchase money will be available to them during the period.[18]

The rule for establishing the value of the land was then, as it is today, the price at which a willing seller would have sold to a willing buyer, neither of them acting under compulsion.[19] In this case, both parties were working under compulsion--the exigencies of war.

Thus, whether the price for a particular parcel was set by contract or by a jury, the Government acquired its title by deed for a price paid to the landowner that did not include an amount for mineral interests. The Government did not acquire title via the jury proceeding, as the Hearing Officer mistakenly stated. The Government is unable to explain away the typical deed, executed after the jury has set the price, which recites that the landowner, as party of the first part, conveys to the United States, as party of the

[17] *Land Grantors VI*, 81 Fed. Cl. 580, 582.
[18] *Id.* at 584 (2008) *citing* DX 182 at DOJ1933-34 (*Cantonment Families Get 13-Day Notices*, HENDERSON GLEANER-JOURNAL, Jan. 30, 1942, at 1, 8).
[19] *United States v. Miller*, 317 U.S. 369, 376 (1943).

second part, for valuable consideration. For example, a typical deed states:

> **THIS DEED OF CONVEYANCE**
>
> Made and entered into this 26 day of June, 1943, by and between Lonnie Baird and his wife, Virginia Fellows Baird, by Peter B. Muir, as Special Commissioner of the District Court of the United States of America for the Western District, Kentucky, parties of the first part, and
>
> The United States of America, party of the second part;
>
> Witnesseth:
>
> That for a valuable consideration paid to the owners [*i.e.*, Mr. and Mrs. Baird] of the land hereinafter described, the receipt of which is hereby acknowledged, the said Peter B. Muir, a Special Master Commissioner aforesaid, acting pursuant to and by virtue of the authority vested in him by the Judgment entered on April 30, 1943. . . . does hereby convey to the party of the second part [the described lands].[20]

Nor can the Government offer any reason why Congress would arbitrarily allow payment to some former Camp Breckinridge landowners, and deny it to others, simply because some landowners allowed the jury to set the sales price for their land. All landowners were equally victims of the mutual mistake regarding the existence of valuable minerals, and all equally believed they would have the opportunity to re-purchase their land after the war was over. All former landowners equally sold and conveyed their land by deed to the United States, and the Government was unjustly enriched regardless of how the sales price was determined.

[20] *See* JX 212 CH1-002-A019-0011. All of the deeds are on the same form and contain essentially identical language.

This Panel should therefore amend the Hearing Officer's report to include all former Camp Breckinridge landowners, regardless of whether their sales price was set by a jury or not.

### III. The report to Congress should clarify that every Claimant need not produce the original "Vendor Affidavit" in order to participate in the recovery

Because Claimants were concerned that the Trustee administering the distribution of funds might (unreasonably) insist that each Claimant physically produce the "Vendor Affidavit" signed by his ancestors in the 1940s, on March 6, 2008, they filed a Motion To Modify Class to eliminate what could appear to be such a requirement.[21] The Hearing Officer denied that Motion, indicating in the process that she did not intend to impose such a burden on Claimants:

> As previously discussed, the evidence in this reference indicates that a Vendor Affidavit appears to have been executed as part of all the 1942-1944 contracts, so this requirement should impose no additional burden on Claimants.[22]

The Government nevertheless argues that Claimants should be required to produce a Vendor Affidavit in order to recover, but offers no reason why Congress or the Hearing Officer would tie restitution in this case to the physical possession of 60-year old affidavits, once in the Government's possession but long since lost or destroyed by the Government itself.

---

[21] Claimants further note that the Government's Real Estate Manual never mentions Vendor Affidavits. DX 60; DX 647.

[22] *Land Grantors VI*, 81 Fed. Cl. 580, 616 (2008).

Thus, Claimants ask this Review Panel to clarify that production of Vendor Affidavits is not required as a condition of recovery in this case.

**IV. The Hearing Officer's rejection of Claimants' estimates of royalty receipts attributable to mineral tracts 7a and 7b was clearly erroneous**

The Hearing Officer concluded that the Government had been unjustly enriched from its income producing leases on Mineral Tracts 7A and 7B.[23] The Government, however, did not possess royalty records for May 1, 1964 to August 31, 1983, and its electronic records showed only a total of $70,718.24 in net royalties for the subsequent period of September 1, 1983 to March of 2005.[24]

In view of these circumstances, the Claimants had Dr. Haywood, their expert in economics and finance, apply the 15 percent royalty rate in the leases to available production and pricing data to estimate the Government's royalty receipts for these two periods. The Hearing Officer rejected these estimates as not "reasonably certain,"[25] which Claimants have filed an exception to. The Government seeks to support the Hearing Officer's conclusion on this point.

The Hearing Officer rejected Dr. Haywood's analysis because she believed that copies of Dr. Haywood's sources for the oil production data were not provided. As Claimants indicated in their Opening Brief, however, Dr. Haywood stated under oath in his Affidavit that the numbers on oil production were taken from *Petroleum Information*

---

[23] *Land Grantors VI*, 81 Fed. Cl. at 609-10.
[24] *Id.* at 611.
[25] *Id.* at 612.

and *PI/Dwight's Plus IHS Energy*.[26] That statement under oath should have been sufficient, particularly since the committee notes to Fed. R. Evid. 703 discuss the impracticability of experts being required to produce all source material relied upon. As Claimants also noted, the source materials Dr. Haywood relied upon have been recognized by this Court, the United States Geological Survey, and the Federal Trade Commission as not only respected, but also the only available sources of historical oil production.[27]

Significantly, the Government's Response does not challenge the accuracy of the oil production information Dr. Haywood presented from *Petroleum Information* and *PI/Dwight's Plus IHS Energy*. Instead, the Government's Response simply states in summary terms that Dr. Haywood made "guesses" about the oil production from Tracts 7A and 7B.[28] But that is not what Dr. Haywood stated in his Affidavit. As his Affidavit explicitly states, he did not guess, he instead took the numbers on oil production from *Petroleum Information* and *PI/Dwight's Plus IHS Energy*.[29]

For example, the Government acknowledges that it has no records for 1964-1983, and the Government does not deny that the leases on Mineral Tracts 7A and 7B were producing during 1964-1983.[30] Dr. Haywood supplied reliable income estimates based on data of *Petroleum Information* and *PI/Dwight's Plus IHS Energy*, which the FTC has

[26] Cl. Open. Br. at 24 *citing Land Grantors VI,* 81 Fed. Cl. at 612.
[27] Cl. Open. Br. at 24-25.
[28] Gov. Resp. Br. at 15.
[29] Cl. Open. Br. at 24.
[30] *Land Grantors VI*, 81 Fed. Cl. 580, 611 (2008) *citing* Lautigar Decl. II ¶ 8 ("My investigation revealed that the electronic royalty records do not exist for the two leases for the time period of April 1964 to August 1983"); *id.* ¶ 14 ("Based on my investigation, I believe that the documents requested were destroyed in accordance with the normal document retention policy" of the Department of Interior, Minerals Management Service.).

determined to be the only sources of historical production data and this Court has held these publications to be "recognized source of oil and gas well data commonly used in the oil and gas industry."[31]

Although the Government produced the Affidavit of Ms. Lautigar summarily reporting that the Government's "electronic records" for the subsequent period of September 1, 1983 to March 2005 totaled only $157,441.82 in "net royalties" collectively from Mineral Tracts 7A and 7B,[32] Ms. Lautigar, provided no monthly or even yearly royalty receipts for that period, instead providing only the dollar amounts the "electronic records" reported as the totals for that lengthy time period. Similarly, Ms. Lautigar gave no oil production numbers for Mineral Tracts 7A and 7B during this period. Ms. Lautigar's summary figures for this period also have no detail to support them--such as monthly or yearly oil production and royalty receipts.

In contrast, Dr. Haywood's estimate for this period, which based on the respected *Petroleum Information* and *PI/Dwight's Plus IHS Energy* data, is more "reasonably certain." In fact, the Government has never explained why Ms. Lautigar's figures are different from industry standards.

The Government also argues that the kind of mathematical calculations Dr. Haywood performed were beyond the scope of his expertise as an expert in "economics and finance."[33] The Government further suggests that Dr. Haywood should

[31] *Exxon Corp. v. United States*, 45 Fed. Cl. 581, 627 n.76 (1999).
[32] *Land Grantors VI*, 81 Fed. Cl. at 611.
[33] Gov. Resp. Br. at 17.

have been an expert "on mineral issues" to perform these calculations.[34] But all Dr. Haywood did was determine the oil production, multiply it by the reported price, and apply the 15 percent royalty rate in the leases. This sort of mathematical calculation is exceptionally simple for an expert in economics and finance. And no specialized minerals or mathematics expertise was required to perform it.

Finally, as previously noted, oil production is still occurring on these properties and the Government continues to receive royalties under its leases of them. Thus, not only should the Review Panel include Dr. Haywood's estimates for the 1964 to 2005 time period in the recommended relief to Congress, it should also recommend to Congress that royalties received by the Government from 2005 forward on Mineral Tracts 7A and 7B be included in the relief.

**Conclusion**

For all the foregoing reasons, and those contained in Claimants' Opening Brief and Response, Claimants respectfully request that the Final Report herein be affirmed and adopted, with those modifications set forth in Claimants' Opening Brief.

---

[34] *Id.* at 15.

Respectfully submitted,

s/Nancie Marzulla
Nancie G. Marzulla
Roger J. Marzulla
MARZULLA LAW
1350 Connecticut Avenue, N.W.
Suite 410
Washington, D.C. 20036
(202) 822-6760

Counsel for Claimants

Dated: August 14, 2008

OF COUNSEL:
M. Stephen Pitt
Merrill S. Schell
Jean W. Bird
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street, Suite 2800
Louisville, KY 40202-2898