**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| LAND GRANTORS IN HENDERSON, UNION and WEBSTER COUNTIES, KENTUCKY and THEIR HEIRS, | ) | No. 93-648X |
| Claimants, | ) | Judge Charles F. Lettow (Presiding Officer), Senior Judges Lawrence S. Margolis, Loren A. Smith, Review Panel |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**UNITED STATES' REPLY IN SUPPORT OF ITS EXCEPTIONS**

## TABLE OF CONTENTS


REPLY MEMORANDUM . . . . . 1

I. Introduction . . . . . 1

II. Claimants Offer No Substantive Response to the United States' Argument that the Officer's Application of the Doctrine of Mutual Mistake is Clearly Erroneous . . . . . 2

III. The Reports' Lack of any Individual Liability or Valuation Findings is Clearly Erroneous . . . . . 3

IV. The Officer's Conclusion that Laches is Inapplicable is Clearly Erroneous . . . . . 5

A. Claimants Are Still Unable to Offer any Justification for Their Decades-Long Delay . . . . . 6

B. The United States is Prejudiced by Claimants' Unreasonable Delay . . . . . 9

V. The Officer's Conclusion that Many Landowners Were Promised a Priority to Repurchase is Clearly Erroneous . . . . . 10

A. The Officer's Admission of, and Reliance on, Hearsay Statements is Clearly Erroneous . . . . . 10

1. The Affidavits . . . . . 12

2. The Deposition Transcripts . . . . . 14

3. The Discovery Responses . . . . . 15

B. The Officer's Conclusion is Based on Nothing More than Hearsay Bootstrapping . . . . . 16

C. Claimants' Argument that the Affidavits Are Admissible Under Federal Rule of Evidence 803(20) or 803(16) is Erroneous . . . . . 20

VI. The Officer's Conclusion that Landowners Were Paid Less than Reasonable Value is Clearly Erroneous . . . . . 22

VII. Conclusion . . . . . 26

## TABLE OF AUTHORITIES

### FEDERAL CASES

Ark-Mo Farms, Inc. v. United States,
530 F.2d 1384 (Ct. Cl. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Cal. Canners & Growers Ass'n v. United States,
9 Cl. Ct. 774 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Carden v. Westinghouse Electric Corp.,
850 F.2d 996 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Cedeck v. Hamiltonian Fed. Sav. & Loan Ass'n,
551 F.2d 1136 (8th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Columbia First Bank, FSB v. United States,
58 Fed. Cl. 333 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Conoco Inc. v. Dep't of Energy,
99 F.3d 387 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Hickman v. United States,
135 Ct. Cl. 380, 1956 WL 8354 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Cook v. Hoppin,
783 F.2d 684 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Hansen Bancorp, Inc. v. United States,
67 Fed. Cl. 411 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Higginson v. United States,
384 F.2d 504 (6th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 23

Idaho v. Wright,
497 U.S. 805 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

In re Cirrus Logic Securities Litigation,
946 F.Supp. 1446 (N.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Land Grantors v. United States,
64 Fed. Cl. 661 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *in passim*

Land Grantors v. United States,
71 Fed. Cl. 614 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Land Grantors v. United States,
81 Fed. Cl. 580 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

New York v. Ocean Club, Inc.,
602 F.Supp. 489 (D.C. N.Y. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

N. Oil Co. v. Socony Mobil Oil Co.,
347 F.2d 81 (2nd Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Res-Care, Inc. v. Omega Healthcare Investors, Inc.,
187 F.Supp.2d 714 (W.D. Ky. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Shields v. Eli Lilly & Co.,
1991 WL 134614 (D.D.C. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Shu-Hui Chen v. Bouchard,
347 F.3d 1299 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Silverstein v. Smith Barney, Inc.,
No. 96 Civ. 8892 (JSM), 2002 WL 1343748 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . 18

Spalding & Son, Inc. v. United States,
24 Cl. Ct. 112 (1991), rejected by, 28 Fed. Cl. 242 (1993) (Cong. Ref.) . . . . . . . . . . . . . 5

Spezzaferro v. F.A.A.,
807 F.2d 169 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Tractor & Farm Supply, Inc. v. Ford New Holland, Inc.,
898 F.Supp. 1198 (W.D. Ky. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. Grayson,
166 F.2d 863 (2nd Cir. 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Hall,
165 F.3d 1095 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Valdez-Soto,
31 F.3d 1467 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**FEDERAL STATUTES**

Surplus Property Act of 1944, ch. 479, 58 Stat. 765 (repealed 1949) . . . . . . . . . . . . . . . . . . . . . . 7

Senate Bill 794 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 26

**FEDERAL RULES**

Fed. R. Evid. 801 (d)(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Fed. R. Evid. 805 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Fed. R. Evid. 807 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 16, 19

Fed. R. Evid. 803(15) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. R. Evid. 803(20) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22

Fed. R. Evid. 803(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22

RCFC 32(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## REPLY MEMORANDUM

### I. Introduction

In accordance with the Review Panel's June 18, 2008 Scheduling Order, the United States hereby submits this Reply Memorandum in Support of its Exceptions. As discussed in the United States' Opening Brief (Docket No. 251) ("US Opening Br."), the Review Panel should reject the Hearing Officer's ("Officer's") Reports because (1) the Reports lack any Claimant-specific findings as required by Senate Bill 794, 103d Cong. (1993) ("S. 794"); (2) the Officer's rejection of the United States' laches defense is clearly erroneous; (3) the Officer's conclusion that the former landowners relied on promises that they could repurchase their properties after the end of World War II is clearly erroneous; (4) the Officer's conclusion that landowners were paid less than reasonable value is clearly erroneous; and (5) the Officer's application of the doctrine of mutual mistake cannot be supported under relevant case law and is based on clearly erroneous factual findings. The Reports' key findings are based on unreliable hearsay evidence, much of which the Officer admitted after trial, without any foundational evidence.

Claimants' Response Brief to the United States' Exceptions (Docket No. 253) ("Claimants' Response" or "Claimants' Resp.") does not respond to most of the United States' arguments. Most tellingly, although the Officer's liability and valuation conclusions are based entirely on a finding of mutual mistake, Claimants offer no discussion of that finding in their Response. The phrase "mutual mistake" does not appear in Claimants' Response, and they do not cite a single case addressing the doctrine.

Claimants also offer no substantive response to the United States' thorough discussion of the Officer's clearly erroneous factual findings upon which the Reports are based. In many instances, Claimants merely repeat the flawed findings in the Reports, in the apparent hope that

the Review Panel will simply accept the Officer's unsupported findings as truth. The Officer's key findings are not supported by the documents cited, and Claimants cannot gloss over the Reports' systemic errors by repeating the Officer's findings as if they had some basis in reality.[1/]

The United States' exceptions, and Claimants' responses, are discussed below.

## II. Claimants Offer No Substantive Response to the United States' Argument that the Officer's Application of the Doctrine of Mutual Mistake is Clearly Erroneous

In its Opening Brief, the United States argued that neither the law nor the evidence supported any of the elements necessary to prove a claim of mutual mistake. See US Opening Br. at 52-73. The Officer's legal analysis is fundamentally flawed and the Officer's factual findings are not supported by the trial record. See id. Claimants offer no response. Claimants' Response does not use the phrase "mutual mistake," does not cite a single case addressing mutual mistake, and does not attempt to rehabilitate the Officer's flawed factual findings.

As a result of Claimants' silence, the following exceptions are unchallenged:

1. Claimants' right to avoid the contracts is barred by a failure to act within a reasonable period of time. See id. at 54.
2. The subsequent discovery of commercially valuable minerals, even if supported by the facts, cannot retroactively create a mistake of fact. See id. at 55-56.
3. There is no evidence to support the Officer's finding that the parties were mistaken about any fact during the United States' acquisition of the Breckinridge Properties. See id. at 56-63.

---

[1/] Claimants have also filed exceptions to the Officer's Reports. The United States filed its opposition to those exceptions on August 4, 2008. If the Review Panel agrees with the United States' exceptions, Claimants' exceptions are rendered moot.

4. There is no evidence to support the Officer's finding that there was a discovery of minerals after the United States acquired the Breckinridge Properties. See id. at 63-65.

5. There is no support for the Officer's conclusion that a mistaken belief about minerals was a "basic assumption" underlying the contracts, or that any mistake had a "material effect" on the agreed exchange of performance. See id. at 65-68.[2/]

6. There is no legal or factual support for the Officer's conclusion that the United States should bear the risk of any mistake. See id. at 68-73.

The Officer's Reports are based entirely on these flawed findings. Since Claimants offered no substantive response to any of these points, the Review Panel should reject the Reports for the reasons cited in the United States' Opening Brief.

## III. The Reports' Lack of any Individual Liability or Valuation Findings is Clearly Erroneous

The Review Panel should reject the Reports because they lack any Claimant-specific findings with regard to liability or quantum of damages, and are instead based on faulty inductive reasoning. See id. at 25-27. The Officer's conclusions are based on evidence that is specific to only a small number of tracts, yet the Officer erroneously concluded that all former landowners, including those who were not Claimants at the time of trial, are entitled to a substantial monetary award. See id. The Officer's assumption that all former landowners can

[2/] With regard to this erroneous finding, Claimants suggest, without citation, that perhaps "the Army did not think it was acquiring any . . . mineral rights." Claimants' Resp. at 18. Of course the United States knew it was acquiring the mineral rights – it expressly acquired the full fee simple absolute in each of these properties. See id. at 7-10 (discussing the Acquisition Documents).

piggy-back on the evidence of a few individuals cannot be supported.

Claimants do not dispute that the Officer's conclusions are based on evidence that is specific to only a handful of Breckinridge Properties. However, Claimants argue that "[t]he evidentiary hearing was essentially handled as a class proceeding," a procedure to which the United States "did not object." Claimants' Resp. at 22 n.61. Claimants' statement is incorrect. Claimants sought class certification in 1995, and that motion was denied. See Order, dated Dec. 23, 1997 (Docket No. 42). The Officer did not adopt a class procedure until June 2006, approximately a year and a half after trial ended. See Land Grantors v. United States, 71 Fed. Cl. 614 (2006). In addition, Claimants never presented any evidence that certain Claimants were representative of any other Claimants.[3/]

Claimants' only citation in support of their position is the transcript of a July 22, 2004 conference, during which Claimants' counsel stated he did not intend to call all of the Claimants as witnesses at trial. See July 22, 2004 Hr'g Tr. at 5, 8. The Officer encouraged Claimants' counsel to present a concise case, but the Officer never established a representative class proceeding. See id. Thus, the reason the United States "did not object" during the June 2006 conference was because there was nothing for the United States to object to. The lack of individual liability and valuation evidence was the result of Claimants' litigation strategy, and they cannot change that fact on the basis that the United States "did not object" to a non-existent motion by the Claimants and a non-existing ruling from the Officer. The lack of any Claimant-specific findings or analyses renders the Reports fundamentally flawed, and the Review Panel

---

[3/] There was no mention of any "representative Claimants" or "class proceeding" at the September 1, 2004 pre-trial conference, or the parties' pre-trial or post-trial memoranda.

should reject the Reports.

## IV. The Officer's Conclusion that Laches is Inapplicable is Clearly Erroneous

The Review Panel should reject the Officer's conclusion that "the doctrine of laches is inapplicable." See Land Grantors v. United States, 64 Fed. Cl. 661, 716 (2005) ("Land Grantors I"); see also US Opening Br. at 27-36. The United States acquired the Breckinridge Properties approximately 50 years before Claimants filed their complaint, and between 27 and 37 years after the Officer concluded Claimants' claims accrued. See US Opening Br. at 28.

This Court and the Court of Claims have sustained a laches defense in cases involving far shorter delays, including Congressional Reference matters. See id. at 28-29 (discussing cases applying laches defense due to delays as short as three and one-half years). Claimants cite no case to the contrary, and their suggestion that this case is "remarkably similar" to the situation in Spalding & Son, Inc. v. United States, 24 Cl. Ct. 112 (1991), rejected by 28 Fed. Cl. 242 (1993), is without merit. See Claimants' Resp. at 27. The claimant in Spalding & Son pursued an administrative claim against the Department of the Interior months after his claim arose. See id. at 128. Spalding & Son filed its complaint only four years after the Department of the Interior denied its administrative claim, and slightly more than six years after its claim arose. See id. In the instant case, Claimants delayed more than 50 years after the United States acquired the Breckinridge Properties, and nearly 30 years after the United States sold those properties, before filing a complaint. Neither the length of the delay nor the prejudice to the United States resulting from Claimants' delay is remotely comparable.

### A. Claimants Are Still Unable to Offer any Justification for Their Decades-Long Delay

Even if there was some legal basis for the Officer's conclusion about laches, her decision that "laches is inapplicable" is based on several clearly erroneous factual findings, none of which are supported by the documents the Officer cited in support. See US Opening Br. at 30-36. Claimants cannot explain or excuse their decades-long delay in attempting to preserve their rights. Claimants could have at least attempted to pursue their rights by filing a timely complaint against the United States. Claimants failed to do so. While a handful of unidentified individuals apparently sought a legislative solution in 1979, they provide no explanation why they waited more than 38 years after the United States acquired these properties to do so.

Claimants respond that there was no unreasonable delay because Claimants "began requesting return of their land soon after the war was over. . . ." Id. at 24.[4/] Like the Officer's finding that "numerous requests/petitions were made by the former landowners to repurchase their land after World War II ended," Land Grantors I, 64 Fed. Cl. at 713, Claimants' statement is false. None of the eight documents cited by the Officer to support her finding stand for the proposition offered. See US Opening Br. at Attach. B. Claimants offer no discussion of any of these documents, and have conceded the argument.

At trial, Claimants admitted that there was no evidence that former landowners sought to reacquire these properties until decades after the war ended. See Trial Tr. at 172:8-15. The first effort undertaken by any former landowner to reacquire his property was initiated in 1965,

---

[4/] Claimants' assertion that Claimants "continued their campaign through a class action," id., is inconsistent with the Officer's conclusion that any Claimant who was "a party or in privity to a named party" in the Higginson litigation has no standing to participate in this matter. Land Grantors v. United States, 81 Fed. Cl. 580, 616 (2008) ("Land Grantors VI").

twenty years after the end of the war. See Higginson v. United States, 384 F.2d 504 (6th Cir. 1967). The first effort most Claimants undertook in pursuing their claims was joining this lawsuit in 1995, some 54 years after the United States acquired the Breckinridge Properties.

Rather than discuss these arguments, Claimants point first to JX-46, an April 16, 1957 letter from the Assistant Secretary of Defense to Congressman William Natcher. See Claimants' Resp. at 19, 24 (citing JX-46). The 1957 letter refers to a February 1946 letter from Congressman Earle C. Clements to the Department of the Army. See JX-46. In the 1946 letter, Congressman Clements noted his belief that there should be "no separation of the surface and mineral rights" because former landowners might be able to repurchase the properties under the temporary priority scheme established by the Surplus Property Act of 1944, ch. 479, 58 Stat. 765 (repealed 1949) ("1944 Act"). See US Opening Br. at 13-15 (discussing the 1944 Act).[5] The letter from Congressman Clements is irrelevant to the possible application of the doctrine of laches, as there is no reasonable argument that the letter interfered with, or in any way affected, any individual's ability to timely preserve his or her rights. Certainly the letter was not an attempt by any former landowner to reacquire his property. In addition, JX-46 (the letter written in 1957) explains that the 1944 Act expired in 1949, and any temporary preferences ended at that time. See id. at DOJ1532. Therefore, the letter does not support Claimants' argument or the

---

[5] Claimants' truncated citation misapprehends the content of the letter. Claimants state that the letter showed that the "Army confirmed to Congressman Clements in 1946" that Claimants would be given a preference to repurchase the land. Claimants' Resp. at 19. This is incorrect. JX-46 refers to (a) a February 14, 1946 letter written by the Army and (b) a February 7, 1946 letter written by Congressman Clements. See JX-46. The language upon which Claimants rely is not the statement of the Army, but was instead the statement of Congressman Clements, made in his February 7, 1946 letter. See id. at DOJ1531 (explaining that the quoted language is the "gist" of Congressman Clements' February 7, 1946 letter).

Officer's laches conclusion.

Next, Claimants cite a March 15, 1957 administrative protest of a proposed protective oil lease brought by two former landowners, Dr. Puryear and Mr. Pritchett. See Claimants' Resp. at 24-25 (citing DX-158). The protest was not a request by either landowner for the "return of [his] land soon after the war was over," as Claimants contend. Id. Rather, the protest makes clear that the landowners merely hoped that Congress would pass legislation in the future to allow repurchase. See DX-158 at DOJ1527 ("[W]e believe that Congress will or should pass an act by the terms of which . . . we [would] be given a chance to repurchase [the property] from the Government."). The Department of the Interior denied the protest on April 22, 1957, and the landowners did not appeal. See DX-40. These individuals, therefore, sat on their claims for the next 38 years (from 1957 to 1995). The protest has no relevance to the laches issue.[6]

Last, Claimants repeat the Officer's clearly erroneous finding that "[s]ometime in 1968, . . . a group of landowners and/or their heirs formed the Breckinridge Land Committee ['Committee'] and turned to Congress to seek redress." Claimants' Resp. at 25 (citing Land Grantors I, 64 Fed. Cl. at 665). The United States discussed this finding in its Opening Brief, and demonstrated that the documents cited by the Officer to support a 1968 date do not stand for the proposition for which they are offered; instead, the documents show that the Committee was

[6] Even if the 1957 protest supported the Officer's conclusion about laches, the conclusion would be relevant only with respect to the individuals who brought the protest, not all former landowners. Dr. Puryear and Mr. Pritchett declined the United States' offer, and elected to have a condemnation jury determine the value of their properties. See DX-537. Hence, these individuals are not even entitled to a portion of the recommended award. See Land Grantors VI, 81 Fed. Cl. at 615 (excluding "landowners who elected to have a jury determine their property's value"). In addition, Dr. Puryear had entered into an oil lease with a third party before the United States' acquisition and, therefore, did not even own the unencumbered mineral rights under that tract. See DX-537.

formed in 1978. See US Opening Br. at 31-32. In addition, Claimants never identified the members of the Committee, or described what, if any, efforts members of the Committee undertook to pursue their claims. Id. at 32. Creation of the Committee, therefore, does not demonstrate diligent pursuit of any individual's claim, and, therefore, is irrelevant to the laches defense. Claimants offer no response to these arguments, and have thus conceded the Officer's error.

**B. The United States is Prejudiced by Claimants' Unreasonable Delay**

Next, Claimants argue that the Officer's conclusion about laches is correct because the United States is not prejudiced by Claimants' decades-long period of inaction. See Claimants' Resp. at 26. Claimants are incorrect. Solely as a result of Claimants' delay, original eyewitness testimony of the acquisition events, if available at all, was more than 50 years old when Claimants filed their complaint. By the time Claimants filed this lawsuit, most key witnesses, including all government employees, were unavailable for deposition or trial testimony. Documents that would have further supported the United States' defenses were no longer available.

Claimants make two responses. First, Claimants argue that the United States has been on notice of Claimants' claims "[f]rom the 1940's." Id. at 26-27. This statement is false. Claimants did not file a complaint until 1994, and did not identify themselves until 1995, more than 50 years after the relevant events. Claimants' suggestion that the United States should have preserved evidence before it knew who Claimants were or what allegations Claimants might bring decades later, cannot be supported.

Second, Claimants argue that the United States "offers no explanation why [the existing

historic records] were insufficient." Id. at 27. The existing historic records are not insufficient – they show that the United States did not make repurchase promises and that the United States paid reasonable value for the Breckinridge Properties. See US Opening Br. at 7-13 (discussing all of the historical evidence). If the Officer had properly evaluated that uncontroverted historical evidence, the Reports would look much different. The prejudice caused by Claimants' delay results from the Officer's admission of, and reliance on, unsupported allegations of wrongdoing, which were generated decades after the relevant events. Although those allegations are contradicted by volumes of historic evidence, Claimants' unexplained and unreasonable delay in bringing suit made it impossible for the United States to cross examine the individuals who alleged wrongdoing. See id. at 29-30. Claimants' delay, therefore, greatly prejudiced the United States, and the Officer's conclusion that laches is inapplicable is clearly erroneous. See id.

## V. The Officer's Conclusion that Many Landowners Were Promised a Priority to Repurchase is Clearly Erroneous

### A. The Officer's Admission of, and Reliance on, Hearsay Statements is Clearly Erroneous

The Officer's conclusion that "many" former landowners sold their property to the United States with the "apparent understanding that they could repurchase their properties after World War II was concluded," Land Grantors I, 64 Fed. Cl. at 700 n.35, is clearly erroneous. See US Opening Br. at 43-47.[7] To support her conclusion, the Officer relied upon three types of

[7] The Officer did not identify any of these "many" landowners. As the United States argued in its Opening Brief, even if the allegations were accepted as true, the Officer's finding is based on the allegations of less than 72 different people (approximately 7% of the 1,011 individuals who joined this lawsuit in 1995). See US Opening Br. at 46. The Officer's decision to treat these few (continued...)

documents, which she admitted pursuant to Fed. R. Evid. 807: affidavits, deposition transcripts, and discovery responses. Land Grantors I, 64 Fed. Cl. at 700 nn.35, 36; 701 n.37. The Officer's admission of, and reliance on, these documents is clearly erroneous, as the documents lack any "equivalent circumstantial guarantees of trustworthiness;" the documents are not "more probative on the point for which [they are] offered than any other evidence"; and the general purposes of the rules of evidence and the interest of justice will not be served by admission of the documents into evidence. Fed. R. Evid. 807 (discussed in US Opening Br. at 36-43); see also Conoco Inc. v. Dep't of Energy, 99 F.3d 387, 393 (Fed. Cir. 1996) (overruling trial court's admission under the residual hearsay exception because the challenged documents were "apparently prepared long after the events they purport to record"); Cook v. Hoppin, 783 F.2d 684, 690-91 (7th Cir. 1986) (overruling trial court's admission under the residual hearsay exception because the documents lacked authentication and the court was "not even in a position to begin to analyze whether the statements have the requisite 'circumstantial guarantees of trustworthiness'").

As the Supreme Court explained in Idaho v. Wright, admission of hearsay statements under the residual hearsay exception is permitted only when "the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility. . . ." 497 U.S. 805, 819 (1990). Such guarantees of trustworthiness are absent here: the challenged documents are nothing more than vague and self-serving allegations, which were prepared decades after the relevant events. See US Opening Br. at 36-43. The allegations are

---

[7/](...continued)
unsupported hearsay allegations as an established fact for all former landowners is clearly erroneous.

directly contradicted by thousands of pages of documents generated at the time the United States acquired the Breckinridge Properties. See id. The documents raise serious concerns about authorship and reliability, yet were admitted after trial without any foundational evidence. See id. The United States had no opportunity to cross examine any of the affiants because Claimants did not provide the affidavits to the United States until all the affiants had died. See id. If the hearsay rule has any meaning at all, these documents should have been excluded. See 5 J. Wigmore on Evidence § 1384 at 84-95 (Chadbourn Rev. 1974) ("[I]t is clear that a mere affidavit – i.e., a statement made upon oath before an officer – is inadmissible. . . . This principle has been consistently recognized and enforced judicially."); Spezzaferro v. F.A.A., 807 F.2d 169, 173 n.2 (Fed. Cir. 1986) (a self-serving affidavit is "a textbook example of the reasons justifying the existence of the hearsay rule").

Claimants' primary response is to assert, repeatedly, that the Officer's admission of these documents is justified because the Officer diligently weighed all of the evidence. See, e.g., Claimants' Resp. at 5-7. The Reports reveal no such analysis. Other than copying the allegations in several lengthy footnotes, the Officer provided no discussion of the serious evidentiary and reliability concerns posed by these documents. See US Opening Br. at 36-47. As discussed below, the Officer's admission of, and reliance on, these documents is clearly erroneous.

**1. The Affidavits**

Since Claimants offered the self-serving affidavits without any foundation, the Officer had no opportunity to undertaken any "critical and painstaking analysis," as Claimants contend. It was for that reason that the Officer stated at trial that she "would not give any reliance on any

of these documents. . . . I have no way of knowing what the circumstances were of how these documents were created. We simply don't find that this is necessarily going to be useful or credible evidence." Trial Tr. at 422:22 to 423:4. The Officer's concerns were well-founded, and there is no reasonable explanation why she changed her mind after trial and concluded that the affidavits were trustworthy. Claimants' Response provides no discussion of the numerous reliability concerns associated with the defective affidavits. See, e.g., US Opening Br. at Attach. D (showing that (1) the allegations contained in the affidavits are based on multiple levels of hearsay and were often offered in response to leading questions, and (2) that many affidavits contain multiple handwritings, are incomplete, are not notarized, and contain erroneous information).

Rather than address these inconvenient facts, Claimants posit that the Officer's admission of these documents is justified because she engaged in an "extraordinarily detailed qualitative review of each tendered affidavit." Claimants' Resp. at 5. According to Claimants, the fact that the Officer rejected "some [of the affidavits], but not all, of them . . . demonstrates the critical and painstaking analysis she gave [those documents]." Id. The Review Panel should reject Claimants' argument. The Officer did not cite nine of the proffered affidavits in support of her finding about repurchase promises. Most likely, the Officer omitted CX-134 because it is an exact duplicate of CX-133 (which the Officer did cite). There is no reasonable explanation why the Officer omitted CX-146, since that document contains the exact same text as CX-147, CX-148 and CX-213 (which the Officer did cite).[8] Similarly, the Officer did not cite CX-220, even

---

[8] These documents raise serious concerns about authorship: the documents contain identical narrative text, yet were apparently signed by different people on different days. See US Opening (continued...)

though its text is nearly identical to the text of CX-219 (which the Officer did cite). The Officer did not cite CX-225, an affidavit signed by I.C. Russell, Jr., but the Officer did rely on DX-678 and DX-679, discovery responses signed by Mr. Russell's daughters, who stated that their understanding was based entirely on what their father had told them. See Land Grantors I, 64 Fed. Cl. at 701 n.37. The Officer did not cite the other affidavits (CX-151, CX-153, CX-157, CX-198, and CX-206) for purposes of her conclusion about repurchase promises, but she cited those same documents to support her conclusion about a mutual mistake. Compare id. at 700 n.36 with id. at 704 n.44. Claimants' contention that the Officer engaged in a "detailed qualitative review of each tendered affidavit" is without merit.

**2. The Deposition Transcripts**

The Officer's admission of, and reliance on, eleven deposition transcripts is clearly erroneous. These documents contain multiple levels of hearsay and unsupported allegations, all of which are directly contradicted by the historical evidence. See US Opening Br. at Attach. E. Claimants do not respond to any of these obvious infirmities, and instead erroneously state that the "Government did not object to the admission of the deposition of witnesses who were deceased or unavailable. . . ." Claimants' Resp. at 6, 14. Claimants' statement is false – the United States expressly and repeatedly objected to the admission of the hearsay statements contained in the deposition transcripts. For example, in a pre-trial motion, Claimants sought leave to file portions of the deposition transcripts of former landowners. See Claimants' Mot. for Leave to File Dep. Tr., dated Aug. 9, 2004) (Docket No. 127). The United States timely

---

[8](...continued)
Br. at Attach. D.

opposed, arguing that the proffered transcripts contained inadmissible hearsay. See Def.'s Resp. to Pls.' Mot. to File Dep. Tr., dated Aug. 13, 2004 (Docket No. 131). The United States repeated its objections at trial. See Trial Tr. at 693:9-18 (government counsel preserving objection to hearsay statements contained in the five depositions); id. at 870:25 to 871:2 (same).

The United States also objected to the admission of each of the deposition transcripts of other witnesses whom the parties had deposed in 2004. See id. at 874:10-11 ("Your Honor, we would object to all of these."). These witnesses, who were not former landowners, had no personal knowledge of the relevant events and their allegations of impropriety were based entirely on inadmissible hearsay. The Officer overruled the United States' objections, but expressly noted that admission of these transcripts would be "[s]ubject to the government's continuing objection." Id. at 872:8-12; 875:2 to 892:6 (expressly noting the government's objection to each deposition transcript). Claimants' assertion that the United States did not object to these documents is not true.

Claimants also argue that the United States waived its right to complain about the admission of the deposition transcripts because the "Government failed to object [to hearsay responses] during the depositions." Claimants' Resp. at 6. This statement is also false. The United States explicitly and repeatedly reserved its objections during the depositions.[9] In any event, the rules are clear that "[o]bjections to the competency of a witness or to the competency,

---

[9] See, e.g., CX-271 at 6:13-20) (GOVERNMENT COUNSEL: "We're treating this like any other deposition where objections to hearsay or any other objection that might make it to trial, we would not waive those at this point. And so the only objections, as we see it, that would be waived would be to the form of the question, as [in] any other deposition. CLAIMANTS' COUNSEL: Absolutely agree with you."). See also CX-273 at 4:9-14; CX-274 at 4:3-5; CX-272 at 8:8-12; CX-275 at 3:17-21; CX-276 at 4:11-13; CX-267 at 21:4-7; CX-269 at 11:24 to 12:2.

relevancy, or materiality of testimony are not waived" during a deposition. RCFC 32(d)(3). Therefore, the United States could not have waived its hearsay objections, and the Review Panel should reject Claimants' argument.

### 3. The Discovery Responses

Last, the Officer's reliance on eleven discovery responses is clearly erroneous. These responses were prepared in 2004 (approximately 63 years after the relevant events), are based on inadmissible hearsay, and are directly contradicted by the historical record. See US Opening Br. at 44-45. Claimants offer no discussion of these points and instead argue only that the Officer's reliance on these documents was appropriate because the United States used these "exhibits for purposes of these proceedings." Claimants' Resp. at 9. The United States offered these documents for a very limited purpose – to demonstrate the multiple levels of hearsay upon which Claimants' case is based, and for no other purpose.[10] In submitting the documents, the United States expressly stated that the discovery responses contained inadmissible hearsay and "Defendant does not intend to offer these documents to prove the truth of the matter asserted and does not intend to waive its hearsay objection with respect to any other documents." Def.'s

---

[10] To take a simple example, consider the case of Carl Culver, one of the individuals whom the parties deposed in 2004. See CX-268. Mr. Culver, who was a teenager at the time of the United States' acquisition, had no personal knowledge of the relevant events. His understanding about repurchase promises was based entirely on a single comment made to him by his aunts in 1942, some 62 years before his deposition. See id. at 14:16-29. Mr. Culver could not identify the name of any government agent who might have made such a promise, and he admitted his understanding of the events was incomplete. See id. at 39:6-11, 77:2-19. Over the years, Mr. Culver repeated his incomplete understanding of events to his relatives, who came to believe the allegations solely because of Mr. Culver's assertions. At least nine of Mr. Culver's relatives submitted discovery responses in this matter. See DX-683 to DX-691. The mere fact that 10 people repeated Mr. Culver's story, rather than just Mr. Culver himself, does not make Mr. Culver's story any more trustworthy.

Submission of Supplemental Ex. List at 5, dated Dec. 10, 2004 (Docket No. 148). The Officer's reliance on the unsupported allegations set forth in these documents is clearly erroneous.

**B. The Officer's Conclusion is Based on Nothing More than Hearsay Bootstrapping**

After vaguely alluding to the Officer's "rigorous analysis" of these hearsay documents, Claimants reveal the gravamen of their argument: "[t]he trustworthiness of the affidavits is shown by the fact that they are corroborated by numerous other witnesses and the generally recognized history of the community. . . ." Claimants' Resp. at 7, 16 ("They corroborate each other."). Claimants' argument should be rejected because courts do not permit hearsay bootstrapping. See, e.g., Shu-Hui Chen v. Bouchard, 347 F.3d 1299, 1308 (Fed. Cir. 2003) (affirming exclusion of document, which had been offered to corroborate other evidence, under Fed. R. Evid. 807 because party "offered no evidence of the 'circumstantial guarantees of trustworthiness'"); United States v. Grayson, 166 F.2d 863, 869 (2nd Cir. 1948) ("'Multiple hearsay' is no more competent now than single hearsay was before."). Claimants are unable to cite a single case where a court admitted a hearsay statement simply because the statement was corroborated by other unreliable hearsay statements.

None of the six cases upon which Claimants rely supports their position. See Claimants' Resp. at 7-8. Three of those cases support the United States' position, as the courts rejected the proffered hearsay evidence as unreliable and inadmissible. See United States v. Hall, 165 F.3d 1095, 1111 (7th Cir. 1999); In re Cirrus Logic Sec. Litig., 946 F.Supp. 1446, 1470 (N.D. Cal. 1996); Shields v. Eli Lilly & Co., No. 87-2166 (RCL) 1991 WL 134614, *4 (D.D.C. July 12, 1991). The other cases upon which Claimants rely are not comparable to the instant case. In United States v. Valdez-Soto, for example, the court admitted the out-of-court statement of a

criminal defendant made to the FBI immediately after his arrest. 31 F.3d 1467 (9th Cir. 1994). In affirming the admission of the statement, the court noted (1) the declarant was available for cross-examination at trial; (2) the statement was made "proximate in time to the event"; and (3) the statement was detailed and consistent with the physical evidence and other trial testimony. Id. at 1470-72. This case presents nearly exactly the opposite situation.

Ark-Mo Farms, Inc. v. United States, 530 F.2d 1384 (Ct. Cl. 1976), is also inapposite. In that case, the challenged evidence was hydrologic data, which had been generated by the Army Corps of Engineers, but was contained in a testifying expert's report. Since the reliability of the evidence was not in question, the court permitted the expert to discuss the hydrologic data over plaintiff's objection. The unsubstantiated and unreliable allegations at issue here are not comparable. The only other case upon which Claimants rely is an unpublished district court decision, which discussed the residual exception in dicta. See Silverstein v. Smith Barney, Inc., No. 96 Civ. 8892 (JSM), 2002 WL 1343748 (S.D.N.Y. Apr. 18, 2002). After concluding that a document was admissible under Fed. R. Evid. 803(15) and 803(3), the Silverstein court stated the document was also admissible under the residual exception because the document was (1) consistent with non-hearsay trial testimony; (2) consistent with the declarant's subsequent actions; and (3) supported by other independent indicia of trustworthiness. These factors are not present in the instant matter.

Finding no support in the law, Claimants next argue the United States' expert historian (Dr. Johnson) corroborated the trustworthiness of the self-serving hearsay statements, when he stated that the "oral tradition was common among the landowners." Claimants' Resp. at 7, 14. Claimants' argument is disingenuous, and Dr. Johnson's statement is taken out of context.

During trial, Dr. Johnson testified that he meant only that the tradition is part of the modern folklore, and nothing more. See Trial Tr. at 430:18-22 (clarifying that the oral tradition was common in the 1970s, not earlier); see also id. at 234:19-21 (Dr. Johnson testifying that "historians consider [folklore] much less reliable [than written documents]. That's why there is a separate folklore department, separate from history, in the universities.").

Next, Claimants attempt to rehabilitate the Officer's finding by noting that the "Officer also relied on a historical local newspaper editorial from the time and correspondence to the Government recounting that the promise was made." Claimants' Resp. at 13. The Officer did indeed rely on these two documents. See Land Grantors I, 64 Fed. Cl. at 702 n.39 (citing CX-3C and CX-3A). Rather than supporting Claimants' position, however, these documents exemplify the critical errors in the Officer's Reports. The first document – a May 1942 unattributed newspaper editorial – does not stand for the proposition for which it was offered, as it says absolutely nothing about repurchase promises. See CX-3C at 27. Claimants' statement that the editorial "recount[ed] that the promise was made" is not true.

The second document is a letter, written in 1978, approximately 37 years after the acquisition events. See CX-3A. The author was not a former owner, and appears to have gained his understanding of the relevant events second-hand. See id. (relating what "[m]y dad told the acquisition man back in 1942"). The letter does not identify any government agent who might have made a repurchase promise, or describe how the author came to understand that former owners had a repurchase promise. Consequently, the letter is nothing more than an unsupported and unreliable allegation of wrongdoing. The Officer's blind reliance on this unsupported and

incompetent allegation cannot be upheld.[11]

Finally, even if the documents are admissible, the Officer's reliance on these documents, rather than the voluminous historic record and the extensive expert evidence, which do not support Claimants' allegations, is clearly erroneous. See US Opening Br. at 45-47.

### C. Claimants' Argument that the Affidavits Are Admissible Under Federal Rule of Evidence 803(20) or 803(16) is Erroneous

Although the Officer's admission of these hearsay documents is based only on Fed. R. Evid. 807, Claimants assert that the Officer's decision could also be upheld under Fed. R. Evid. 803(20) or 803(16). See Claimants' Resp. at 16. The Review Panel should disregard Claimants' argument, as Claimants should not be permitted to introduce a new argument at this late date.

If the Review Panel is inclined to entertain Claimants' untimely argument, it should conclude that neither evidentiary rule justifies the Officer's conclusion. Fed. R. Evid. 803(20) is narrowly tailored, permitting hearsay statements related to a specific type of evidence:

> [r]eputation in a community, arising before the controversy, as to boundaries or customs affecting lands in the community, and reputation as to events of general history important to the community or State or nation in which located.

Fed. R. Evid. 803(20).[12] The rule is inapplicable. The affidavits at issue here contain

---

[11] The letter contains information that is known to be incorrect. See id. (stating that the United States sold the mineral rights for $68 million). In addition, the letter repeats another commonly held, but completely false, rumor – that Lady Bird Johnson acquired a controlling interest in the mineral rights underlying the Breckinridge Properties. See id. The author's unsupported belief in the Lady Bird Johnson rumor is no more reliable than the author's statement about repurchase promises. It is interested to note that the author was apparently willing to accept allegations of government wrongdoing at face value. See id. at 2 ("I am enclosing some articles taken from National Enquire [sic], proving just how our Federal Government operates."). Surely this matter must be conducted pursuant to a higher standard of proof.

[12] The rule is rarely applied. See 5 Wigmore on Evidence § 1599 (noting that the "paucity of
(continued...)

unsupported allegations of repurchase promises, not evidence "as to boundaries or customs affecting lands" or "reputation." Id. Moreover, evidence admitted under Fed. R. Evid. 803(20) may only be used to show "reputation," not to prove the truth of the matter asserted. See New York v. Ocean Club, Inc., 602 F.Supp. 489, 491 (D.C. N.Y. 1984) (reputation evidence could not be used to show truth of matter asserted). Therefore, even if the Officer had concluded Fed. R. Evid. 803(20) was applicable, use of the admitted documents to support her findings would have been clearly erroneous.[13]

Fed. R. Evid. 803(16) is also inapplicable. That rule permits admission of "[s]tatements in a document in existence twenty years or more the authenticity of which is established." Id. Claimants are correct that they did not provide the challenged affidavits to the United States until those documents were 25 years old, and all the affiants had died. Nevertheless, the documents are plainly not admissible under the rule. Claimants offered no foundation or authentication for any of the affidavits. Hence, the authenticity of those documents was not established, as required by the rule. Even if Claimants had authenticated the affidavits, the hearsay statements contained within the affidavits (e.g., some unknown person told the affiant that some unknown

---

[12](...continued)
rulings upon this class of evidence is probably due to the consideration that when a fact – for example, the date of Washington's birth or of Lincoln's assassination – is one of such general interest as to render an accepted historical treatise admissible upon the present principle," the court will generally rely on the principles of judicial notice to accept the fact as true).

[13] In addition, the rule is inapplicable because the affidavits do not attempt to show the reputation in a community "arising before the controversy," as required by the rule. See also United States' Mot. in Limine to Exclude Claimants' Exs., dated Aug. 13, 2004 (Doc. No. 128) (arguing that Rule 803(20) is inapplicable because (1) the challenged evidence is documentary, not testimonial; (2) the rule cannot be used to introduce documents to prove the truth of the matter asserted; and (3) the challenged evidence contained multiple hearsay issues, and is therefore prohibited under Fed. R. Evid. 805).

federal employee told someone else about repurchase promises) are not admissible.[14] See, e.g., Columbia First Bank, FSB v. United States, 58 Fed. Cl. 333, 338 (2003) (even if a document is admissible under Fed. R. Evid. 803(16), the court would exclude "parts of such documents because of double hearsay [as] an appropriate application of Rule 805"); 5 Weinstein's Federal Evidence 2d ed. § 803.18 at 118.3 ("Thus, to be admissible under Rule 803(16), an ancient document must generally be based on the personal knowledge of its author.").

The Officer recognized these problems and did not rely upon either Fed. R. Evid. 803(20) or 803(16) in support of her decision to admit the affidavits. The Officer's rejection of those rules was not clearly erroneous, and the Review Panel should reject Claimants' argument.[15]

## VI. The Officer's Conclusion that Landowners Were Paid Less than Reasonable Value is Clearly Erroneous

The Officer disregarded all of the expert valuation evidence. See US Opening Br. at 47-

---

[14] Many affidavits contain significantly less information than the tenuous hearsay chain articulated above. See, e.g., CX-144 (answering "Yes. The promise that it would be sold back to original owner" in response to a leading question about repurchase promises); CX-172 (answering only "Yes" to leading question about repurchase promises); CX-178 (same); CX-180 (same); CX-190 (same); CX-196 (same); CX-218 (same); CX-223 (same); CX-226 (same); CX-228 (same); CX-230 (same).

[15] Claimants assert, without citation or discussion, that two affidavits allegedly signed by former government employees should be treated as an "admission of a party." Claimants' Resp. at 2. An admission of a party opponent is admissible only when the statement concerns "a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D). When those affidavits were signed in 1979, neither affiant was a government employee, and Rule 801(d)(2) is inapplicable. See Young v. James Green Mgmt, 327 F.3d 616, 622 (7th Cir. 2003). Rule 801(d)(2) is also inapplicable with respect to the other affidavits, which do not identify the government employee who allegedly made a repurchase promise. See Carden v. Westinghouse Electric Corp., 850 F.2d 996, 1002 (3d Cir. 1988) (erroneous admission of statement when party could not identify employee who allegedly made statement); Cedeck v. Hamiltonian Fed. Sav. & Loan Ass'n, 551 F.2d 1136, 1138 (8th Cir. 1977) (same); N. Oil Co. v. Socony Mobil Oil Co., 347 F.2d 81, 85 (2nd Cir. 1965) (same).

49. The government's expert testimony, which utilized historic aerial photographs, well-accepted appraisal principles, and comprehensive statistical analyses, conclusively demonstrated that the United States paid reasonable value for the Breckinridge Properties. See id. It is undisputed that the United States paid approximately two to three times the average per-acre value of nearby properties. See id. at 50. Claimants offer no justification for the Officer's decision to disregard this evidence, and they offer no response to the substance of the United States' expert testimony.[16]

Rather than address these points, Claimants state, without citation, that the Officer's conclusion that the United States did not pay for the mineral interests "finds overwhelming evidentiary support in the court record." Claimants' Resp. at 9. Claimants' position is inconsistent with their concession at trial that "We've now found from discovery that the minerals were paid for." Trial Tr. at 198:12-13. Claimants' new position is also not supported by any evidence. It is beyond dispute that the United States bought, and the landowners sold, the full fee simple absolute interest in each of the Breckinridge Properties, not just the surface interests. See US Opening Br. at 67. As the United States Court of Appeals for the Sixth Circuit

---

[16] Claimants' statement that the United States did not except to the "Officer's calculation of the appropriate amount of restitution" is not correct. Claimants' Resp. at 2. It was impossible for the United States to object to any actual recommended award since the Officer did not articulate any individual award. Moreover, the United States stated its disagreement to the Officer's calculation of damages, noting that the quantum was based "on Claimants' submissions, submitted over the United States' objection after trial." US Opening Br. at 2 n.5. Further, the United States discussed the Officer's errors (as well as the only trial valuation evidence) at length at pages 47 to 52 of its Opening Brief, and at pages 3 to 8 of its Response Brief. Since disgorgement of the 1960-era sales proceeds would not put Claimants in the position they would have occupied had the contract not been made, the Officer's recommended award is clearly erroneous. In any event, given Claimants' decision to not support the Officer's claim of mutual mistake, the point is moot.

held 41 years ago, the United States "received full fee title" to the Breckinridge Properties and the United States' "title cannot now be disputed under any accepted property theory." Higginson v. United States, 384 F.2d 504, 506 (6th Cir. 1967).[17]

At base, Claimants' argument rests on a single fact, already known to the Senate when it transmitted this Congressional Reference to this Court: the United States sold these properties for more money in the 1960s than it paid for the properties 25 years earlier. However, the higher sales price does not support entitlement to an equitable claim. As Claimants argued at trial, the 1960-era sales price reflected "increased demand not only for oil and gas but also for coal." Pls.' Pre-Trial Mem. at 12. In addition, the higher sales price was likely due to (1) inflation, (2) an unexpected bidding war, which artificially drove up auction prices in the 1960s, and (3) the United States' decision to sell the Breckinridge Properties in larger tracts. See US Opening Br. at 51-52. Most Claimants' complaints about the mineral sales in the 1960s are without merit, in any event, because most former landowners had already sold or leased their mineral rights to third parties at the time the United States acquired the Breckinridge Properties. See US Opening Br. at 62.

Although Claimants make no attempt to support the Officer's conclusions about mutual

---

[17] Consequently, Hickman v. United States, 135 Ct. Cl. 380, 1956 WL 8354 (1956), which Claimants contend is "nearly identical to this" case, is inapposite. Claimants' Resp. at 11. First, unlike the instant case, the United States in Hickman admittedly did not pay for a known gravel deposit on Claimant's property. Second, it was undisputed that during a condemnation suit in that case, the district court refused to admit Claimant's proffered testimony about the value of the gravel. Third, unlike this matter, it was undisputed that the Hickman claimant had the right of repurchase. Finally, it is also important to note that Hickman was decided in 1956, and is, therefore, based on an outdated view of equitable claims. See Spalding & Son, 28 Fed. Cl. at 250 (explaining that the "occasionally expressed view" that "an equitable claim was one that rested on considerations of moral responsibility . . . no longer finds favor"); Cal. Canners & Growers Ass'n v. United States, 9 Cl. Ct. 774, 785 (1986) (same).

mistake, Claimants assert that the Officer's recommendation should be upheld based on the unproven assumption that the 1960-era sale proceeds amounted to unjust enrichment. Claimants' argument is inconsistent with the Reports, which are based entirely on a claim of mutual mistake, not some stand-alone claim of unjust enrichment.

In addition, Claimants' argument is not supported by the law or the facts. Under Kentucky law, "the doctrine of unjust enrichment has no application in a situation where there is an explicit contract which has been performed." Tractor & Farm Supply, Inc. v. Ford New Holland, Inc., 898 F.Supp. 1198, 1206 (W.D. Ky. 1995) (citing Codell Const. Co. v. Commonwealth, 566 S.W.2d 161, 165 (Ky. App. 1977)); Res-Care, Inc. v. Omega Healthcare Investors, Inc., 187 F.Supp.2d 714, 719 (W.D. Ky. 2001) (same); see also Hansen Bancorp, Inc. v. United States, 67 Fed. Cl. 411, 426 (2005) ("Restitution then is a remedy typically not allowed in the context of an express contract, unless the contract has been rescinded, repudiated, materially breached, or otherwise annulled."). In the instant case, there is an "explicit contract which has been performed" – the United States acquired the full fee simple absolute in the Breckinridge Properties decades ago. Accordingly, unjust enrichment has no application here.

Even if a claim of unjust enrichment was not barred by the performance of the explicit contracts, the facts do not support such a claim. Under Kentucky law,

> [f]or an unjust enrichment claim to be viable, Plaintiffs must show the following elements: (1) a benefit conferred upon the defendant at the plaintiff's expense, (2) a resulting appreciation of the benefit by the defendant, and (3) an inequitable retention of the benefit without payment for its value.

Tractor & Farm Supply, Inc., 898 F.Supp. at 1206. As discussed above, the "benefit conferred" was not "at the plaintiff's expense" – the United States paid the former landowners reasonable value for their properties, including their mineral interests. In addition, Claimants' frustration

with the later sale proceeds is misplaced given that most of the former landowners did not even own their mineral rights at the time of the United States' acquisition. The Reports do not support a conclusion that the 1960-era proceeds were "unjust," and, therefore, the Review Panel should reject Claimants' arguments.[18/]

## VII. Conclusion

The Review Panel should reject the clearly erroneous Reports. Fundamentally, the Reports lack any Claimant-specific findings about liability or damages. Claimants do not disagree. The Review Panel should not endorse a recommendation that Congress simply appropriate a multi-million dollar award to unnamed, and unknowable, individuals – most of whom did not submit any evidence in support of their claims. This is not what Congress requested.

In addition, Claimants offered no justification for the Officer's flawed legal conclusions or factual findings relevant to a claim of mutual mistake, upon which the Reports are based. Therefore, the United States' exceptions are unopposed.

Even apart from the Officer's analysis of a mutual mistake claim, the Reports are seriously flawed with respect to all of its major conclusions, including: (a) laches; (b) whether

---

[18/] Claimants repeat the Officer's erroneous finding that the United States destroyed relevant documents during the pendency of this litigation. See Claimants' Resp. at 28 n.92. Citing a May 25, 2004 table (denoted as "Court Ex. 2"), the Officer stated the General Services Administration ("GSA") "disposed of records potentially relevant to this case in 1975, 1977, 1979, 1980, 1983, 1990 and 1995." Land Grantors I, 64 Fed. Cl. at 716. The finding is wrong. Court Exhibit 2 is a table showing the current location of documents "[r]egarding [p]roperty [d]isposal [r]ecord [i]nformation" (i.e., documents related to the surplusing of the Breckinridge Properties). Court Ex. 2. The table lists the dates GSA transferred these documents to certain Federal Record Centers, not the dates GSA destroyed the documents. The Officer apparently thought "[p]roperty [d]isposal" meant "document disposal," a conclusion that is clearly erroneous.

any former landowner was promised that he would be given priority to repurchase his former land; and (c) whether any former landowner was paid less than reasonable value "due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights." S. 794, Sec. 2. The Officer's findings are based on self-serving and incompetent hearsay allegations, which are directly contradicted by thousands of pages of documents generated at or near the time of the relevant events. The Officer's decision to disregard all of the parties' valuation evidence is unexplained, and clearly erroneous.

Therefore, the Review Panel should reject the Reports, reject Claimants' exceptions, and issue a Panel Report recommending that any monetary award would be a mere gratuity.

Respectfully submitted this 14th day of August 2008,

RONALD J. TENPAS
Assistant Attorney General

_s/ William J Shapiro_________
WILLIAM SHAPIRO
United States Department of Justice
Environment and Natural Resources Division
501 I Street
Suite 9-700
Sacramento, CA 95814
(916) 930-2207 (phone)
(916) 930-2210 (fax)

Of Counsel:
Martin Cohen
Dale Holmes
Stephen J. Allison
U.S. Army Corps of Engineers